# EXHIBIT A

# MCLENNAN DISTRICT CLERK

501 Washington Avenue , Suite300 Annex
Waco , TX , 76701
PHONE # : (254) 757-5057
FAX : N/A

## DOCKET SHEET - CIVIL CASE

**DOCKET NO. :** 2022-2685-3 **CASE STATUS:** PENDIN( **FILED DATE :**08/08/2022 **TJC CODE :** ALL OTHER (

**STYLE :** KIMBERLY WISEMAN Vs COMMISSIONERS COURT ET AL

**DISPOSITION :** **DISPOSED :** N/A **TJC CODE :**

| TYPE | PARTY | ATTORNEY |
|---|---|---|
| PLAINTIFF | KIMBERLY WISEMAN | PRO SE |
| | 419 BARRON LANE AXTELL TX 76624 | MCLENNAN COUNTY TX 0 |
| DEFENDAN | COMMISSIONERS COURT | |
| | 501 WASHINGTON AVENUE WACO TX76701 | 0 |
| DEFENDAN | JIM SMITH | |
| | 0 | 0 |
| DEFENDAN | PATRICIA MILLER | |
| | 0 | 0 |
| DEFENDAN | WILL JONES | |
| | 0 | 0 |
| DEFENDAN | BEN PERRY | |
| | 0 | 0 |
| DEFENDAN | JARED GOLDSMITH | |
| | 214 N 4TH STREET WACO TX 76701 | 0 |
| DEFENDAN | SCOTT FELTON | |
| | 501 WASHINGTON AVENUE WACO TX76701 | 0 |

**HEARING NOTES :** 2022-2685-3

| DATE | TEXT |
|---|---|
| 08/08/2022 | E-FILE INFORMATION SHEET |
| 08/08/2022 | PETITION FOR DECLARATORY JUDGMENT AND EMERGENCY RELIEF AGAINST ELECTRONIC VOTING SYSTEMS AND DESTRUCTION OF RECORDS |
| 08/10/2022 | ORDER OF VOLUNTARY RECUSAL |
| 08/24/2022 | PETITIONER'S MOTION FOR EMERGENCY HEARING WITH EXPEDITED AND COMPELLED DISCOVERY |
| 08/24/2022 | REQUEST FOR ISSUANCE |
| 08/24/2022 | REQUEST FOR ISSUANCE |
| 08/24/2022 | REQUEST FOR ISSUANCE |
| 08/24/2022 | REQUEST FOR ISSUANCE |
| 08/24/2022 | REQUEST FOR ISSUANCE |
| 08/24/2022 | REQUEST FOR ISSUANCE |
| 08/26/2022 | RECEIPTS FOR CERTIFIED MAIL NOTICES OF SUIT AND PR |
| 08/26/2022 | E-FILE INFORMATION SHEET |
| 08/29/2022 | E-FILE INFORMATION SHEET |
| 08/31/2022 | PETITIONER'S MOTION FOR EMERGENCY MANDAMUS ORDER |
| 08/31/2022 | CITATION ISSUED TO JIM SMITH |
| 08/31/2022 | CITATION ISSUED TO PATRICIA MILLER |

CERTIFIED DOCUMENT
PAGE 1 OF 2
DISTRICT CLERK OF
McLENNAN COUNTY, TEXAS

# MCLENNAN DISTRICT CLERK

501 Washington Avenue , Suite300 Annex
Waco , TX , 76701
PHONE # : (254) 757-5057
FAX : N/A

## DOCKET SHEET - CIVIL CASE

**CASE NO. :** 2022-2685-3 **STYLE :** KIMBERLY WISEMAN Vs COMMISSIONER

| | |
|---|---|
| 08/31/2022 | CITATION ISSUED TO WILL JONES |
| 08/31/2022 | CITATION ISSUED TO BEN PERRY |
| 08/31/2022 | CITATION ISSUED TO JARED GOLDSMITH CERA |
| 08/31/2022 | CITATION ISSUED TO SCOTT FELTON |
| 08/31/2022 | E-FILE INFORMATION SHEET//PE (MOTION) |
| 09/08/2022 | DEFENDANTS' JOINT ANSWER |
| 09/08/2022 | RESPONSE TO REQUEST FOR INJUNCTIVE RELIEF |
| 09/09/2022 | E-FILE INFORMATION SHEET |

The State of Texas
County of McLennan

I, Jón R. Gimble, Clerk of the District Court of McLennan County Texas do hereby certify that the foregoing is a true and correct copy of the original as the same appears on file in the District Court, McLennan County Texas witness my official hand and seal of office this the 12 day of September A.D. 2022

Jón R. Gimble
McLennan County, Texas
By ______ Deputy

DISTRICT COURT OF MCLENNAN COUNTY, TEXAS

CERTIFIED DOCUMENT
PAGE 2 OF 2
DISTRICT CLERK OF
McLENNAN COUNTY, TEXAS

FILED
MCLENNAN COUNTY
8/8/2022 10:47 AM
JON R. GIMBLE
DISTRICT CLERK
Tiffany Madkins

**IN THE DISTRICT COURT**
**FOR THE STATE OF TEXAS**

**MCLENNAN County**

74TH JUDICIAL DISTRICT

**No.** 2022-2685-3

**KIMBERLY WISEMAN**

**PETITIONER(s),**

v.

**COUNTY COMMISSIONERS JIM SMITH, PATRICIA MILLER, WILL JONES, BEN PERRY; ELECTIONS ADMINISTRATOR JARED GOLDSMITH, CERA; COUNTY JUDGE SCOTT FELTON**

**RESPONDENT(S)**

# PETITION FOR DECLARATORY JUDGMENT AND EMERGENCY RELIEF AGAINST ELECTRONIC VOTING SYSTEMS AND DESTRUCTION OF RECORDS

*TO THE HONORABLE COURT:*

COME NOW, PETITIONERS KIMBERLY WISEMAN, (hereinafter collectively referred to as "Petitioners"), file this Petition for Declaratory and Injunctive Relief against electronic voting systems with preservation of records barring Defendants from using computerized equipment to

administer the collection, storage, counting, and tabulation of votes in any election indefinitely until proper investigations and reconciliation of the elections for 2020 general, 2021 special, and 2022 primaries are conducted.

## PARTIES AND SERVICE

Petitioners are all MCLENNAN County, Texas citizens and registered voters who voted in the Nov 2020 election and intend to vote in the Nov 2022 elections.

Pro se Petitioner

KIMBERLY WISEMAN

kimwiseman522@gmail.com

419 Barron Ln.

Axtell, TX 76624

760-525-7493

Each Respondent

Contact Info

COMMISSIONERS COURT

501 Washington Ave.

Waco, TX 76701

JIM SMITH

254-757-5061

PATRICIA MILLER

254-757-5062

WILL JONES

254-757-5063

BEN PERRY

254-757-5064

JARED GOLDSMITH, CERA

Elections Administrator

elections@co.mclennan.tx.us

214 N 4th St

Suite 300

Waco, TX 76701

254-757-5043

SCOTT FELTON

County Judge

501 Washington Ave.

Room 214

Waco, TX 76701

254-757-5049

## MEMORANDUM OF POINTS AND AUTHORITIES

The right to vote and know that one's vote is fairly and accurately counted is foundational to our democracy. With this case Petitioners seek to eliminate the black box voting system that has developed in this country as it is used in this State. Texas voters no longer know whether their vote has been accurately tabulated or manipulated, and there can be no spot check within reasonable levels of confidence. This is a violation of Petitioners' Constitutional rights.

Petitioner(s) have a vested interest in protecting the quality, accuracy, and effectiveness of our individual votes to ensure our representative servants are lawfully elected by the consent of the governed for the protection against tyranny and for healthy maintenance of our Republican form of government afforded to us by our ancestors and for the benefit of our successors.

For centuries, American voters recorded their votes by hand on paper ballots and were counted by human beings. In the last two decades, all states including Texas adopted electronic, computerized voting systems. Expert analyses, studies, and investigations have determined that even the most sophisticated computers can be and have been hacked. The equipment used in our elections is often assembled or made in countries like China which grants unauthorized access to foreign nations. Indeed, countries such as Russia, China, and Iran have thousands of highly trained individuals whose sole function is to penetrate commercial and government computers in the United States— including our election systems. Countries like France have responded to these threats by banning the use of computerized voting machines due to their inherent security flaws and opaqueness.

Experience has now proven the move to computerized voting in Texas was a mistake – an unnecessary, unsecure change that opened election results to manipulation by unauthorized persons. This is not a partisan issue. Experts across the political spectrum have long sounded the alarm about the inherent lack of both security and transparency in computerized voting systems such as those used in Texas. It is time to reverse this mistake. The right to vote is constitutionally guaranteed. Computerized voting systems leave an open door for votes to be changed, deleted, or fabricated in violation of constitutional requirements. A return to the tried-and-true paper ballots of the past – and of the present, in countries like France, Taiwan, and Israel – is necessary.

Petitioners submit this memorandum and related expert declarations and documentary evidence in support of their request that this Court enter an emergency injunction barring Respondents from using computerized equipment to administer the collection, storage, counting, and tabulation of votes in any election for the protection of the Petitioners' voice and will through elections (U.S. CONST. 1st AMEND., TEX. CONST. art. VI § 2) and the preservation of records of the elections for 2020 general, 2021 special, and 2022 primaries until such time that proper accounting of said elections are conducted.

## CONSTITUTIONAL QUESTIONS

The specific questions brought before this court are:

a. If the electronic voting systems are not lawfully certified in compliance with voting system standards, does it impede the Petitioner(s)' lawful vote in elections? TEX. CONST. art 6 § 4, US CONST. amend XIV.

b. If the electronic voting systems and their various devices are not lawfully certified, does it cause the Petitioner(s) to cast illegal ballots? 52 U.S.C. § 10307(a), Due Process Clause.

c. Since Texas officials presented uncertified voting systems as certified, did they abridge the Petitioner(s)' federally protected right to vote, as well as affronted TEX. PEN. CODE § 37.03, § 37.09, § 37.10, 18 U.S.C. § 245

d. Would it dilute the expressed intent and effectiveness of the Petitioner(s)' voice if the electronic voting systems and their various devices are vulnerable to hacking, tampering, and algorithmic preprogramming? TEX. CONST. art 6 § 4, Right to Vote Clause.

e. If the electronic voting systems are unreliable mechanisms for accurately collecting, retaining, and communicating the expression of the Petitioner(s)' vote, is it acceptable to injure the Petitioner(s)' voice and will under the Constitutional premise of the consent of the governed.? Declaration of Independence, Guarantee Clause.

f. Were Constitutionally protected free and fair elections negatively impacted by Texas officials' modification of election laws? TEX. ELEC. CODE § 276.019 and TEX. CONST. art 1 § 28.

g. If the acting representative servants were unlawfully elected as a result of unreliable, unlawful vote collection devices are they acting in their official capacity? TEX. CONST. art I § 19 and § 29.

h. Would they not, then, be impersonating public servants? TEX. PEN. CODE § 37.11.

i. The "elected" officials within the Texas courts prevent a fair hearing of cases involving the election. Where can Petitioner(s) find an objective perspective without being denied redress of grievances? TEX. CONST. art I § 3, § 13 § 27, and US CONST. amend I.

j. What is the Constitutional remedy for the usurpation of the Petitioner(s)' role as the underlying governmental authority, and for forcing the Petitioner(s) to participate in their own servitude through fraudulent policies, systems, and measures? TEX. CONST. art I § 29, US CONST. amend XIII § 1 and US CONST. amend X.

## PRELIMINARY STATEMENT

This action is not an election contest case. It is an action to bring transparency, fairness, honesty, and exemplary quality to Texas elections and to hold responsible those government officials who violate the equal protection and due process rights of Petitioners (and all Texas citizens) guaranteed by the Texas Constitution. Petitioners seek redress under Texas law only. Petitioners need not, and do not, seek redress under any federal law. Petitioners (and all Texas citizens) have a fundamental legal right to the clearly established principles of election equality, integrity, accurateness, honesty, and justice.

Texas law recognizes the clearly established principle of one-citizen, one-vote. This is the bedrock of Texas law and the most cherished and valuable right of any Texas citizen, including Petitioners, guaranteed by the Texas Constitution. "The conception of political equality from the Declaration of Independence to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing - one person, one vote." Reynolds v. Sims, 377 U.S. 533, 558 (1964). "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right." Wesberry v. Sanders, 376 U.S. 1, 17 (1964). Texas law adopts these fundamental principles. This case seeks to enforce these clearly established fundamental principles of Texas law.

"In any state-adopted electoral scheme, '[t]he right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the

State may not, by later arbitrary and disparate treatment, value one person's vote over that of another.'" (Curling v. Raffensperger, 397 F. Supp. 3d 1334, 1404 (N.D. Ga. 2019) (quoting Bush v. Gore, 531 U.S. at 104–05, 121 S.Ct. 525(2000)). Thus, it is the paramount duty of all government, with respect to election justice, to ensure that one-citizen, one-vote is clearly and proactively protected. This foundational principle of Texas law and its constitutional republic is at issue.

In Texas, election officials must preserve election information and such information must be transparent to the citizens if democracy and a constitutional republic are to be upheld. For these reasons, pursuant to federal law, 52 U.S.C. § 20701, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of any general...election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives... are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election...

Petitioner(s) seek a Declaratory Order that the Respondents adhere to the constitutionally protected process of collecting and counting votes that ensures integrity and transparency. This is to require hand-marked paper ballots that can be cast with anonymity, following all Texas state election laws, and hand-counted by residents of the state of Texas, not machines as Texas Election law specifies. (TEX. CONST. art. VI § 4 and TEX. ELEC. CODE Chp. 65). Additionally, Petitioner(s) seek redress for the abuse and devastation of our Constitutional rights and protections by our elected officials. Computerized equipment is, by nature, vulnerable to manipulation by unauthorized persons. The true results of an election that relies upon computerized equipment can never be known with full confidence, and Petitioners' constitutional rights to vote will be denied if computerized equipment is used.

## JURISDICTION AND VENUE

Pursuant to TEX. GOV. CODE § 24.008 and TEX. CONST. art. V § 8, jurisdiction and venue are proper in this Court as Respondents, electronic voting machines and devices, ballots, and related documentation and information are located within MCLENNAN County, Texas. At all times pertinent to this action, the acts complained of by Petitioner(s) have occurred in and have continued to occur in MCLENNAN County, Texas. This action arises under Article I, Section 3 of the Texas Constitution (Equal Protection); Article I, §§ 17 and 19 of the Texas Constitution (Due Process); TEX. GOV. CODE § 24.011; and the Texas Election Code. For these reasons, this Court has subject matter jurisdiction over this action.

## NATURE OF THIS ACTION

This is an action in law and equity under the Texas Constitution for violation of Petitioners' Equal Protection and Due Process rights by Respondents. Petitioners seek only equitable, injunctive, and declaratory relief against Respondents for violation of Petitioners clearly established Equal Protection and Due Process rights guaranteed to them by and through the Texas Constitution. Petitioners do not seek damages.

## STANDING

Voters have standing and are not barred by sovereign immunity claims to challenge an unconstitutional voting system, in spite of what the SoS or other government officials might claim. As stated in Andrade v. NAACP of Austin, 345 S.W.3d 1, 8 (Tex. 2011), "The Secretary urges a blanket rule that would ensure no voter ever has standing to challenge a voting system. We think the Secretary overreaches in that

respect. The voters assert a denial of equal protection — a claim voters often have standing to bring." *See Baker v. Carr, 369 U.S. 186, 206, 82 S.Ct. 691, 7L.Ed.2d 663 (1962)* (noting that voters have standing to bring equal protection challenges to complain of vote dilution, and observing that "[m]any of the cases have assumed rather than articulated the premise in deciding the merits of similar claims"). For example, the Supreme Court has permitted Virginia residents to sue for a declaration that Virginia's poll tax was unconstitutional. *Harper v. Va. State Bd. Of Elections, 383 U.S. 663, 666, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966)* (holding that poll tax violated the equal protection clause)." *Dec. of Ind. and Preamble to the U.S. CONST.*

## FACTUAL ALLEGATIONS

### *HART INTERCIVIC VERITY*

1. No universal definition exists for what constitutes a "paper ballot", thus enabling vendors and their surrogates to characterize "machine-marked paper printouts from ballot marking devices" (BMD) as "paper ballots".
2. The machine-marked ballot is then counted on a separate scanner.
3. Most independent cybersecurity election experts caution against putting these insecure BMDs between voters and their ballots and instead recommend hand-marked paper ballots as primary voting system.[1]
4. Currently "hybrid" systems that combine both a BMD and a scanner into a single unit are considered more controversial.

[1] https://whowhatwhy.org/politics/elections/philly-ignores-cybersecurity-and-disability-access-in-voting-system-selection/ Last visited 06/21/22

5. The Verity Touch Writer DUO is a daisy chained configuration comprised of a Verity controller device, a proprietary cord, and is capable of connecting up to twelve BMD devices.[2]

6. The software application, Verity Relay, is a remote transmission software application that receives election data transmissions sent by Verity Scan device (tabulator) unit that scans the ballots, Verity Touch Duo scanner firmware, and digital scanner devices that are equipped with the Relay modem accessory. Per the contract obtained through PIA requests, it appears that Tarrant County purchased this capability.

7. Two manufacturers of the voting machines utilized in Texas, ES&S and Hart, testified before the House Administration Committee that some tabulators have wireless modem capabilities.[3]

8. Several aspects/components of Hart InterCivic's Verity Voting are concerning when in close proximity to the internet.

9. One known county contract of the Hart InterCivic tabulators indicates that (9) nine of the add-on modems were purchased.

    a. Per Hart contract, a modem kit is required for electronic transmission from Verity Scan.

---

[2] https://www.eac.gov/sites/default/files/voting_system/files/Hart%20Intercivic%20Verity%20Voting%202.4%20EAC%20Certification%20Test%20Report%20v1.1.pdf See page 21 Last visited 06/21/22

[3] https://www.nbcnews.com/politics/elections/online-vulnerable-experts-find-nearly-three-dozen-u-s-voting-n1112436 Last visited 06/21/22

C. Voting Devices continued

| | | | Price breakdown per year | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Year 1 | | | Year 2 | | | Year 3 | | |
| Component | Version | Description | Unit Price ($) | Est. Qty. | Total ($) | Unit Price ($) | Est. Qty. | Total ($) | Unit Price ($) | Est. Qty. | Total ($) |
| Relay Modem Kit | | Modem kit required for electronic transmission from Verity Scan. May be shipped separately pending customer carrier selection; invoicing and testing will be independent if shipped separately | $ 500 | 9 | $ 4,500 | | | | | | |
| AutoBallot Kit | | Barcode scanner kit for automatic Verity access code creation from VR/electronic poll book data | $ 419 | 400 | $ 167,600 | | | | | | |
| License & Support for Verity Hardware | | Annual License & Support Fee | $471,880 | 1 | $ 471,880 | $471,880 | 1 | $471,880 | $471,880 | 1 | $ 471,880 |
| TOTAL | | | $ | | 13,303,792 | $ | | 471,880 | $ | | 471,880 |

b. On August 1, 2019, the SoS Office sent a letter of approval for the above contract, which included the add-on modems, to Heider Garcia. (Relay Modem Kit).

c. The Relay Modem Kit is listed as required by Hart for the ENR to function but is not a listed component on the SoS examination or on the certification.

10. Brandon Hurley, a SOS appointed examiner, pointed out the connectivity capabilities of this make and version of voting system in his examination report.[4]

11. The exact component that allows these connectivity capabilities was not identified in Hurley's report. The visuals of Verity Voting, however, as well as several item descriptions in SLI Compliance's testing report could be points

[4] https://www.sos.texas.gov/elections/forms/sysexam/brandon-hurley-hart-2.4.pdf

of vulnerability given the lack of compliance with VVSG.[5] See 1.6.1 Block Diagram

Hart InterCivic
Verity Voting 2.4
EAC Modification Test Plan

## 1.6 Scope of Testing

### 1.6.1 Block Diagram




Overview of the diagram:

- The components are displayed as touch points of data access, transfers, and verification.
- Dotted lines show the flow of data and air gaps using vDrives and are also used to separate the deployment models shown within the polling place.
- Verity Print is a ballot production device that provides unmarked printed ballots.
- Verity Touch Writer and Scan may be installed in polling places to support paper-based voting.
- Verity Controller, Touch Writer Duo, and Scan may be installed in polling

EAC Modification Test Plan v1.2
Document No. HRT-19003-CTP-01

Page 17 of 33 [6]

---

[5] https://www.eac.gov/sites/default/files/voting_system/files/Attachment%20F1%20-%20Hart%20Verity%20Voting%202.4%20Modification%20Test%20Plan%20As%20Run%20v1.2.pdf Last visited 06/21/22

[6] https://www.eac.gov/sites/default/files/voting_system/files/Hart%20Intercivic%20Verity%20Voting%202.4%20EAC%20Certification%20Test%20Report%20v1.1.pdf

12. "Air-gapping" measures are intended to prevent internet/network access. Several experts have presented testimonies and demonstrations that contradict "air-gapping" as fail safe.

13. "Most traditional air gaps involve what is popularly known as a "sneakernet," a physical method of transferring data, e.g., a Wi-Fi dongle or USB port."[7]

> At this point, human nature takes over. Even well-intentioned users will accidentally leave doors unlocked or USB ports unguarded. They may get lazy and neglect to follow security procedures. One worrisome example of this risk occurs on merchant ships and naval vessels, whose mechanical control and navigation systems are air-gapped because, well, they're on a ship and generally not connected to the Internet (though even that is starting to change.) Once a ship is docked, however, a malicious actor can gain access to the ship and use a USB stick to insert malware into the system. When a ship undergoes maintenance, and hundreds of semi- or non-vetted workers are aboard the vessel while the regular crew is away, it's easy to see how an air gap will fall apart.

Last visited 06/21/22.

[7] https://www.rubrik.com/insights/what-is-an-air-gap-and-why-is-it-important Last visited 06/21/22

**2.5 Materials**

Items identified in the table reflect materials required to perform hardware, software, telecommunications, security, accuracy and integrated system tests in a manner that reflects real world use and needs.

The following test materials are required for the performance of testing including, as applicable, test ballot layout and generation materials, test ballot sheets, and any other materials used in testing.

- Ballots & blank ballot grade paper
- Thumb drives
- USB dongles
- Ballot marking pens
- Printer paper rolls [8]

14. Further, Brandon Hurley noted an *over vote* issue "….bring up a warning when more than one candidate can be voted for in a specific race. However, when you make your selection to continue, there is an automatic de-selection of another candidate chosen rather than allowing the voter to decide who gets deselected……. led to a voter confusion….casting of an unintended vote without voter's knowledge."[9]

### *HART INTERCIVIC BALLOT ISSUES*

15. Hood County District Attorney Matthew Mills contacted Attorney General Ken Paxton requesting clarification of ballot numbering issues associated with the use of Hart InterCivic voting systems.

16. Mills pointed out the following issues with electronic voting systems, specifically Hart's hybrid voting system.[10]

    a. Questions arising about compliance with election code.[11]

    b. Who has the authority to select the method for numbering ballots?

---

[8] https://www.eac.gov/sites/default/files/voting_system/files/Hart%20Intercivic%20Verity%20Voting%202.4%20EA Last visited 06/21/22

[9] https://www.sos.texas.gov/elections/forms/sysexam/brandon-hurley-hart-2.4.pdf#search=hart%202.4.2

[10] https://katychristianmagazine.com/wp-content/uploads/2021/12/Request-for-Opinion-on-Ballot-Numbering_RQ-0405-KP_status-Borgelt-letter.pdf Last visited 06/24/22

[11] See Tex. Elec Code § 520.62

17. Texas Secretary of State legal director of the elections division informed election administrators of two ways to comply.[12]

a. First method: Pre-print numbers on blank ballot stock, email deems "simplest and easiest way"

b. Second method: The voting machine generates random numbers on blank ballots.

18. Mills poses (3) three questions regarding the ballot numbering issues with Hart.

13

The relevant language in § 52.062 is the following: "[t]he ballots prepared by each authority responsible for having the official ballot prepared." Does this indicate that using pre-printed numbers on blank ballot stock is the only legal way to comply with the statute? Or does the machine generation method also comply with the numbering requirement?

a. A memorandum from a staff attorney, Chuck Pinney, to the Director of Elections, Keith Ingram, dated May 18, 2020, states machine-generated numbering on the Hart Verity 2.4 system complies with Texas ballot numbering requirements.

b. According to Elec. Code Ann § 31.032 the election commission has the authority to appoint an election administrator as well as suspend or terminate the administrator under § 31.037. Under § 31.039, the commissioners court maintains authority over various budgetary issues including salary and staffing.

i. A 1988 Tex. Att'y Gen. Op. No. LO-88-62 (1988)[14] the AG's office opined that election administrators should be "largely independent of both the commissioners court and election

---

[12] https://www.sos.texas.gov/elections/forms/sysexam/chuck-pinney-hart-2.4.pdf See page 3 Last visited 06/22/22

[13] https://katychristianmagazine.com/wp-content/uploads/2021/12/Request-for-Opinion-on-Ballot-Numbering_RQ-0405-KP_status-Borgelt-letter.pdf See page 12 Last visited 06/22/22

[14] https://www2.texasattorneygeneral.gov/opinions/opinions/47mattox/lo/1988/pdf/lo1988062.pdf Last visited 06/22/22

commission.", essentially stating that the elections commission does not possess the authority to suspend an elections administrator.

ii. Senate Bill 12333 from 2011 may render the AG opinion moot which gave new authority to elections commissions to suspend elections administrators.

iii. In 1997, the San Antonio Court of Appeals provided a different conclusion in Krier v. Navarro, 952 S.W.2d 25. The elections administrator was greatly restricted in the exercise of his duties from "…selecting polling places and early voting sites, issuing orders calling for elections, adopting a voting system, selecting election judges and phone bank clerks…leasing voting systems…The evidence presented establishes that the governmental functions performed by Navarro were not exercised 'largely independent of the control of others."*Id*

Assuming the reasoning in *Krier* is correct, is the method of ballot numbering akin to "adopting a voting system," which is controlled by the commissioners court? Or has the commissioners court already determined the voting system by purchasing voting equipment, and the elections administrator may then determine which method of ballot numbering is appropriate?

Chapter 52 of the Election Code contains various provisions for the preparation of ballots. Under § 52.001, ballots are for the "vote in *an election*." (emphasis added) Does the suggestion in the director's advisory that jurisdictions may conduct subsequent elections with ballot numbers starting higher than "1" comply with § 52.062? Or should ballots begin with the number "1" for each election?

c. On October 23, 2019, Keith Ingram of the Texas Secretary of State office published Election Advisory 2019-23. Sec. 13(1)(a)(iv)(1)[15].

[15] https://www.sos.state.tx.us/elections/laws/advisory2019-23.shtml Last visited 06/22/22

The director suggests that jurisdictions *MAY* start with the number "1" and then start subsequent elections with ballots with much higher starting numbers. *(Emphasis added)* See below Election Advisory 2019-23, which reads as follows:

iv. The jurisdiction can pre-number the ballots and split them into batches for each election, with each batch beginning with a number that ends in the number "1". Those batches must be no smaller than units of 100, though a jurisdiction could batch in larger units if needed (1000, 10,000, etc.).

1. **Example:** For the November election, the jurisdiction could use ballots 1-1500, and for the May election that jurisdiction could then use ballots 1501-2400, and for the following November election the jurisdiction could use ballots 2401-4200, etc.

19. Is the Director of Elections advising jurisdictions to ignore Tex. Elec Code § 52.001?

20. Hood County Attorney Matthew Mills raises three very specific questions concerning the numbering of the ballots in which Hart InterCivic voting systems does not comply in accordance with Tex. Elec Code.[16]

21. In response to Mills' request for an opinion regarding numbering of the ballots, Roger B. Borgelt of Borgelt Law provided an opinion to the Attorney General's office on July 29, 2021.[17]

22. The Texas legislature is constitutionally required to provide for ballot numbering in Texas.[18]

23. The Texas legislature passed the consecutive ballot number statute 35 years ago[19] and provides integrity of the ballot by detecting counterfeited, missing, or duplicate ballots.

24. Tex. Elec Code § 52.062 requires consecutive ballot numbering consecutively beginning with number "1" and is referenced in (6) six other Election Code provisions, therefore making it an established mandatory procedure.

---

[16] See Tex. Elec Code § 52.062, § 52.006, § 51.007, § 51.008, § 51.10, § 62.007 and § 62.009

[17] https://katychristianmagazine.com/wp-content/uploads/2021/12/Request-for-Opinion-on-Ballot-Numbering_RQ-0405-KP_status-Borgelt-letter.pdf See page 3 Last visited 06/22/22

[18] See Tex. Con. Article 6 Sec. 4

[19] See Tex. Elec Code § 52.062

**a. § 51.006. PREPARING BALLOTS FOR DISTRIBUTION**

The authority responsible for distributing election supplies shall package and seal each set of ballots before their distribution and shall mark the package with the number of ballots enclosed and the range of the ballot serial numbers.

Acts 1985, 69th Leg., ch. 211, Sec. 1, eff. Jan. 1, 1986. Amended by Acts 1991, 72nd Leg., ch. 203, Sec. 2.47; Acts 1991, 72nd Leg., ch. 554, Sec. 18, eff. Sept. 1, 1991.

**b. § 51.007. RECORD OF BALLOT DISTRIBUTION**

(a) As soon as practicable after the ballots are packaged for distribution, the authority responsible for distributing election supplies shall prepare a record of the number of ballots and the range of serial numbers on the ballots to be distributed to each presiding judge and the early voting clerk.

(b) The authority shall preserve the record for the period for preserving the precinct election records.

Acts 1985, 69th Leg., ch. 211, Sec. 1, eff. Jan. 1, 1986. Amended by Acts 1991, 72nd Leg., ch. 203, Sec. 2.48; Acts 1991, 72nd Leg., ch. 554, Sec. 19, eff. Sept. 1, 1991.

**c. § 51.008. SUPPLEMENTING DISTRIBUTED BALLOTS**

(a) The authority responsible for distributing election supplies shall retain a reserve of ballots to supplement the distributed ballots and on election day may reallocate previously distributed ballots among the polling places.

(b) The authority shall enter on the record of ballot distribution the number of ballots reserved and the number of ballots distributed from the reserve to each polling place. The range of serial numbers on the ballots shall be included in the record.

(c) If distributed ballots are reallocated, the authority shall indicate the reallocation on the record of ballot distribution and shall issue a receipt to each presiding election judge showing the number of ballots and the range of serial numbers on the ballots taken from the judge's polling place for redistribution. Each presiding judge shall indicate on the ballot register any reallocation of ballots affecting that polling place.

(d) The authority shall retain the undistributed reserve for the period for preserving the precinct election records.

Acts 1985, 69th Leg., ch. 211, Sec. 1, eff. Jan. 1, 1986.

**d. § 51.010. FAILURE TO DISTRIBUTE OR DELIVER SUPPLIES**

(a) A person commits an offense if the person is responsible for distributing election supplies for an election and intentionally fails to distribute any of the supplies by the deadline prescribed by Section 51.004(b).

(b) A person commits an offense if the person is entrusted with the delivery of election supplies for use at polling places and intentionally

fails to deliver any of the supplies within the time specified by the person who entrusted the delivery to the person.

(c) An offense under this section is a Class C misdemeanor.

Acts 1985, 69th Leg., ch. 211, Sec. 1, eff. Jan. 1, 1986. Amended by Acts 1997, 75th Leg., ch. 864, Sec. 46, eff. Sept. 1, 1997.

**e. § 62.007. EXAMINING BALLOTS**

(a) An election officer shall unseal the ballot package, remove the ballots, and examine them to determine whether they are properly numbered and printed.

(b) An unnumbered or otherwise defectively printed ballot shall be placed in ballot box no. 4.

Acts 1985, 69th Leg., ch. 211, Sec. 1, eff. Jan. 1, 1986.

**f. § 62.009. DISARRANGING BALLOTS FOR VOTERS' SELECTION**

(a) As needed for voting, an election officer shall disarrange a supply of the ballots so that they are in random numerical order.

(b) The disarranged ballots shall be placed face down on a table in a manner preventing an election officer or other person from ascertaining the number of a ballot selected by a voter.

(c) The provisional ballots shall be placed separately from the regular ballots.

Acts 1985, 69th Leg., ch. 211, Sec. 1, eff. Jan. 1, 1986. Amended by Acts 1997, 75th Leg., ch. 1078, Sec. 6, eff. Sept. 1, 1997; Acts 2003, 78th Leg., ch. 1315, Sec. 22, eff. Jan. 1, 2004.

25. As noted above in Election Advisory 2019-23, the SoS notates that jurisdiction using ES&S and Hart InterCivic systems does not comply with § 52.062.[20]

i. **ES&S ExpressVote – Tracking Ballot Numbers Through the ExpressVote Activation Card Printer/ExpressLink Software**

1. Each ExpressVote Activation card printer that is assigned to a specific polling place will be given a two to three digit alpha code. This code will be printed on each Ballot Card as it is generated for the voter.
2. In addition to the alpha code, each polling place will print a randomly generated serial number between 1 to 99,999 on the card along with the identifying information related to the election.
3. The system will generate a report showing which ballots (based on their serial number) were used at each location. This report must be retained with your precinct election records.
4. For tracking purposes, you will continue to have the presiding judge fill out the Ballot Register (PDF), and the original and duplicate forms will be returned in the applicable envelopes. The ballots shall be tracked, distributed, and retained just as you would with a traditional pre-printed full ballot in accordance with Sections 51.006, 51.007, 51.008 with the exception of notating the serial number of the ballot ranges.

26. Randomized ballot numbering procedures will cause jurisdictions to violate several election codes.[21]

27. In the same advisory[22] the SoS Office does not advise how jurisdictions will comply with the following Tex. Elec Codes:

**a.** § 51.010 – how will officials distribute serial numbered range records to polls.

**b.** § 62.007 - how officials at polls determine if ballots are properly numbered.

**c.** § 62.009 – how will election judges place numbered ballots face down.

[20] https://www.sos.state.tx.us/elections/laws/advisory2019-23.shtml Last visited 06/22/22

[21] See Tex. Elec Code § 52.062, 51.006, 51.008

[22] https://www.sos.state.tx.us/elections/laws/advisory2019-23.shtml Last visited 06/22/22

28. Allowing voting machines to generate random text values on ballots will cause confusion and violate several Tex. Elec Code statues, and these violations are punishable by law.[23]

29. The SoS is provided the authority to prescribe "operating procedures" related to voting systems. The Tex. Elec Code does not provide the SoS the authority to advise election administrators to ignore any sections of the Election Code, as law and procedure are not the same.

30. The Legislative Branch did not provide the SoS the authority to ignore Tex. Election code nor the authority to advise to jurisdiction to do the same, which is a violation of Tex. Con. Art. 6 Sec. 4. in regards to numbering of the tickets/ballots. No authority grants the SoS defendants the ability to *interpret* Tex. Elec Code for the following:

   **a.** Advising jurisdictions to ignore Tex. Elec Code § 52.062.

   **b.** Hindering jurisdictions' ability to "detect and punish fraud and preserve the purity of the ballot box. ….as randomized ballot numbers prevent election judges from recording, validating, and tracking the official ballot serial number ranges they were in possession of, personally distributed, and retained at their polling locations, again violating Tex. Con. Art. 6, Sec 4."[24]

31. The Election Code specifically assigns the SoS duties[25] to ensure uniform compliance but does NOT provide the SoS with "discretion" to advise any jurisdictions to ignore or refuse to comply with the Election Code.[26]

---

[23] See Tex. Elec Code § 51.010(c), § 51.007(b), 51.008 (d) and 13 TAC § 7.125(a)(10) and Tex. Penal Code § 37.10(3)

[24] https://katychristianmagazine.com/wp-content/uploads/2021/12/Request-for-Opinion-on-Ballot-Numbering_RQ-0405-KP_status-Borgelt-letter.pdf Last visited 06/22/22

[25] See Elec. Code § 31.003

[26] See Elec. Code § 52.062, § 51.010(c), § 51.007(b), 51.008 (d)

32. The SoS Defendants and County Officials disregard for Tex. Elec. Code in their guidance to jurisdictions violates the Separation of Powers clause of Art. 2 Sec. 1 of the Texas Constitution.

33. The Texas Constitution provides that only the Legislature can suspend laws, not the SoS, a member of the Executive Branch.

34. These actions are in contradiction to the Election Code and its interpretation and application to ensure uniformity across the state of Texas in all voting systems.[27]

35. By suspending laws and authorizing exceptions to the Election Code, the SoS Defendants have and continue to unlawfully modify election law.[28]

36. The Legislature provided a very clear and specific mandate: prepare and distribute detailed and comprehensive written directives and instructions that comply with the Election Code to state and local election authorities.[29]

37. The SoS Defendants' and County Officials' defiance of Election Code knowingly caused the Plaintiff(s), registered voters of Texas to:

**a.** Cast a vote under false pretense[30]

**b.** Prevent a cast of a legal vote in which Plaintiff(s) are eligible to vote.[31]

**c.** Cause the ballot not to reflect the intent of the Plaintiff(s)/voter[32]

**d.** Defendants committed the offense while acting in the capacity of an elected official.[33]

---

[27] See Tex. Elec Code § 122.032

[28] See Tex. Elec Code § 276.019. UNLAWFUL ALTERING OF ELECTION PROCEDURES - A public official or election official may not create, alter, modify, waive, or suspend any election standard, practice, or procedure mandated by law or rule in a manner not expressly authorized by this code.

[29] See Elec. Code § 31.003

[30] See Tex. Elec Code 273.013(1)

[31] See Tex. Elec Code 273.013(2)

[32] See Tex. Elec Code 273.013(6)

[33] See Tex. Elec Code 273.013(b)(1)

38. Randomized ballot numbering generated by Hart InterCivic Verity 2.4 results in multiple violations of election law, the Texas Constitution, and the Texas Penal Code.

### *HART INTERCIVIC ESLATE*

39. During the 2018 midterms a number of "straight-ticket" voters complained that Hart's eSlate system had switched their choices to the opposite party. [34]

40. Others reported that the Hart eSlate machines appear to remove any selection for the U.S. Senate. [35]

41. In 2008, the Texas Democratic Party sued then-Secretary of State Roger Williams over a similar straight ticket voting error affecting the same Hart eSlate machine.[36]

42. April 30, 2009, the SoS's office certified Hart eSlate Voting System Version 6.2.1. for use in Texas elections without the required EAC certification.[37]

43. California Secretary of State Debra Bown released results of the state's review of the voting systems used in the state.[38]

   a. Red Team, led by UC Davis computer scientist Mathew Bishop, was tasked with examining security vulnerabilities and found that Hart InterCivic could be compromised. Many of the attacks could be mitigated but *not all*. *(Emphasis added)*

   b. Red Team also noted that they did not have enough time to fully examine the systems and were confident that further examination would reveal additional security vulnerabilities in the voting system.

---

[34] https://techcrunch.com/2018/10/26/texas-voting-machines-changing-votes-hart-eslate/ Last visited 06/21/22

[35] https://www.houstonchronicle.com/news/politics/texas/article/Voting-machine-errors-changed-some-Texans-13339298.php Last visited 06/21/22

[36] https://www.austinchronicle.com/news/2008-08-08/658341/ Last visited 06/21/22

[37] https://www.sos.state.tx.us/elections/forms/sysexam/hart621cert.pdf Last visited 06/23/22

[38] https://www.wired.com/2007/07/ca-releases-res/ Last visited 06/23/22

c. Samples of the kinds of attacks the team was able to conduct on the Hart InterCivic System:

> 1. Election Management System. The testers did not test the Windows systems on which the Hart election management software was installed because Hart does not configure the operating system or provide a default configuration. Hart software security settings provide a restricted, Hart-defined environment that the testers bypassed, allowing them to run the Hart software in a standard Windows environment. They also found an undisclosed account on the Hart software that an attacker who penetrated the host operating system could exploit to gain unauthorized access to the Hart election management database. 2. eScan. The testers were able to overwrite the eScan firmware. The team also accessed menus that should have been locked with passwords. Other attacks allowed the team to alter vote totals; these attacks used ordinary objects. The team, in cooperation with the source code review team, was able to issue administrative commands to the eScan.
>
> 3. JBC. The team developed a surreptitious device that caused the JBC to authorize access codes without poll worker intervention. The team verified that the mobile ballot box (MBB) card can be altered during an election. The team also found that post-election safeguards to prevent the altered data on a tampered MBB card from being counted can be easily bypassed.
> 4. eSlate. The testers were able to remotely capture the audio from a voting session on an eSlate with audio enabled, thereby providing an attack that violates voter privacy.
> The team was also able to force an eSlate to produce multiple barcodes after printing
> "BALLOT ACCEPTED" on the VVPAT records. This could cause a county that used bar code readers to read the VVPAT to produce erroneous vote totals.

44. Brandon Hurley, a SoS examiner, notates on his examination report dated February 19, 2008: "…January 18, 2008, all of the appointed Examiners gather with Hart officials for remainder of the inspection and testing of the 6.2.1 System…. The examiner and the Hart officials held a lengthy discussion concerning past published issues and issues in other states that have come up with the Hart Intercivic 6.2.1 System and its predecessors. In particular, a previous "decertification" by the California Secretary of State was discussed…Hart officials represented that California immediately recertified the system after it was decertified."[39]

[39] https://www.sos.texas.gov/elections/forms/sysexam/brandonhurley.pdf#search=hart%206.2.1 Last visited 06/23/22

45. Hurley further noted: "…recommendation is conditioned on satisfactory answers being provided by Hart to the Secretary of State's office in response to the list provided to Hart on February 6, 2006. The answers to these questions are due from Hart on February 22, 2008. If any of the questions or additional issues, then I would suspend this recommendation pending the resolution of such issues."

46. Tom Watson, a SoS examiner, notates on his examination report the following:

a. "Tally, Rally, and SERVO employ the "secure desktop" feature which is supposed to prevent access to the operating system by the operator during the election processing. A flaw in the "secure desktop" was discovered during the Tally examination. The standard Windows file dialog is used to select a file when exporting VR data…This is a significant flaw because it allows an operator to delete files or launch a program that could manipulate the data files."

b. "…but there is a security issue. The file dialog flaw is significant and must be corrected."

47. Stephen Berger prepared a report for the SoS on Hart InterCivic Voting System Version 6.2.1 in which he recommended that this system NOT be certified until Hart InterCivic addressed the issues he cited below.[40]

a. Conditions of Certification

i. "All files installed with the system must be filed with the NIST NSRL. Hart InterCivic's response is egregiously deficient. To support incoming inspection of new systems a list of all files installed is need so that the new system can be verified as having

[40] https://www.sos.texas.gov/elections/forms/sysexam/stephenberger621.pdf#search=hart%206.2.1 Last visited 06/23/22

only the system as certified. Pre and post election checks to confirm that software has not been changed or tampered with are recommended. To do this local jurisdictions must have HASH codes of all static files. Further, to avoid the system having a single point vulnerability the non-static files, that change with use, should be evaluated by an entity other than the vendor. Why non-static files change should be understood by state and local authorities. Election officials should make their own independent determination that files that change with use and are not included in pre and post election checks are appropriate and do not represent a security vulnerability."

ii. In response to the question:

"Beyond the files installed with the Hart software, what other files in the operating system and elsewhere do the applications in the Hart 6.2.1 system use?"

Hart responded:

"Like most Windows based software, System 6.2.1's HVS applications make broad use of Windows resources, including hundreds of DLLs and other executable files. Hart would be happy to provide information on the identification of each of these individual files and there respective purpose and characteristics (e.g. why does its HASH code value change from one day to the next or one install to the next), but the information was not required during the original ITA and NASED certification testing, nor during subsequent "

"In its response Hart illustrates the importance of this point. The Hart software makes "broad use of Windows resources, including hundreds of DLLs and other executable files". Each of those files represents a potential vulnerability, an opportunity to introduce malicious code into the system. For that very reason it is essential that the information be available to verify these files both in the certification process and pre and post election. Past

deficiencies are no reason to propagate a vulnerability into the future. Being able to confirm that the software certified at the national and state level is identical to that installed and used in elections is one of the most significant improvements to total election system security that can be made. Implementing such checks requires not modification or recertification of a voting system, unlike many changes. The tools to verify HASH codes are readily available and do not require extensive training to use. It is hard to imagine why a change that is this beneficial is being resisted."

iii. In response to the HASH code issue, Hart InterCivic states:

"These criteria have been imposed on Hart HASH code submissions by arrangements agreed between Hart and NIST in the absence of other specific authoritative requirements for vendor reference files."

"This statement is inaccurate and misleading. This examiner has met personally and had multiple telephone conversations with NIST NSRL staff. NIST NSRL will HASH and post any files a vendor gives them to post."

iv. "Although the Hart InterCivic system is NASED certified it fails to meet some requirements for NASED certification dealing with operating system configuration. A secure configuration of the operating systems provided must be provided with instructions on how to check the configuration. To assure that the system is adequately secure Hart must specify an operating system configuration, with adequate safeguards to assure that the Hart applications will only run in a secure configuration of the operating system. The configuration should be consistent with industry practice as represented in the NIST security configuration checklist for its operating system, Windows 2000 Professional?"

v. In response to questions about the Hart Intercivic recommended configuration, the company stated:

"Setup and configuration of HVS application computers is accomplished only by qualified Hart technical personnel and includes all Windows updates as of the date of the install."

> "This practice is not acceptable. Voting system applications use many operating system functions. Changes to the operating system should only be made after approve by the Texas Director of Elections after appropriate review. Further, safeguards are needed to assure that only the approved update is installed on systems. The current practice potentially allows additional software to be installed under the guise that it is part of the operating system update."
>
> "To assure a secure election system there should never be a point at which individuals from a single organization can change software. At a minimum individuals from two different organizations should approve and verify any changes to the operating system. In the case of operating system upgrades it would be preferable that the vendor recommend and the Director of Elections approve any patches to the operating system. Then that the vendor install the patches and the local jurisdiction have the tools and information to verify that the system delivered to them have only certified software, including the version and updates to the operating system. Further local jurisdictions should have the tools and information to confirm that no additional software has been added to the system."

vi. Recommended administrative use procedures for this system are needed.

48. Hart InterCivic has a history of issues regarding hash validations, including version 6.2.1, yet the SoS's office did certify without publishing answers regarding if condition had been met.

49. Berger's report listed a multitude of security flaws presented in the Hart InterCivic 6.2.1 voting system.

3. **VSS 2002 Vol. 1 Sec. 2.2.5.3**

**"2.2.5.3 COTS General Purpose Computer System Requirements**

Further requirements must be applied to COTS operating systems to ensure completeness and integrity of audit data for election software. These operating systems are capable of executing multiple application programs simultaneously. These systems include both servers and workstations (or "PCs"), including the many varieties of UNIX and Linux, and those offered by Microsoft and Apple. Election software running on these COTS systems is vulnerable to unintended effects from other user sessions, applications, and utilities, executing on the same platform at the same time as the election software.

"Simultaneous processes" of concern include unauthorized network connections, unplanned user logins, and unintended execution or termination of operating system processes. An unauthorized network connection or unplanned user login can host unintended processes and user actions, such as the termination of operating system audit, the termination of election software processes, or the deletion of electionsoftware audit and logging data. The execution of an operating system process could be a full system scan at a time when that process would adversely affect the election software processes. Operating system processes improperly terminated could be system audit or malicious code detection.

To counter these vulnerabilities, three operating system protections are required on all such systems on which election software is hosted. First,

25 of 33

**Version: 2.0**
**Date: March 3, 2008** [41]

50. These security vulnerabilities provide access to election system in a way in which vote totals may be altered.

51. The SoS's office issued a "Preliminary Statement" on April 30, 2009 under the conditions the examiners discovered two potential security concerns and advised security protocols to follow to mitigate these vulnerabilities.

52. If these security protocols are not followed, then it is theoretically possible to have access to the operating system and run or delete other programs. Jurisdictions are advised to (1) restrict usage of the voting system[42] and (2) restrict what software is loaded onto the voting system computer.

53. The SoS's office further "conditioned" the certification of version 6.2.1 by applying procedures for jurisdictions. (1) Two-person access with one person login on Windows 2000 OS and one person to start the application. (2) Two-

[41] https://www.sos.texas.gov/elections/forms/sysexam/stephenberger621.pdf#search=hart%206.2.1 See page 25 Last visited 06/23/22

[42] Election Advisory 2008-09, Section 5(f)(i-iii)

person control team on the Tally when open. (3) Windows 2000 audit logs which tracks log-ons and attempts. (4) Windows 2000 to harden operating systems. (5) Jurisdiction must file an initial written confirmation with the SoS that they are in compliance with the procedures.[43]

54. By the SoS's current website, there are 35 counties utilizing this version of Hart.[44]

55.

## DECLARATIONS FROM AUTHORITIES

56. The Affidavit of Terpsehore Maras attests that the 2017 elections is null and void due to lack of Election Assistance Commission (EAC) certifications of Voting Systems and the Voting System Test Laboratories (VSTL) used to certify the Voting Systems. (APPENDIX P-1) [45]

RULE: Section 231(b) of the Help America Vote Act (HAVA) of 2002 (*42 U.S.C. §15371(b)*) requires that the EAC provide for the accreditation and revocation of accreditation of independent, non-federal laboratories qualified to test voting systems to Federal standards. Generally, the EAC considers for accreditation those laboratories evaluated and recommended by the National Institute of Standards and Technology (NIST) pursuant to HAVA § 231(b)(1). However, consistent with HAVA § 231(b)(2)(B), the Commission may also vote to accredit laboratories outside of those

[43] https://www.sos.state.tx.us/elections/forms/sysexam/hart621cert.pdf Last visited 06/23/22
[44] https://www.sos.state.tx.us/elections/forms/sysexam/voting-sys-bycounty.pdf Last visited 06/23/22
[45] https://storage.courtlistener.com/recap/gov.uscourts.wied.92717/gov.uscourts.wied.92717.9.13.pdf

recommended by NIST upon publication of an explanation of the reason for any such accreditation.

57. CONCLUSION: This affidavit presents unambiguous evidence of:

a. Foreign interference
b. Complicit behavior by the previous administrations from 1999 to present to hinder the voice of the American people
c. Knowingly and willingly colluding with foreign powers to manipulate the outcome of the 2020 election
d. Foreign nationals, through investments and interests, assisted in the creation of the Dominion software
e. Akamai Technologies merged with a Chinese company that makes and distributes the COTS components of election machines
f. US persons holding an office and private individuals knowingly and willingly oversaw fail safes to secure our elections
g. The EAC failed to abide by standards set in HAVA ACT 2002
h. The IG of the EAC failed to address complaints since their appointment regarding vote integrity
i. Christy McCormick of the EAC failed to ensure that EAC conducted their duties as set forth by HAVA ACT 2002
j. Both Patricia Layfield (IG of EAC) and Christy McCormick (Chairwoman of EAC) were appointed by Barack Hussein Obama and have maintained their positions since then

k. The EAC failed to have a quorum for over a calendar year leading to the inability to meet the standards of the EAC.

l. AKAMAI Technologies and Hurricane Electric raise serious concerns for NATSEC due to their ties with foreign hostile nations

58. This is a summary of the Declaration of Mr. J. Alex Halderman regarding the case of Curling et al v. Raffensperger et al.[46] Mr. Halderman makes these claims under oath, and this summary will neither make inferences from nor inflate his statements. APPENDIX P-2

59. The DRE machines do not create a paper record of each vote. Paperless DRE machines are notoriously vulnerable to cyber attacks that can cause a multitude of issues. Votes can be changed or erased. Extra votes can be cast, and machines can be made to not work at all. He goes on to state that paperless DRE machines do not provide even adequate security against cyber attacks.

60. Mr. Halderman claims the 2016 presidential election was subject to multiple attempts to interfere with and undermine the election process through cyberspace. He cites incidents such as compromised email accounts belonging to the Democratic National Committee and John Podesta. He also cites attempted intrusions into election-related systems via cyberspace in at least eighteen States. Voter data was successfully exfiltrated in two states, and in a subset of those eighteen, attackers could have altered or deleted voter registration data.

61. Shawn Smith, retired Military officer with a Master's degrees in National Security Affairs and in Aeronautical Science, filed a declaration on 6/8/2022

---

[46] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Declaration of Halderman

into Kari Lake, et al. v. Katie Hobbs, Arizona Secretary of State (case 2:22-cv-00677-JJt)[47]. APPENDIX P-3

62. He states: "I have been asked to testify about the threat of the compromising of our supply chain and attack(s) to U.S. national security systems and critical infrastructure, in particular to election related systems, including voting systems and consequently, to elections." As noted in other expert affidavits and declarations, Smith describes the vulnerability of the United States' critical systems resulting from compromised supply chains, which includes U.S. elections. He states that it is his, "conclusion that U.S. elections are critically vulnerable to exploitation by foreign adversaries through compromising of our computerized election systems through supply chains."

63. "Even if states and localities could afford the caliber of cybersecurity expertise needed to defend voting systems, the U.S. workforce of qualified cyber professionals is too small to staff voting systems offices in 50 states, much less over our 3,000 U.S. Counties. Hart InterCivic appears to use Hewlett-Packard computers, which are remanufactured and assembled overseas, containing overseas-manufactured components, built by foreign workers, and all without U.S government oversight and "effectively no safeguards in the entirety of the testing and certification regime for voting systems"

64. "ES&S is owned by the private equity firm McCarthy Group, which doesn't disclose the information of investors, including if any other investments or financial interests, have a controlling interest in ES&S."

65. The Declaration of John R. Mills and the testimony of Mr. Mills regarding the use of remote access operations for the unlawful entry and purposes into

[47] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Declaration of Shawn Smith

computer networks was requested. The information is unclassified and based on his personal experience, publicly available reporting, and open-source information. (APPENDIX P-4)

66. Remote access operations are designed to gain access to computer networks to avoid detection and residual forensic evidence. This is accomplished via implanted malware, other software, and/or algorithms that facilitate access to the targeted system.

67. Electronic election infrastructure is considered critical infrastructure and can be subjected to remote access operations. A successful remote access operation could change vote totals, rendering elections null and void. Mr. Mills states he has very low confidence in the security of American election critical infrastructure.

68. Mr. Mills states there is no independent third-party review of electronic voting systems. The level of expertise by those officials who review or access these systems is woefully inadequate.

69. He states contractors use intellectual property rights or contractual terms to deny any third-party review of the election systems they provide.

70. Mr. Mills points out that ES&S has admitted to building in remote access to their machines. He goes on to state that many of the security procedures designed to restrict the ability of remote access operations are not being used.

71. Mr. Mills concludes by assessing the current voting process has become over-sophisticated and asks why this is necessary for elections. He raises legitimate questions of why counties are spending inordinate amount of resources on a technology environment without an evaluation of whether it is truly required. He further assesses there are no checks and balances on sworn elected officials and states the entire notion of electronic voting machines needs to be revisited.

72. The Declaration of Douglas Logan (APPENDIX P-5) concurs with the aforementioned affidavits and presents evidence from DEFCON Reports (Exhibits A, B, C).

73. See Appendix P-6 for issues related to the accreditation of electronic voting systems.

74. See Appendix P-7 for foreign countries involved in election infrastructure, manipulation, and supply chain management.

**FAILURES, NEGLECT, AND OFFENSIVE VIOLATIONS**

UNDER 42 U.S.C. §1985, 42 U.S.C. §1986, GUARANTEE CLAUSE, 28 U.S.C §1367

Respondent County Officials: COMMISSIONERS JIM SMITH, PATRICIA MILLER, WILL JONES, BEN PERRY, ELECTION ADMINISTRATOR JARED GOLDSMITH,CERA, COUNTY JUDGE SCOTT FELTON have violated state and federal law with violations that include:

a. Operating systems lacking proper certifications.
b. Unmonitored network communications.
c. Restricting access to public information.
d. Concealing and refusing to release voting system software/firmware versions.
e. Once informed of any problematic issues with voting systems/software, proceeded with elections without informing the public nor issued any public statement as the malfunction continued to affect casting of ballots during the election.
f. Under the advice of SoS, violated Tex. Elec Code § 52.062 requiring the numbering of ballots, which produced a violation of Art. 1 § 28.

g. Under the advice of SoS, violated Tex. Const. Art. 6 § 4 by providing for numbering of tickets specifically reserved for the Legislative Branch.

h. Impeded election workers and staff from the ability to "detect and punish fraud and preserve the purity of the ballot box." Randomized ballot numbers prevented recording, violating, and tracking the official ballot serial number ranges in possession of, personally distributed, and retained at polling locations, violating Tex. Const. Art. 6 § 4.

i. Set off a chain reaction of violations of several ballot numbering statues that are not only illegal but also criminally punishable in the election code. Tex. Elec. Code § 51.010(c), 51.007(b), 51.008(d), and 13 TAC § 7.125(a)(10), and Tex. Penal Code § 37.10(3)

j. Certified not only the November 3, 2020 election results but every subsequent election after receiving evidence from constituents that cast doubt on the integrity of the ballot.

k. Knowingly remiss in their duties, acting under the color of law, and are in violation of Texas statute. These officials did not acknowledge the expiration of certification of accreditations of VSTLs nor the lack of legal signature per HAVA, thereby continuing to allow these voting machines to be used in county elections since 2020. What is confirmed is that Pro V& V and SLI Compliance were ***Not Accredited*** VSTL. *(Emphasis added)*

l. Under the guise of 'protecting the vote', County Officials with undisputed knowledge of HAVA have nefariously sought to suppress the violations of federal and state law from Petitioner. After multiply attempts in the form of PIA(s), the county actors have attempted to conceal public information regarding the voting equipment and software utilized in the election process.

m. Officials and employees, under the directive of the SoS office, withheld from the public that the malfunctions of the voting equipment/software were not resolved but were, in fact, affecting multiply counties during the elections.

n. Acting under the color of law, administered elections with non HAVA complaint voting system equipment, software, and modifications for the state of Texas that have been used in state and federal elections from 2020 through 2022, violating Tex. Elec. Code § 122.032, § 52.062, Tex. Admin. Code § 81.60 and § 81.61, and are also apparent violations of Tex. Const. Art. 6, § 2 and Art. 6 § 4 and federal 52 U.S.C. 20971.

o. By Officials' own admission via the State of Texas' Secretary of State website regarding education of the HAVA, they knowingly certified voting system equipment, software, and modification without a valid VSTL accreditation from the EAC.

p. Respondents' duplicitous activity and arrangement seem to only exist for a singular self-serving purpose of covering misdeeds and offenses.

q. Respondents have, by their actions, demonstrated an intention to continue to allow these same failures to be repeated in future elections.

## EMERGENCY RELIEF IS NECESSARY

The Constitution requires that elections be free, fair, and accurately counted. Changing reported votes or vote totals in a public election violates Petitioners' fundamental right to vote and Petitioners' rights under the Due Process clause and the Equal Protection clause. The only way to prevent these violations is to refrain from using vulnerable Electronic Voting Systems to administer future elections, including the 2022 November Election. The relief requested by Petitioners is the

only way to eliminate the likelihood that Texas election results will be secretly changed by malicious programs hidden in Electronic Voting Systems. Accordingly, a emergency relief is appropriate and necessary to remedy the impending violations of Petitioners' constitutional rights. "In order to obtain a restraining order a plaintiff must establish (1) 'that he is likely to succeed on the merits,' (2) 'that he is likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'that the balance of equities tips in his favor,' and (4) 'that an injunction is in the public interest.'" Hernandez v. Sessions, 872 F.3d 976, 989-90 (9th Cir. 2017) (quoting Winter v. NRDC, Inc., 555 U.S. 7, 20 (2008)). "Under our 'sliding scale' approach, 'the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another.'" Hernandez, 872 F.3d at 990 (quotations omitted). Petitioners meet each of the four elements here. Due to irreparable harm to Petitioners' personal property (my vote) and under principles of the balance of equity, Petitioners are entitled to emergency writ of injunction. TEX. CIV. PRAC. & REM. CODE § 65.011 and TEX. ELEC. CODE § 273.081.

### A. Petitioners Are Likely to Succeed on the Merits.

Petitioners will prevail on the merits of their claims because the right to vote and have one's vote counted correctly together with all other votes is a basic right guaranteed by multiple constitutional provisions, and the use of Electronic Voting Systems as Texas intends grossly infringes that right.

Voting is an indisputable right "of the most fundamental significance under our constitutional structure." Burdick v. Takushi, 504 U.S. 428, 433 (1992) (internal quotation marks and citation omitted). "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." Wesberry v. Sanders, 376 U.S. 1, 17 (1964).

Therefore, states may not, by arbitrary action or other unreasonable impairment, burden a citizen's right to vote. Baker v. Carr, 369 U.S. 186, 208 (1962) ("citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution"). "A law that severely burdens the right to vote must be narrowly drawn to serve a compelling state interest." Curling, 493 F. Supp. 3d at 1280 (citing Burdick, 504 U.S. at 434). "Since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." Reynolds v. Sims, 377 U.S. 533, 562 (1964).

The scope of the right to vote requires states to adopt methods of voting, vote collection, vote counting, and vote tallying that ensure fair, accurate, and secure counting of all legal ballots and exclude any attempt to change the total results reported to differ from the true sum of the votes legally cast. The fundamental right to vote is "the right of qualified voters within a state to cast their ballots and have them counted." United States v. Classic, 313 U.S. 299, 315 (1941). It necessarily encompasses the right to have all votes counted accurately. "Every voter's vote is entitled to be counted once. It must be correctly counted and reported." Gray v. Sanders, 372 U.S. 368, 380 (1963). Because the significance of a vote is inherently comparative – the meaning of a vote is destroyed by improper inflation of opposing vote totals, just as much as if the vote itself was wrongfully prevented – a state's entire system of collecting, counting, and tallying votes must prevent any manipulation of the reported totals.

"[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." Reynolds, 377 U.S. at 555. See also United States v. Saylor, 322 U.S. 385, 386 (1944) ("'[T]he free exercise and enjoyment of the rights and

privileges guaranteed to the citizens by the Constitution and laws of the United States'" entails "the right and privilege . . . to have their expressions of choice given full value and effect by not having their votes impaired, lessened, diminished, diluted and destroyed by fictitious ballots fraudulently cast and counted, recorded, returned, and certified.").

A voting system that counts ballots cast by some voters using different standards from ballots cast by other voters also violates the Equal Protection rights of the voters. "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." Bush v. Gore, 531 U.S. 98, 104-05 (2000); Dunn v. Blumstein, 405 U.S. 330, 336 (1972) ("[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."). Electronic Voting Systems are inherently vulnerable to improper manipulation of votes and vote totals. They cannot be effectively secured against improper manipulation. Therefore, they cannot be constitutionally used to administer Texas elections.

## B. Petitioners Will Suffer Irreparable Harm Absent Emergency Relief.

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)); Hernandez, 872 F.3d at 994-95. Texas's intended use of Electronic Voting Systems in future elections, including the 2022 Election, will deprive Petitioners of their constitutional rights. Petitioners and all Texas voters will suffer irreparable harm absent the grant of preliminary relief. Furthermore, immediate and irreparable injury, loss, or damage will result to Petitioners if the requested injunctive relief is not granted Immediate preservation of ballots, followed by a thorough forensic examination of each ballot by highly qualified, independent document examiners, will serve to

restore the public's confidence in the state's election process. Petitioners show that a basic tenet of a free republic requires that the counting and tabulation of fraudulent ballots cannot be allowed to stand unchallenged.

### C. The Balance of Equities Favors an Injunction.

The balance of equities favors entering the injunction sought by Petitioners. It will cause little, if any, harm to the Respondents, because the system currently intended to be used already calls for the creation of paper ballots. TEX. CONST. art. VI § 4, TEX. ELEC. CODE Chp. 65. By Texas law, the Respondents are already able to carry out the relief sought by Petitioners. The requested injunction would merely require the use of hand counting for all voters and all contests. In contrast, failing to enter the injunction and permitting use of the currently intended system would inflict immeasurable harm. In addition to the deprivation of Petitioners' constitutional rights, the true election results would never be known with certainty, casting a shadow of illegitimacy over the subsequent official acts of the winning candidates. If the defining feature of self-government is the selection of governing officials by majority vote, then conducting an "election" process in which the people cannot confidently know which candidate received the majority vote means intentionally casting aside self-government. That enormous harm would be felt by all persons, whether citizen, voter, or neither, because it would bring into dispute the governance of the public authorities. The resulting loss of legitimacy and increase in political strife would be felt by all.

The Petitioners seek to have the Court ensure, by an appropriate Order, the safe-keeping and non-spoliation of all original ballots and all other related election information – tabulation databases, adjudication databases, pollbook databases, election definition files, scanned ballot images, cast vote records, logic and accuracy testing results, logs and reports stored on all electronic election

equipment, including, but not limited to the Election Management System (EMS), client workstations, pollbooks, tabulators, Direct Recording Electronic (DRE) devices, Ballot Marking Devices (BMD), and Election Night Reporting (ENR) archives, project database backups, and any other form of backups – from the November 2020 election until such time that an extensive forensic inspection by qualified independent document examiners and experts is conducted to determine which ballots are original and which are counterfeit, if any. Petitioners request all other and further relief, at law and in equity, which the Court deems necessary to ensure accurate certifications of the elections occur in the State of Texas, given that the current certification is plagued with demonstrable errors. Petitioners show that the preservation of records and evidence – with subsequent investigation – will have the resulting benefit of ensuring that McLennan County implements the necessary changes, safeguards and best practices to ensure that future elections are conducted in strict accordance with Texas law.

**D. The Requested Injunction Is in the Public Interest.**

The public interest requires free, fair, and accurately counted elections in which the votes of all legal voters are counted equally and are not diluted by altered votes or phantom votes. This is also the constitutional right of Petitioners and all Texas voters. "Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution." Hernandez, 872 F.3d at 996 (quoting Preminger v. Principi, 422 F.3d 815, 826 (9th Cir. 2005)). Further, eliminating even the appearance of unsecure elections serves the public interest. "[P]ublic confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process." Crawford v. Marion Cnty. Election Bd.,

553 U.S. 181, 197 (2008). The use of Electronic Voting Equipment creates large, invisible risks of vote dilution and/or alteration. Therefore, the injunction against the use of this equipment sought by Petitioners strongly serves the public interest. The principle that a federal court should not cause confusion among voters by enjoining state election laws immediately before an election, Purcell v. Gonzalez, 549 U.S. 1 (2006), does not apply in these circumstances.

The 2022 Election is four months away. "When an election is 'imminen[t]' and when there is 'inadequate time to resolve . . . factual disputes,'" Purcell will "often" (though "not always") prompt courts to "decline to grant an injunction to alter a State's established practice." Ohio Republican Party v. Brunner, 544 F.3d 711, 718 (6th Cir. 2008). The 2022 Election is upcoming, but not so imminent that inadequate time remains to allow for the relief sought by Plaintiffs. In light of the clear risk that illegal manipulation of vote totals may occur through unauthorized access to electronic election equipment, another policy affirmed by Purcell weighs in favor of granting injunctive relief:

Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will be disenfranchised. "[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." Reynolds v. Sims, 377 U.S. 533, 555 (1964). Purcell, 549 U.S. at 4.

Furthermore, it is the objective of these Petitioners to evidence preserved for investigations and inspection in order to answer the question, once and for all, whether there was corruption and in the end to restore the public confidence in the principle of one-citizen one-vote, The public's faith and trust in this core principle is essential to the future of Texas and the Republic. Petitioners do not

seek to overturn or contest the General Election of 2020—but rather to discover uncontroverted evidence of an accurate account of legal, not counterfeit ballots, and to play a role in fashioning a remedy in order to prevent the harm and injury from occurring in the future.

## PETITIONER(S) FACE DIFFICULT CIRCUMSTANCES

The Secretary (s) of State, the Deputy Secretary of State, the Election Director and the County Election Administrator(s) and County Officials knowingly allowed Texans to vote on networked machines that were not certified due to lack of accredited VSTL(s) since the November 3, 2020 elections. This onerous conduct renders the results void. The Respondents continued to certify election results knowing they violated Texans' civil liberties, subsequently forcing Petitioner(s) into fraudulent contracts with illegally elected government officials. Officials were provided unlawful power to enforce actions under the color of law and used this power to coerce and subject Petitioner(s) into servitude through unlawful elections. Petitioner(s)' liberty to determine our own course and way of life has been strong-armed from us. "The secretary of State has no authority to pass upon the question of negligence or freedom from negligence. He has no discretion but is obliged to act as the law provides." *DeVries v. Secretary of State, 329 Mich. 68 (1950). 44 N.W.2d 872.*

Petitioner(s) are entitled to free and fair elections of our representatives, affirmed by the U.S. Constitution, Article 1. The government provides the means by which we exercise that Right. Petitioners do not have an alternate means of ensuring our election process. Therefore, we are burdened by the system put in place through our elected officials. In Rice v. Cayetano, the Court ruled the Fifteenth Amendment,

"...reaffirms the equality of races at the most basic level of the democratic process, the exercise of the voting franchise." The Court did not specify the 15th Amendment applies only to a protected class, but rather it applies to everyone.[48]

As part of their sworn duty, our elected officials have an imperative responsibility to guarantee protection of the election process from any form of fraud or profiteering as this could lead to discrimination of voters, regardless of classification. Additionally, when elected officials fail to provide the level of protection necessary to secure the election franchise, it is the Right and Duty of the American people to correct this deficiency. The Court cannot deny this Right to the people when the injury is widespread. It is infeasible to imagine an entire population advancing on the Court for relief.

Failure to perform their sworn duty has allowed discrimination to occur across the equality of races in the State of Texas. This violates the Right to Vote Clause of the Fifteenth Amendment. Furthermore, by failing to protect against private interference (i.e.: vendor voting systems, Scytl, et al) of the election process by not adhering to Federal election/ voting system certification standards (HAVA 2002), and the most basic cyber security defense and hardening frameworks, Respondents failed to comply with 18 USC Section 245(1)(a). Therefore, Respondents do not comply with the Enforcement clause of the Fifteenth Amendment.[49]

Each day Petitioner(s) has suffered irreparable harm living under a government that no longer represents we the people and deprives us, the Petitioners, and all voters of the state of Texas, of the Republic that the Constitution of the State of Texas and United States Constitution outline as protection from a tyrannical government. The general public benefits from the remedy against the constitutional

---

[48] http://cdn.loc.gov/service/ll/usrep/usrep528/usrep528495/usrep528495.pdf

[49] https://uscode.house.gov/view.xhtml?req=(title:18%20section:245%20edition:prelim)%20OR%20(granuleid:USC-prelim-title18-section245)&f=treesort&num=0&edition=prelim

infringements where any citizen can bring a case before the court as long as it impacts the public interest, and benefits the general public, not just the Petitioner. *Assoc. Indus. of New York v. Ickes, 134 F.2d 694, 704 (2d Cir. 1943).*

It is our constitutional duty to invoke our authority as free persons to petition and address this court regardless of the outcome of this complaint, it serves as notice to all acting officials and non-officials within our government that we demand justice for any and all criminal behavior and fraud. 'When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right.' *Baker v. Carr 369 US 186, 208 (1962) citing 364 U.S. at 347, 81 S.Ct. at 130.57.*

*Sherar v. Cullen, 481 F 946* (1973), "There can be no sanction or penalty imposed upon one because of this exercise of constitutional rights." "No state legislator or executive or judicial officer can war against the Constitution without violating his undertaking to support it." *Cooper v. Aaron, 358 U.S. 1, 78 S. Ct. 1401 (1958).* Although Respondents may assert immunity against these claims, the Constitutional theory is that we the people are the sovereigns, the state and federal officials only our agents. As Judge P. Higginbotham dissented, "the 11th Amendment does not bar these claims under the 14th Amendment… The role of the Court in protecting the most vital right of a democratic government: the right to vote; should not be denying the right to vote." *Texas Alliance for Retired Americans; Sylvia Bruni; DSCC; DCCC v. Scott Secretary of State 20-40643 March 16, 2022. United States Court of Appeals, Fifth Circuit.*

The immediate injury continues as Texas officials continue to allow us to vote in another election conducted on uncertified and networked machines is a violation of our 1st, 14th, and 15th amendment rights and a violation of Tex. Elec. Code §52.062, §122.01(3)(4), § 129.054(a) (b)(c), § 122.031(c) and United State Code 52

U.S.C. § 20511 (2)(a)(b), which is criminal. The Petitioner(s) stand to lose more of our freedoms as each day passes without resolution.

However, knowing what we, the Petitioners, now recognize as the illegality of the certifications, did the Petitioners cast an illegal ballot unknowingly at the time? Since 2020, we have been **Forced** to continue this illegal practice by our own government due to their reckless disregard for the law and constitution. Our only remedy thus far has been:

a. Notify the proper authorities in our respective counties and our state government in pursuant with Tex. Elec. Code § 273 in which the Petitioners have made many attempts for over a year.
b. Not to participate in unlawful elections and thereby denied our right to vote as our last alternative.
c. Seek legal means via the Peoples' court.

This brings us here today as we seek redress of our 1st, 14th, and 15th amendment rights under 42 U.S.C. § 1983, "taking on the mantel of the sovereign," guarding for all of us the individual liberties enunciated in the Constitution. Section 1983 represents a balancing feature in our governmental structure whereby individual citizens are encouraged to police those who are charged with policing us all. Thus, it is of special import that suits brought under this statute be resolved by a determination of the truth rather than by a determination that the truth shall remain hidden." Frankenhauser v. Rizzo, 59 F.R.D. 339 (E.D. Pa. 1973).

We, the people, have the Right to elect our representatives. The government provides the means by which we exercise that Right. The Framers could not foresee the day computerized touch screens or FROG ciphers would be used any more than they could an AR-15. But we, the people, have the Right to ensure elections are free and fair. We are not just ensured the Right to CAST the vote. We, the people, are guaranteed the Right to ELECT our government. This entire process must be

guaranteed. Anything that circumvents that process is inherently infringing upon the Right we are granted to pursue life, liberty, and the pursuit of happiness.

We maintain a Right to defend ourselves and others from attack. We also maintain the same Right to defend our election process when it is subject to profiteering by actors who would seek to abolish our sovereignty in favor of a dictatorship. We, the people, carry this Right and every other Right in the same manner we would a physical firearm. Every single Right we enjoy, as affirmed in the Constitution, is a weapon and protection against tyranny. A violation of one Right is a violation of all Rights. We exercise our free will and choose, through our Rights, to remain free. As Justice Oliver Wendell Holmes put it: "We do not inquire what the legislature meant; we ask only what the statute means."

## <u>COUNTS</u>

### COUNT I - Violation of Procedural Due Process UNDER TEX. CONST. art. I § 17, § 19, 42 U.S.C. §1983, 28 U.S.C. §1331dp (1st, 14th, and 15th Amendments)

(Seeking declaratory and injunctive relief against All Defendants)

Petitioners incorporate the foregoing paragraphs as if set forth in full herein: In order establish a claim under section 1983 of the Civil Rights Act, a plaintiff must prove a Defendant: (a) acted under the color of state law; (b) proximately causing; (c) the Petitioner to be deprived of a federally protected right. *42 U.S·C. §1983.* For this matter, Respondents violated the federally protected rights of voting. *18 U.S·C. 245.* In the instant case, Respondents unquestionably acted under the color of state and federal law. Each Individual Respondent is an official with the authority of duties pursuant to Texas Constitution and Statutes for the State of Texas. Under the

First Amendment to the Constitution, no official may abridge the freedom of speech. The Fourteenth Amendment applies the protections of the First and Fifteenth Amendment to state actors. U.S. Const. Ann., Amendment XIV. Under the Fifteenth Amendment to the Constitution, the right to vote for each citizen of the United States shall not be denied or abridged by any state on account of servitude by those in power without due process of law.

Petitioners have constitutionally protected interests in the benefits that come from the right to vote. Petitioners have been subjected to the illegal voting systems/equipment, software, and modifications. We have also been hindered in our ability to pursue our First Amendment right to legal elections without being subjected to casting an illegal vote that violates federal and state laws. Respondents knowingly approved voting system/equipment, software, and modifications, which unlawfully deprives Petitioners of these and other constitutionally protected interests without due process of law.

Such deprivation occurred after Respondents had open communications with voting vendors and the EAC in which Respondents did not disclose these communications to the public nor gave notice or meaningful opportunity for open public discussion regarding defects of voting equipment/software to the Petitioners prior to certifications. Such deprivation was arbitrary, capricious, based on ignorance without inquiry into facts, and in violation of the Texas laws, Federal laws, and other applicable laws. Such deprivation violates the First, Fourteenth, and Fifteenth Amendments of the Unites States Constitution, thereby depriving Petitioners guaranteed civil rights in regard to casting a “legal” vote. Despite Respondents’ knowledge of voting systems noncompliance with state and federal law, Respondents intend to continue to utilize these non-compliance systems in future elections. Petitioners were harmed and continue to be irreparably harmed by these unlawful acts, which also includes suffering forced contracts with

representatives through deceptive practices and fraudulent certifications. *TEX. PEN. CODE § 39.06.*

**COUNT II - Violation of Substantive Due Process**
**UNDER TEX. CONST. art. I § 3, 42 U.S.C. §1983, 18 U.S.C. §245**
**(Fourteenth Amendment, Equal Rights)**

(Seeking declaratory and injunctive relief against All Respondents)

Petitioners incorporate the foregoing paragraphs as if set forth in full herein: In order establish a claim under section 1983 of the Civil Rights Act, a Petitioner must prove a Respondents: (a) acted under the color of state law; (b) proximately causing; (c) the Petitioner to be deprived of a federally protected right. 42 U.S.C. §1983. For this matter, Respondents violated the federally protected rights of voting. *18 U.S.C. §245.* In the instant case, Respondents unquestionably acted under the color of state law. Each Individual Respondent is an official with the authority of duties pursuant to Texas Constitution and Statutes for the State of Texas. Under the Fourteenth Amendment of the Constitution, and as established by state law, including the state created Accardi doctrine, Petitioners have a fundamental right to cast a ballot and vote in a legal and fair election. Petitioners were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering forced contract with representatives through deceptive practices and fraudulent certifications. *TEX. ELEC. CODE § 276.013(a)(4)*

**COUNT III – Deprivation of Civil Rights**

**UNDER TX Const. Art. I, § 13 and Art. I, § 19,**

**42 U.S.C §1983vp, 28 U.S.C. 1985**

(Seeking declaratory and injunctive relief against All Respondents)

Petitioners incorporate the foregoing paragraphs as if set forth in full herein: Article 1, § 13 of the Texas Constitution provides, "All courts shall be open, and every person, for an injury done him, in his land, goods, person, or reputation, shall have remedy by due course of law." Article 1, § 19 of the Texas Constitution affords the people of Texas with the right to be free from violations of the procedural due process rights, and no person may be deprived of life, liberty, or property without due process of law. Petitioners have constitutionally protected interests in the benefits that come from the right to vote and not being subject to the illegal voting systems/equipment, software, and modifications. This includes the ability to pursue our First Amendment right to legal elections without being subjected to casting illegal votes in violation of both state and federal laws.

Respondents knowingly approved voting system/equipment, software, and modifications unlawfully, which deprives Petitioners of these and other constitutionally protected interests without due process of law. Such deprivation occurred after Respondents had open communications with voting vendors and the EAC in which Respondents did not disclose to the public and gave no notice or meaningful opportunity for open public discussion regarding defects of voting equipment/software to the Petitioners prior to certifications. Such deprivation was arbitrary, capricious, based on ignorance without inquiry into facts, and in violation of the Texas and Federal laws and other applicable laws. Such deprivation violates Article 1, § 13 and Article 1, § 19 of the Texas Constitution thereby depriving Petitioner civil rights regarding casting a "legal" vote. *TEX. PEN. CODE § 37.03, § 37.10.* Petitioners were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering forced contracts with representatives through deceptive practices and fraudulent certifications.

**COUNT IV – Deprivation of Constitutional Rights**

**UNDER TX Const. Art. I, § 13 and TX Const. Art. I, § 19,**

**28 U.S.C. 1331vc**

(Seeking declaratory and injunctive relief against All Respondents)

Petitioners incorporate the foregoing paragraphs as if set forth in full herein: Article 1, § 13 of the Texas Constitution provides, "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law." Article 1, § 19 of the Texas Constitution affords the people of Texas with the right to be free from violations of the substantive due process rights, and no person may be deprived of life, liberty, or property without due process of law. Under Article 1, § 19 of the Texas Constitution, and as established by state law including the state created Accardi doctrine, Petitioners have a fundamental right to cast a ballots and vote in a legal and fair election. Petitioners were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering forced contracts with representatives through deceptive practices and fraudulent certifications. *TEX. PEN. CODE §39.03(2).*

**COUNT V – Voting Rights Violation**
**UNDER TEX. CONST. art. VI § 2 to Count V,**
**52 U.S.C § 20511 (2)(a)(b), 52 U.S.C. §10101, 28 U.S.C. 1943**
**(First and Fourteenth Amendment)**

(Seeking declaratory and injunctive relief against All Respondents)

Petitioners incorporate the foregoing paragraphs as if set forth in full herein: In order establish a claim under section 20511(a)(b) of Title 52-Voting and Elections, a plaintiff must prove a Respondents: (a) acted under the color of state law; (b) proximately causing; (c) the Petitioners to be deprived of a federally protected right. *42 U.S.C. §1983.* In the instant case, Respondents unquestionably acted under the

color of state and federal law. Each Individual Respondent is an official with the authority of duties pursuant to Texas Constitution and Statues for the State of Texas. Under the First and Fourteenth Amendment to the Constitution, and as established by state law including the state created Accardi doctrine, Petitioners have a fundamental right to cast a ballot and vote in a legal and fair election. Petitioners were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering forced contract with representatives through deceptive practices and fraudulent certifications. *TEX. PEN. CODE § 39.02.*

**COUNT VI – DECLARATORY JUDGMENT**

**UNDER 28 TEX. CIV. PRAC. & REM. CODE § 37.003, § 37.004 (a)(b), 28 U.S.C. § 2201**

(Against All Respondents)

Petitioners incorporate the foregoing paragraphs as set forth in full herein: Respondents conduct has and will continue to violate the rights of citizens of Texas, as set forth above. The Court has the authority pursuant to 28 U.S.C. § 2201 to issue an Order enjoining the State from conducting an election in which the votes are not accurately or securely tabulated. If the State of Texas proceeds with the forthcoming election as described above, it will violate the rights of Texans by conducting an unsecure, vulnerable electronic voting systems that are susceptible to manipulation and intrusion. If the State of Texas proceeds with the forthcoming election as described above, it will violate the rights of Texans by conducting an election on illegally certified voting systems in violation of both the State of Texas and Federal election laws. The Court should issue an Order enjoining the State from using any electronic voting system and respective devices to include, but not limited, to poll pads, tabulators, printers, etc.

Furthermore, immediate and irreparable injury, loss, or damage will result to Petitioners if the requested emergency relief against the destruction of the 2020 general election records does not occur. The Court should issue order enjoining officials from the spoilation, destruction, alteration of all records including, but not limited to: paper ballot, absentee ballots, tabulation databases, adjudication databases, pollbook databases, election definition files, scanned ballot images, cast vote records, logic and accuracy testing results, logs and reports stored on all electronic, election equipment (including, but not limited to the Election Management System (EMS), client workstations, pollbooks, tabulators, Direct Recording Electronic (DRE) devices, Ballot Marking Devices (BMD), and Election Night Reporting (ENR)archives, project database backups, and any other form of backups). *TEX. ELEC. CODE § 66.02, § 66.058*; and further, to order a thorough independent forensic examination of each ballot by highly qualified document examiners, will serve to restore the public's confidence in the state's election process. *See Karen Wiseman v. Tarrant County, Texas and Heider Garcia (2021) No. 096-330696-21, Texas*.

## PRAYER FOR RELIEF

WHEREFORE, "For there is no authority except from God, and the authorities that exist are appointed by God." *Romans 13:1* (NKJV). Petitioners pray that the Court grant the following relief:

a. ASSUMES jurisdiction of this action in the interest of justice.

b. ISSUES and EXPEDITES judgement;

c. Vacates and sets aside all uncertified and illegal voting systems/equipment, software, and modifications and implement a precinct level hand-marked paper ballot and hand counting system as permissible by Tex. Elec. Code Chp 65.

d. DECLARES that the Respondents have violated the Texas Constitution Equal Protection Clause;

e. DECLARES that the Respondents have violated the Texas Constitution Due Process Clause;

f. GRANTS an emergency injunction prohibiting Respondents from requiring or permitting voters to have votes cast or tabulated using any electronic voting systems, pollbooks, or devices.

g. GRANTS an emergency injunction prohibiting Respondents from destruction/deletion of any and all election records created under Title 8 of the Tex. Elec Code to include all paper ballots created by voting systems, USB devices, memory cards, electronic storage devices, mail in ballots, tabulation tapes, USB final counts from precincts and all other election records not specifically stated from the 2020, 2021, and 2022 elections.

h. DECLARES that the Respondents approval of all voting system/equipment, software, and modifications are void and without legal force or effect;

i. DECLARES that the institution of the approval policies is arbitrary, capricious, and based on negligence and disregard, in accordance with law and without observance of both the required procedure and Accardi doctrine;

j. DECLARES that the approvals and the actions taken by Respondents are in violation of the Constitution and contrary to the laws of the United States and the State of Texas;

k. Temporarily restrains, as well as preliminarily and permanently enjoins Respondents, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, from implementing and/or enforcing the certifications of all voting systems/equipment, software and modifications that are not in compliance with the applicable law;

l. ORDERS to unseal absentee ballots, absentee ballot return envelopes, the absentee ballot election reports, and other paper and electronic

information election materials from the General Election 2020 and to permit Petitioners to review, examine, inspect, and duplicate such materials including, but not limited to electronic images of electronic drives used by Respondents in the General Election;

m. ORDERS Respondents to terminate all employees, agents, and contractors shown to have had knowledge of or acquiesced in the improper acts described herein;

Respectfully submitted this 7 th day of AUGUST, 2022.

By: /s/ *KIMBERLY WISEMAN*

Kimberly Wiseman

*419 Barron Ln*

*Axtell, TX 76624*

*kimwiseman522@gmail.com*

*Pro se*

760-525-7493

**Affidavit**

Pursuant to 28 U.S.C. 1746, I, KIMBERLY WISEMAN, make the following declaration:

**Affiant** supports in writing a cause that demonstrates Respondents' actions as outlined above in this complaint/petition violate several state and federal laws, which are against The People of Texas, and also , against the peace and dignity of the State.

1. I have read the affidavit of Terpsehore Maras which states that the EAC failed to abide by standards set in HAVA Act 2002. The EAC failed to have a quorum for over a year thus not meeting standard of EAC. Election machines were not lawfully certified after 2017. Therefore, every election since then has taken place on uncertified machines and should be declared null and void.

In addition, shortly after the 2020 election, I attended a presentation given by Russell Ramsland at a meeting of the McLennan County Republican Women's Club where he demonstrated the many vulnerabilities of all types of voting machines, that they are all connected to the internet. He gave specific information regarding Texas election results as well as those in McLennan County. There has since been an ongoing effort to discredit him and his company by left others, which makes it more likely, in my opinion, that he may be on to something.

The work of Seth Keshel supports the notion that things are not right with our voter rolls and election results.

2. I have little confidence my vote and/or the votes of others were counted as intended. The inaccuracies of the voter rolls is a huge problem. The addition of votes cast by non-citizens, deceased people, children, and other ineligible voters is concerning, and may be the direct result of faulty voter rolls. The possibility that

votes may have been switched from one candidate to another is appalling. The voices of legal, eligible voters were diluted. How can anyone have confidence that our elections have been free and fair under these circumstances?

3. If we continue using the same complicated machines, known to have multiple vulnerabilities, that are not transparent in the way they collect, manipulate and tabulate election data, voters will have no confidence that their elections (elections belong to the People) are free, fair and honest. Therefore, voters will have no confidence that those who hold elected office at any level, hold those positions legitimately. The will of the people will continue to be usurped.

**I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge. Executed this** August 7, 2022.

**Affiant:** /s/*KIMBERLY WISEMAN*

**760-525-7493**

*kimwiseman522@gmail.com*
*419 Barron Ln.*
*Axtell, TX 76624*
*760-525-7493*

# APPENDIX LIST

1. Declaration of Terpsehore Maras
2. Declaration of Alex Halderman
3. Declaration of Shawn Smith
4. Declaration of John R. Mills
5. Declaration of Douglas Logan
6. Accreditation in Texas
7. Foreign Infrastructure in Texas

# APPENDIX P-1

Declaration of Terpsehore Maras

Declaration of [redacted]

Pursuant to 28 U.S.C Section 1746, I, [redacted], make the following declaration.

1. I am over the age of 21 years and I am under no legal disability, which would prevent me from giving this declaration.
2. I have been a private contractor with experience gathering and analyzing foreign intelligence and acted as a LOCALIZER during the deployment of projects and operations both OCONUS and CONUS. I am a trained Cryptolinguist, hold a completed degree in Molecular and Cellular Physiology and have FORMAL training in other sciences such as Computational Linguistics, Game Theory, Algorithmic Aspects of Machine Learning, Predictive Analytics among others.
3. I have operational experience in sources and methods of implementing operations during elections both CONUS and OCONUS
4. I am an amateur network tracer and cryptographer and have over two decades of mathematical modeling and pattern analysis.
5. In my position from 1999-2014 I was responsible for delegating implementation via other contractors sub-contracting with US or 9 EYES agencies identifying connectivity, networking and subcontractors that would manage the micro operations.
6. My information is my personal knowledge and ability to detect relationships between the companies and validate that with the cryptographic knowledge I know and attest to as well as evidence of these relationships.
7. In addition, I am WELL versed due to my assignments during my time as a private contractor of how elections OCONUS (for countries I have had an assignment at) and CONUS (well versed in HAVA ACT) and more.
8. On or about October 2017 I had reached out to the US Senate Majority Leader with an affidavit claiming that our elections in 2017 may be null and void due to lack of EAC certifications. In fact Sen. Wyden sent a letter to Jack Cobb on 31 OCT 2017 advising discreetly pointing out the importance of being CERTIFIED EAC had issued a certificate to

Pro V & V and that expired on Feb 24, 2017. No other certification has been located.



United States Election Assistance Commission

Certificate of Accreditation

**Pro V&V, Inc.**
**Huntsville, Alabama**

*is recognized by the U.S. Election Assistance Commission for the testing of voting systems to the 2005 Voluntary Voting Systems Guidelines under the criteria set forth in the EAC Voting System Testing and Certification Program and Laboratory Accreditation Program. Pro V&V is also recognized as having successfully completed assessments by the National Voluntary Laboratory Accreditation Program for conformance to the requirements of ISO/IEC 17025 and the criteria set forth in NIST Handbooks 150 and 150-22.*

*Effective Through*
February 24, 2017

Date: 2/24/15
*Acting Executive Director, U.S. Election Assistance Commission*

EAC Lab Code: **1501**

9. Section 231(b) of the Help America Vote Act (HAVA) of 2002 (42 U.S.C. §15371(b)) requires that the EAC provide for the accreditation and revocation of accreditation of independent, non-federal laboratories qualified to test voting systems to Federal standards. Generally, the EAC considers for accreditation those laboratories evaluated and recommended by the National Institute of Standards and Technology (NIST) pursuant to HAVA Section 231(b)(1). However, consistent with HAVA Section 231(b)(2)(B), the Commission may also vote to accredit laboratories outside of those recommended by NIST upon publication of an explanation of the reason for any such accreditation.

United States Department of Commerce
National Institute of Standards and Technology

NVLAP®

## Certificate of Accreditation to ISO/IEC 17025:2017

NVLAP LAB CODE: 200978-0

**Pro V&V**
Huntsville, AL

*is accredited by the National Voluntary Laboratory Accreditation Program for specific services, listed on the Scope of Accreditation, for:*

**Voting System Testing**

*This laboratory is accredited in accordance with the recognized International Standard ISO/IEC 17025:2017. This accreditation demonstrates technical competence for a defined scope and the operation of a laboratory quality management system (refer to joint ISO-ILAC-IAF Communique dated January 2009).*

2020-03-26 through 2021-03-31
*Effective Dates*

DEPARTMENT OF COMMERCE • UNITED STATES OF AMERICA

*For the National Voluntary Laboratory Accreditation Program*

10.

11. VSTL's are VERY important because equipment vulnerabilities allow for deployment of algorithms and scripts to intercept, alter and adjust voting tallies.

12. There are only TWO accredited VSTLs (VOTING SYSTEM TEST LABORATORIES). In order to meet its statutory requirements under HAVA §15371(b), the EAC has developed the EAC's Voting System Test Laboratory Accreditation Program. The procedural requirements of the program are established in the proposed information collection, the EAC **Voting System Test Laboratory Accreditation Program Manual**. Although participation in the program is voluntary, adherence to the program's procedural requirements is mandatory for participants. The procedural requirements of this Manual will supersede any prior laboratory accreditation requirements issued by the EAC. This manual shall be read in conjunction with the EAC's **Voting System Testing and Certification Program Manual** (OMB 3265-0019).

U.S. Election Assistance Commission

# MICHIGAN

*State Participation:* **Requires Testing by an Independent Testing Authority.** MI requires that voting systems are certified by an independent testing authority accredited by NASED and the board of state canvassers.

*Applicable Statute(s):* "An electronic voting system shall not be used in an election unless it is approved by the board of state canvassers … and unless it meets 1 of the following conditions: (a) Is certified by an independent testing authority accredited by the national association of state election directors and by the board of state canvassers. (b) In the absence of an accredited independent testing authority, is certified by the manufacturer of the voting system as meeting or exceeding the performance and test standards referenced in subdivision (a) in a manner prescribed by the board of state canvassers." MICH. COMP. LAWS ANN § 168.795a (2009).

*Applicable Regulation(s):* MI does not have a regulation regarding the federal certification process.

*State Certification Process:* The Secretary of State accepts requests from persons/corporations wishing to have their voting system examined. The requestor must pay the Secretary of State an application fee of $1,500.00, file a report listing all of the states in which the voting system has been approved and any reports that these states have made regarding the performance of the voting system. The Board of State Canvassers conducts a field test involving Michigan electors and election officials in simulated election day conditions. The Board of State Canvassers shall approve the voting system if it meets all of the state requirements. MICH. COMP. LAWS ANN § 168.795a (2009).

*Fielded Voting Systems:* *[After the EAC completes and issues the 2008 Election Administration and Voting Survey, information about fielded voting systems will be added to this document. In the meantime, readers may find information on the voting systems at the following website (if available)].* http://www.michigan.gov/sos/0,1607,7-127-1633_8716_45458---,00.html



13.

# WISCONSIN

| | |
|---|---|
| *State Participation:* | **Requires Testing by a Federally Accredited Laboratory.** WI requires that its voting systems receive approval from an independent testing authority accredited by NASED verifying that the voting systems meet all of the recommended FEC standards. |
| *Applicable Statute(s):* | "No ballot, voting device, automatic tabulating equipment or relating equipment and materials to be used in an electronic voting system may be utilized in this state unless it is approved by the board [of election commissioners]." WIS. STAT. ANN. § 5.91 (West 2009). |
| *Applicable Regulation(s):* | "An application for approval of an electronic voting system shall be accompanied by all of the following … [r]eports from an independent testing authority accredited by the national association of state election directors (NASED) demonstrating that the voting system conforms to all the standards recommended by the federal elections commission." WIS. ADMIN. CODE GAB § 7.01 (2009). |
| *State Certification Process:* | The Board of Election Commissioners accepts applications for the approval of electronic voting systems. Once the application is completed, the vendor must set up the voting system for three mock elections using: (1) offices, (2) referenda questions and (3) candidates. A panel of local election officials can assist the Board in the review of the voting system. The Board conducts the test using a mock election for the partisan primary, general election, and nonpartisan election. The Board may also require that the voting system be used in an actual election as a condition of the approval. WIS. ADMIN. CODE GAB §§ 7.01, 7.02 (2009). |
| *Fielded Voting Systems:* | *[After the EAC completes and issues the 2008 Election Administration and Voting Survey, information about fielded voting systems will be added to this document. In the meantime, readers may find information on the voting systems at the following website (if available)].* http://elections.state.wi.us/section.asp?linkid=643&locid=47 |



14.

U.S. Election Assistance Commission

# GEORGIA

*State Participation*

**Requires Federal Certification.** GA requires that its voting systems are tested to EAC standards by EAC accredited labs and certified by the EAC.

*Applicable Statute(s):*

"Any person or organization owning, manufacturing, or selling, or being interested in the manufacture or sale of, any voting machine may request the Secretary of State to examine the machine. Any ten or more electors of this state may, at any time, request the Secretary of State to reexamine any voting machine previously examined and approved by him or her. Before any such examination or reexamination, the person, persons, or organization requesting such examination or reexamination shall pay to the Secretary of State the reasonable expenses of such examination; provided, however, that in the case of a request by ten or more electors the examination fee shall be $ 250.00. The Secretary of State may, at any time, in his or her discretion, reexamine any voting machine." GA CODE ANN. § 21-2-324 (2008).

*Applicable Regulation(s):*

"Prior to submitting a voting system for certification by the State of Georgia, the proposed voting system's hardware, firmware, and software must have been issued Qualification Certificates from the EAC. These EAC Qualification Certificates must indicate that the proposed voting system has successfully completed the EAC Qualification testing administered by EAC approved ITAs. If for any reason, this level of testing is not available, the Qualification tests shall be conducted by an agency designated by the Secretary of State. In either event, the Qualification tests shall comply with the specifications of the *Voting Systems Standards* published by the EAC." GA. COMP. R. & RES. 590-8-1-.01 (2009).

*State Certification Process:*

After the voting system has passed EAC Qualification testing, the vendor of the voting system submits a letter to the Office of the Secretary of State requesting certification for the voting system along with a technical data package to the certification agent. An evaluation proposal is created by the certification agent after a preliminary view of the Technical Data Package and sent to the vendor. Any additional EAC ITA testing identified in the evaluation proposal is arranged by the vendor and the certification agent will perform all other tests identified in the evaluation proposal. The certification agent submits a report of their findings to the Secretary of State. Based on these findings the Secretary of State will make a final determination on whether to certify the voting system. GA. COMP. R. & RES. 590-8-1-.01 (2009).

*Fielded Voting Systems:*

*[After the EAC completes and issues the 2008 Election Administration and Voting Survey, information about fielded voting systems will be added to this document. In the meantime, readers may find information on the voting systems at the following website (if available)].*
http://www.sos.georgia.gov/Elections/



15.



Exhibit 13

# PENNSYVANIA

*State Participation:* **Requires Testing by a Federally Accredited Laboratory.** PA requires that its voting systems are approved by a federally recognized independent testing laboratory as meeting federal voting system standards.

*Applicable Statute(s):* "Any person or corporation owning, manufacturing or selling, or being interested in the manufacture or sale of, any electronic voting system, may request the Secretary of the Commonwealth to examine such system if the voting system has been examined and approved by a federally recognized independent testing authority and if it meets any voting system performance and test standards established by the Federal Government." 25 PA. CONS. STAT. ANN. Code § 3031.5 (West 2008).

*Applicable Regulation(s):* PA does not have a regulation regarding the federal certification process.

*State Certification Process:* The Secretary of State examines voting systems, upon request, once the voting systems have received approval by a federally recognized independent testing authority. The person(s) requesting the examination of the voting system are responsible for the cost of the examination. After the examination, the Secretary of State issues a report stating whether or not the voting systems are safe and compliant with state and federal requirements. If the voting systems are deemed safe and compliant by the Secretary of State then the systems may be adopted and approved for use in elections by each county through a majority vote of its qualified electors. 25 PA. CONS. STAT. ANN. Code §§ 3031.5, 3031.2 (West 2008).

*Fielded Voting Systems:* *[After the EAC completes and issues the 2008 Election Administration and Voting Survey, information about fielded voting systems will be added to this document. In the meantime, readers may find information on the voting systems at the following website (if available)].* http://www.votespa.com/HowtoVote/tabid/74/language/en-US/Default.aspx



16.

U.S. Election Assistance Commission

# ARIZONA

*State Participation:* **Requires Testing by a Federally Accredited Laboratory.** AZ requires that its voting systems are HAVA compliant and approved by a laboratory that is accredited pursuant to HAVA.

*Applicable Statute(s):* "On completion of acquisition of machines or devices that comply with HAVA, machines or devices used at any election for federal, state or county offices may only be certified for use in this state and may only be used in this state if they comply with HAVA and if those machines or devices have been tested and approved by a laboratory that is accredited pursuant to HAVA." ARIZ. REV. STAT. § 16-442(B) (2008).

*Applicable Regulation(s):* AZ does not have a regulation regarding the federal certification process.

*State Certification Process:* The Secretary of State appoints a committee of three people that test different voting systems. This committee is required to submit their recommendations to the Secretary of State who then makes the final decision on which voting system(s) to adopt. ARIZ. REV. STAT. § 16-442(A) and (C) (2008).

*Fielded Voting Systems:* *[After the EAC completes and issues the 2008 Election Administration and Voting Survey, information about fielded voting systems will be added to this document. In the meantime, readers may find information on the voting systems at the following website (if available)].* http://www.azsos.gov/election/equipment/default.htm



17.

18. **Pro V& V** and **SLI Gaming** both lack evidence of EAC Accreditation as per the Voting System Testing and Certification Manual.

19. **Pro V& V** is owned and Operated by Jack Cobb. Real name is Ryan Jackson Cobb. The company ProV&V was founded and run by Jack Cobb who formerly worked under the entity of Wyle Laboratories which is an AEROSPACE DEFENSE CONTRACTING ENTITY. The address information on the EAC, NIST and other entities for Pro V& V are different than that of what is on ProV&V website. The EAC and NIST (ISO CERT) issuers all have another address.




