Selected Talks (2009–present)

- **The Security Impact of HTTPS Interception.** Invited talk, GOTO Copenhagen, Oct. 2, 2017.
- **Let's Encrypt: A Certificate Authority to Encrypt the Entire Web.** Invited talk, Summer school on real-world crypto and privacy, Croatia, June 9, 2017; Invited talk, Cubaconf, Havana, April 25, 2016.
- **Cybersecurity and U.S. Elections**
  Invited speaker, Global Election Summit, San Francisco, May 17, 2017; Invited speaker, Wolverine Caucus Forum, Lansing, February 21, 2017; Invited speaker, CSE Science on Screen at Michigan Theater, Ann Arbor, January 25, 2017.
- **The Legacy of Export-grade Cryptography in the 21st Century.** Invited talk, Summer school on real-world crypto and privacy, Croatia, June 9, 2016.
- **Logjam: Diffie-Hellman, Discrete Logs, the NSA, and You.** Invited talk, NYU Tandon School of Engineering, April 8, 2016 [host: Damon McCoy]; Invited talk, UIUC Science of Security seminar, February 9, 2016 [host: Michael Bailey].
- **The Network Inside Out: New Vantage Points for Internet Security.** Invited talk, Qatar Computing Research Institute, Doha, May 24, 2015; Invited talk, University of Chile, Santiago, April 8, 2015; Invited talk, Princeton University, October 15, 2014; Invited talk, U.T. Austin, March 9, 2014.
- **Decoy Routing: Internet Freedom in the Network's Core.** Invited speaker, Internet Freedom Technology Showcase: The Future of Human Rights Online, New York, Sep. 26, 2015.
- **The New South Wales iVote System: Security Failures and Verification Flaws in a Live Online Election.** 5th International Conference on E-Voting and Identity (VoteID), Bern, Switzerland, Sep. 3, 2015; Invited talk, IT Univ. of Copenhagen, Sep. 1, 2015; Invited talk (with Vanessa Teague), USENIX Journal of Election Technologies and Systems Workshop (JETS), Washington, D.C., Aug. 11, 2015.
- **Security Analysis of the Estonian Internet Voting System.** Invited talk, 5th International Conference on E-Voting and Identity (VoteID), Bern, Switzerland, Sep. 3, 2015; Invited talk, Google, Mountain View, CA, June 3, 2014; Invited talk, Copenhagen University, June 12, 2014.
- **Indiscreet Tweets.** Rump session talk; 24th USENIX Security Symposium, Washington, D.C., August 12, 2015.
- **How Diffie-Hellman Fails in Practice.** Invited talk, IT Univ. of Copenhagen, May 22, 2015.
- **Influence on Democracy of Computers, Internet, and Social Media.** Invited speaker, Osher Lifelong Learning Institute at the University of Michigan, March 26, 2015.
- **E-Voting: Danger and Opportunity.** Invited talk, University of Chile, Santiago, April 7, 2015; Keynote speaker, 14th Brazilian Symposium on Information Security and Computer Systems (SBSeg), Belo Horizonte, Brazil, November 3, 2014; Crypto seminar, University of Tartu, Estonia, October 10, 2013; Invited speaker, US–Egypt Cyber Security Workshop, Cairo, May 28, 2013; Invited speaker, First DemTech Workshop on Voting Technology for Egypt, Copenhagen, May 1, 2013; Invited keynote, 8th CyberWatch Mid-Atlantic CCDC, Baltimore, MD, Apr. 10, 2013;

Invited speaker, Verifiable Voting Schemes Workshop, University of Luxembourg, Mar. 21, 2013; Invited speaker, MHacks hackathon, Ann Arbor, MI, Feb. 2, 2013; Public lecture, U. Michigan, Nov. 6, 2012.

– **Internet Censorship in Iran: A First Look.** 3rd USENIX Workshop on Free and Open Communications on the Internet (FOCI), Aug. 13, 2013.

– **Mining Your Ps and Qs: Detection of Widespread Weak Keys in Network Devices.** Invited talk, NSA, Aug. 8, 2013; Invited talk, Taiwan Information Security Center Workshop, National Chung-Hsing University (Taichung, Taiwan), Nov. 16, .2012

– **Securing Digital Democracy.** U. Maryland, Apr. 8, 2013 [host: Jonathan Katz]; CMU, Apr. 1, 2013 [host: Virgil Gligor]; Cornell, Feb. 28, 2013 [host: Andrew Myers].

– **Telex: Anticensorship in the Network Infrastructure.** Invited speaker, Academia Sinica (Taipei), Nov. 14, 2012 [host: Bo-Yin Yang]; TRUST Seminar, U.C., Berkeley, Dec. 1, 2011 [host: Galina Schwartz]; Think Conference, Nov. 5, 2011; Ideas Lunch, Information Society Project at Yale Law School, Oct. 26, 2011; Invited speaker, Committee to Protect Journalists Online Press Freedom Summit (San Francisco), Sept. 27, 2011.

– **Deport on Arrival: Adventures in Technology, Politics, and Power.** Guest lecture, U-M School of Art and Design, Nov 5, 2012 [host: Osman Khan]; Invited speaker, CS4HS Workshop, U. Michigan, Aug. 21, 2012; Invited speaker, U. Michigan IEEE, Feb. 15, 2012.

– **Attacking the Washington, D.C. Internet Voting System.** Invited speaker, International Foundation for Election Systems (IFES), Nov. 2, 2012 [host: Michael Yard]; Invited speaker, IT University of Copenhagen, May 11, 2012 [host: Carsten Schürmann].

– **Voter I*Don't*.** Rump session talk; 21st USENIX Security Symposium (Bellevue, WA), Aug. 8, 2012; Rump session talk; EVT/WOTE '12 (Bellevue, WA), Aug. 6, 2012 [with Josh Benaloh].

– **Reed Smith's Evening with a Hacker.** Keynote speaker (New Brunswick, NJ), Oct. 20, 2011.

– **Are DREs Toxic Waste?** Rump session talk, 20th USENIX Security Symposium (San Francisco), Aug. 10, 2011; Rump session talk, EVT/WOTE '11 (San Francisco), Aug. 8, 2011.

– **Security Problems in India's Electronic Voting Machines.** Dagstuhl seminar on Verifiable Elections and the Public (Wadern, Germany), July 12, 2011; Harvard University, Center for Research on Computation and Society (CRCS) seminar, Jan. 24, 2011 [host: Ariel Procaccia]; U. Michigan, CSE seminar, Nov. 18, 2010 [with Hari Prasad]; MIT, CSAIL CIS Seminar, Nov. 12, 2010 [with Hari Prasad; host: Ron Rivest]; Distinguished lecture, U.C. San Diego, Department of Computer Science, Nov. 9, 2010 [with Hari Prasad; host: Hovav Shacham]; U.C. Berkeley, Center for Information Technology Research in the Interest of Society (CITRIS), Nov. 8, 2010 [with Hari Prasad; host: Eric Brewer]; Google, Inc., Tech Talk (Mountain View, CA), Nov. 5, 2010 [with Hari Prasad; host: Marius Schilder]; U.C., Berkeley TRUST Security Seminar, Nov. 4, 2010 [with Hari Prasad; host: Shankar Sastry]; Stanford University, CS Department, Nov. 3, 2010 [with Hari Prasad; host: David Dill]; Princeton University, Center for Information Technology Policy, Oct. 28, 2010 [with Hari Prasad, host: Ed Felten]; University of Texas at Austin, Department of Computer Science, Aug. 27, 2010 [host: Brent Waters].

- **Ethical Issues in E-Voting Security Analysis.** Invited talk, Workshop on Ethics in Computer Security Research (WECSR) (Castries, St. Lucia), Mar. 4, 2011 [with David Robinson].
- **Electronic Voting: Danger and Opportunity.** Invited speaker, "Interfaces 10: Technology, Society and Innovation," Center for Technology and Society (CTS/FGV) (Rio de Janeiro), Dec. 2, 2010 [host: Ronaldo Lemos]; Invited speaker, Conference on "EVMs: How Trustworthy?," Centre for National Renaissance (Chennai, India), Feb. 13, 2010; Google, Inc., Tech Talk (Mountain View, CA), Jan. 10, 2008; Star Camp (Cape Town, South Africa), Dec. 8, 2007; Lehigh University, Nov. 27, 2007; Princeton OiT Lunch-'n-Learn, Oct. 24, 2007; University of Waterloo (Canada), Feb. 28, 2007.
- **A New Approach to Censorship Resistance.** Think Conference, Nov. 7, 2010.
- **Practical AVC-Edge CompactFlash Modifications can Amuse Nerds [PACMAN].** Rump session, 19th USENIX Security Symposium (Washington, D.C.), Aug. 11, 2010; Rump session, EVT/WOTE '10 (Washington, D.C.), Aug. 9, 2010.
- **Legal Challenges to Security Research.** Guest lecture, Law 633: Copyright, U. Michigan Law School, Apr. 7, 2010; Invited talk, University of Florida Law School, Oct. 12, 2006.
- **Adventures in Computer Security.** Invited talk, Greenhills School, grades 6–12 (Ann Arbor, MI), Mar. 8, 2010.
- **The Role of Designers' Incentives in Computer Security Failures.** STIET Seminar, U. Michigan, Oct. 8, 2009.
- **Cold-Boot Attacks Against Disk Encryption.** Invited speaker, SUMIT 09 Security Symposium, U. Michigan, Oct. 20, 2009.
- **On the Attack.** Distinguished lecture, U.C. Berkeley EECS, Nov. 18, 2009.

## Selected Other Speaking (2010–present)

- Panelist: **"Critical Infrastructure" Designation for Election Operations: Risks, Mitigations, & Import for 2018.** Election Verification Network Conference, Miami, March 16, 2018.
- Panelist: **The Technology of Voting: Risks & Opportunities.** U.C. Irvine Cybersecurity and Policy Research Institute, March 13, 2018.
- Panelist: **Election Law Conflicts and the Vulnerability of our Election Systems.** Co-panelists: Stephen Berzon, Holly Lake, Harvey Saferstein. Ninth Circuit Judicial Conference, July 18, 2017.
- **Congressional Briefing: Free, Automated, and Open Web Encryption.** August 8, 2017; hosted by Congressional Cybersecurity Caucus.
- **Congressional Briefing: Strengthening Election Cybersecurity.** Co-panelists: James Woolsey, Lt. Col. Tony Shaffer, Lawrence Norden, Susan Greenhalgh, James Scott; moderator: Karen Greenberg. May 15, 2017.
- Moderator: **Apple & the FBI: Encryption, Security, and Civil Liberties.** Panelists: Nate Cardozo and Barbara McQuade. U-M Dissonance Speaker Series, April 12, 2016.

- Moderator: **Privacy, IT Security and Politics.** Panelists: Ari Schwartz and David Sobel. U-M ITS SUMIT_2015, Oct. 22, 2015.
- Panelist: **The Future of E-Voting Research.** 5th International Conference on E-Voting and Identity (VoteID), Bern, Switzerland, Sep. 4, 2015.
- Moderator: **Panel on Research Ethics.** 24th USENIX Security Symposium, Washington, D.C., August 13, 2015.
- Panelist: **Theories of Privacy in Light of "Big Data."** Michigan Telecommunications and Technology Law Review Symposium on Privacy, Technology, and the Law, University of Michigan Law School, Feb. 21, 2015.
- Panelist: **Measuring Privacy.** Big Privacy symposium, Princeton University CITP, Apr. 26, 2013 [moderator: Ed Felten].
- Panelist: **Civil Society's Challenge in Preserving Civic Participation.** The Public Voice workshop: Privacy Rights are a Global Challenge, held in conjunction with the 34th International Conference of Data Protection and Privacy Commissioners, Punta del Este, Uruguay, Oct. 22, 2012 [moderator: Lillie Coney].
- Panelist: **Election Technologies: Today and Tomorrow.** Microsoft Faculty Summit (Redmond), July 17, 2012 [moderator: Josh Benaloh].
- Panelist: **Is America Ready to Vote on the Internet?** CSPRI Seminar, George Washington University (Washington, D.C.), May 16, 2012 [moderator: Lance Hoffman].
- Panelist: **Technical Methods of Circumventing Censorship.** Global Censorship Conference, Yale Law School, Mar. 31, 2012.
- Panelist: **Internet Voting.** RSA Conference (San Francisco), Mar. 1, 2012 [moderator: Ron Rivest].
- Panelist: **The Law and Science of Trustworthy Elections.** Association of American Law Schools (AALS) Annual Meeting, Jan. 5, 2012 [moderator: Ron Rivest].
- Panelist: **Connecticut Secretary of State's Online Voting Symposium** (New Britain, CT), Oct. 27, 2011 [moderator: John Dankosky].
- Panelist: **Cyber Security / Election Technology.** Overseas Voting Foundation Summit, Feb. 10, 2011 [moderator: Candice Hoke].
- ~~Tutorial speaker/organizer: **Security Issues in Electronic Voting,** ICISS (Gandhinagar, India), Dec. 15, 2010~~ [canceled under threat of deportation].
- Invited testimony: **On D.C. Board of Elections and Ethics Readiness for the Nov. 2010 General Election.** D.C. Council Hearing, Oct. 8, 2010.
- Panelist and organizer: **India's Electronic Voting Machines.** EVT/WOTE (Washington, D.C.), Aug. 9, 2010.
- Panelist: **Ethics in Networking and Security Research.** ISOC Network and Distributed System Security Symposium (San Diego, CA), Mar. 2, 2010 [moderator: Michael Bailey].

## Advising and Mentoring

### Graduate Students

- Allison McDonald (Ph.D. in progress)
- Matthew Bernhard (Ph.D. in progress)
- Benjamin VanderSloot (Ph.D. in progress)
- David Adrian (Ph.D. in progress)
- Andrew Springall (Ph.D. 2018; went on to software engineering position at Google)
- Rose Howell (M.S. 2018)
- Zakir Durumeric (Ph.D. 2017; Google Ph.D. Fellowship in Computer Security; accepted tenure-track faculty position at Stanford)
- Travis Finkenauer (M.S. 2016; went on to security position at Juniper Networks)
- Eric Wustrow (Ph.D. 2016; accepted tenure-track faculty position at U. Colorado, Boulder)
- James Kasten (Ph.D. 2015; went on to software engineering position at Google)
- Scott Wolchok (M.S. 2011; went on to software engineering position at Facebook)

### Post Docs

- Will Scott (2017–18)
- Colleen Swanson (2014–15)

### Doctoral Committees

- Denis Bueno (C.S. Ph.D. expected 2018, Michigan) «««< HEAD
- Andrew Springall (C.S. Ph.D. 2018, Michigan; chair) =======
- Kyong Tak Cho (C.S. Ph.D. 2018, Michigan)
- Andrew Springall (C.S. Ph.D. 2018, Michigan; chair)
- Armin Sarabi (E.E. Ph.D. 2018, Michigan) »»»> cafe174a0ef54b0c9772a62bcca30a9a006dba03
- Zakir Durumeric (C.S. Ph.D. 2017, Michigan; chair)
- Armin Sarabi (E.E. Ph.D. 2017, Michigan)
- Eric Crockett (C.S. Ph.D 2017, Georgia Tech)
- Kassem Fawaz (C.S. Ph.D. 2017, Michigan)
- Amir Rahmati (C.S. Ph.D. 2017, Michigan)
- Earlence Fernandez (C.S. Ph.D. 2017, Michigan)
- Huan Feng (C.S. Ph.D. 2016, Michigan)
- Jakub Czyz (C.S. Ph.D. 2016, Michigan)
- Eric Wustrow (C.S. Ph.D. 2016, Michigan; chair)
- James Kasten (C.S. Ph.D. 2015, Michigan; chair)
- Jing Zhang (C.S. Ph.D. 2015, Michigan)
- Katharine Cheng (C.S. Ph.D. 2012, Michigan)
- Matt Knysz (C.S. Ph.D. 2012, Michigan)
- Zhiyun Qian (C.S. Ph.D. 2012, Michigan)

- Xin Hu (C.S. Ph.D. 2011, Michigan)
- Ellick Chan (C.S. Ph.D. 2011, UIUC)

### Undergraduate Independent Work

- 2017: Gabrielle Beck, Alex Holland
- 2016: Ben Burgess, Noah Duchan, Mayank Patke
- 2015: Ben Burgess, Rose Howell, Vikas Kumar, Ariana Mirian, Zhi Qian Seah
- 2014: Christopher Jeakle, Andrew Modell, Kollin Purcell
- 2013: David Adrian, Anthony Bonkoski, Alex Migicovsky, Andrew Modell, Jennifer O'Neil
- 2011: Yilun Cui, Alexander Motalleb
- 2010: Arun Ganesan, Neha Gupta, Kenneth Meagher, Jay Novak, Dhritiman Sagar, Samantha Schumacher, Jonathan Stribley
- 2009: Mark Griffin, Randy Yao

## Teaching

- **Introduction to Computer Security**, EECS 388, University of Michigan
  Terms: Winter 2017, Fall 2016, Fall 2015, Fall 2014, Fall 2013, Fall 2011, Fall 2010, Fall 2009
  Created new undergrad security elective that has grown to reach >750 students/year. An accessible intro, teaches the security mindset and practical skills for building and analyzing security-critical systems.
- **Computer and Network Security**, EECS 588, University of Michigan
  Terms: Winter 2016, Winter 2015, Winter 2014, Winter 2013, Winter 2012, Winter 2011, Winter 2010, Winter 2009
  Redesigned core grad-level security course. Based around discussing classic and current research papers and performing novel independent work. Provides an intro. to systems research for many students.
- **Securing Digital Democracy**, Coursera (MOOC)
  Designed and taught a massive, open online course that explored the security risks—and future potential—of electronic voting and Internet voting technologies; over 20,000 enrolled students.

## Professional Service

### Program Committees

- 2017 ACM Conference on Computer and Communications Security (CCS '17)
- 2017 ISOC Network and Distributed Systems Security Symposium (NDSS '17)
- 2016 ACM Internet Measurement Conference (IMC '16)
- 2016 USENIX Security Symposium (Sec '16)
- 2016 International Joint Conference on Electronic Voting (E-VOTE-ID '16)
- 2016 Workshop on Advances in Secure Electronic Voting (Voting '16)
- 2015 ACM Conference on Computer and Communications Security (CCS '15)
- 2015 ACM Internet Measurement Conference (IMC '15)
- 2015 USENIX Security Symposium (Sec '15)

- 2014 ACM Conference on Computer and Communications Security (CCS '14)
- 2014 USENIX Security Symposium (Sec '14)
- 2013 ACM Conference on Computer and Communications Security (CCS '13)
- **Program co-chair**, 2012 Electronic Voting Technology Workshop/Workshop on Trustworthy Elections (EVT/WOTE '12)
- 2012 Workshop on Free and Open Communications on the Internet (FOCI '12)
- 2012 IEEE Symposium on Security and Privacy ("Oakland" '12)
- 2012 International Conference on Financial Cryptography and Data Security (FC '12)
- 2011 Workshop on Free and Open Communications on the Internet (FOCI '11)
- 2011 Electronic Voting Technology Workshop (EVT/WOTE '11)
- 2010 ACM Conference on Computer and Communications Security (CCS '10)
- 2010 USENIX/ACCURATE/IAVOSS Electronic Voting Technology Workshop (EVT '10)
- 2010 USENIX Security Symposium (Sec '10)
- 2010 IEEE Symposium on Security and Privacy (Oakland '10)
- 2010 International World Wide Web Conference (WWW '10)
- 2009 ACM Conference on Computer and Communications Security (CCS '09)
- 2009 ACM Workshop on Digital Rights Management (DRM '09)
- 2009 ACM Workshop on Multimedia Security (MMS '09)
- 2009 USENIX Workshop on Offensive Technologies (WOOT '09)
- 2009 International World Wide Web Conference (WWW '09)
- 2008 ACM Conference on Computer and Communications Security (CCS '08)
- 2008 ACM Workshop on Privacy in the Electronic Society (WPES '08)
- 2008 USENIX/ACCURATE Electronic Voting Technology Workshop (EVT '08)
- 2008 International World Wide Web Conference (WWW '08)

## Boards

- Board of Directors for the Internet Security Research Group (2014–present)
- Board of Advisors for the Verified Voting Foundation (2012–present)
- External Advisory Board for the DemTech Project, IT University of Copenhagen (2011–present)
- Advisory Council for the Princeton University Department of Computer Science (2012–2014)

## Department and University Service

- Faculty Advisor for Michigan Hackers student group (2012–present)
- CSE Graduate Affairs Committee (member, 2014–2017)
- CSE Undergraduate Program Advising (CS/ENG) (2011–2017)
- Faculty Senate, Rules Committee of the Senate Assembly (member, 2011–12)
- CSE Graduate Admissions Committee (member, 2010–11)
- CSE Graduate Committee (member, 2009–10)

# EXHIBIT B

APRIL GLASER SECURITY 07.27.16 9:30 AM

# HERE'S WHAT WE KNOW ABOUT RUSSIA AND THE DNC HACK



GETTY IMAGES

AS THE DEMOCRATIC National Convention continues its week-long stay in Philadelphia, accusations of Russian hacking continue to cloud the proceedings. At this point, it seems likely that Russia is responsible. What's less clear is what that will mean going forward.

It's been a bad stretch for the Democratic National Committee. Hackers broke into its servers months ago, stealing private emails, opposition research, and campaign correspondence. Last Friday, Wikileaks made nearly 20,000 of those private emails public, revealing embarrassing details of the political machine's inner workings. DNC official allege that the Russian government is behind the breach. The *New York Times* reports that US intelligence agencies increasingly share that opinion. According to a number of top cybersecurity researchers, they're probably right.

## A Brief History of a Hack

News of the hack of the Democratic National Committee first broke in mid-June. That's when Crowdstrike, a firm that analyzes threats to network security, revealed that the DNC had called it in to inspect the party's servers, where it found "two separate Russian intelligence-affiliated adversaries present in the DNC network." Crowdstrike released a comprehensive report of its findings on June 14, which accompanied a *Washington Post* article detailing the attacks. One of the hacking groups, Crowdstrike found, had access to the DNC servers for almost a year.

A day after that report, someone calling themselves Guccifer 2.0 (an allusion to notorious hacker Guccifer) claimed responsibility for the hack in a blog post. Through the blog and an accompanying Twitter account, Guccifer 2.0 refuted Crowdstrike's claims that this was a Russian operation, instead calling himself a "lone hacker." He also claimed to have handed much of the DNC bounty to Wikileaks.

The following week, two cybersecurity firms, Fidelis Cybersecurity and Mandiant, independently corroborated Crowdstrike's assessment that Russian hackers infiltrated DNC networks, having found that the two groups that hacked into the DNC used malware and methods identical to those used in other attacks attributed to the same Russian hacking groups.

But some of the most compelling evidence linking the DNC breach to Russia was found at the beginning of July by Thomas Rid, a professor at King's College in London, who discovered an identical command-and-control address hardcoded into the DNC malware that was also found on malware used to hack the German Parliament in 2015. According to German security officials, the malware originated from Russian military intelligence. An identical SSL certificate was also found in both breaches.

The evidence mounts from there. Traces of metadata in the document dump reveal various indications that they were translated into Cyrillic. Furthermore, while Guccifer 2.0 claimed to be from Romania, he was unable to chat with Motherboard journalists in coherent Romanian. Besides which, this sort of hacking wouldn't exactly be outside of Russian norms.

"It doesn't strain credulity to look to the Russians," says Morgan Marquis-Boire, a malware expert with CitizenLab. "This is not the first time that Russian hackers has been behind intrusions in US government, and it seems unlikely that it will be the last." Last year Russian hackers were able to breach White House and State

Department email servers, gleaning information even from President Obama's Blackberry.

Meanwhile, the Kremlin has denied Russian involvement in the DNC breach. But the reverberations continue; DNC Chairwoman Debbie Wasserman Schultz will resign at the end of the week, after emails revealed what many view as the unfair treatment of Bernie Sanders.

## From Russia With Love

As compelling as the evidence is, there's still a small amount of room to argue that Guccifer 2.0 was a lone actor, an individual motivated by hacktivist ideals of dismantling state power. He wouldn't be the first. And in a recent interview on NBC, Julian Assange of Wikileaks gave a soft disavowal of claims that his whistleblowing organization is in cahoots with Russian intelligence, "Well, there is no proof of that whatsoever," he said. "We have not disclosed our source, and of course, this is a diversion that's being pushed by the Hillary Clinton campaign."

This is, of course, the same Assange who boasts responsibility for helping find Snowden a home in Russia and Wikileaks publicly criticized the Panama Papers for implicating Putin in financial misdeeds. He's also an outspoken frequent critic of Hillary Clinton's time at the State Department. A damning document dump the weekend before Clinton's nomination arguably aligns with both Russian interests and his own.

If the allegations do prove correct, this is an unprecedented step for Russia. Hacking is nothing new, but publicizing documents to attempt to sway an election certainly is. Putin would clearly prefer a Trump presidency. The billionaire Republican candidate is a longtime admirer of Putin's, and has publicly stated that he wouldn't necessarily defend NATO allies against a Russian invasion. To top it all off, Trump's campaign manager, Paul Manafort, formerly worked as an advisor to Viktor Yanukovych, the Russian-backed President of Ukraine before he was ousted in 2014.

"Due to the nature and timing of this hack, it all seems very political," says Marquis-Boire.

And there's a whole lot of election left—and likely more leaks to come with it. On Sunday, a Twitter user asked Wikileaks if more DNC leaks were on their way. The reply: "We have more coming."

**Update:** In a press conference Wednesday, Republican presidential candidate Donald Trump invited Russia to retrieve "missing" emails from Hillary Clinton's campaign and release them. Cybersecurity experts described the remarks as "unprecedented" and "possibly illegal."

# EXHIBIT C

The New York Times | http://nyti.ms/2eqNSVY

ELECTION 2016 Full Results | Exit Polls | Trump's Cabinet

# Private Security Group Says Russia Was Behind John Podesta's Email Hack

By NICOLE PERLROTH and MICHAEL D. SHEAR OCT. 20, 2016

SAN FRANCISCO — At the start of 2014, President Obama assigned his trusted counselor, John D. Podesta, to lead a review of the digital revolution, its potential and its perils. When Mr. Podesta presented his findings five months later, he called the internet's onslaught of big data "a historic driver of progress." But two short years later, as chairman of Hillary Clinton's presidential campaign, Mr. Podesta would also become one of the internet's most notable victims.

On Thursday, private security researchers said they had concluded that Mr. Podesta was hacked by Russia's foreign intelligence service, the GRU, after it tricked him into clicking on a fake Google login page last March, inadvertently handing over his digital credentials.

For months, the hackers mined Mr. Podesta's inbox for his most sensitive and potentially embarrassing correspondence, much of which has been posted on the WikiLeaks website. Additions to the collection on Thursday included three short

email exchanges between Mr. Podesta and Mr. Obama himself in the days leading up to his election in 2008.

Mr. Podesta's emails were first published by WikiLeaks earlier this month. The release came just days after James R. Clapper Jr., the director of national intelligence, and the Department of Homeland Security publicly blamed Russian officials for cyberattacks on the Democratic National Committee, in what they described as an effort to influence the American presidential election.

To date, no government officials have offered evidence that the same Russian hackers behind the D.N.C. cyberattacks were also behind the hack of Mr. Podesta's emails, but an investigation by the private security researchers determined that they were the same.

Threat researchers at Dell SecureWorks, an Atlanta-based security firm, had been tracking the Russian intelligence group for more than a year. In June, they reported that they had uncovered a critical tool in the Russian spy campaign. SecureWorks researchers found that the Russian hackers were using a popular link shortening service, called Bitly, to shorten malicious links they used to send targets fake Google login pages to bait them into submitting their email credentials.

The hackers made a critical error by leaving some of their Bitly accounts public, making it possible for SecureWorks to trace 9,000 of their links to nearly 4,000 Gmail accounts targeted between October 2015 and May 2016 with fake Google login pages and security alerts designed to trick users into turning over their passwords.

Among the list of targets were more than 100 email addresses associated with Hillary Clinton's presidential campaign, including Mr. Podesta's. By June, 20 staff members for the campaign had clicked on the short links sent by Russian spies. In June, SecureWorks disclosed that among those whose email accounts had been targeted were staff members who advised Mrs. Clinton on policy and managed her travel, communications and campaign finances.

Independent journalism.
More essential than ever.
Subscribe to the Times

Two security researchers who have been tracking the GRU's spearphishing campaign confirmed Thursday that Mr. Podesta was among those who had inadvertently turned over his Google email password. The fact that Mr. Podesta was among those breached by the GRU was first disclosed Thursday by Esquire and the Motherboard blog, which published the link Russian spies used against Mr. Podesta.

"The new public data confirming the Russians are behind the hack of John Podesta's email is a big deal," Jake Sullivan, Mrs. Clinton's senior policy adviser, said Thursday. "There is no longer any doubt that Putin is trying to help Donald Trump by weaponizing WikiLeaks."

The new release of Mr. Podesta's email exchange with Mr. Obama from 2008 made clear that Mr. Obama's team was confident he would win.

In one of the emails, Mr. Podesta wrote Mr. Obama a lengthy memo in the evening on Election Day recommending that he not accept an invitation from President George W. Bush to attend an emergency meeting of the Group of 20 leaders.

"Attendance alongside President Bush will create an extremely awkward situation," the memo said. "If you attempt to dissociate yourself from his positions, you will be subject to criticism for projecting a divided United States to the rest of the world. But if you adopt a more reserved posture, you will be associated not only with his policies, but also with his very tenuous global standing."

The White House did not respond to questions about the email.

***Correction: October 22, 2016***

An article on Friday about suspected email hacking by Russia's foreign intelligence service misstated the name of one organization that first disclosed that a presidential counselor, John D. Podesta, was among those whose accounts were breached. The blog is Motherboard, not VICE Motherload.

Nicole Perlroth reported from San Francisco, and Michael D. Shear from Washington.

*Follow The New York Times's politics and Washington coverage on Facebook and* Twitter, *and sign up for the First Draft politics newsletter.*

A version of this article appears in print on October 21, 2016, on page A14 of the New York edition with the headline: Private Security Group Says Russia Was Behind Hack of Clinton Campaign Chairman.

---

© 2016 The New York Times Company

# EXHIBIT D

NBC NEWS SECTIONS

advertisement




NEWS > U.S. NEWS

WORLD INVESTIGATIONS CRIME & COURTS ASIAN AMERICA LATINO NBCBLK

NEWS AUG 30 2016, 4:54 AM ET

# Russians Hacked Two U.S. Voter Databases, Officials Say

by ROBERT WINDREM, WILLIAM M. ARKIN and KEN DILANIAN

SHARE

Hackers based in Russia were behind two recent attempts to breach state voter registration databases, fueling concerns the Russian government may be trying to interfere in the U.S. presidential election, U.S. intelligence officials tell NBC News.

The breaches included the theft of data from as many as 200,000 voter records in Illinois, officials say.

The incidents led the FBI to send a "flash alert" earlier this month to election officials nationwide, asking them to be on the lookout for any similar cyber intrusions.

One official tells NBC News that the attacks have been attributed to Russian intelligence agencies.

"This is the closest we've come to tying a recent hack to the Russian government," the official said.

That person added that "there is serious concern" that the Kremlin may be seeking to sow uncertainty in the U.S. presidential election process.



Voters cast their ballots at ChiArts High School on March 15 in Chicago, Illinois. Scott Olson / Getty Images

Two other officials said that U.S. intelligence agencies have not yet concluded that the Russian government is trying to do that, but they are worried about it.

They said the Russians have long conducted cyber espionage on political targets. The question now is whether they are moving into a covert intelligence operation designed to destabilize the U.S. political process.

The alert, first reported by Yahoo News, provided IP addresses associated with the hack attempts, though it did not mention Russia.

One of the IP addresses was involved in both breaches, the FBI alert said.

"The FBI is requesting that states contact their Board of Elections and determine if any similar activity to their logs, both inbound and outbound, has been detected," the alert said.

The bulletin does not identify the targeted states, but officials told NBC News they were Illinois and Arizona. Illinois officials said in July that they shut down their state's voter registration after a hack. State officials said Monday the hackers downloaded information on as many 200,000 people.

State officials told the Chicago Tribune they were confident no voter record had been deleted or altered.

In Arizona, officials said, hackers tried to get in using malicious software but were unsuccessful. The state took its online voter registration down for nine days, beginning in late June, after malware was discovered on a county election official's computer. But the state concluded that the system was not successfully breached.

Those incidents led Homeland Security Secretary Jeh Johnson to host a call earlier this month with state election officials to talk about cybersecurity and election infrastructure.

Johnson said DHS isn't aware of any specific cyber threat against election-related networks, but he urged officials to examine how to better secure their systems, according to a summary of the call put out by the department.

U.S. intelligence officials have previously said Russian intelligence agencies were behind hacks into the Democratic National Committee and related organizations. There has been a long running debate among intelligence analysts about what Russia is up to.

Voting systems have not been considered "critical infrastructure," by the Department of Homeland Security, so they are not subject to federal government protections.

Independent assessments have found that many state and local voting system are extremely vulnerable to hacking.

ROBERT WINDREM

WILLIAM M. ARKIN

KEN DILANIAN

TOPICS U.S. NEWS, INVESTIGATIONS, SECURITY, WORLD

FIRST PUBLISHED AUG 29 2016, 6:05 PM ET

NEXT STORY Trump's Victory Has Fearful Minorities Buying Up Guns

**More to Explore** Sponsored Links by Taboola

**A Solution That Puts Snoring to Bed**
My Snoring Solution

**Tiny Device Transforms Old Computer into a Blazingly Fast PC**
Xtra-PC

**You Don't Need to Remember You Passwords Anymore Thanks to This Device**
Everykey

**SPONSORED CONTENT**

Your Warrington Grocery Store is 70% Mo... Blue Apron

Harry's Releases New Blade, Keeps

**MORE FROM NBC NEWS**


© 2016 NBCNEWS.COM

# EXHIBIT E

# U.S. official: Hackers targeted voter registration systems of 20 states




In this June 5, 2015, file photo, the Homeland Security Department headquarters in northwest Washington. A Homeland Security Department official says hackers have targeted the voter registration systems of more than 20 states in recent months. FBI Director James Comey told lawmakers this week that the agency is looking "very, very hard" at Russian hackers who may try to disrupt the U.S. election. (Susan Walsh / AP)

By **Tribune news services**

SEPTEMBER 30, 2016, 4:42 PM | WASHINGTON

Hackers have targeted the voter registration systems of more than 20 states in recent months, a Homeland Security Department official said Friday.

The disclosure comes amid heightened concerns that foreign hackers might undermine voter confidence in the integrity of U.S. elections. Federal officials and many cybersecurity experts have said it would be nearly impossible for hackers to alter an election's outcome because election systems are very decentralized and generally not connected to the internet.

ADVERTISING



The official who described detecting the hacker activity was not authorized to speak publicly on the subject and spoke to The Associated Press on condition of anonymity. It was unclear, the official said, whether the hackers were foreign or domestic, or what their motives might be. ABC News earlier reported that more than 20 states were targeted.

The FBI last month warned state officials of the need to improve their election security after hackers targeted systems in Illinois and Arizona. FBI Director James Comey told lawmakers this week that the agency is looking "very, very hard" at Russian hackers who may try to disrupt the U.S. election.

Last month, Donald Trump, the GOP nominee for president, suggested that he feared the general election "is going to be rigged."

The Homeland Security Department has stepped up its outreach to states and localities, but it is up to them to ask for help. So far, 19 states have expressed interest in a general "cyber hygiene" scan of key websites — akin to ensuring that windows in a home are properly closed, according to another Homeland Security official directly involved in securing local elections who also was not authorized to speak publicly about ongoing efforts.

The FBI has detected a variety of "scanning activities" that are early indications of hacking, Comey told the House Judiciary Committee this week.

The FBI held a conference call on Friday with the local officials who run elections in the battleground state of Florida. Meredith Beatrice, a spokeswoman for Secretary of State Ken Detzner, called it an "informational call related to elections security," but a person on the call who was not authorized to discuss it and requested anonymity said authorities had seen evidence of someone probing a local elections website.

Homeland Security Secretary Jeh Johnson spoke to state election officials by phone last month, encouraging them to implement existing technical recommendations to secure their election systems and ensure that electronic voting machines are not connected to the internet.

DHS is offering states more comprehensive, on-site risk and vulnerability checks. Only four states have expressed interest in the assessment, and because the election is only weeks away, the department will likely only be able to conduct an assessment of one state before Election Day on Nov. 8, the official said.

Two of the hacking attempts involved efforts to mine data from the Arizona and Illinois voter registration systems, according to Kay Stimson, a spokeswoman for the National Association of Secretaries of State. She said in Arizona a hacker tried to probe voter registration data, but never infiltrated the system, while in Illinois hackers got into the system, but didn't manipulate any data.

These systems have "nothing to do with vote casting or counting," Stimson said in an email. "While it is theoretically possible to disrupt an election by infiltrating a voter registration system, their compromise would not affect election results" and there are system controls in place to catch any fraud.

Rep. Henry Johnson, D-Ga., introduced two bills earlier this month that would require voting systems be designated as critical infrastructure and limit purchases of new voting systems that don't provide paper ballots, among other measures. It's unlikely the bills will be passed before the election.

The Homeland Security Department is already considering designating voting systems as critical infrastructure in the future, though it is unlikely to happen before the election, the second official said.

A presidential directive released in 2013 details 16 sectors that are considered critical infrastructure, including energy, financial services, healthcare, transportation, food and agriculture, and communications. The designation places responsibilities on the Homeland Security secretary to identify and prioritize those sectors, considering physical and cyber threats. The secretary is also required to conduct security checks and provide information about emerging and imminent threats.

*Associated Press*

Copyright © 2016, Chicago Tribune

**This article is related to:** Jeh Johnson, James Comey

# EXHIBIT F

theguardian

# Senators call for declassification of files on Russia's role in US election

Eight members of Senate intelligence committee hint that government may still hold secret information 'concerning the Russian government'




The eight senators did not directly accuse the Russian government or Donald Trump of wrongdoing. Photograph: Timothy A Clary/AFP/Getty Images

**Spencer Ackerman in New York**

Thursday 1 December 2016 11.07 EST

All of the Democratic and Democratic-aligned members of the Senate intelligence committee have hinted that significant information about Russian interference in the US presidential election remains secret and ought to be declassified.

The eight senators, including the incoming ranking member Mark Warner of Virginia, wrote to Barack Obama to request he declassify relevant intelligence on the election. They did not directly accuse the Russian government or President-elect Donald Trump, a Republican, of wrongdoing in the letter.

"We believe there is additional information concerning the Russian government and the US election that should be declassified and released to the public. We are conveying specifics through classified channels," wrote Warner and his colleagues Ron Wyden of Oregon, Martin Heinrich of New Mexico, Mazie Hirono of Hawaii, Barbara Mikulski of Maryland and independent Angus King of Maine.

Jack Reed of Rhode Island, an honorary and non-voting member of the committee due to his seat as ranking member of the Senate armed services committee, also signed the letter, which was dated Tuesday and publicly released on Wednesday. No Republican joined the declassification call.

The outgoing ranking Democrat, Dianne Feinstein of California, signed the classified version of the letter sent to Obama.

Neither the terse letter nor discussions with sources on Capitol Hill detailed the particular intelligence concerning the Russians, its strength or its impact on the outcome of the election. Thus far, no credible evidence of vote fraud or electoral malfeasance exists, despite an evidence-free claim from Trump himself.

A spokesman for Wyden, Keith Chu, said the senator believed the intelligence needed to be declassified "immediately", as it was in the "national interest that the American public should see it".

It is understood this is the first declassification request by eight senators in at least twelve years.

On 7 October, the US director of national intelligence and the secretary of homeland security took the rare step of directly accusing Russia's "senior-most" officials of ordering the breach of the Democratic National Committee's digital networks. Director James Clapper and Secretary Jeh Johnson accused the Russians of attempting to "interfere" in the US election, something the Obama administration had previously suggested but did not allege publicly.

The FBI has acknowledged investigating such interference, but has reportedly not established any link to Trump or his campaign. Two US officials have told the Guardian that the FBI was reluctant to sign off on Clapper and Johnson's public allegation.

Yet Harry Reid, the outgoing Democratic Senate leader, asserted without evidence in October that the FBI director, James Comey, "possess[es] explosive information about close ties and coordination between Donald Trump, his top advisers, and the Russian government".

Unusually for any presidential nominee, and particularly for a Republican, Trump has exhibited a warmth toward the Russian president, Vladimir Putin, that has prompted a widespread expectation Trump will tilt US foreign policy toward Russia. Trump and Putin spoke soon after Trump's electoral victory in a phone call heralded by the Kremlin.

There was no immediate comment from the White House or Clapper's office as to whether Obama would order the declassification or whether the intelligence agencies even support such a move.

## Since you're here ...

... we have a small favour to ask. More people are reading the Guardian than ever but far fewer are paying for it. And advertising revenues across the media are falling fast. So you can see why we need to ask for your help. The Guardian's independent, investigative journalism takes a lot of time, money and hard work to produce. But we do it because we believe our perspective matters - because it might well be your perspective, too.

Fund our journalism and together we can keep the world informed.

Become a Supporter
Make a contribution
More news

## Topics

US elections 2016 Russia US politics US Senate

Save for later Article saved
Reuse this content

# EXHIBIT G

# Joint Statement from the Department Of Homeland Security and Office of the Director of National Intelligence on Election Security

**Release Date:** October 7, 2016

For Immediate Release
DHS Press Office
Contact: 202-282-8010

The U.S. Intelligence Community (USIC) is confident that the Russian Government directed the recent compromises of e-mails from US persons and institutions, including from US political organizations. The recent disclosures of alleged hacked e-mails on sites like DCLeaks.com and WikiLeaks and by the Guccifer 2.0 online persona are consistent with the methods and motivations of Russian-directed efforts.

These thefts and disclosures are intended to interfere with the US election process. Such activity is not new to Moscow—the Russians have used similar tactics and techniques across Europe and Eurasia, for example, to influence public opinion there. We believe, based on the scope and sensitivity of these efforts, that only Russia's senior-most officials could have authorized these activities.

Some states have also recently seen scanning and probing of their election-related systems, which in most cases originated from servers operated by a Russian company. However, we are not now in a position to attribute this activity to the Russian Government. The USIC and the Department of Homeland Security (DHS) assess that it would be extremely difficult for someone, including a nation-state actor, to alter actual ballot counts or election results by cyber attack or intrusion. This assessment is based on the decentralized nature of our election system in this country and the number of protections state and local election officials have in place. States ensure that voting machines are not connected to the Internet, and there are numerous checks and balances as well as extensive oversight at multiple levels built into our election process.

Nevertheless, DHS continues to urge state and local election officials to be vigilant and seek cybersecurity assistance from DHS. A number of states have already done so. DHS is providing several services to state and local election officials to assist in their cybersecurity. These services include cyber "hygiene" scans of Internet-facing systems, risk and vulnerability assessments, information sharing about cyber incidents, and best practices for securing voter registration databases and addressing potential cyber threats. DHS has convened an Election Infrastructure Cybersecurity Working Group with experts across all levels of government to raise awareness of cybersecurity risks potentially affecting election infrastructure and the elections process. Secretary Johnson and DHS officials are working directly with the National Association of Secretaries of State to offer assistance, share

information, and provide additional resources to state and local officials.

###

Last Published Date: October 7, 2016

# EXHIBIT H

The CHRISTIAN SCIENCE MONITOR

Passcode | Monitor Breakfast | EqualEd

Log In | Register

FREE E-mail Newsletters

| World | USA | Commentary | Business | Energy / Environment | Technology | Science | Culture | Books | Take Action |

Subscribe

Passcode
Modern field guide to security and privacy




WORLD | PASSCODE

# Ukraine election narrowly avoided 'wanton destruction' from hackers (+video)

A brazen three-pronged cyber-attack against last month's Ukrainian presidential elections has set the world on notice – and bears Russian fingerprints, some say.

By **Mark Clayton**, Staff writer | JUNE 17, 2014

Save for later

Share Tweet E-mail More



David Mdzinarishvili/Reuters | View Caption

A three-pronged wave of cyber-attacks aimed at wrecking Ukraine's presidential vote – including an attempt to fake computer vote totals – was narrowly defeated by government cyber experts, Ukrainian officials say.

The still little-known hacks, which surfaced May 22-26, appear to be among the most dangerous cyber-attacks yet deployed to sabotage a national election – and a warning shot for future elections in the US and abroad, political scientists and cyber experts say.

National elections in the Netherlands, Norway, and other nations have seen hackers probe Internet-tied election systems, but never with such destructive abandon, said experts monitoring the Ukraine vote.

Recommended: **How much do you know about cybersecurity? Take our quiz.**

"This is the first time we've seen a cyber-hacktivist organization act in a malicious way on such a grand scale to try to wreck a national election."



About these ads

## Popular Now

1. Does this crab have the most crushing claws?
2. 7 recipes for green bean casserole
3. Does your dog remember what you did?
4. With Nikki Haley pick, Trump sends different message
5. Why Hillary Clinton lost the white women's vote

## Follow Passcode

Passcode covers security and privacy in the digital age. Sign up below to stay up to date with Passcode news, columnists, and upcoming events. Read more about us.

E-mail address SIGN-UP

Michael B. Farrell
Passcode Editor | Michael is an editor and writer based in Boston.

Sara Sorcher
Passcode Deputy Editor | Sara covers security and privacy policy from DC.

Jack Detsch
Staff writer | Jack is the Mark Clayton Fellow in Cybersecurity

malicious way on such a grand scale to try to wreck a national election," says Joseph Kiniry, an Internet voting systems cyber-security expert. "To hack in and delete everything on those servers is just pillaging, wanton destruction."

That wanton destruction began four days ahead of the national vote, when CyberBerkut, a group of pro-Russia hackers, infiltrated Ukraine's central election computers and deleted key files, rendering the vote-tallying system inoperable. The next day, the hackers declared they had "destroyed the computer network infrastructure" for the election, spilling e-mails and other documents onto the web as proof.

A day later, government officials said the system had been repaired, restored from backups, and was ready to go. But it was just the beginning.

Only 40 minutes before election results were to go live on television at 8 p.m., Sunday, May 25, a team of government cyber experts removed a "virus" covertly installed on Central Election Commission computers, Ukrainian security officials said later.



TEST YOUR KNOWLEDGE | How much do you know about cybersecurity? Take our quiz.



IN PICTURES | Ukraine: 10 years in 30 images




VIDEO | Ukraine election results

If it had not been discovered and removed, the malicious software would have portrayed ultra-nationalist Right Sector party leader Dmytro Yarosh as the winner with 37 percent of the vote (instead of the 1 percent he actually received) and Petro Poroshenko (the actually winner with a majority of the vote) with just 29 percent, Ukraine officials told reporters the next morning.

Curiously, Russian Channel One aired a bulletin that evening declaring Mr. Yarosh the victor with 37 percent of the vote over Mr. Poroshenko with 29 percent, Ukraine officials said.

"Offenders were trying by means of previously installed software to fake election results in the given region and in such a way to discredit general results of elections of the President of Ukraine," the Ukrainian Security Service (SBU) said in a statement.

Still, there was more to come.

In the wee hours of the morning after polls closed, as results flowed in from Ukrainian election districts, Internet links feeding that data to the vote tally system were hit with a barrage of fake data packets – known as distributed denial of service (DDoS) attacks. So from about 1 to 3 a.m. on May 26, election results were blocked, delaying the finally tally until the early



Paul F. Roberts
Correspondent | Paul covers critical infrastructure and the Internet of Things.



Jaikumar Vijayan
Correspondent | Jaikumar is an award-winning technology reporter.



Nadya T. Bliss
Columnist | Nadya directs the Global Security Initiative at Arizona State Uni...



Lorrie Faith Cranor
Columnist | Lorrie is chief technologist at the Federal Trade Commission



Dan Geer
Columnist | Dan is chief information security officer for In-Q-Tel.



Jason Healey
Columnist | Senior Research Scholar, Columbia University SIPA



Sascha Meinrath
Columnist | Sascha founded the Open Technology Institute.



Lysa Myers
Columnist | Lysa Myers is a security researcher at ESET.



Bruce Schneier
Columnist | Bruce is a noted cryptographer and security expert.



Evan Selinger
Columnist | Evan is a philosophy professor at Rochester Institute of Technology.



Melanie Teplinsky
Columnist | Melanie teaches information privacy law at American University.



Nicole Wong
Columnist | Nicole served as deputy chief technology officer at the White House.




SUBSCRIBE

morning, a preliminary report by international election observers recounted.

An analysis of the DDoS attack by Arbor Networks, a Burlington, Mass., cyber-security company, ties it to CyberBerkut.

In the end, international observers declared Ukraine's vote "a genuine election." But US researchers say it's clear that Ukraine dodged a major cyber-bullet.

"We've seen vote fraud before in Ukraine, including a rigged computer system in 2004," says Peter Ordeshook, a California Institute of Technology political scientist. "But this wasn't an effort to steal the election outcome, so much as to steal the election itself – by entirely discrediting it in the eyes of key segments of the population in Ukraine and in Russia, too."

While it was well understood across most of Ukraine and internationally that the far-right candidate Yarosh had little political support, the faked results would have lent credibility to Russian-inspired accounts that the popular revolt last fall against the Ukraine government was fomented by ultra-nationalists.

"In that light, the cyber fakery looks incredibly clumsy from the outside because no one there would have believed it," Dr. Ordeshook says. "But these faked results were geared for a specific audience in order to feed the Russian narrative that has claimed from the start that ultra-nationalists and Nazis were behind the revolution in Ukraine."

If the virus with the faked computer results had not been discovered, it would have fomented unrest across the volatile ethnic-Russian Donetsk region now under the shadow of Russian forces on the border with Ukraine, he says. Such spurious results also would have undermined the credibility of the new Ukraine government and could have paved the way for Russian military action, say political scientists who monitor Ukraine elections.




The Ukraine hack is a stark warning for the US and other democracies that use the Internet for tabulation and even direct voting, election security experts say. One clear lesson, they say, is to always have paper ballots to back up election results – like Ukraine – and to avoid Internet voting.

"The Ukraine attack story demonstrates there is no shortage of methods which a determined adversary will make use of to sabotage an election," says Pamela Smith, president of the Verified Voting Foundation, a US group that has researched US election systems security.

In the runup to the election, President Obama on May 2 warned Russia not to interfere or the US "will not have a choice but to move forward with additional, more severe sanctions."

Since then, US officials appear reluctant to make too much of the attacks. References to the cyber-attacks have been brief and oblique. With anonymity cloaking cyber-attacks across the Internet, it's difficult to tell

anonymity cloaking cyber attacks across the Internet, it's difficult to tell how deeply involved Russia's government might have been.

Ukraine experienced "cyber-attacks on the Central Election Commission of the kind that generally would require outside support," Victoria Nuland, assistant secretary of State for European affairs, acknowledged in a May 27 interview on the Charlie Rose show. Mark Green, a former congressman, said in Senate testimony June 6 that he had been told by a US diplomat of a failed Russian cyber-attack on the election.

Ukrainian officials have been unabashed in throwing blame at Russia, saying that arrests were made in the case, although no names have yet been made public.

"It was prepared in advance and stored on Russian (Internet) re-sources," Volodymyr Zverev, head of the Ukraine's Administration of Public Service of Special Communication and Protection of Information said of the malware that was intended to deliver the fake election results, according to Interfax-Ukraine. "They wanted to, and made the preparations, but they did not succeed."

While Russian hacktivists appear to be linked to at least some of the attacks, not everyone agrees the Russian government had a hand in the most devious element. Internet security expert Mr. Kiniry, for instance, says there is no solid proof yet to back the Ukrainian government claim of a virus carrying fake election results.

Others say Russia's paw prints are all over the attack.

"Did Russia attempt to sway the Ukrainian Presidential Election? I honestly don't know the answer to that," says Jeffery Stutzman, CEO of Red Sky Alliance, a cyber-security group in New Hampshire.

But, he adds, "the idea that these guys were trying to poison the election result by compromising the election commission computers is amazing to me – and this coincidence with the Russian channel showing the same fake results – is just too much. If it walks like a duck and quacks like one, maybe it's a duck."

## Next up



PASSCODE
How much do you know about cybersecurity? Take our quiz.

Major cyber-assaults on Ukraine, then Moscow, on eve of Crimea vote (+video)

How Iran duped high-ranking US officials with fake website

US indicts five in China's secret 'Unit 61398' for cyber-spying on US firms (+video)




About these ads

Share Tweet E-mail More Print/Reprints

About these ads
Sponsored Content by LockerDome




How the Great Bubble Burst of 2017 Can Make You




Our Award-Winning Publication

Subscribe to the Monitor's trustworthy weekly review of global news and ideas.

SUBSCRIBE

Global Galleries



Latest News



Doing Good





Photos of the day 11/23



Does your dog remember what you did?



DIFFERENCE MAKER He's championed cleanup of the Chesapeake Bay for four decades

IQ Test: What is your IQ?

Answer 30 Questions to find out! View Your IQ Report Go to iq-tests-online.com

The Christian Science Monitor

STAY CURRENT. GO FAR.

DISCOVER THE MONITOR DIFFERENCE

ABOUT | CONTACT US | SUBSCRIBE | E-READERS | ADVERTISE WITH US | CAREERS | FIND US ONLINE

CONTENT MAP | TEXT | CORRECTIONS | REPRINTS & PERMISSIONS | MULTIMEDIA | A CHRISTIAN SCIENCE PERSPECTIVE

© The Christian Science Monitor. All Rights Reserved. Terms under which this service is provided to you. Privacy Policy.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **DECLARATION OF J. ALEX HALDERMAN IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>**Civil Action No. 1:17-CV-2989-AT** |

Pursuant to 28 U.S.C. § 1746, J. ALEX HALDERMAN declares under penalty of perjury that the following is true and correct:

1. I hereby incorporate my previous declarations as if fully stated herein. I have personal knowledge of the facts in this declaration and, if called to testify as a witness, I would testify under oath to these facts.

2. State Defendants characterize Georgia's BMD-based election system as "an electronic voting system used throughout the country,"[1] and they remark that BMDs are used in "six of the ten largest counties in the country, including Los Angeles, California; Cook County/City of Chicago; Maricopa, Arizona; San Diego,

---

[1] State Defendants' Response in Opposition to Curling Plaintiffs' Fourth Motion for Preliminary Injunction, Dckt. 821 at 1.

California; Dallas, Texas; and Riverside, California."[2] These statements are misleading. The vast majority of jurisdictions that use BMDs use hand-marked paper ballots as the primary method of voting and reserve BMDs for accessibility purposes—including four of the six localities that State Defendants cite (all but Los Angeles and Dallas).[3] I explained in my previous declaration that BMDs are much safer when used by only a small fraction of voters, as in these localities.[4]

3. The map below shows the primary in-person voting technology that will be used in each U.S. county this November. The great majority of states, counties, and voters will use hand-marked paper ballots with BMDs available for accessibility (shown in dark green).

[2] *Id*. at 19.
[3] Verified Voting, *The Verifier*, https://verifiedvoting.org/verifier/ (accessed Aug. 30, 2020.)
[4] Decl. of J. Alex Halderman (Aug. 19, 2020), Dckt. 785-2 at 47-50.




**Primary Polling-Place Equipment by County, November 2020**

(Data/image: Verified Voting, *The Verifier,* https://verifiedvoting.org/verifier/.)

4. State Defendants further characterize Georgia's BMD-based election system as "a system recommended by the National Academy of Sciences and the U.S. [*sic.*] Intelligence Committee."[5] Again, this statement is misleading. Both the

---

[5] Dckt. 821 at 1.

National Academies[6] and the Senate Select Committee on Intelligence[7] recommended the use of voter-verified paper ballots, as opposed to paperless DREs or DREs with VVPAT printers. These recommendations were based on testimony heard in 2017 and 2018, including my own testimony to each body. At the time, only about 1% of voters lived in jurisdictions with BMDs as the primary method of voting, while nearly a quarter of voters used paperless DREs. Moreover, there had been little research about whether BMD ballots were accurately verified by voters. An election system like Georgia's, which uses barcode-based BMDs for nearly all in-person voters statewide, was not specifically addressed in either report.

---

[6] National Academies of Sciences, Engineering, and Medicine, *Securing the Vote: Protecting American Democracy* (2018) at 80, available at http://nap.edu/25120. "Elections should be conducted with human-readable paper ballots. These may be marked by hand or by machine (using a ballot-marking device); they may be counted by hand or by machine (using an optical scanner). [...] Voting machines that do not provide the capacity for independent auditing (e.g., machines that do not produce a voter-verifiable paper audit trail) should be removed from service as soon as possible."

[7] U.S. Senate Select Committee on Intelligence, "Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, Volume 1: Russian Efforts Against Election Infrastructure" (June 2019) at 59, available at https://www.intelligence.senate.gov/sites/default/files/documents/Report_Volume1.pdf. "As states look to replace HAVA-era machines that are now out of date, they should purchase more secure voting machines. Paper ballots and optical scanners are the least vulnerable to cyber attack; at minimum, any machine purchased going forward should have a voter-verified paper trail and remove (or render inert) any wireless networking capability."

5. The Academies' 2018 report also notes that "[w]ell designed, voter-marked [i.e., marked by hand] paper ballots are the standard for usability for voters without disabilities. Research on VVPATs has shown that they are not usable/reliable for verifying that the ballot of record accurately reflects the voter's intent, but there is limited research on the usability of BMDs for this purpose. [...] Additional research on ballots produced by BMDs will be necessary to understand the effectiveness of such ballots."[8] It goes on to call on the National Science Foundation and other federal agencies to fund research to "determine voter practices regarding the verification of ballot marking device–generated ballots and the likelihood of voters, both with and without disabilities, will recognize errors or omissions."[9]

6. Last year, with National Science Foundation funding, my research group conducted an extensive study on this question, which I discuss at length in a previous declaration.[10] Our study was peer reviewed and published in January 2020 at the IEEE Symposium on Security and Privacy,[11] which is the most selective top-tier

---

[8] *Securing the Vote* at 79-80.
[9] *Id.* at 124.
[10] Decl. of J. Alex Halderman, Dckt. 682 (Dec. 16, 2019) at 25-33.
[11] Matthew Bernhard, Allison McDonald, Henry Meng, Jensen Hwa, Nakul Bajaj, Kevin Chang, and J. Alex Halderman, "Can Voters Detect Malicious Manipulation of Ballot Marking Devices?" in *Proceedings of the 41st IEEE Symposium on*

publication venue for computer security research. The work received special commendation from the review committee as the best research paper with a graduate student as the first author to appear in this year's symposium. The main findings of the study were that 60% of voters failed to review their ballots at all, and voters only reported 6.6% of misprinted ballots caused by a hacked BMD. We also tested a variety of procedural interventions, including those practiced in Georgia, to see how much they improved verification, but the magnitude of the improvements was likely too small to allow election officials to reliably detect BMD attacks in close races.

7. Other recent research, which State Defendants' and their expert Dr. Gilbert cite favorably,[12] actually confirms the key results from my study. It found that although voters *who do* review BMD printouts often are able to spot errors, few voters review the printouts at all, which is corroborated by field reports from polling place observers. These findings are further bolstered by previous research in the contexts of VVPATs and DRE review screens, which found that voters are also unlikely to catch errors when using those technologies.[13]

---

*Security and Privacy* (2020), https://jhalderm.com/pub/papers/bmd-verifiability-sp20.pdf.

[12] Dckt. 821 at 11, "there is other research indicating that voters can detect manipulation of ballots."

[13] This literature is summarized in Bernhard et al., § II.B.

8. On this basis, I find it misleading for State Defendants to say that "the science is not yet settled" regarding whether voters accurately verify BMD printouts.[14] Although science is always open to new evidence, there are now several studies that strongly support the proposition that the voter population does not verify BMD printouts accurately enough to allow reliable detection of misprinting attacks. To my knowledge, there is no research at all that suggests the contrary.

9. State defendants incorrectly ascribe my technical conclusions about the relative security of different voting technologies to mere personal preference.[15] This mistakes cause for effect. Like other security experts, I generally recommend hand-marked paper ballots over DRE and all-BMD systems *because* only a primarily hand-marked system can be strongly defended in practice using existing technology. My recommendations would change as appropriate if technological breakthroughs or compelling new scientific results were to alter the security analysis.

10. State Defendants misread my earlier testimony and erroneously conclude that I have changed my views about BMD auditability: "While Dr.

---

[14] Dckt. 821 at 11.

[15] *Id.* at 17. "Dr. Halderman's opinions are based on his personal beliefs that hand-marked paper ballots are a superior election system. He simply decided, as a policy matter, that the only acceptable election system is hand-marked paper ballots and reasons backward from that conclusion."

Halderman previously agreed that a sufficient audit of a BMD-generated ballot can 'detect and correct' the kinds of hypothetical hacking attacks about which he warns, [Doc. 619-2 at ¶¶ 6-7], he now says that no audit of any BMD system would ever be enough to satisfy him, [Doc. 785-2 at ¶ 51]."[16] There is no contradiction. Both declarations discuss two styles of attack: (1) changing both the barcode and the human-readable text and (2) changing only the barcode. Both declarations explain that the first kind of attack could not be detected by any kind of audit of the printouts, since all the records of the voter's intent would be fraudulent.[17] Both declarations also explain that the second kind of attack *could* be detected with a sufficiently rigorous audit that compared the contents of the barcode to the human-readable text,[18] but, to my knowledge, Georgia has no plans to conduct such an audit.

11. State Defendants falsely claim that "the evidence demonstrates that Georgia's new BMD system is completely separate from the DRE/GEMS systems, down to hand-entry from original source documents[.]"[19] To my knowledge, the only

---

[16] Dckt. 821 at 19.
[17] Dckt. 619-2 at 12; Dckt. 785-2 at 41.
[18] Dckt. 619-2 at 6-7; Dckt. 785-2 at 31-35. I was slightly imprecise in Dckt. 619-2 when I said that a sufficiently rigorous audit could "correct" a barcode-only attack in addition to detecting it. That is only the case if the auditors are somehow able to establish that the barcodes and not the human-readable text have been manipulated, but both would be suspect in the event that the BMDs had been hacked.
[19] Dckt. 821 at 8.

"evidence" for this claim appears to come from Mr. Coomer and Dr. Gilbert, but Dr. Gilbert never examined the Georgia system, and it is unclear what personal knowledge Mr. Coomer has, as there is no evidence he has conducted or participated in an examination of the Georgia system. In any event, neither could know what the workers with access to Georgia's technology are doing day to day, such as connecting USB devices to it that were connected to the prior system or connecting components to the Internet.

12. [redacted]

[20] [redacted]

[redacted]

13. While State Defendants are correct that the "Dominion system has been the subject of penetration testing" in other states,[24] they neglect to point out that this testing revealed a slate of serious vulnerabilities that likely remain unmitigated in the Dominion hardware and software used in Georgia. My previous declaration cites the results of penetration tests commissioned by the California Secretary of State, which found that attackers could modify the Dominion software installation files and "it would be possible to inject more lethal payloads into the installers", that the anti-virus software was insufficient or non-existent, and that the BMDs had

---

[21] Hamilton decl.
[22] The public facing portion of the ENR system is located at https://results.enr.clarityelections.com/GA/
[23] Dckt. 723 at 15 (Throop Decl.).
[24] Dckt. 821 at 10.

vulnerabilities that "would be open to a variety of actors including a voter, a poll worker, an election official insider, and a vendor insider," among other problems.[25]

14. In the context of evidence that I discuss in my previous declarations regarding vulnerabilities in the Dominion equipment uncovered by certification testing in Texas,[26] State Defendants state incorrectly that the security problems "primarily relate to the optical scanners (ICP units), not the BMDs, which Curling Plaintiffs advocate the State continue using."[27] This is misleading. Both Texas and California found serious weaknesses impacting the BMDs, including the use of dangerously obsolete software and means by which the software could be manipulated by attackers. Both also found serious weaknesses impacting the scanners. Vulnerabilities in the BMDs are relevant to the relief that Plaintiffs' seek with respect to the use of hand-marked paper ballots, which are the only practical countermeasure to some BMD-based attacks. Vulnerabilities in the scanners are a threat to Georgia elections however the ballots are marked, and they are relevant to Plaintiffs' requested relief regarding rigorous auditing of the scanners' tallies.

---

[25] Dckt. 785-2 at 21-27.
[26] *Id.* at 19.
[27] Dckt. 821 at 8, fn. 7.

**Status of Forensic Testing**

15. Plaintiffs have asked me to update the Court about the status of the forensic analyses that I am performing on their behalf. My work is still in progress, but there are several preliminary findings I can report.

16. In December 2019, I received a copy of a forensic image created by the FBI of the server at the KSU Center for Election Systems.

17. In late July, I began a limited analysis of log files from approximately 4500 sequestered memory cards from Cobb, DeKalb, and Fulton counties to extract DRE serial numbers for statistical sampling. On August 13, 2020, shortly after the Court granted permission for a forensic examination of the memory cards, I began creating forensic images and have so far imaged around 25% of the cards.

18. On August 25, I received forensic images of the internal memory from six AccuVote-TS DREs from Athens-Clarke County. To facilitate imaging these machines, I created a software patch for the DREs' bootloader software, which a forensic technician programmed into a read-only memory chip and physically inserted into each DREs. On August 30, I received forensic images of three memory cards associated with those DREs.

19. To my knowledge, this is the first time that detailed forensic analysis of large parts of a state-wide DRE system has been conducted. Due to the scope and

complexity of the work, my analysis is necessarily still in an initial phase. I have had to developed specialized software and techniques to efficiently image and analyze the thousands of memory cards and the proprietary data formats of the DRE system.

20. The objective of my analysis is to determine the security posture of the DRE-based system as it was operated in Georgia. Although older and newer versions of the AccuVote DRE software have been shown to suffer from critical exploitable vulnerabilities, forensic analysis allows for direct confirmation that vulnerabilities were present in the specific hardware and software configuration Georgia used. The analysis also allows me to more fully assess what opportunities attackers would have had to spread malware through the Georgia system and manipulate election results.

21. As a secondary objective, the analysis may also uncover evidence that the election system was successfully compromised. However, one of the key deficiencies of paperless voting systems is that successful attacks might not leave forensic evidence, since well designed malware would remove the electronic records of its presence once its task was complete. Although there is a possibility that attackers were careless and did leave some digital traces, absence of evidence cannot support a strong conclusion that the system was not attacked.

22. Moreover, the digital records to which Plaintiffs have access are badly incomplete. Thus far, they have received memory cards from only three counties,

and most of these cards have records from only a single election. Only six DREs have been imaged, all from a single county. Log files from the CES server from before November 10, 2016 were erased prior to the server begin imaged by the FBI, severely limiting forensic visibility into the period of Russia's documented attacks against state election systems in the leadup to the 2016 election.[28] While these data sources provide abundant insight into how the DRE-based system was operated and ways in which it was vulnerable, finding a "smoking gun" proving that a Georgia election result was stolen by hackers is akin to finding the proverbial needle in a haystack, even assuming it occurred and left some trace in the data.

23. Nevertheless, there is evidence that hackers penetrated the system. My initial analysis of the CES server image has confirmed the principal findings that Logan Lamb described in his January 16, 2020 declaration.[29] The most important finding is that the CES server likely was compromised by an external attacker in December 2014. Mr. Lamb describes this evidence in detail.[30] Determining what actions the outside party took on the server is difficult, given the amount of time that elapsed before the server was imaged, but my analysis is ongoing.

---

[28] Suppl. Decl. of Logan Lamb, Dckt. 699-10 at 21-23.
[29] *Id.* at 11.
[30] *Id.* at 13-20.

24. Even if nothing more can be determined about the apparent attack, the evidence shows that the CES server was vulnerable to unauthorized access from the Internet for many years. Additionally, the FBI image shows that the CES server housed security-critical data, including installation files for the BallotStation software that ran on every DRE, the hash verification software that CES ran on its GEMS servers, and election databases. An outside attacker who infiltrated the server and compromised these files could have spread malicious software to the GEMS servers and DREs.

25. My initial analysis of the AccuVote-TS memory images confirms several severe vulnerabilities in the DREs themselves.

26. The bootloader software used in the DREs is version 1.0.2 and dates from June 2002. This software is critical to the DREs' security, since it runs every time they are powered on and controls sensitive operations such as loading the operating system and installing software updates. That it was not updated for 18 years demonstrates that Georgia's DRE systems were subject to an even wider range of vulnerabilities than had been previously established.

27. The version of the BallotStation election software installed on the DREs is 4.5.2!, which displays a 2004 copyright date. This confirms that the Georgia BallotStation software was not materially updated since that time.

28. The installed BallotStation software matches the contents of the installer file "BS_CE-TSR6-4-5-2!-DS.ins" found on CES's Internet-facing server. This is consistent with the assertion that copies of the software to be installed on the DREs were stored on the vulnerable CES server, where they could have been modified by an attacker. Although I have thus far been unable to determine whether the installation files on the server were modified by attackers, they had the opportunity to do so.

29. By analyzing the bootloader and BallotStation software, I have so far been able to confirm the presence of several critical vulnerabilities.

a) The vulnerability discovered by Harri Hursti in 2006 and described by Michael Shamos as "one of the most severe security flaws ever discovered in a voting system" is present in the DREs software that was used in Georgia until this year.

b) The vulnerabilities I exploited in a 2007 study to create vote-stealing malware that spreads from machine-to-machine as a computer virus[31] is present in the DREs software that was used in Georgia until this year.

---

[31] Ariel J. Feldman, J. Alex Halderman, and Edward W. Felten, "Security Analysis of the Diebold AccuVote-TS Voting Machine," in *Proc. USENIX/ACCURATE Electronic Voting Technology Workshop* (2007).

c) The vulnerability I exploited to demonstrate a vote-stealing attack to the Court in 2018 is present in the DREs software that was used in Georgia until this year.

30. All the memory cards and DREs I have analyzed use the same encryption key, `F2654hD4`. This is the default encryption key that was installed on the AccuVote DREs at the factory. It was publicly revealed by security researchers in 2003.[32]

31. Changing the encryption key to a different, secret value would have been straightforward for the state, but Georgia instead continued to use the manufacturer's default key for 17 years after that key was leaked to the public. Since the key was publicly known during that period, all confidentiality and integrity protections provided by the cryptography were completely negated. For instance, anyone with access to the memory cards could have read or modified any of the election data they contained.

32. The election log files from the county memory cards record that those cards were used in 1945 separate DREs in Cobb County, 1982 in DeKalb County,

---

[32] Tadayoshi Kohno, Adam Stubblefield, Aviel D. Rubin, and Dan S. Wallach, "Analysis of an Electronic Voting System," in *IEEE Symposium on Security and Privacy* (2004), § 4.4. Available at https://avirubin.com/vote.pdf.

and 2123 in Fulton County. Analysis of the logs shows that all three counties engaged in practices that would have facilitated spreading viral malware throughout their election systems.

a) County workers sometimes reused the same card in hundreds of machines for testing and training purposes. For example, in DeKalb, one memory card was sequentially inserted into at least 288 DREs. If any of those DREs was infected with viral malware, the malware could have spread to the other DREs during this operation by exploiting the confirmed vulnerabilities I discuss above.

b) In each of Fulton and Cobb counties, a single DRE was used to process data from more than a thousand different cards. If that DRE was infected with malware, it could have spread directly to over a thousand other DREs.

c) Each county used only a small number of DREs to program memory cards from the GEMS server. In Fulton, every election represented in the log files was prepared using one of only 17 machines; in Cobb, 28 machines; and in DeKalb, 28 machines. These DREs would provide a centralized point from which to launch an attack. If they were infected

with malware, the malware could have spread directly to all other DREs in the counties.

33. Despite the assertion that Georgia operated a uniform voting system across all counties, the three counties represented in my analysis had starkly different practices for maintaining their memory cards. This indicates that counties developed their own *ad hoc* processes for important security tasks. Some of these county-specific processes would have further facilitated the spread of malware.

d) Although Fulton and DeKalb counties appear to have erased their cards before each election, Cobb County did not, and some cards I examined contained election data from as long ago as 2004. This failure to erase the cards means that if they were infected, malware could continue to spread to new machines for many election cycles.

e) DeKalb County appears to have erased cards by overwriting them with the contents of other cards—most likely by using a machine designed for duplicating the cards. Around 8% of the DeKalb cards I have analyzed so far are identical to other DeKalb cards. This practice could rapidly spread malware if the cards used as a source for the duplication were infected.

34. The log files from the memory cards record hundreds of instances of technical malfunctions, including data corruption, software crashes, and machines freezing and needing to be restarted during voting. There also appear to be frequent instances of human error and procedural deviation, such as failing to correctly perform logic and accuracy testing.

35. These findings directly confirm the vulnerability of the DRE system and reveal additional ways that malware could have spread through it, beyond those already in evidence. Since my analysis is still in an early stage, it is likely that additional problems will be uncovered as the work proceeds.

**Rebuttal of Declaration of Jack Cobb[33]**

36. Mr. Cobb gives only a partial history of certification tests that apply to Georgia's Dominion equipment.[34] His company, Pro V&V, appears never to have performed penetration testing on the Dominion equipment nor any security testing on the version of the Dominion system used in Georgia (5.5A). Although he states that his company performed certification tests for the U.S. Election Assistance Commission ("EAC") for version 5.5 of the software, EAC certification testing

---

[33] Decl. of Jack Cobb (Aug. 25, 2020), Dckt. 821-6.
[34] *Id.* at 5.

involves only limited security evaluation and not penetration testing. I find it interesting that Mr. Cobb points to security tests performed by another company, SLI Compliance, as part of certification testing for Pennsylvania, but that he neglects to point to later tests performed by the same company for California, which found a number of serious vulnerabilities.[35] I discuss these vulnerabilities and their impact in my previous declaration.[36] I also find it interesting that despite the fact that Pro V&V had never performed penetration testing of the Dominion system, the Secretary of State hired Pro V&V to perform certification tests for the State of Georgia.[37]

37. In reference to my August 19, 2020, declaration, Mr. Cobb opines that I "clearly [do] not understand the specific setup and nature of the Dominion system or its security features."[38] His first example concerns the QR codes (barcodes) printed on the BMD ballots. Based on his company's role in certifying the Dominion system for the EAC and the State of Georgia, I would expect Mr. Cobb to have a detailed technical understanding of these barcodes, which are central to the security

---

[35] California Secretary of State's Office of Voting Systems Technology Assessment, "Dominion Voting Systems Democracy Suite 5.10 Staff Report" (Aug. 19, 2019) at 29, https://votingsystems.cdn.sos.ca.gov/vendors/dominion/dvs510staff-report.pdf.
[36] Decl. of J. Alex Halderman (Aug. 19, 2020), Dckt. 785-2 at 21-27.
[37] Cobb decl. at 6.
[38] *Id.* at 9.

of votes cast using Dominion BMDs. Indeed, Mr. Cobb states that during the limited testing that his company conducted for the Secretary of State, "Pro V&V also verified the contents of the QR code which includes a digital signature and is encrypted."[39] He later states that, "In this system, the election files, including the QR codes, are digitally signed and encrypted."[40]

38. These technical claims about the Dominion QR codes used in Georgia are entirely wrong. Based on my own analysis of the QR codes from ballot images provided by Fayette County during discovery, which I understand to be scans of ballots cast during the June 9, 2020 election, no portion of the QR codes is encrypted.[41] I am prepared to demonstrate that the contents can be read and understood without the use of a secret key, thus proving they are not encrypted.

39. Moreover, Dominion QR codes do not include a digital signature, but rather what is known as a message authentication code ("MAC"). A MAC provides

---

[39] *Id.* at 6.
[40] *Id.* at 9.
[41] In my previous declaration, I myself incorrectly described the QR codes as "encrypted" (Dckt. 785-2 at 7(a), 32). My understanding at the time, before I had received a Georgia BMD ballot with which to conduct my own tests, was based on the California Secretary of State's test report. California Secretary of State's Office of Voting Systems Technology Assessment, "Dominion Voting Systems Democracy Suite 5.10 Staff Report" (Aug. 19, 2019): "The QR code is encrypted" (p. 14); "The ICX ballot marking device uses an encrypted QR code" (p. 28).

somewhat similar protections to a digital signature but is weaker in important aspects. The distinction between digital signatures and MACs is an elem-entary concept that I regularly test students about in introductory security classes.

40. Mr. Cobb's errors about these basic facts regarding the Dominion system and its security are troubling. They lead me to believe either that Mr. Cobb does not understand the specific setup and nature of the Dominion system or its security features, that he is not telling the truth when he states that his laboratory "verified the contents of the QR code" while testing the system for Georgia, or that Pro V&V's tests of critical aspects of the system were poorly conducted.

41. Mr. Cobb goes on to imply that the Dominion voting system software cannot be altered by attackers without detection, because the BMDs have "a built-in feature that will generate a SHA-256 hash value at any point before and during voting to allow for easy checks to determine if it matches with Georgia's version."[42] This view again reflects a misunderstanding of fundamental security concepts, such as what hash values are and how they can be used to verify the integrity of software.

42. In the security field, a hash value is a number that is calculated based on the contents of a file by applying an algorithm that is designed so that it is

---

[42] Cobb decl. at 7.

extremely difficult for an attacker to generate another file with different content that yields the same hash value. Given two files, I can apply a hash algorithm to compute the hash value of each file, and if the hash values are identical, I can conclude that the files' contents are also identical.

43. The scenario Mr. Cobb describes is completely different. Instead of Mr. Cobb calculating the hash values of the files on the BMD, he describes a scenario where the software on the BMD calculates *its own* hash value, which is then compared to the hash value of the software that is supposed to be installed—in essence, asking the BMD itself whether it is malicious. This is akin to a bouncer asking bar patrons to card themselves. If the BMD *has* been attacked and is running malicious software, that software can simply lie about its hash value.

44. Hash values are not trustworthy if the system used to compute and display them is compromised. In this case, the software running on the BMD is computing and displaying its own hash. If the software has been compromised because the machine has been infected with malware, the compromised software could display whatever hash the attacker has programmed—including the hash of the uncompromised software. This mechanism may have utility for administrative compliance (e.g., checking which version of the software is supposedly installed), but it has little or no value for deterring attacks.

45. Mr. Cobb also says his firm helped Georgia "perform acceptance testing of each BMD using a hash value. This ensured that the BMD had not been altered and had the correct software installed at the time it was accepted by the State."[43] Here, acceptance testing refers to checking the hash of the software on the machine at the time it is delivered from the manufacturer. Mr. Cobb does not specify the procedure he used to conduct these tests, but verifying the integrity of software running on an embedded device such as the ICX BMD is difficult to do securely. If there is already malware on the device, that malware can conceal its presence from other software using what is known as a rootkit. Therefore, computing hash values on the device itself is not a reliable method of acceptance testing. Nor can one simply remove the storage medium and hash it using a trusted computer, since the flash storage chips in the ICX are permanently integrated into the circuitry. In any event, Mr. Cobb only describes checking the integrity of the BMD software when the BMDs were first delivered, so this testing could not prevent the software from being altered later by attackers. Nor could it detect any subsequent attack.

46. Mr. Cobb also mistakenly concludes that "[i]f a QR code was somehow manipulated on the BMD (which I have never seen occur in any context using the

---

[43] *Id.* at 8.

Dominion system), the digital signature would also be altered and it would not be accepted by the scanner." Again, the QR codes do not contain a digital signature, but rather a MAC. Even then, the data protected by the MAC is the same in every ballot that has the same votes. This means, for example, that an attacker can simply duplicate the QR code from a ballot with votes he favors in order to produce another ballot with those same votes that will be accepted and counted by the scanner. This is an important security flaw that Pro V&V should have been aware of after reviewing the contents of the QR codes. Dominion could have designed the QR codes in a way that would have allowed the scanners to detect and prevent such duplication, but did not do so.

47. Mr. Cobb goes on to imply that malware cannot be spread to scanners or BMDs from the election management system ("EMS"), because "the election files, including the QR codes, are digitally signed and encrypted," and if the digital signatures do not match, "decryption fails and nothing is loaded on the machine."[44] Once again, this assertion is technically nonsensical, even aside from the fact that the QR codes are neither signed nor encrypted. Although the ballot programming that workers copy to the BMDs and scanners from the EMS may be encrypted and

[44] *Id.* at 10.

signed, this has no relevance to whether malware can spread from the EMS as part of those files. The EMS *generates* the ballot programming files. Therefore, malware running on the EMS could arbitrarily alter their contents before the encryption and signatures are applied, ensuring that the BMDs would accept the files as genuine.

48. In a similar vein, Mr. Cobb asserts that, "If a QR code was somehow manipulated on the BMD [...], the digital signature would also be altered and it would not be accepted by the scanner."[45] This is, again, nonsense. First, the QR code contains a MAC rather than a digital signature. A MAC is a number that works similarly to a hash, except that its value can only be computed with knowledge of a secret key. Each QR code contains a MAC of the vote data that is computed using a secret key that is shared by the BMD and the scanner. The scanner reads the QR code, extracts the vote data and MAC, and uses the secret key to compute the correct MAC of the vote data. If the MAC from the QR code is different from the computed MAC, the scanner should reject the ballot.

49. This implies that in order to print *any* ballots that the scanner will accept, the software on the BMD must have access to the secret key. Therefore, if the BMD is infected with malware that modifies the operation of the software, the

---

[45] *Id.* at 11.

malware too will have access to the secret key, and will be able to generate QR codes that the scanner will accept as valid for whatever ballot choices the attacker prefers.

**Rebuttal of Declarations of Juan E. Gilbert**

50. State Defendants have refiled a declaration from Dr. Juan E. Gilbert November 13, 2019.[46] I respond to Dr. Gilbert's assertions in my declaration of December 16, 2019.[47]

51. In a brief supplemental declaration, Dr. Gilbert makes several additional statements that require clarification.[48]

52. Dr. Gilbert correctly notes new SEB rules require poll workers to verbally instruct voters to review their ballots.[49] As Dr. Gilbert points out, my own peer-reviewed research measured the effect of such instructions on verification and error detection rates and found them to have a small positive effect. However, even with such instructions, voters failed to detect about 86% of errors on BMD printouts (vs. 93% without instructions). As my study explains, voters would have to verify

---

[46] Decl. of Juan E. Gilbert, Dckt. 821-2, originally 658-3.
[47] Decl. of J. Alex Halderman (Dec. 19, 2019), Dckt. 682 at 16, 38-49.
[48] Supp. Decl. of Juan E. Gilbert, Dckt. 821-7.
[49] *Id.* at 7(A).

their ballots much more carefully than that in order to reliably detect outcome-changing fraud in close elections.

53. Dr. Gilbert also notes that SEB rules require reminding voters that a sample ballot is available to help with verification. My study suggests that voters who use a sample ballot do detect errors more reliably. However, the gain will be limited to the fraction of voters who can be induced to use a sample ballot. I am not aware of any research that shows verbal reminders are effective in this regard, and I would be surprised if they were.

54. Dr. Gilbert highlights a new SEB rule that holds that if, in any recount or audit, "a discrepancy is found between the voter's choice indicated by the printed text on the ballot and the result tabulated by the ballot scanner, the printed text shall control and be counted."[50] However, this rule does not provide an effective defense against BMD misprinting attacks. An attacker could cause a BMD to alter both the barcodes read by the scanners and the human readable text, in which case there would be no disagreement. And if there were a discrepancy between the barcodes and the human-readable ballot text, the reliably of both records would be in doubt, because either might have been altered.

---

[50] *Id.* at 7(B).

55. Dr. Gilbert cites a recent study by Byrne and Whitmore, which I also cite in my previous declaration.[51] Byrne and Whitemore's results are generally in agreement with my own BMD research (although, unlike my study, theirs has not been peer reviewed). Both studies find that few voters are likely to spot errors on BMD printouts. Of 108 participants who voted on a hacked BMD, Byrne and Whitemore report that only 17.5% detected alterations to the printout. This average includes both voters who were heavily primed to review their ballots through repeated verbal and written instructions and voters who were not. Unsurprisingly, the study finds that verification performance is much better among voters who actually examine their ballots, but the fact remains that only 23% of their subjects did so. This is further evidence that voters do not reliably detect errors on BMD printouts.

56. Dr. Gilbert questions why I "make no mention of interventions which foster higher review rates."[52] As I have discussed, the magnitude of the improvements that have been measured by these studies for practical kinds of interventions are simply too small to reliably uncover cheating in close elections.

---

[51] *Id.* at 8-11.
[52] *Id.* at 11 and 13.

57. Dr. Gilbert's assertion that barcode manipulation attacks could occur with hand-marked paper ballots defies common sense.[53] Although timing marks or the placement of vote targets could be manipulated, this kind of problem would be detected during routine logic and accuracy testing. Election workers would simply need to perform L&A testing with one ballot and flip through the remaining stack of blank ballots to verify that they are all the same.

58. Dr. Gilbert argues that BMD barcode manipulation attacks are "an unlikely avenue for a bad actor since, as other scholars have recently noted, such an attack is unlikely to go undetected in a jurisdiction conducting RLAs[.]"[54] The only scholar Dr. Gilbert cites for this proposition is Dr. Dan Wallach, who, like Dr. Gilbert, is the creator of a BMD system that use barcodes. The proposition is incorrect. While it is true that "an audit which recognizes a single inconsistent barcode/text combination would signal a significant problem", in order to find even a single inconsistency, the audit would have to sample at least one manipulated ballot *and* actually compare the barcode to the text. Georgia has announced no plans to inspect the barcodes during its intended audits. Even if it did, the proposed Georgia RLA is designed to target only a single race to be selected by the SOS every two

---

[53] *Id.* at 12.
[54] *Id.* at 12.