years. There is no assurance that it will select enough ballots to uncover barcode-based cheating in races that are not targeted. For instance, if the Democratic Presidential Preference Primary had been selected for audit statewide (as it was in Fulton county), the probability that the audit would have detected barcode-based fraud sufficient to change the outcome of another state-wide race with a 1% margin of victory would be only around 30%, and that's under the counterfactual assumption that the auditors decoded the barcodes. In elections where no RLA was conducted (as in every election but the November general election in even years), the probability would be 0%.

59. Contrary to Dr. Gilbert's repeated implications, the issue is not whether interventions can improve voter verification rates *at all*, but whether they can ensure that *sufficiently many* voters carefully review their ballots.[55] The effectiveness of verification for detecting attacks increases dramatically only when the rate of verification is high. When the rate is low, as appears to be the case based on a growing number of studies, small increases (like those my study found were achieved by instructing voters to verify their ballots) have little utility.

---

[55] *Id.* at 13.

60. Moreover, the security of Georgia's voting system depends on whether voters are likely to spot errors when using the actual BMDs operated by the state—not theoretical future BMDs with transparent screens like those conceived by Dr. Gilbert or hypothetical interventions that somehow raise voters' verification performance well beyond the levels measured thus far. In fact, that Dr. Gilbert sees a need for such BMDs seems to indicate that he recognizes the unreliability of the ballots generated by the BMDs used in Georgia, lest there would be no need for transparent screens.

61. Dr. Gilbert and I agree that scanners can be hacked and that rigorous RLAs are necessary.[56] However, he fails to acknowledge that BMDs, particularly when they are used as the primary method of voting, as in Georgia, create a second place, in addition to the scanners, where outcome-changing attacks could succeed, multiplying the opportunities for attackers. In the absence of rigorous audits of a kind not now contemplated in Georgia, barcodes greatly magnify this risk. Dr. Gilbert does not seem to seriously dispute either claim.

---

[56] *Id.* at 14.

## Rebuttal of Declaration of Mark Riccobono

62. State Defendants have refiled a declaration from Mark Riccobono, president of the National Federation of the Blind, dated August 1, 2019.[57] I respond to Mr. Riccobono's assertions in my declaration of December 16, 2019.[58]

## Remarks on Declaration of David Hamilton[59]

63. [redacted]

64. [redacted]

[57] Decl. of Mark Riccobono, Dckt. 821-8, originally 658-4.
[58] Decl. of J. Alex Halderman (Dec. 19, 2019), Dckt. 682 at 34-37.
[59] [redacted]
[60] [redacted]
[61] [redacted]

65. [redacted]

66. [redacted]

67. [redacted]

62 [redacted]

63 [redacted]

[redacted]

68. [redacted]

---

[64] As the Court noted, the "assessment of the eNet voter registration systems and database rang serious alarm bells." Dckt. 579 at 76.

[65] Dckt. 579 footnote at 74. "On July 1, 2019 the SOS took over hosting eNet's voter registration database that creates the express pollbooks, but continued its

[redacted]

I declare under penalty of the perjury laws of the State of Georgia and the United States that the foregoing is true and correct and that this declaration was executed this 1st day of September, 2020 in Rushland, Pennsylvania.

J. ALEX HALDERMAN

contract with PCC for licensed use of the PCC software and for PCC's maintenance and support of the PCC application."

66 [redacted]

67 [redacted]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **DECLARATION OF**<br>**J. ALEX HALDERMAN**<br><br>**Civil Action No. 1:17-CV-2989-AT** |

Pursuant to 28 U.S.C. § 1746, J. ALEX HALDERMAN declares under penalty of perjury that the following is true and correct:

1. I hereby incorporate my previous declarations as if fully stated herein. I have personal knowledge of the facts in this declaration and, if called to testify as a witness, I would testify under oath to these facts.

2. I have reviewed the expert disclosures prepared by Dr. Juan Gilbert and Dr. Benjamin Adida for State Defendants. Neither Dr. Gilbert not Dr. Adida offers any rebuttal to the numerous, critical vulnerabilities in Georgia's BMDs that I described in my July 1, 2021 expert report. Dr. Adida did not respond to my report at all; State Defendants reissued prior declarations from him previously provided in this litigation. Neither of them disputes the presence of any of the serious

vulnerabilities I detail in my report or the steps I describe for exploiting those vulnerabilities to alter individual votes and election outcomes in Georgia. Nor does either of them claim to have examined any of the voting equipment used in Georgia to evaluate whether the vulnerabilities I identified—or others—have been exploited in any past election. Although each of them presumably could do this with the permission of State Defendants, who I understand engaged them as experts in this case, there is no indication either has undertaken any such inquiry or asked to do so. As a result, neither Dr. Gilbert nor Dr. Adida has anything to say about the reliability of the voting equipment used in Georgia elections. This is surprising, given that they have had at least the last year to examine Georgia's voting equipment.

3. State Defendants urgently need to engage with the findings in my report and address the vulnerabilities it describes before attackers exploit them. Nothing in Dr. Gilbert's or Dr. Adida's responses indicates that State Defendants understand the seriousness of these problems or have taken any measures to address them and their implications for the Plaintiffs' individual votes in future elections. Established practice in the security field would require State Defendants to promptly subject Georgia's voting system to rigorous testing in response to my report, to assess the extent and significance of each of the vulnerabilities I described, and to identify and *promptly implement* specific measures (where possible) to eliminate or mitigate each

of those vulnerabilities. Neither Dr. Gilbert nor Dr. Adida indicates any such efforts on their own part or on the part of State Defendants or anyone else. Again, Dr. Adida did not respond to my report.

4. In my report—a 25,000-word document that is the product of twelve weeks of intensive testing of the Dominion equipment provided by Fulton County—I find that Georgia's BMDs contains multiple severe security flaws. Attackers could exploit these flaws to install malicious software, either with temporary physical access (such as that of voters in the polling place) or remotely from election management systems. I explain in detail how such malware, once installed, could alter voters' votes while subverting all the procedural protections practiced by the State, including acceptance testing, hash validation, logic and accuracy testing, external firmware validation, and risk-limiting audits (RLAs). Finally, I describe working proof-of-concept malware that I am prepared to demonstrate in court.

5. My report concludes, *inter alia*, that Georgia's BMDs are not sufficiently secured against technical compromise to withstand vote-altering attacks by bad actors who are likely to target future elections in the state; that the BMDs' vulnerabilities compromise the auditability of Georgia's paper ballots; that the BMDs can be compromised to the same extent as or more easily than the DREs they replaced; and that using these vulnerable BMDs for all in-person voters, as Georgia

does, greatly magnifies the level of security risk compared to using hand-marked paper ballots and providing BMDs to voters who need or request them.

**Reply to Declaration of Dr. Juan Gilbert**

6. Rather than engage with the facts in my report, Dr. Gilbert responds largely with vague generalities. He gives no indication that he has ever used an ICX BMD, let alone tested its security. He begins by conceding that "any computer can be hacked," but he contends that "this general statement is largely irrelevant," because hand-marked paper ballot systems use computers too (to scan the ballots) (¶ 6). His position is inconsistent with accepted standards for election security and with the facts of the particular voting system used in Georgia.

7. My testing has shown that the BMDs used in Georgia suffer from specific, highly exploitable vulnerabilities that allow attackers to change votes despite the State's purported defenses. There is no evidence that Georgia's ballot scanners suffer from the same extraordinary degree of exploitability, nor does Dr. Gilbert contend they do. He ignores the relative ease with which Georgia's BMDs can be hacked, including by a voter in a voting booth in mere minutes. That extreme difference in security as compared to other voting technologies, particularly hand-marked paper ballots, is far from "irrelevant" as Dr. Gilbert implies.

8. Furthermore, even if the scanners were just as insecure as the BMDs, Georgia's practice of requiring essentially all in-person voters to use highly vulnerable BMDs would needlessly give attackers *double* the opportunity to change the personal votes of individual Georgia voters, since malware could strike either the BMDs or the scanners. Accepted standards in election security compel reducing points of attack for bad actors, not unnecessarily expanding them—a point Dr. Gilbert ignores.

9. Lastly, Dr. Gilbert also ignores that accepted election security protocols include an effective measure to protect against hacks of ballot scanners when the ballots are hand-marked rather than generated by BMDs—namely, reliable risk-limiting audits (RLAs), which would have a high probability of detecting any outcome-changing attack on the scanners. Not only do Georgia's BMDs defeat the efficacy of RLAs, but Dr. Gilbert continues to ignore the fact that Georgia requires an RLA of just one statewide contest every two years (and, to my knowledge, has not adopted specific, adequate procedures to ensure a reliable RLA for that one audit every other year).

10. Dr. Gilbert goes on to discuss issues related to voter verification of BMD ballots (which I respond to below). Yet he fails to address the potential for attackers to cheat by changing only the QR codes printed by Georgia's BMDs.

Voters cannot read the QR codes, but they are the only part of the ballots that the scanners count. My report details several routes by which malicious hardware or software can manipulate the QR codes and cause the recorded votes to differ from voters' selections. In principle, a rigorous risk-limiting audit would be likely to detect such an attack if the attacker changed enough votes to alter the outcome of the contest being audited, but again Georgia rules require such an audit in only a single statewide contest once every two years. As my report explains, this leaves the vast majority of elections and contests in Georgia vulnerable to QR code (and others) attacks, yet Dr. Gilbert says nothing about this threat.

11. Instead, Dr. Gilbert focuses exclusively on a different threat: attacks that change *both* the QR codes and the ballot text. In addition to the barcode-only attacks I just discussed, my report demonstrates that Georgia's BMDs can be manipulated so that both the barcodes and the printed text indicate the same fraudulent selections. No audit or recount can catch such fraud, because all records of the voter's intent would be wrong. The only reliable way to detect it would be if enough voters carefully reviewed their ballots, noticed that one or more selections differed from their intent, and reported the problems to election officials, *and* if Georgia officials then discerned from the pattern of voter reports that the BMDs were systematically misbehaving. Thus, Dr. Gilbert is mistaken when he contends that the distinction

between "voter-verifiable" and "voter-verified" paper ballots "only matters in principle" (¶ 7). All BMD ballots are potentially voter-verifiable, but unless enough BMD ballots are actually voter-*verified*, BMD-based attacks could alter election outcomes even in the rare instances where the State conducts a risk-limiting audit. And unless *every* BMD ballot is actually voter-*verified*, BMD-based attacks could alter individual voters' selections without detection..

12. A large body of recent scientific evidence has established that few voters are likely to catch errors caused by malicious BMDs. I have reviewed this evidence in previous declarations.[1] It comes from both field observations (which report how long real voters review their ballots during real elections) and laboratory tests (which report the fraction of errors that subjects detect when voting on hacked BMDs in simulated elections). These methodologies are complementary, and results to-date from all studies of both kinds point to a low rate of voter-verification.

13. Dr. Gilbert criticizes field observations because "[t]ime spent reviewing a ballot has little to do with whether it was actually verified" (¶ 9). This claim is inconsistent with accepted election security principles. Of course, they are not exactly the same question, but obviously the time spent reviewing a ballot can

---

[1] *Halderman decl.* (Dec. 16, 2019), Dkt. 682 at 23-33; *Halderman decl.* (Sept. 1, 2020) Dkt. 855-1 at 6-8, 55.

provide important insight into whether it was likely verified. For example, we can conclude that a voter who spends only a second or two reviewing a lengthy, complicated ballot is unlikely to have reliably verified each of their selections on the ballot. And of course, the same is true for a voter who spends no time at all reviewing their ballot. Review time is both practical to measure and clearly correlated with the error detection success, making it a valuable and relevant metric, as multiple studies confirm.

14. Dr. Gilbert seems to contend, without evidence, that a casual glance is sufficient to review Georgia-style ballots because selections are printed together with party affiliations (¶ 9). He cites no research (and I am unaware of any) that supports this conclusion, particularly when, as in Georgia, the party affiliations are printed in small type and in a different horizontal position for each contest. A real BMD ballot is reproduced on page 15 of my expert report. This is just one example of such a ballot; they can be longer and more confusing. Dr. Gilbert provides no basis for believing that voters would likely catch deliberate errors caused by compromised BMDs when voting such a ballot.

15. Dr. Gilbert references my award-winning peer-reviewed study about voter verification behavior, which found very poor rates of error detection and

reporting in a mock election using BMDs that my team hacked (¶ 10).[2] He contends that my study "ignores the reaction to such manipulation in an actual election, particularly one as heated in the public domain as the 2020 Election." (¶ 11). He does not explain how or why such circumstances would be expected to materially increase voter verification of their respective BMD ballots, nor does he cite any support for his claim to believe they would. And, just last week, the Atlanta Journal-Constitution obtained a study (under the Georgia Open Records Act) commissioned by the Secretary of State's Office in which researchers from the University of Georgia observed Georgia voters during the November 2020 election and reported how long they spent reviewing their BMD ballots.[3] Although it appears the Secretary of State had this study at the time of Dr. Gilbert's response to my report, he does not address or acknowledge it. The new study suggests that voters in the real world review their ballots *even less carefully* than voters in recent laboratory studies—despite the reminders election workers are supposed to give them to carefully review

[2] Matthew Bernhard, Allison McDonald, Henry Meng, Jensen Hwa, Nakul Bajaj, Kevin Chang, and J. Alex Halderman, "Can Voters Detect Malicious Manipulation of Ballot Marking Devices?" In *41st IEEE Symposium on Security and Privacy* (May 2020). Available at https://ieeexplore.ieee.org/document/9152705.

[3] Mark Niesse, "Under half of Georgia voters checked their paper ballots, study shows," *Atlanta Journal-Constitution* (July 27, 2021). Available at https://www.ajc.com/politics/under-half-of-georgia-voters-checked-their-paper-ballots-study-shows/6HSVHHFOBRBDPODRZXLIBTUS64/.

their ballots at the polling sites, which Dr. Gilbert emphasizes as a remedy for poor voter verification of BMD ballots.[4]

16. The University of Georgia researchers report that 20% of voters they observed did not check their ballots at all.[5] Only about 49% examined their ballots for at least one second, and only 19% did so for more than five seconds. This is significantly worse performance than observed in my study, which found that when voters were verbally prompted to review their ballots before casting them, as should occur in Georgia, 63% of voters reviewed their ballots for only *two* seconds or more, compared to 19-49% in the new study.

17. This suggests that laboratory studies like mine tend to *overestimate* the rate at which real Georgia voters would detect errors on their BMD ballots. Since real Georgia voters were observed to review their ballots even less carefully than the

---

[4] Secretary Raffensperger appears to disagree with Dr. Gilbert about the value of measuring voter review time for assessing voter verification performance. He told the Atlanta Journal-Constitution that the new study "shows voters do indeed review their ballots for accuracy before casting them" and offers "proof the votes that were counted were for the candidates the voters intended." (*Id.*). I agree that the new study provides valuable insights about voter behavior, but, contrary to the Secretary's pronouncements, the results indicate that real Georgia voters are even less likely to detect errors caused by compromised BMDs than previous studies have suggested.

[5] Audrey A. Haynes and M.V. Hood III, "Georgia Voter Verification Study" (January 22, 2021). Available at https://s3.documentcloud.org/documents/21017815/gvvs-report-11.pdf.

participants in my study, it is reasonable to infer that real voters would catch an even smaller fraction of errors. The participants in my study who were similarly prompted to review their ballots caught 14% of errors. Therefore, real voters in Georgia are likely to catch substantially less than 14% of errors.

18. How often would voters have to detect errors on their BMD ballots to effectively safeguard against attacks? The answer depends on the margin of victory, since an outcome-changing attack would need to change fewer votes in a close contest. The model from my study shows that, given the margin of victory from the 2020 Presidential contest in Georgia, voters would need to have detected 46% of errors for there to be even one error report per 1000 voters, under a hypothetical scenario where the election outcome had been changed by hacked BMDs.[6] The University of Georgia observations show that barely 49% of voters looked at their ballots for even a second, let alone studied them carefully enough to reliably spot errors.

---

[6] To reiterate, the November presidential race was the only state-wide contest subjected to a risk-limiting audit. In other contests, attackers could change the outcome by tampering with only the ballot QR codes, and voters would have no practical way to detect this manipulation regardless of how diligently they reviewed their ballots.

19. Dr. Gilbert performs a similar calculation using the baseline error detection rate measured in my study. He finds that an outcome changing attack on Georgia's Presidential contest would have resulted in only 832 voters noticing that their BMD ballots showed the wrong selection. Dr. Gilbert suggests that there have not been such complaints from any voters, and says he finds it implausible that so many voters would have "simply not said anything or otherwise simply corrected their ballot and thought nothing of it then or since" (¶ 12).

20. This is an oddly constructed hypothetical, since Curling Plaintiffs do not claim here that the Presidential outcome was altered by hacking the BMDs. And Dr. Gilbert does not indicate any effort to determine the total number of spoiled ballots in Georgia's Presidential contest, which he presumably could have explored with State Defendants. Neither does he provide any basis to believe there were only 832 or fewer spoiled ballots. But suppose for the sake of argument that the Presidential election outcome in Georgia had been altered by hacking the BMDs, and there *were* complaints from the 832 voters that Dr. Gilbert has calculated. What then? It seems all but certain that these complaints would have been dismissed or drowned out in the cacophonous aftermath of the election or simply disregarded by election workers at the polling sites as voter errors. Yet the official count, the risk-limiting audit, and the recount would all have found the wrong winner, and there would be no

way to recover any altered vote or correct the election outcome short of rerunning the election. With a mere 832 complaints among 5 million participating voters (amidst a sea of other complaints, real and imagined), it is unlikely that poll workers or election officials, including State Defendants, would realize or even suspected there was a systemic problem with the BMDs, and it is completely implausible that they would take the drastic but necessary step of asking Georgians to vote again. Georgia's election system is susceptible to this extraordinary risk as long as it remains vulnerable to the attacks I described in my report (and potentially others).

21. To get to the point of making a decision to rerun an election, State Defendants (among others, perhaps) would first need to know how many voters discovered a problem when verifying their ballots. As Dr. Gilbert points out, the number of spoiled BMD ballots provides an upper bound on the number of voters who discovered and corrected an error (¶ 12). He does not say how many spoiled ballots there actually were in November 2020. If State Defendants knew the number was less than 832, they likely would have shared this fact with Dr. Gilbert, and he would have stated it in his report. It is reasonable to infer that either there were more than 832 spoiled ballots (and the attack is plausible) or State Defendants *do not know* how many BMD ballots were spoiled during the election, eight months later, despite

what Dr. Gilbert acknowledges those ballots would suggest about the reliability of the election.

22. That State Defendants may not know this information is consistent with gaps in other important election data that Georgia counties report to the Secretary of State. State Defendants recently produced electronic data (election projects) that I understand were required to be returned to them by counties after the November 2020 and January 2021 elections. In both elections, a large fraction of counties failed to return any data, returned the wrong data, or omitted data necessary for assessing the security and integrity of the result, such as election databases or ballot images. More than six months after these elections, the Secretary of State has not been able to assemble these electronic records and has not indicated any effort or willingness to do so. Yet the only way that State Defendants could use the number of spoiled ballots as a defense against BMD-based cheating would be if the poll workers accurately tracked it, counties accurately aggregated it, and the Secretary's Office received such data from across the state before the election result was determined. Even then, it is unlikely that the Secretary would be prepared to react by *rerunning the election* if the number of spoiled ballots exceeded the number predicted in an outcome-changing attack.

23. Given the ineffectiveness of such defenses and the critical security problems in Georgia's BMDs, I (like Dr. Appel) recommend that BMDs be reserved for voters who need or request them, as is the case in most states. Dr. Gilbert responds by claiming, without evidence, that "[d]isabled voters are even less likely to identify an error on their printed ballot" (¶ 14). I am unaware of any study that supports this sweeping indictment of voters with disabilities, which encompasses a vast array of disabilities that would not impact the ability of the voter to identify an error on their printed ballot in any way. He also contends that blind voters cannot detect errors on their ballot at all, but this is not true. Many blind voters use assistive technology to read printed text and likely could do so to verify their ballots. Moreover, only some voters who need BMDs are blind. For instance, those with motor impairments that prevent them from marking a ballot by hand would not necessarily have any greater difficulty verifying the printed text than any other voter. In any case, if BMDs are used primarily by voters with disabilities (as in most jurisdictions that use BMDs), they will represent a *much* smaller target,[7] and an

---

[7] Although Dr. Gilbert cites a figure that would imply that 10% of Georgians who voted in 2020 were disabled, data from Maryland, where BMDs are available upon request, suggests that only about 1.8% of voters would request to use BMDs if they were offered a hand-marked ballot first. (*Halderman decl.*, Aug. 19, 2020, Dkt. 785-2 at 49.) Dr. Gilbert's citation to the number of all Georgia voters with disabilities is highly misleading since, again, very few of those voters would be

outcome-changing attack on any given election will be detectable with a much lower rate of voter error detection than when all in-person voters use BMDs as they do in Georgia today. This in turn creates a strong disincentive for bad actors to attempt hacking an election (the risk likely is not worth the reward when the outcome is highly unlikely to be changed), which means individual votes would be less likely to be altered by hacking.

24. In his only direct response to my expert report, Dr. Gilbert states that he is not aware that I have "provided equipment marred by 'undetectable' hacks to any other independent researcher" (¶ 15).[8] This is a curious and ironic criticism coming from Dr. Gilbert, since he evidently chose not to evaluate my findings through an examination of the voting equipment himself, which he does not explain. Moreover, Dr. Gilbert misreads my report. It does not claim that malicious software infecting a BMD would be undiscoverable by any possible means. If an individual BMD is

---

unable to vote on a hand-marked paper ballot, consistent with the number reported in Maryland.

[8] Dr. Gilbert ignores that, as I understand it, State Defendants have objected to my report and the underlying work being shared with third parties (except Dominion), including other independent researchers, with whom I am eager to share my work for review. I am confident in my findings and believe they should be shared promptly with appropriate election security researchers and officials in an effort to mitigate the critical vulnerabilities in Georgia's voting equipment that I describe. I invite Dr. Gilbert to join me in seeking State Defendants' consent to do that.

*known* to contain malware, there will likely be some level of detailed forensic scrutiny that can detect where the malware is, perhaps requiring months of expert analysis per machine at extraordinary expense. It would be completely infeasible to perform this level of analysis on every machine before every election, much less between an election and the deadline for certification of its results. (And after manipulating ballots, malware could remove all traces of its presence from a machine, defeating any possible post-election examination of the device.) What my report shows is that vote-stealing malware of the type I have constructed would not be detected by any of the defenses that State Defendants purport to practice. I describe in detail how such malware would defeat QR code authentication, logic and accuracy testing, on-screen hash validation, and external APK validation (as was used by Pro V&V after the November election). Dr. Gilbert offers no rebuttal to these findings. He does not dispute them or even address them.

25. Moreover, there is already an example of an "undetectable" attack entered into testimony: exploitation of the Drupal vulnerability discovered by Logan Lamb in the Center for Election Systems server. As Lamb attested, the developers of the primary tool for detecting this vulnerability stated that "[n]either [the defensive tool] nor an expert can guarantee a website has *not* been compromised. They can only

confirm with certainty a website *has* been compromised."[9] Furthermore, the Drupal developers state that any server running the vulnerable software after the initial disclosure of the vulnerability should be assumed to have been compromised unless it was patched within *hours* of disclosure. According to the timeline presented in Lamb's declaration, he found the KSU server to be in a vulnerable state on August 28, 2016, nearly two years after the initial announcement of the critical vulnerability (October 15, 2014).[10] The KSU server image also contains evidence that a second vulnerability, the so-called Shellshock flaw, was exploited on December 2, 2014.[11] This vulnerability was publicly disclosed more than two months earlier and widely publicized in the media as a critical vulnerability, yet the KSU server remained unpatched.

26. An attacker who compromised the KSU server could therefore have maintained undetected access to the compromised server. Since the server remained in a vulnerable state undetected for almost two years, it is highly likely that it was successfully attacked at some point in time. An attacker who did so would have been able to move laterally to other systems within the CES network and to other

---

[9] *Lamb decl.*, Dkt. 258-1 at 19.
[10] See "Drupal Core - Highly Critical - Public Service announcement" (Oct. 29, 2014), available at https://www.drupal.org/PSA-2014-003.
[11] *Halderman decl.* (Sept. 1, 2020) Dkt. 855-1 at 23.

components of Georgia's voting system. As I have previously pointed out, many election system components that could have been compromised in this way are still in use in Georgia today, where they provide a means by which attackers could spread vote-stealing malware to the BMDs.

27. Rather than address the many threats to Georgia's voting system, Dr. Gilbert persists in drawing illogical comparisons between BMDs and hand-marked paper ballots. For instance, he questions why Plaintiffs have presented no research "regarding voters' proclivity to review [hand-marked paper ballots] to ensure their ballots are marked and will count as intended" (¶ 8). Much like Dr. Gilbert's earlier testimony that "[i]n essence, a BMD is nothing more than an ink pen,"[12] one does not need expertise in election security to find fault with this reasoning. Preventing voters from making accidental mistakes is a completely different problem from preventing their selections from being deliberately and systematically changed by an attacker who has compromised the BMDs. There is abundant evidence that voters do sometimes make errors whether filling out a ballot by hand or by machine. Bad ballot design exacerbates this problem with both voting modalities, but following ballot design best practices can greatly reduce it. Both

[12] *Gilbert decl.*, Dkt. No. 658-3 at 60.

BMDs and scanners that count hand-marked ballots can also be configured to reject overvotes and to warn voters about undervotes, the most common kinds of voter errors. Moreover, unlike older technologies for counting hand-marked ballots, the scanners used in Georgia (when properly configured) can detect improperly or incompletely marked bubbles and present them to human operators to adjudicate whether the marks should count as votes. Election officials can use all of these options to help protect voters from their own mistakes, but none of them offers protection against a BMD that deliberately changes the selections printed on a voter's ballot (or those encoded in the ballot barcode). The central problem with Georgia's highly vulnerable BMD system—that attackers can change all records of the voter's intent without being detected by election officials—has no parallel in a hand-marked paper ballot system.

28. Dr. Gilbert concludes as he started, with vague and sweeping generalities. "Simply put, BMD elections systems are no more insecure than [hand-marked] systems" (¶ 16). It is unclear whether he is claiming that *all* BMD systems are at least as secure as all hand-marked systems or merely that some specific BMD system (such as the one he recently developed himself to address some of the reliability problems that exist with Georgia's BMDs) is at least as secure as some hand-marked system, but this is of little consequence. The only BMD system that is

relevant here is the Dominion ICX as used in Georgia. As my expert report details, Georgia's BMD system suffers from numerous, severe vulnerabilities. These vulnerabilities would have little potential to change election outcomes if use of BMDs were limited to voters who need or request them, as Curling Plaintiffs desire, and they would be far less likely to affect the personal votes of individual Georgia voters.

**Reply to Declarations of Dr. Benjamin Adida**

29. The declarations by Dr. Adida that State Defendants have submitted predate my expert report, so Dr. Adida's opinions are not informed by the critical vulnerabilities in Georgia's BMD equipment that my analysis has revealed or by anything else in my lengthy, detailed report. Nor are they informed by any events that occurred in the year since he first provided these declarations, such as any aspect of the November 2020 election in Georgia or the Secretary of State's study indicating that few voters verified their respective ballots in that election.

30. Nevertheless, Dr. Adida's first declaration is correct that "Running a risk-limiting audit is one of the most important advances states can take in improving election integrity—without an RLA, we are effectively trusting computerized scanners to count our paper ballots" (Dkt. 834-2 at ¶ 5). This is true, but, as my expert report shows, without a risk-limiting audit Georgia is also trusting its critically

vulnerable BMDs to generate ballots with QR codes that correctly reflect voters' selections. Obviously compromised BMDs and compromised scanners could change individual votes and election outcomes. But again, nothing suggests that Georgia's scanners suffer from such easily exploitable critical vulnerabilities as the BMDs do.

31. Dr. Adida and I also agree that RLAs are important for discovering whether compromised BMDs have manipulated enough ballot QR codes to change the outcome of an election (¶ 12). Although RLAs are, as Dr. Adida says, "of the utmost importance" (¶ 6), Georgia does not require an RLA in the vast majority of elections and the vast majority of contests, leaving both election outcomes and individual voters' votes susceptible to manipulation via BMD malware. Additionally, it is insufficient for states to merely (in Dr. Adida's words) "take meaningful steps to implement RLAs"; rather, states have to *actually conduct* reliable RLAs, which Georgia does not intend to do for the vast majority of its elections (or perhaps any of its elections, depending on the reliability of the audit procedures it implements).

32. In his second declaration, Dr. Adida refers to a "dispute amongst academics regarding whether voters verify their ballots using ballot-marking devices" (Dkt. 912-1 at ¶ 11). This statement reflects a misunderstanding of the state of research today. I am not aware of any scientific research that supports the proposition that Georgia voters would likely detect more than a small fraction of

errors caused by BMD malware. In contrast, the past two years have seen a wave of laboratory studies and multiple field observation studies addressing this question, all of which strongly indicate the opposite, that few voters carefully review their ballots and so the vast majority of errors caused by BMD malware would likely to go undiscovered and uncorrected. Although there once was uncertainty about whether most voters carefully verify their BMD ballots, there is no longer any serious scientific dispute that they do not. It is the hallmark of good science (and of good public policy) that it evolves based on new evidence, such as the University of Georgia study commissioned by the Secretary of State that I discussed above—which Dr. Adida has not addressed.

33. Georgia's election system needs to evolve as well. Due to the critical vulnerabilities in Georgia's BMDs that are described in my expert report, Georgia voters face an extreme risk that BMD-based attacks could manipulate their individual votes and alter election outcomes. Even in the rare contests for which the State requires a risk-limiting audit, the scientific evidence about voter verification shows that attackers who compromise the BMDs could likely change individual votes and even the winner of a close race without detection. Georgia can eliminate or greatly mitigate these risks by adopting the same approach to voting that is practiced in most of the country: using hand-marked paper ballots and reserving

BMDs for voters who need or request them. Absent security improvements such as this, it is my opinion that Georgia's voting system does not satisfy accepted security standards. Neither Dr. Gilbert nor Dr. Adida offers a contrary opinion in their respective declarations, instead ignoring the critical issue of whether the *voting system used in Georgia*—which neither claims to have examined—reliably protects the right to vote for individual Georgia voters.

I declare under penalty of the perjury laws of the State of Georgia and the United States that the foregoing is true and correct and that this declaration was executed this 2nd day of August, 2021 in Rushland, Pennsylvania.

J. ALEX HALDERMAN

# APPENDIX P-3

Declaration of Shawn Smith

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | | |
|---|---|---|
| Kari Lake, *et al.*,<br>Plaintiffs,<br>v.<br>Katie Hobbs, Arizona Secretary of State, *et al.*,<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 2:22-cv-00677-JJT |

**Declaration of Shawn A. Smith**

I, SHAWN A. SMITH, declare under penalty of perjury that the following is true and correct:

1. I have personal knowledge of the matters set forth below and could and would testify competently to them if called upon to do so.

2. My name is Shawn A. Smith. I am a retired military officer. I have Master's degrees in National Security Affairs from the Naval Postgraduate School and in Aeronautical Science from Embry-Riddle Aeronautical University. I have held an active Top Secret security clearance since 1992 and have been cleared for Sensitive Compartmented Information since 1996.

3. My military occupational specialty was space and missile operations, and I have extensive experience over 25+ years of active duty service in operating, specifying requirements for, planning the procurement of, training, testing, and commanding the employment of complex, computer-based military weapon systems.

4. My military service included significant experience in Special Technical Operations, involving advanced technology, at every level from tactical employment through operational planning, national-level policy, Presidential tasking, and requirements definition and procurement of future sensitive capabilities. I have

conceived, and advised agencies within the United States Government on, opportunities and technical approaches for supply chain compromise to affect foreign adversaries' ability to wage war against the United States, and to benefit United States national security.

5. My final active duty assignment prior to retirement in 2017 was for four years as the Senior Military Evaluator for Space and Intelligence, Surveillance, and Reconnaissance systems in the office of the Director, Operational Test & Evaluation, under the Office of the Secretary of Defense. In that role, I was responsible to execute the Director's oversight of operational testing of all non-satellite communications space systems in the Department of Defense, including the Global Positioning System, the Space-Based Infrared System, the Space Fence, the Geosynchronous Space Situational Awareness Program, and many others. Execution of that oversight required subject-matter expertise in the space domain, in the technologies involved in each system, in Scientific Test and Analysis Techniques to determine adequate and efficient test designs, and in the threat capabilities and modus operandi of foreign nation states, with respect to U.S. national security.

6. After retirement, I continued to support the Director, Operational Test & Evaluation as a consultant to adversarial assessment project teams which reviewed the results of cyber threat conduct against U.S. governmental and non-governmental national security targets by foreign adversaries, drew conclusions about the risks and impacts of that conduct, and wrote recommendations for responsive and preventive changes in technology, force structure, and defense policy, which the Director provided under his signature to the heads of the military Departments, the Secretary of Defense, and the President of the United States.

7. I have been asked to testify about the threat of supply chain compromise and attack to U.S. national security systems and critical infrastructure, in particular to election-related systems, including voting systems and, consequently, to elections. This

declaration will define and describe supply chain compromise threats, provide examples, explain that they have become pervasive and sophisticated, affecting and placing at risk the supply chain for U.S. computer systems and components, and explain the consequent ramifications for and vulnerability of U.S. election and voting systems. The information presented is unclassified and based upon my personal experiences, publicly available reporting, studies, events, incidents, policy, and de-classified U.S. Government information.

8. Given my background, experience, education, and training, and now my exposure to and understanding of the technology employed in U.S. election systems, my conclusion is that U.S. elections are critically vulnerable to exploitation by foreign adversaries through supply chain compromise of our computerized election systems.

9. Although elements of the U.S. Government appear keenly aware of the risk of supply chain compromise to our critical systems, that awareness does not appear to extend to any agency responsible for the procurement, security, certification, or use of election and voting systems, nor to imbue them with any capacity to respond effectively. Whether or not they are aware, their conduct reflects no defensive adaptation or response to that risk to protect the security and integrity of U.S. election systems or the elections using them. Given the proliferation of supply chain threats and the origin of so many attacks with deliberate, well-funded, large-scale, targeted foreign nation governmental programs, the near-universal foreign sourcing of our computers and computer components, and this lack of awareness and/or response in agencies responsible for U.S. election and voting systems, it is highly likely that numerous supply chain compromises have already been introduced to our election and voting systems and it is improbable and unwarranted to assume those compromises have not been introduced.

10. In fact, targeting U.S. voting and election systems must be an extraordinarily high priority for foreign powers; it is inconceivable that, given the opportunity, foreign

powers would not have taken the opportunity to exercise control or influence over U.S. elections, elected leadership, and thus U.S. foreign and domestic policy through supply chain attacks on U.S. election systems.

11. A "supply chain" is the aggregate of organizations, activities, people, and resources required to produce and provide a service or product. With respect to national security computer and communication systems and critical infrastructure, including election-related and voting systems, the supply chain includes computer hardware, hardware components, software, and firmware, as well as mechanisms for delivery of services, updates, modifications, and maintenance of those aggregate devices and networks comprised of or including that hardware, software, and firmware.

12. A "supply chain compromise" or "supply chain attack" (used interchangeably, throughout, though a compromise is technically one potential outcome or result from an attack) is the deliberate introduction of flaws, covert access or functionality, malicious code, and other undesirable attributes into a product or service, without the knowledge of the consumer or customer intended to receive or use the product or service, in the supply chain lifecycle of the product or service. A compromise or attack can be intended to make a device, network, or service unreliable, accessible to unauthorized parties, or to fail or behave differently when locally or remotely commanded, or when triggered autonomously by singular conditions or combinations of criteria (such as time, system state, user state, geolocation, etc.).

13. For integrated circuits (also known as "computer chips," such as the central processing unit (CPU) of a computer workstation or server), components, and computing systems, the "supply chain lifecycle" stages include "1. Conceptual, 2. Design, 3. Integration, 4. Fabrication, 5. Testing, 6. Provisioning, and 7. Deployment," and there are methods and types of attack unique or common to each of those stages. Of those stages, the Manufacturing stage is subject to the greatest variety of attack methods, including Insider Threats, Trojan Circuitry, Trojan Components, Design Alterations,

Component Replacement, Reverse Engineering, Unauthorized Disclosure, and Attacks on Design Networks.[1] According to MITRE,[2] "supply chain compromise can take place at any stage of the supply chain including: Manipulation of development tools, Manipulation of a development environment, Manipulation of source code repositories (public or private), Manipulation of source code in open-source dependencies, Manipulation of software update/distribution mechanisms, Compromised/infected system images (multiple cases of removable media infected at the factory), Replacement of legitimate software with modified versions, Sales of modified/counterfeit products to legitimate distributors, and Shipment interdiction."[3] MITRE's 2013 "Supply Chain Attack Framework and Attack Patterns" Technical Report identified 89 different attacks across and specific to the acquisition and lifecycle phases for national security systems, with all but 22 of those attacks applicable to phases prior to operational use and support.[4]

14. Supply chain compromise is no longer a hypothetical risk; it is pervasive, sophisticated, and widespread, and the most urgent, important question is not whether our computer systems are at risk of supply chain attack, but what is the precise extent of undetected supply chain attack. A 2018 global software supply chain survey reported that 66% of senior information technology (IT) decision-makers and security professionals had experienced a software supply chain attack.[5] By 2021, 93% of

---

[1] https://www.intel.com/content/dam/www/public/us/en/documents/white-papers/supply-chain-threats-v1.pdf

[2] MITRE is a Federally-funded research and development center which operates, among other centers, the National Cybersecurity FFRDC (NCF), sponsored by the National Institute of Standards, advising the Federal government on cybersecurity threats and mitigation.

[3] https://attack.mitre.org/techniques/T1195/.

[4] https://www.mitre.org/sites/default/files/publications/supply-chain-attack-framework-14-0228.pdf

[5] https://www.crowdstrike.com/resources/wp-content/brochures/pr/CrowdStrike-Security-Supply-Chain.pdf

companies surveyed had suffered a cybersecurity supply chain breach, and 97% of companies had been negatively impacted by cybersecurity breaches in their supply chain.[6] Supply chain attack is so pervasive that it must be assumed to threaten and affect all computers, computer components, hardware with embedded electronics, software, and firmware, to the extent that any aspect of them is accessible, at any time in their lifecycle from conception through end-of-life, to malicious or self-interested domestic or non-governmental actors but especially to foreign nation states and their agents.

15. A 2020 National Counterintelligence and Security Center report stated: "The exploitation of key supply chains by foreign adversaries—especially when executed in concert with cyber intrusions and insider threat activities—represents a complex and growing threat to strategically important U.S. economic sectors and critical infrastructure. Foreign adversaries are attempting to access our nation's key supply chains at multiple points—from concept to design, manufacture, integration, deployment, and maintenance—by inserting malware into important information technology networks and communications systems. The increasing reliance on foreign-owned or controlled hardware, software, or services as well as the proliferation of networking technologies, including those associated with the Internet of Things, creates vulnerabilities in our nation's supply chains. By exploiting these vulnerabilities, foreign adversaries could compromise the integrity, trustworthiness, and authenticity of products and services that underpin government and American industry, or even subvert and disrupt critical networks and systems, operations, products, and weapons platforms in a time of crisis."[7]

---

[6] https://www.bluevoyant.com/resources/managing-cyber-risk-across-the-extended-vendor-ecosystem/

[7] National Counterintelligence and Security Center, "Supply Chain Risk Management: Reducing Threats to Key U.S. Supply Chains," 20200925, at:

16. The National Institute of Standards and Technology's (NIST) Information Technology Laboratory (ITL) discussed the risk of information and communications technology (ICT) supply chain attacks in a June, 2015 publication, stating:

"Without effective security processes and practices throughout the life cycle of a system, intentional and unintentional vulnerabilities can be placed into systems. The systems may then be exploited by attackers who insert malicious content, capture data, or take other advantages, resulting in untrustworthy products or services, unanticipated failure rates, or compromise of federal missions and information."[8]

17. The Office of the Director of National Intelligence agreed, in a 2021 report: "Global trends indicate supply chain risk management is becoming one of the most prevalent areas of cybersecurity vulnerability. The increasing volume and scale of supply chain compromises and rapid advancement of technology makes standardizing a Supply Chain Risk Management (SCRM) practice crucial for organizations to protect against current supply chain threats and prepare for the future."[9]

18. The Department of Commerce (DoC) is similarly aware; in 2021, the DoC's Office of the Inspector General (OIG) stated, in a report on FirstNet Authority's management of security for the Nationwide Public Safety Broadband Network (NPSBN) that "Cyber threats to critical infrastructure, such as the NPSBN, pose a significant risk for 'wide scale or high-consequence events' that could harm or disrupt services essential to U.S. economy, business, and communities." The OIG asked MITRE to assess NPSBN security risks and MITRE concluded "The NPSBN security architecture may be susceptible to supply chain attacks due to FirstNet Authority's inability to validate AT&T's Supply Chain

---

https://www.dni.gov/files/NCSC/documents/supplychain/20200925-NCSC-Supply-Chain-Risk-Management-tri-fold.pdf

[8] https://csrc.nist.gov/CSRC/media/Publications/Shared/documents/itl-bulletin/itlbul2015-06.pdf

[9] Office of DNI, April 2021, Annual Threat Assessment of the U.S. Intelligence Community, and Homeland Security, October 2020, Homeland Threat Assessment

Risk Management (SCRM)," because "FirstNet had not performed supply chain risk assessment" for NPSBN since its inception in 2017 and "Consequently...has limited visibility into the NPSBN supply chain and is not fully aware of the level of risk it has taken on."[10]

19. The supply chain threat against computers, computer components, computer networks, and computer-enabled systems and infrastructure is particularly dire, for several reasons. In the first place, the U.S. no longer manufactures the majority of computer chips or hardware it uses. While in 1990 the U.S. manufactured 37% of the world's semiconductors, or computer chips, by 2019 the U.S. made just 12% of world semiconductors and 8% of U.S. computing hardware, and those numbers have continued to fall.[11] Many of the computer chips and hardware in use in the U.S. may be designed in the U.S., but those designed components and devices are then manufactured, tested, integrated and configured mostly overseas, using foreign raw materials and foreign labor, with little to no U.S. government oversight to ensure that no supply chain compromise occurs. The People's Republic of China (PRC), in particular, is estimated to manufacture about 70% of U.S. mobile phones[12] and 90% of the world's personal computers,[13] and the PRC is the primary source for U.S. computer imports.[14] Secondly, the convergence of exponentially-increased computer complexity, power, and miniaturization and the meteoric increase and ubiquity of embedded computers in

---

[10] https://www.oversight.gov/report/DOC/FirstNet-Authority-Must-Increase-Governance-and-Oversight-Ensure-NPSBN-Security

[11] https://www.semiconductors.org/wp-content/uploads/2020/09/Government-Incentives-and-US-Competitiveness-in-Semiconductor-Manufacturing-Sep-2020.pdf

[12] https://www.androidauthority.com/70-percent-us-smartphones-made-in-china-1146888/

[13] https://archive.ph/2i0ur

[14] The U.S. imports three times as many computers from the PRC as the U.S. exports, total, to all countries. https://oec.world/en/profile/bilateral-product/computers/reporter/usa

connected and connectable devices, from smartphones to appliances to industrial control systems to vehicles to wearable electronics ensures that the opportunities for malicious actors to reach and compromise targeted systems and networks proliferate at a scale unmatched *and unmatchable* by U.S. governmental and private industry detection and defensive capability.

20. The supply chain threat for critical computer-based infrastructure is so severe and extensive that the computer networks of the Cybersecurity and Infrastructure Security Agency (CISA), the very U.S. government institution responsible for critical infrastructure security, were compromised by software supply chain attacks in 2020, the SolarWinds SUNBURST[15] and SUPERNOVA[16] attacks, for ten months or more without detection and, even then, that compromise only became known to CISA due to the intervention of a private company.[17] It may be true that CISA successfully defended its own networks and other critical U.S. infrastructure against many, or most attacks, but that possibility is irrelevant under conditions in which a single successful attack means failure or catastrophe. This is the threat environment for computer-based critical infrastructure, and the offense has the advantage- perhaps permanently.

21. In light of CISA's inability to defend even its own computer systems from nation-state-level supply chain attacks from March through December 2020, little credence can be given to CISA's July 2020 declaration that the 2020 election would "be the most secure election in modern history,"[18] and its declaration in November 2020 that the 2020 election was the "most secure in American history."[19] Many public officials and media have repeated and cited those claims as rationale for their own confidence in

---

[15] https://www.cisa.gov/uscert/ncas/alerts/aa20-352a
[16] https://www.cisa.gov/uscert/ncas/analysis-reports/ar21-112a
[17] https://www.mandiant.com/resources/sunburst-additional-technical-details
[18] https://www.meritalk.com/articles/krebs-says-2020-will-be-the-most-secure-election-yet-still-recommends-backup-paper-ballots/
[19] https://www.youtube.com/watch?v=YzBJJ1sxtEA

election security, and for their unwillingness to undertake or support independent investigation.

22. For the public and for public officials such as state and local election officials, to whom much of the computer technology intertwined in the fabric of our society, including carelessly so in our election and voting systems, is sufficiently complex to be incomprehensible, the claims made by officials such as CISA's head and their repetition by trusted institutions and media impede public awareness, and thus, adequate public and governmental response to the supply chain threat.

23. Because the SolarWinds supply chain attack is relatively well-known to the public,[20] it is most unusual and most distinguished from other supply chain attacks by that very fact. Most such attacks are never brought to the public's attention. Other recent significant supply chain attacks largely unknown to the public include the insertion of malware into the software utilities on USB flash drives included with solar electric monitoring devices in widespread use,[21] the insertion of malware into the USB flash drives included with IBM network storage systems,[22] the insertion of keylogger[23] malware into the installation files of personal computer utility software in widespread

---

[20] Not that the public necessarily understands what happened in the attack, but the term "Solarwinds" is familiar enough that members of the public with no computer or cyber expertise may be able to associate the term with "hacking."

[21] https://download.schneider-electric.com/files?p_enDocType=Technical+leaflet&p_File_Name=SESN-2018-236-01+Conext+USB+Malware.pdf&p_Doc_Ref=SESN-2018-236-01

[22] https://www.ibm.com/support/pages/storwize-usb-initialization-tool-may-contain-malicious-code

[23] A keylogger records the keystrokes on victims' computers, and relays the keystrokes to the perpetrators, thereby allowing the perpetrator to, e.g., obtain victim username and passwords and access the victims' sensitive accounts and information. Keyloggers may be introduced through hardware, such as USB device, cable, and keyboard keyloggers, introduced by vendors in the supply chain or by interdiction of shipments.

use,[24] insertion of malicious code in a JavaScript module which was being downloaded by approximately two million victims per week,[25] a series of eight different zero-day vulnerability attacks executed by Chinese hackers against Google, Adobe, and Microsoft services and infrastructure, using 18 different command and control servers,[26] and the reported compromise of U.S. company Super Micro's PRC-manufactured motherboards through covert insertion of hardware during the manufacturing, integration, or shipping phase, affecting U.S. companies including Amazon and Apple,[27] which Super Micro has denied and has denied is possible.[28] Seventeen individuals, including 6 former senior national security officials, have confirmed the Super Micro supply chain compromise occurred, and security researchers have demonstrated it is possible.[29] If true, the Super Micro compromise would have affected not only Amazon and Apple, but dozens of other companies, and potentially U.S. military warships, the Department of Homeland Security, and both houses of Congress.[30]

24. The Super Micro attack reflects an instructive pattern:

a. a U.S. company, products of which are manufactured overseas, in the PRC, and used by other U.S. companies and government agencies;

---

[24] https://blog.avast.com/new-investigations-in-ccleaner-incident-point-to-a-possible-third-stage-that-had-keylogger-capacities

[25] https://www.trendmicro.com/vinfo/dk/security/news/cybercrime-and-digital-threats/hacker-infects-node-js-package-to-steal-from-bitcoin-wallets

[26] https://web.archive.org/web/20190717233006/http://www.symantec.com/content/en/us/enterprise/media/ security_response/whitepapers/the-elderwood-project.pdf

[27] https://archive.ph/2i0ur

[28] https://www.cyberscoop.com/supermicro-bloomberg-big-hack-investigation-no-tampering/

[29] https://securityledger.com/2019/01/more-questions-as-expert-recreates-chinese-super-micro-hardware-hack/

[30] https://archive.ph/2i0ur

b. an emerging report that the products may be compromised through supply-chain hardware and/or software insertion attacks;

c. denial by both the company and its customers that any compromise has occurred or is possible, in particular because of the company's and customers' procedural or technical "safeguards;" and

d. independent expert investigation demonstrating that the compromise is possible, or that it has, in fact, occurred.

25. The first public reporting on the alleged Super Micro supply chain compromise was in October, 2018, but the attack itself took place years earlier and was reportedly first detected by a private company and reported to the Federal government in 2015. The Federal government reportedly chose to notify only "a small number of important Supermicro customers."[31] The public, whose data and services and lives and businesses would have been dependent on the integrity of those companies' and institutions' Super Micro-equipped infrastructure, was left vulnerable.

26. Part of the reason for the public's lack of awareness of the severity and pervasiveness of supply chain compromise threats is that malicious cyber activity is commonly portrayed in media as a real-time or near-real-time function of opportunistic "hackers," which are usually presented as some malicious non-governmental organization or individual hobbyist. In fact, the most severe threat posed to computer systems, including all computer-enabled and –embedded systems[32] are nation state-operated or –sponsored advanced persistent threat (APT) groups.

---

[31] https://archive.ph/2i0ur

[32] Most people don't think of a power plant or a passenger aircraft as a computer, but all modern utility-scale power plants and passenger aircraft are, to some extent if not fully, computer-controlled. The threshold at which those become not, e.g. an "airplane with computers" but a "computer which flies" is not clear, but certainly when most or all critical functions for the vehicle, facility, or process are controlled by or must have the reliable operation of computers to function, the facility or vehicle must be

27. MITRE has identified over 120 sophisticated cyber threat groups in unclassified publications, including 18 named and dozens of other probable APTs.[33] There may well be more threat groups, including APTs, identified in classified fora and publications. Publicly known APTs include Iranian, North Korean, and other foreign nations' cyber threat teams, but primarily the APTs are associated with one of two countries: Russia and the PRC, and the number of PRC APTs far exceeds the number of Russian APTs.

28. What distinguishes APTs from the popular cultural portrayal and public misconception of the cyber threat as comprised of real-time/near-real-time "hackers," is that the APTs are organizations composed of multiple, sometimes hundreds or thousands, of state-trained, state-sponsored cyber experts engaged in deliberate years- and decades-long campaigns to not only discover and exploit vulnerabilities in targeted institutions and systems, but to create those vulnerabilities. The APTs are not merely opportunistic actors, finding the occasional misconfiguration which allows access to a system discovered or targeted in real-time, but sophisticated, methodical creators of vulnerability which may employ 25 or more distinct, known attack techniques against a single target,[34] creating novel attacks and tools tailored to their targets or to leverage vulnerabilities they have installed in hardware and software they and affiliates have compromised through supply chain attacks.

29. Mandiant, the same company that discovered and reported the SolarWinds supply-chain attack in 2020, after it had been operating undetected on CISA's networks for ten months, also released a detailed public report in 2013 on the PRC's APT1.

---

considered, for cyber-defensive purposes, to actually BE a computer. In fact, former United States Air Force Chief of Staff, General David Goldfein, has been quoted as describing the F-35, Joint Strike Fighter, as "a computer that happens to fly." https://breakingdefense.com/2018/04/a-computer-that-happens-to-fly-usaf-raf-chiefs-on-multi-domain-future/

[33] https://attack.mitre.org/groups/

[34] https://businessinsights.bitdefender.com/chinese-apt-targeting-asian-government-institutions

Although that report was widely distributed in the cybersecurity community, posted or mentioned tens of thousands of times online, it remains largely unknown to the American public, and likely unknown to most public officials. Mandiant estimated that APT1, also known as Unit 61398 of the PRC's military (People's Liberation Army (PLA)), has manpower in the "hundreds, and perhaps thousands," including human resources functions sufficiently extensive and sophisticated to not only recruit top university graduates in cybersecurity and computer engineering, English linguistics, and software programming, but to groom them through recommended coursework. The report showed APT1, Unit 61398, as part of the PRC military's PLA General Staff Department (GSD) (akin to the U.S. Department of Defense's Joint Staff), occupying a compound that includes a 12-story headquarters, medical clinic, kindergarten, and guesthouses, with technical infrastructure partly equipped by China Telecom[35] for "national defense." APT1 resources include not only cyber operators, but linguists, open source researchers and partnerships with other PLA-controlled Bureaus and with research institutes within the Chinese Academy of Sciences.[36]

30. The 2013 Mandiant report showed APT1 targeting and compromising at least 141 organizations in the U.S. and other English-speaking western nations from 2006 through the end of 2012, including at least 16 organizations in the Information Technology sector, at least six organizations in the High-Tech Electronics sector, and 10 organizations in the Public Administration sector, which APT1 began to focus on in 2009,

---

[35] China Telecom Corp, LTD is a subsidiary of PRC state-owned China Telecommunications Corporation. It is the second largest wireless carrier in the PRC, with more subscribers than the entire U.S. population, and helps implement the PRC CCP's social credit/monitoring/conduct program. CTC was listed and traded on the NYSE and did business in the United States until delisted from the NYSE, prohibited from investment by U.S. entities, and prohibited from doing business in the U.S. in January, 2021, along with 34 other CCP-controlled parent companies and over 1,100 of their subsidiaries, by Executive Order 13959 of President Trump.

[36] http://www.mandiant.com/apt1

after spending at least three years compromising the Information Tech and High-Tech Electronics sectors.[37] The scale of this compromise, from one APT alone, is staggering. Mandiant reported that APT1 stole 6.5 terabytes of compressed intellectual property (IP) data from a single organization in a 10-month period.[38] When that 6.5 terabytes is uncompressed, it is roughly equivalent to the information contained in the 26 million books of the Library of Congress circa 2000.[39] APT1's resources were sufficient to compromise at least 17 new targets in 10 different industries in a single month in 2011. The cyberoperators themselves are not reading all the compromised, exfiltrated data; it is distributed to other APTs, and to state-owned and -controlled research institutes and corporations, to be studied for purposes from vulnerability exploitation to counterfeiting to contractual, political, and financial leverage.

31. One of the other APTs to which APT1 distributes exfiltrated, compromised, stolen IP data from U.S. companies and governmental and non-governmental organizations is APT17, a threat group specializing in supply-chain compromise, run by the PRC's Jinan Bureau of the Chinese Ministry of State Security (MSS).[40]

32. The MSS is responsible for foreign intelligence and counterintelligence operations, but is much more similar to the former Soviet KGB than to the U.S. CIA. Like the KGB and CIA, the MSS collects and analyzes information on foreign adversaries, from both open sources and espionage, and works with its nation's military intelligence services in a two-way exchange of information. Unlike the CIA, but like the KGB, the

---

[37] Ibid.

[38]http://160592857366.free.fr/joe/ebooks/ShareData/A%20Comparitive%20Study%20of%20Text%20Compression%20Algorithms.pdf

[39] https://www2.sims.berkeley.edu/research/projects/how-much-info/how-much-info.pdf#page=110

[40] https://www.cfr.org/cyber-operations/apt-17

MSS is as focused on what the KGB called "active measures,"[41] as on intelligence collection. For example, at the peak of KGB operations in the U.S., which the USSR and KGB had designated the "Main Enemy," the KGB had not only infiltrated and stolen technical and scientific information from the U.S. that enabled the USSR's ultimate development of nuclear weapons, but had also infiltrated the U.S. Departments of Treasury and State, the White House, and U.S. Congress, using those infiltrators to influence and change U.S. foreign and national security policy.[42]

33. The MSS, or its precursor known as the "Ministry of Public Security" (MPS),[43] infiltrated the U.S. Department of the Army during WWII, before the Department of Defense existed, and later the CIA, and some of that infiltration went undetected for four decades, passing critical information to the PRC, e.g. directly affecting Nixon's 1972 rapprochement with the PRC.[44] The Cox Report in 1999 concluded that the PRC, through MSS espionage targeting U.S. national laboratories over an approximately 20 year period, had "obtained at least basic design information on several modern U.S. nuclear reentry vehicles...a variety of U.S. weapon design concepts and weaponization features, including those of the neutron bomb."[45] In 2020, a former CIA officer was arrested for spying for the PRC's MSS from 2001 through 2020, in cooperation with a relative who

---

[41] "Active Measures" include not only disinformation and influence operations, but active subversion of both organizations, societies, governments, and discrete efforts (e.g., the Manhattan Project) to demoralize and undermine identified enemies, but also, importantly, sabotage. https://www.cia.gov/static/79ba0e7b5cfc2541728b7d646353fc13/active-measures-and-information-wars.pdf and "Active Measures, The Secret History of Disinformation and Political Warfare," Thomas Rid, Library of Congress ISBN: 978-0-374-28726-9

[42] https://thescholarship.ecu.edu/bitstream/handle/10342/6426/NCLA%20FSB%20KGB-Final.pdf?sequence=1

[43] "Ministry of Public Security" (MPS), before 1983; now largely separate; MSS merged the Central Investigation Department and MPS' counter-intelligence organization.

[44] https://www.courtlistener.com/opinion/506679/in-the-case-of-united-states-v-larry-wu-tai-chin-united-states-of-america/

[45] https://sgp.fas.org/news/dci042199.html

had been a CIA officer in the 1970s.[46] In each of these cases, the MSS' recruitment and use of infiltrators and technical collection against the U.S. were not discovered until long after the damage to U.S. national security had been done. These publicized incidents are a small subset of the total incidents discovered, and it can reasonably be assumed that discovered incidents are only a portion of total incidents.[47]

34. In 2020, the U.S. Department of Justice indicted five APT41 operatives who helped hack more than 100 U.S. companies, and the FBI was well-aware that the operatives were working for the MSS.[48,49] The FBI's and DOJ's public statements acknowledge APT41's supply chain attacks and association with the MSS.[50]

35. CISA has acknowledged, as early as October 2020, that APTs have targeted not only Federal government, but state, local, tribal, and territorial (SLTT) government, critical infrastructure, and elections organizations, including successful APT establishment of unauthorized access to election support systems.[51] With respect to that unauthorized access to election support systems, CISA stated "...however, CISA has

---

[46] https://www.justice.gov/opa/pr/former-cia-officer-arrested-and-charged-espionage

[47] MSS active measures in the U.S. are not often or deeply covered in U.S. media, and are therefore reduced or non-existent in the public awareness. For example, the MSS is also responsible for the recruitment of Senator Dianne Feinstein's long-time driver as an operative, as well as Fang Fang (aka Christine Fang), who reportedly had a romantic relationship with Representative Eric Swalwell and other government officials in the U.S., and who placed at least one intern in Swalwell's Congressional office.

[48] https://www.justice.gov/opa/press-release/file/1317206/download

[49] https://www.fbi.gov/wanted/cyber/china-mss-guangdong-state-security-department-hackers

[50] The inconsistency of US Government (USG) reporting and warnings on PRC APT groups is of some concern. Although MITRE's ATT&CK database information for APT41, et al, is unambiguous regarding APT41's campaign of supply chain attacks (https://attack.mitre.org/groups/G0096/), contemporaneous CISA alerts in the National Cyber Awareness System make no mention of APT41's supply-chain attack techniques (https://www.cisa.gov/uscert/ncas/alerts/aa22-131a)

[51] https://www.cisa.gov/uscert/ncas/alerts/aa20-283a

no evidence to date that integrity of elections data has been compromised,"[52] but CISA's credibility in their conclusion must be tempered by knowledge that this was during the same period that CISA was unaware that its own networks had been compromised.

36. Mandiant again reported on APT41 activity in March 2022, stating that systems, particularly internet-facing web applications, of at least six U.S. state governments had been attacked and compromised by APT41 over an eight month period in 2021 and 2022.

37. The above discussion covered only a subset of the activity of three of eighteen named APTs acknowledged in unclassified sources, among over 120 named, sophisticated cyber threat groups acknowledged in unclassified sources and engaged, relentlessly, in the development and exploitation of vulnerabilities in western, and particularly U.S., critical and national security systems. It is the tip of the iceberg. In the year 2000, the U.S. was dominant in cyber; now, due to foreign advances in capability, the off shoring of our electronics and computer manufacturing, our monumental expansion of dependence on computers and networked systems, and our naivety with respect to their vulnerability, we are vulnerable beyond comprehension. We face an offensive cyber juggernaut, and supply chain attacks are the most difficult of all threats, often impossible, to detect, prevent, and mitigate.

38. In a May 2022 Alert, CISA advised Managed Service Providers (MSP) and their customers, to mitigate the expected increased targeting of MSPs and their customers by APTs, to enable/improve monitoring and logging processes, enforce multifactor authentication, manage internal architecture risks and segregate internal networks, apply the principle of least privilege, deprecate obsolete accounts and infrastructure, apply updates, backup systems and data, develop and exercise incident response and

[52] Ibid.

recovery plans, understand and proactively manage supply chain risk, promote transparency, and manage account authentication and authorization.[53]

39. As applied to computerized voting systems, which fall under CISA's protective mandate, and for which voting system vendors function as MSPs with state and local public officials as "customers," CISA's alert is like advising the ordinary consumer to implement enterprise security policy changes on their personal electronics. Those public officials responsible for the voting systems have little idea what CISA's recommendations mean, and they lack the ability to implement CISA's recommendations. More importantly, the complexity of the devices means that the policy changes at best present a superficial veneer of increased security, like fresh paint over rust. With computerized systems, what is not secure from inception can never be secured.

40. The time-sensitive nature of elections, the exceedingly small windows of time for the public or candidates to gather facts and challenge election results, the strong incentives of public officials and related institutions to dismiss public concerns and queries, and the rarity and delay in public access to voting system monitoring and logging processes means that no satisfactory "incident response and recovery plan" for an election system compromised by a supply chain attack is possible.

41. Arrayed against the offensive cyber threat juggernaut, for elections, is an ecosystem of organizations led by a Federal agency, the U.S. Election Assistance Commission (EAC), the priorities of which are illustrated by the fact that it has devoted its resources to passing out named awards for "Creative and Original 'I Voted'

[53] https://www.cisa.gov/uscert/ncas/alerts/aa22-131a

Case 2:22-cv-00677-JJT Document 41 Filed 06/08/22 Page 20 of 69

Stickers,"[54] but has only just now in 2022 pledged to add "Supply chain risk management and security testing" to voting system manufacturer agreements.[55]

42. The NIST is the technical body and agency identified in Title 52, U.S.C.[56] to advise the EAC, and NIST has repeatedly recommended,[57] at least as early as 2012,[58] to secure ICT against supply chain attacks. The EAC, however, has effectively provided no standards, procedures, or safeguards to implement those recommended protections for election systems and elections.[59] Many states use the Federal Election Commission's 2002 Voting System Standards (VSS) as their minimum statutory basis for certification of voting systems, but the VSS doesn't even mention supply chain security.

43. The VSS does not specify standards, procedures, or safeguards to protect election systems and elections against supply chain attacks, stating only that voting system vendors must "Ensure that components provided by external suppliers are free from damage or defect that could make them unsatisfactory for their intended purpose."[60] Nor do the EAC's first successor standards to the VSS, the 2005 Voluntary Voting System Guidelines (VVSG) mention or describe supply chain attack risks, or methods or

---

[54] U.S. Election Assistance Commission Chairman Donald Palmer, presentation "Updates – Colorado County Clerks Association," January 2022, obtained through Colorado Open Records Act.
[55] Ibid.
[56] https://www.law.cornell.edu/uscode/text/52/20971
[57] https://tsapps.nist.gov/publication/get_pdf.cfm?pub_id=918801
[58] https://tsapps.nist.gov/publication/get_pdf.cfm?pub_id=913338
[59] The EAC actually published a draft "Election Operations Assessment – Threat Trees and Matrices and Threat Instance Risk Analyzer (TIRA)" document in December, 2009, but the document was focused on taxonomy and methods of representing attack actions and scope, rather than on actionable mitigation of risk, leading to "recommended controls" for supply chain attack such as "establish chain of custody and system and services acquisition controls."
[60] https://www.eac.gov/sites/default/files/eac_assets/1/28/Voting_System_Standards_Volume_I.pdf

standards for mitigation in election systems.[61] The same is true for the 2015 VVSG Version 1.1. Nearly all certified voting systems in use in the United States have been certified to the 2015 or prior standards; i.e., the voting systems used in U.S. elections have no and have had no supply chain security, nor any testing or verification of that security.

44. U.S. voting methods have careened from manually-hand-counted paper ballots at the precinct-level to increasingly centralized mechanical, electro-mechanical, electronic, and now computer-based and completely computerized voting, with a relentless institutional pressure toward not only computerized, but remote and even mobile computerized voting. All while the institutions intended and required to safeguard and secure elections and elections systems lag further and further behind the event horizon beyond which they can neither understand nor control the technology involved, or the inherent risks in that architecture. An apt comparison would be like watching an organization and system of rules and standards built to regulate horse-drawn carriage safety failing to recognize its anachronism, and failing to adapt, in the face of ubiquitous internal-combustion engine automobile and jet turbine aircraft transportation.

45. The latest version of the VVSG,[62] Version 2.0 approved in February 2021, finally acknowledges supply chain risk management as a necessity, but treats the threat as if it can be mitigated by paperwork, the way vehicle speeds are "limited" by speed limit signs. These standards are barely better than the EAC's non-existent standards for electronic poll books, centralized statewide voter registration systems, and election auditing systems.

---

[61] https://www.eac.gov/sites/default/files/eac_assets/1/28/VVSG.1.0_Volume_1.PDF

[62] https://www.eac.gov/sites/default/files/TestingCertification/Voluntary_Voting_System_Guidelines_Version_2_0.pdf

46. These are the requirements of VVSG 2.0, Section 14.3-A, Supply chain risk management strategy: "The voting system's documentation must contain a supply chain risk management strategy that at minimum includes the following:

1. a reference to the to the template or standard used, if any, to develop the supply chain risk management strategy;
2. the assurance requirements to mitigate supply chain risks
3. the contract language that requires suppliers and partners to provide the appropriate information to meet the assurance requirements of the supply chain risk management strategy;
4. the plan for reviewing and auditing suppliers and partners; and
5. the response and recovery plan for a supply chain risk incident."

47. Accompanying the EAC's VVSG are a published set of "test assertions" for the VVSG, which are meant to translate each VVSG requirement into an unambiguous, specific, testable condition so that the Voting System Testing Lab (VSTL) may verify the conformance of a given voting system to the VVSG standard. Here's what the EAC's VVSG Test Assertions state for supply chain security of voting system components: "2.1.1-A – General build quality, ...TA211A-2: IF components from third-party suppliers are used for their intended purpose within the voting system, THEN the voting system manufacturer MUST ensure that third-party suppliers document the quality assurance procedures used to ensure components supplied from third parties are free from damage or defect."[63]

48. The correlating EAC Testing and Certification Program Manuals and VSTL Program Manuals intended to ensure that VSTLs are capable of properly testing voting systems to verify their conformance with VSS and VVSG, and that their tests ensure the security

---

63 https://www.eac.gov/sites/default/files/TestingCertification/VVSG_2_0_Test_Assertions_1_0.pdf

and integrity of voting systems, do not address supply chain attack threats or their mitigation or their assessment, at all. Instead, the program manuals and certification program requirements reflect an assumption that "commercially available models of general purpose information technology equipment" and "production models of special purpose information technology equipment," and "ancillary devices" can be trusted.[64] Security testing guidelines do not even require VSTLs to review the publicly available common vulnerabilities and exploits (see Appendix 3) associated with commercial hardware and software, and the latest VVSG requires only that: "The underlying system platform generally needs to be free of well-known vulnerabilities before certification, *unless the certification authority allows it*." (emphasis added). "Generally," "unless allowed" is not a standard that can reasonably be assumed to ensure voting system integrity; it is a loophole precisely as large as the standard, itself.

49. Eight years after Mandiant's 2013 report on APT1, six years after the NIST's 2015 warning about supply chain vulnerability and attack, and five years after the Department of Homeland Security declared election infrastructure to be "critical infrastructure" of the U.S.,[65] it is inexplicable that the EAC, responsible for security standards for voting systems, has yet to promulgate standards which reflect the advanced persistent threat against them and their supply chains. The EAC's standards of accreditation for VSTLs do not even ask, let alone require, awareness in the VSTLs of supply chain vulnerabilities in computerized voting systems, much less awareness or proficiency in the detection of supply chain compromises, or in their assessment of effective mitigation, where even possible, by voting system vendors.

50. For those, like myself, with experience in government office or working closely with government agencies in regulated, technically complex domains, the EAC's

---

[64] https://www.eac.gov/voting-equipment/manuals-and-forms

[65] https://www.dhs.gov/news/2017/01/06/statement-secretary-johnson-designation-election-infrastructure-critical

immensely inadequate response is unsurprising and potentially attributable to two phenomena: bureaucracy and regulatory capture. Bureaucracy is merely a fact of life for any government enterprise; except in the most unusual, extraordinary, and rare circumstances, the government, particularly the Federal government, does not adapt well or quickly. Its organizations and agencies are often preoccupied by struggles over autonomy and funding, rather than focused on public interest. Consensus is more important than quality; constituency in power corridors is more important than service. These are truisms for anyone who has worked in or had more than incidental contact with governmental bureaucracy.

51. In this case, because the EAC is intended and authorized to provide a degree of regulation to the election industry, it is subject to and fully entangled in regulatory capture, which is the corruption of a regulatory authority and agency by sympathy toward and influence from the industry it is intended to regulate. In addition to the typical "revolving door" where individuals rotate directly from the election industry or associated non-profits in and out of EAC positions, one need look no further than the EAC's Technical Guidelines Development Committee (TGDC), an advisory body established by HAVA to "assist the (EAC) in the development of (VVSG)." Its fifteen appointed members include far more lawyers, politicians, public affairs, and psychology grads than computer scientists or software experts, at a 4:1 ratio, and those few computer scientists and software experts include, e.g., the director for software development at one of the largest U.S. voting system vendors. The American National Standards Institute (ANSI) representative is a public affairs specialist. The NIST representative and chair is a physicist.[66] This bodes ill for the likelihood of significant or influential cyber technical expertise shaping the technical guidelines for voting system

---

66 https://www.eac.gov/sites/default/files/tgdc/TGDC_Roster_as_of_October_18_2021.pdf

standards at the EAC and that is evident in TGDC's recommendations. Although the NIST Security and Transparency Subcommittee was recommending to the TGDC that no wireless devices be permitted on voting systems as early as 2006,[67] the TGDC in 2020 still recommended a "compromise position" with no prohibition on wireless devices for the latest, 2021 VVSG.[68] This "compromise" illustrates the pressure placed on a regulatory agency to acquiesce to the regulated industry's preference as opposed to fulfilling its charter, in this case, attempting to ensure the security of computerized voting systems.

52. Permitting wireless devices in computerized voting systems is irrational and indefensible in light of the known and persistent threats to those systems. The Federal government's Security Technical Implementation Guide (STIG), published in 2011, covering wireless systems requires removal of wireless radios from all computers used to transfer, receive, store, or process classified information,[69] stating "simply disabling the transmit capability is an inadequate solution." The fact that wireless capability has been allowed to continue in voting systems and the reasons for that compromise illustrate key effects which characterize and shape government regulation and conduct, broadly, and the security of election and voting systems, specifically. In particular, it is not only that EAC staff and advisors rotate in and out of the elections industry, so that they may develop affinity and sympathy which interfere with their effective action to secure voting systems. It is also that rapid advancement of technology and the inverse

---

67 https://www.nist.gov/system/files/documents/itl/vote/DraftWhitePaperOnWirelessInVVSG2007-20061120.pdf

68 https://www.eac.gov/sites/default/files/TestingCertification/VVSG_2_Dispelling_Misinformation.pdf

69 https://www.stigviewer.com/stig/final_draft_general_wireless_policy/2011-09-30/finding/V-19813

relationship of illiteracy in a domain to capacity to recognize that illiteracy, play a significant role failing to address such threats.

53. For example, in 2013, a computer security consultant presented a practical demonstration using an Android phone application he'd authored to remotely attack and take control of a commercial aircraft in flight, exploiting two common avionics information services, known as Automatic Dependent Surveillance-Broadcast (ADS-B) and Aircraft Communications Addressing and Reporting System (ACARS).[70] Back in 2010, the Federal Aviation Administration (FAA) had mandated that all aircraft, including commercial passenger aircraft, military fighter and transport aircraft, and even Air Force One, employ ADS-B in U.S. airspace.[71] ACARS is not mandated by the FAA, but is one of several aircraft data link systems approved for use in U.S. airspace, which allows operators to access particular airspace planning and operations features, critical for efficient operations.[72] ACARS use by U.S. commercial and military aircraft is widespread.

54. In 2016, the FAA used a joint Government-industry working group to develop recommendations to increase cybersecurity for aircraft systems; among its 30 recommendations was "detecting vulnerabilities in (ADS-B)"—the system that was shown three years earlier to be exploitable to help an attacker to take control of commercial aircraft in flight using a smartphone. Despite the demonstrated vulnerability, and despite the cybersecurity working group's recommendation, the vulnerability was not only not addressed, it was expanded through mandated ADS-B adoption.

55. In 2019, a computer security consultant firm presented their findings of critical exploitable vulnerabilities in the Boeing 787 which could include supply chain attack and

---

[70] https://www.helpnetsecurity.com/2013/04/10/hijacking-airplanes-with-an-android-phone/
[71] https://www.law.cornell.edu/cfr/text/14/91.225
[72] https://www.faa.gov/documentLibrary/media/Advisory_Circular/AC_90-117_(E-update).pdf

misuse of aircraft data link systems to take control of an aircraft, in flight.[73] In the same year, the Department of Transportation Inspector General noted that the FAA had still not implemented the ADS-B cybersecurity recommendation discussed above.[74] Despite the FAA having a cybersecurity testing and certification program[75] which is, by all appearances, significantly more capable and comprehensive than the EAC's regime for voting systems, and despite the FAA being well-aware of identified catastrophic cyber risks to in-flight aircraft, the FAA has not implemented the 2016 recommendations regarding ADS-B and aircraft data systems risks. A 2021 Government Accountability Office (GAO) report helps explain why; the FAA's Cybersecurity Steering Committee (CSC) receives technical reports and discusses vulnerabilities, but does not follow up or through.[76] The CSC members, as it turns out, have almost no practical cybersecurity experience, beyond program management and policy recommendations, leaving them unable to adequately assess and address, from a technical perspective, what is a credible and plausible, even urgent threat.[77] In other words, technical illiteracy suppresses recognition of technical risk; people have a blind spot for what they do not understand.

56. The EAC has demonstrated inadequate awareness, comprehension, and response to the clear and present danger posed by foreign nation states' supply chain attacks against the computers and components used in U.S. voting systems. It cannot be relied upon to protect U.S. elections by competently examining voting systems, prior to use,

---

[73] https://i.blackhat.com/USA-19/Wednesday/us-19-Santamarta-Arm-IDA-And-Cross-Check-Reversing-The-787-Core-Network.pdf

[74] https://www.oig.dot.gov/sites/default/files/FAA%20Cybersecurity%20Program%20Final%20Report%5E03.20.19.pdf

[75] https://www.faa.gov/air_traffic/technology/cas/ct/

[76] https://www.gao.gov/assets/gao-21-86.pdf

[77] https://www.linkedin.com/pulse/cybersecurity-aviation-government-where-weve-been-we-today-natke/?trackingId=6iUunn6TTvW5nN23Na%2BjMw%3D%3D

for indicators of compromise and vulnerability. Nor can we rely upon the expertise and professionalism of EAC-accredited VSTLs and their staff, particularly in the absence of adequate EAC standards, to protect U.S. elections by competently examining our voting systems for indicators of supply chain compromise. In federal court testimony in 2020, the Laboratory Director (and corporate principal) for Pro V&V, one of only two accredited VSTLs in the U.S., stated that he had no "specialized expertise in cybersecurity testing or analysis or cybersecurity risk analysis."[78] The EAC accredited a VSTL led by someone with no specialized expertise in cybersecurity testing or analysis or risk analysis.

57. These same VSTLs, with no specialized expertise in cybersecurity testing or analysis or cybersecurity risk analysis, have been responsible to not only conduct initial and modification testing, but to assess proposed engineering change orders (ECO) from voting system vendors, and to recommend to the EAC whether those changes may be implemented without testing, as "de minimis."[79] The EAC has approved at least 150 of these engineering changes to currently certified voting systems. One ECO, representative of many, perfectly epitomizes the inconceivable inadequacy and unsuitability of this approach and the utter ignorance or disregard for cybersecurity risk the approach entails: DVS ECO 100833.[80] DVS ECO 100833 was "analyzed" in April,

---

[78] *Curling v. Raffensperger*, 493 F.Supp.3d 1264, 1277 (N.D. Ga. 2020).

[79] A "De minimis" change, according to the EAC, is a change to a certified voting system's hardware, software, TDP, or data, the nature of which will not materially alter the system's reliability, functionality, capability, or operation. I.e., if a vendor submits a recommended or requested change for approval as a de minimis change, a VSTL then provides analysis and a recommendation to the EAC on whether the change should be approved as a "de minimis" change, and then the EAC approves the request, and the change, as a modification to the certified system configuration which neither invalidates the certification (of conformance with voting system certification standards or guidelines) nor requires additional testing.

[80] https://www.eac.gov/sites/default/files/eoc-documents/ECO%20Analysis%20Form%20100833.pdf

2022, and approved, as recommended by Pro V&V, by the EAC within three days of Pro V&V's recommendation. DVS ECO 100833 affects four different DVS D-Suite EAC-certified versions, and at least 17 different versions certified at the state level, including D-Suite voting systems used in Arizona, California, Georgia, Iowa, Louisiana, Michigan, Missouri, Nevada, New Jersey, New Mexico, New York, Ohio, Pennsylvania, Tennessee, Utah, Virginia, and Washington states.

58. In other words, this ECO affects the voting systems in states which represent over half the population of the U.S. What was the "de minimis" change approved in this ECO? A completely different CPU on the aValue ImageCast X motherboard, and a new Basic Input/Output System (BIOS), which is the firmware that controls basic functions for the CPU, motherboard, and respective computer. In other words, the vendor proposed, the VSTL recommended, and the EAC approved a modification, without testing, to a voting system which involved the complete replacement of what are probably the two most critical, fundamental components which determine the function and security of a computer. This would be like the FAA allowing an aircraft manufacturer to change the wing design and engine design for a passenger aircraft, without additional testing.

59. It is difficult to convey the magnitude of inadequacy of the EAC's guidelines and response to the threat of supply chain attack facing voting and election systems. In order to protect against supply chain attack and compromise for computers and computer components, including software and firmware it is necessary to have qualified experts monitor, without exception or hiatus: the purity of every single material used in your device; the digital design templates and controls for fabrication; the fabrication of every single component, the resulting fabricated components, the assembly of all those components, composed of materials you have verified, according to your design, into a finished product. The same vigilance must be applied to uninterrupted expert monitoring of the finished product itself, including configuration, maintenance, and

updates, including 100% of installed code, for its entire lifecycle from concept through end-of-use. Only then is there even a reasonable chance to secure a system against supply chain attack. And, if all those measures are not vigilantly undertaken, then there is a reasonable chance of an undetected supply chain attack. None of those measures are or have been in place for our voting systems.

60. In comparison, the Department of Commerce Inspector General formally expressed concern that the FirstNet Authority had not conducted a supply chain risk assessment for the NPSBN in its four years of existence. How immeasurable is our risk if the EAC and state governments have not conducted a supply chain risk assessment for U.S. election and voting systems in the 20 years since the EAC was created?

61. What Peter Neumann, Principal Scientist at the Computer Science Laboratory of SRI International, wrote in 1995 seems prescient and still applicable: "Existing standards for designing, testing, certifying and operating computer-based vote-counting systems are inadequate and voluntary, and provide few hard constraints, almost no accountability, and no independent expert evaluations. Vendors can hide behind a mask of secrecy with regard to their proprietary programs and practice, especially in the absence of controls. Poor software engineering is thus easy to hide. Local election officials are typically not sufficiently computer-literate to understand the risks. In many cases, the vendors run the elections. Providing sufficient assurances for computer-based election integrity is an extremely difficult problem. Serious risks will always remain and some elections will be compromised."[81] Neumann wrote that expert assessment before the majority of U.S. computers and computer components were manufactured overseas, and before the threat became so pervasive that nearly 100% of companies had been affected by supply chain attacks.

---

[81] Peter G. Neumann, "Computer Related Risks," 1995. ISBN: 020155805X.

62. The situation is worse than it first seems. Decades ago, many states had their own voting system examiners, of varying capability. However, most of the voting systems at that time were electro-mechanical or had relatively simple embedded computers. The complexity of modern computer-based voting systems and the relentless advance of cyber threat actor capabilities now demands a skillset for cybersecurity that few, if any, states and localities possess or can afford. Even if states and localities could afford the caliber of cybersecurity expertise needed to defend voting systems, the U.S. workforce of qualified cyber professionals is too small to staff voting systems offices in our 50 states, much less our over 3,000 U.S. counties. A trade organization's annual report shows a cybersecurity workforce gap in the U.S. of 377,000 skilled professionals,[82] and state and county government cybersecurity position salaries typically top out at or below the median starting salaries for the same skillset in the private sector. States and counties are thus exposed to vast unmitigated cybersecurity risk in our election and voting systems.

63. The lack of skilled, qualified expert cybersecurity personnel at state and local government helps explain the insecure state of our nation's centralized statewide voter registration systems. An August, 2020 Center for Election Innovation and Research (CEIR) report, "Voter Registration Database Security (VRDB)," concluded:

a. Only 25 states reported meeting an eight-character password length requirement to access their VRDB.
b. Only 15 states required multi-factor authentication to access their VRDB.
c. Only 27 of 29 responding states "currently conduct systems audits," and many of those states audited their systems less than once per year.[83]

---

[82] https://www.isc2.org//-/media/ISC2/Research/2021/ISC2-Cybersecurity-Workforce-Study-2021.ashx

[83] The inadequacy of any auditing approach, other than "persistent, constant, and real-time" for an internet-connected device or service cannot be overstated. The SolarWinds

d. Only 26 of 28 responding states reported monitoring both successful and unsuccessful login attempts.

e. Only 19 of 24 states monitored signatures of database injection threats.

f. A Cloudflare Area 1 Security report stated "less than half of America's local election officials use even basic protections to ward off the threat of phishing," and "The federal government has immense resources and capability, but little authority. Local officials...find themselves in the crosshairs of nation-state cyber warfare without the knowledge or tools to fight back...from a cybersecurity perspective this complex system is a cluster[REDACTED] of vulnerability."

64. The futility of "Logic and Accuracy Tests" (LAT) that vendors and government election officials rely upon as a verification and demonstration of voting system security perfectly illustrates the nexus of false assurance, technical illiteracy, and unmitigated risk inherent in our current architecture of technology, procedures, and standards. First instituted when voting machines were mechanical or electro-mechanical, a LAT made perfect sense; when a machine is barely or un-reconfigurable, a simple demonstration with a few repetitions, particularly with prior testing, is sufficient to verify the function of a mechanical system. As the machine becomes more complex, and particularly when the machine is computerized, reconfigurable by code, amenable to covert and

SUNBURST software supply-chain compromise malware was deployed in February 2020 on thousands of corporate, institutional, and U.S. government systems, including on networks within the Departments of Defense, Homeland Security, Justice, and Treasury which are monitored in real-time by skilled cyber defenders using intrusion-prevention and –detection tools tuned to their systems and networks. The malware was not detected until 13 December 2020, after nearly 10 months of operation, and even then was not detected by any of those government agencies or their billions of dollars in cyber defense capability. The U.S. Government only, and finally, became aware of SUNBURST because Mandiant's FireEye team detected SUNBURST on their own systems and notified the USG of the attack signature.

undisclosed functions and functionality, and when the tester doesn't even have full access to all available controls on the system under test, a LAT's adequacy diminishes to zero. This is not new information; in 2004, an associate professor of computer science at Rice University stated in his testimony before an Ohio Legislature committee that "while 'logic and accuracy testing' can sometimes detect flaws, it will never be comprehensive; important flaws will always escape any amount of testing."[84]

65. A March, 2022 EAC report underscores this point. Despite certification of the DVS D-Suite 5.5-B voting system by an EAC-accredited VSTL, and despite the "trusted build" procedures recommended by the EAC, and despite the conduct of a LAT by county staff, some precinct-level ImageCast Precinct (ICP) DVS tabulators in Williamson County, TN in an October, 2021 municipal election did not properly tabulate the votes from a large number of ballots, nor include them in the final tally the machines produced.[85] An EAC "investigation," with no independent examiners involved, reported "the direct cause of the anomaly was inconclusive," but also that the system had outdated configuration files ("erroneous code") installed and that post-investigation ECOs for modified ICP software source code "fixed" the problem. Obvious deficiencies in the EAC's report and process include that:

a. There is evidence of the failure of internal controls (e.g., certification, trusted build, LAT), but the EAC has not acknowledged the failures nor initiated the external, independent audit which an internal control failure should trigger;

[84] https://votingmachines.procon.org/questions/is-logic-and-accuracy-testing-an-effective-method-of-assuring-that-electronic-voting-machines-are-operating-properly-before-an-election/

[85] https://www.eac.gov/sites/default/files/TestingCertification/EAC_Report_of_Investigation_Dominion_DSuite_5.5_B.pdf

b. The correct election results in Williamson County were finally obtained by rescanning ballots on a central scanner and then verifying the tallies with a hand-count, but the EAC didn't complete its report until over five months after the affected election and didn't notify other users, much less the public, of the problem with the D-Suite 5.5-B (and 5.5-C), so the public should have no confidence in any other election result tabulated on those systems, in any jurisdiction, and also no confidence in the EAC.

c. Had the Williamson County staff not noticed the anomaly, they would have reported inaccurate election results, and only after hand-counting did they have confidence in their results. In other words, no safeguard professed by the EAC or election officials or the election industry functioned properly to prevent or detect the introduction of erroneous code in our computerized voting systems, and the mechanism for producing trustworthy results was a hand-count of paper ballots. If our voting systems were passenger aircraft, they would all be grounded.

66. The fact of that anomaly, the EAC report, and its findings is almost non-existent in any news source, over six months after the election, over a month after the report, and on the precipice of new primary elections, so the American public remains, by-and-large, uninformed regarding the failure of the voting system safeguards and the possibility of erroneous software that would change their election results.

67. It is the same with the declarations of J. Alex Halderman, a professor of computer science at the University of Michigan and a widely-recognized expert on voting system security whose written testimony in the case of Curling v. Raffensperger in the U.S. District Court for the Northern District of Georgia expose a number of critical points[86], including:

[86] https://gaverifiedvoting.org/pdf-litigation/20200819-785_2-Declaration-Alex-Halderman.pdf

a. "The Director of Product Strategy and Security for Dominion Voting Systems does not dispute that its products can be hacked by sufficiently capable adversaries."

b. "Software of the size and complexity of the Dominion code inevitably has exploitable vulnerabilities."

c. "Nation-state attackers often discover and exploit novel vulnerabilities in complex software."

d. "...the Dominion software used in Georgia utilizes a wide range of outdated off-the-shelf software..." and "outdated software components are a security risk because they frequently contain known, publicly documented vulnerabilities"

e. "Malware could potentially be introduced in several ways, including: ...(b) through an attack on the hardware or software supply-chain"

f. "Rigorous post-election audits are necessary in order to reliably prevent attacks that compromise election results by manipulating ballot scanners" and "post-election audits are not sufficient to detect attacks against BMDs, since such attacks could change both the printed and electronic records of the votes."

g. Halderman discovered multiple severe security flaws in Georgia's Dominion Voting Systems which would also affect voting systems in numerous other states, and which, if exploited, would subvert "all procedural protections practiced by the State, including acceptance testing, hash validation, logic and accuracy testing, external firmware validation, and risk-limiting audits (RLAs)."[87]

---

[87] https://www.documentcloud.org/documents/21038844-20210802-expert-rebuttal-declaration-of-j-alex-halderman

68. Halderman explicitly refers to RLAs as one of the subvertible "procedural protections practiced by states." The election industry is increasingly adopting and promoting RLAs as their preferred approach to verify election accuracy and integrity. The premise of RLAs is that, by comparing a small, randomly-selected sample of the total individual digital cast vote records (CVR) for an election to ballot images and original paper ballots, where available, election officials can *efficiently* confirm, to a degree of statistical confidence, that voting systems correctly tabulated the election results. Paraphrased, RLAs assert "if we find no error in this random sample, then we can assume no error[88] in the total calculation, with X confidence."

69. The concept behind RLA comes from industrial quality control acceptance sampling originated to spot check production bullet quality in World War II. RLAs are attractive to many election officials for their "efficiency," in time and cost, compared to alternative and traditional post-election auditing. Indeed, much of the election industry and many public officials refer to RLAs by the marketing label "gold standard" for post-election audits, even referring to them as "forensic risk-limiting audits," which is deeply misleading. There are profound differences between RLAs and "forensic audits;" see Appendix 5 for a brief comparison.

70. Whatever their "efficiency," RLAs do not offer a panacea for election auditing. Philip Stark, Professor of Statistics at the University of California, Berkeley, and the "father" of the RLA, is a critic of the way RLAs have been oversold through overstated validity, inappropriate application, and non-adherence to required principles stated, "Whitewashing inherently untrustworthy elections by overclaiming what applying RLA procedures to an untrustworthy paper trail can accomplish sets back election integrity.

[88] More accurately, "little error," or "too little error to have affected the race/issue outcome."

This is security theater, not election integrity."[89] Professor Stark expressed that opinion in a two-and-a-half page resignation letter from the board of Verified Voting (VV), writing "Instead, we're saying, 'Don't worry: VV will teach you to sprinkle magic RLA dust and fantasies about parallel testing on your untrustworthy election. All will be fine; you can use our authority and reputation to silence your critics.'"

71. The flaws inherent in RLAs as a safeguard for election accuracy and integrity far exceed Stark's concerns. In the first place, RLAs are spot check sampling; even where appropriate for an industrial production process, which elections are not,[90] spot check sampling was always intended as a supplement to a broader quality control plan, not as a substitute for that comprehensive, adequate quality control plan. Second, auditing is an academic and professional discipline with a body of theoretical and philosophical standards, including among seven assumed postulates that: "An audit requires independence and freedom," and "Auditors are skilled judges who are able to measure and compare actual performance against standards of accountability." Neither of these is true of an RLA, which relies upon opaque, untested, uncertified software running on opaque, untested, uncertified hardware, with no transparency to the public, executed by public officials with no independence and no expertise in either auditing or the computer software and hardware involved. RLAs, despite the name, do not satisfy the criteria for audits.

---

[89] https://www.stat.berkeley.edu/~stark/Preprints/vv-resign-19.pdf?utm_source=JangoMail&utm_medium=Email&utm_campaign=Are+all+audits+created+equal%3f+(341331552)&utm_content=

[90] Industrial processes, e.g., manufacturing, often involve machine production and spot check sampling at the batch or lot level to verify manufacturing quality. Those industrial processes are designed to detect error, not deliberate sabotage – the equivalent of fraud in an election. Spot checks provide little chance of detecting sabotage, if the individual saboteur is cognizant of the spot check approach, because the saboteur can avoid sabotaging the spot checked samples, influence the sample selection to avoid sabotaged products, or spoil or change the spot check records.

72. An election audit must be able to do more than check that voting system computers can successfully execute addition for a small subset of ballots cast. The purpose of auditing elections is to satisfy the legal obligations of election officials that elections are free and fair, and to provide a warranted, transparent basis for public confidence that election results accurately reflect the sum of votes cast by eligible voters in a given contest, race, or ballot issue. An adequate audit should confirm or refute each of the following four statements:

a. No ineligible voters' ballots, nor ineligible ballots (e.g., a subsequent, illicit ballot cast from an otherwise eligible voter, or a ballot cast too late to be counted, or without proper credential verifying eligibility) were counted.
b. Each eligible voter's cast ballot was counted, and only once.
c. All legitimate ballots were counted accurately.
d. Tallies for each contest, race, or ballot issue accurately reflect the sum of votes on eligible voters' cast ballots; no more and no less.

73. In other words, election audits must be able to detect fake voters, fake ballots, and fake ballot counts. The adequacy of any audit method is a function of the extent to which the audit method can or cannot confirm or refute those four statements, and the question of efficiency should be a distant consideration, after adequacy to answer the four statements is confirmed. An RLA is completely incapable of detecting fake voters and fake ballots, and is unlikely to detect fake ballot counts, in part because RLAs not only rely upon black-box RLA software and hardware, so that the "randomness" of "random" CVR selections must be in question, but because they rely upon data provided by the voting systems themselves to identify and select CVRs for comparison and are executed without independence, expertise, or access to full forensic evidence.

74. In financial auditing, required of all publicly-traded companies to assure investors and regulators that company financial statements are authentic and accurate, a method like RLA would be considered an "internal control." Internal controls are a management

tool for process monitoring, not a substitute for independent external auditing by skilled experts with full access to all evidence. Regardless of how a recount or a partial recount for post-election audits is conducted, recounting ballots cannot detect fake voters or fake ballots, and is unlikely to detect the sophisticated, complex manipulation possible through supply chain attack.

75. Arizona is one of several states that allow for or require limited hand count post-election audits, under the assumption that they can reduce or eliminate risk of erroneous or fraudulent machine counts for the entire election. Arizona's approach to hand counts entails several inherent weaknesses, from an auditing standpoint. The first, again, is the "spot check" approach to limited sampling, in that Arizona only requires counties to hand count a small subset of ballots from a small subset (2% of precincts or 2 precincts, whichever is greater) of jurisdictions. This means that as many as 98% of precincts are not hand count audited. Since early voting (mail-in and drop box) ballots in Arizona are returned to counties and not precincts, counties must also hand count 1% of the total early ballots cast, or approximately 5,000 early ballots, whichever is less.[91] This means that in Maricopa County, AZ, where only 5,165 early ballots were hand counted out of more than 1.9 million "early votes" cast in 2020, less than three tenths of one percent of the early votes were hand counted in the post election audit.

76. The method of hand counting prescribed by the Arizona Secretary of State's Election Procedures Manual makes that small proportion of hand counting auditing even less valuable. There are two generally-recognized methods of hand counting,

[91] https://azsos.gov/sites/default/files/2019_ELECTIONS_PROCEDURES_MANUAL_APPROVED.pdf

called "Sort-and-Stack,"[92] and "Read-and-Mark,"[93] respectively. The Arizona Secretary of State requires the Sort-and-Stack method. The Sort-and-Stack method is known to be significantly more error-prone than Read-and-Mark, with a mean error rate between 35 percent and 78% greater than Read-and-Mark. When total error, including standard error (or uncertainty in error) is included, Sort-and-Stack can have a total error rate in excess of 2.5 percent.[94] Given this error rate, it is remarkable that Maricopa County's 2020 hand count audit report shows zero differences between the hand count and machine count, for 5,165 early voting ballots.

77. Making matters worse, the Arizona Secretary of State's procedures do not require video recording of hand counting, and prohibit video recording of the ballot content for hand counts, so there is no opportunity for citizens to verify that even those extremely-limited hand counts are accurate. That is, if the hand count post election audit is even conducted; Arizona's procedures allow the county officer in charge of elections to cancel the hand count and use the electronic tabulation of ballots as the

---

[92] Sort-and-Stack is a hand count method which counts one race at a time by placing each ballot to be audited into a stack which corresponds to the vote choice in the race being audited. For example, in a race between Candidate A and Candidate B, there would be one stack for each candidate, comprised of ballots sorted into those stacks. After sorting, the total quantity of ballots in each stack would represent the vote totals for those candidates.

[93] Read-and-Mark is a hand count method which counts a single, multiple, or all races and issues on a ballot by having one or more counters read the marks on the ballot, either simultaneously or in turn, and then mark a tally sheet formatted to show aggregate marks, corresponding to ballot votes, for each candidate.

[94] Stephen N. Goggin, Michael D. Byrne, and Juan E. Gilbert, *Post-Election Auditing: Effects of Procedure and Ballot Type on Manual Counting Accuracy, Efficiency, and Auditor Satisfaction and Confidence*, 11 Election L.J. 36 (2012), *available at* https://www.liebertpub.com/doi/epdf/10.1089/elj.2010.0098.

official count, by simply removing Hand Count Board members until there are too few to conduct the hand count.[95]

78. Numerous independent forensic examination reports mirror Professor Halderman's findings, including reports from Antrim County, MI,[96] and Maricopa County, AZ,[97] and Mesa County, CO,[98,99,100] which all show critical security vulnerabilities, non-compliance with published voting system standards, and anomalies and phenomena attributable to unauthorized and malicious activity, and which demonstrate that existing safeguards for U.S. voting system security are ineffective to detect even simple misconfiguration, much less more complex and sophisticated supply chain attacks of the kind that CISA could not detect in its own networks for ten months or more. The pattern is clear: no one who has asserted that U.S. voting systems are secure has been independent and expert, with access to full forensic evidence; every single independent expert with access to forensic evidence in an election or election system has concluded that the voting systems are not secure.

79. The first four appendices to this Declaration show, respectively, 1) voting systems used in Arizona's five largest counties, by population; 2) ownership of the companies which provide those voting systems; 3) some known, published vulnerabilities of components, mostly software, of those voting systems; and 4) country of manufacture or origin for a representative sampling of computers and computer hardware

---

95 Arizona Secretary of State, 2019 Elections Procedures Manual, p. 214, available at https://azsos.gov/sites/default/files/2019_ELECTIONS_PROCEDURES_MANUAL_APPROVED.pdf

96 https://www.depernolaw.com/all-expert-reports.html

97 https://www.azsenaterepublicans.com/cyber-ninjas-report

98 https://useipdotus.files.wordpress.com/2021/09/21.09.21-amended-exhibit-f-ex-f-1-1.pdf

99 https://useipdotus.files.wordpress.com/2022/03/mesa-county-forensic-report-no.-2.pdf

100 https://useipdotus.files.wordpress.com/2022/03/mesa-3-report.pdf

components used in those voting systems. These counties represent 6.46 million, or 85%, of Arizona's 7.6 million residents, and include Maricopa, the fourth largest county, by population, in the U.S. The voting systems used in these counties represent three of the top four U.S. voting system vendors, whose voting systems are used to cast and or tabulate over 80% of votes in U.S. elections. The third largest U.S. voting system vendor, not shown in the appendices, is Hart InterCivic; unlike the Dell computers used in ES&S, DVS, and Unisyn voting systems, Hart InterCivic seems to use Hewlett-Packard (HP) computers. It is a difference without distinction, as HP computers are also manufactured and assembled overseas, primarily in the PRC, of overseas-manufactured components, by foreign workers, with no U.S. government oversight and effectively no safeguards in the entirety of the testing and certification regime for voting systems. The voting system vendors all use "Commercial, Off-The-Shelf" (COTS) software with collectively thousands of known vulnerabilities that might be exploited before or after delivery of voting system components.

80. If these systems used in Arizona are compromised through supply chain attacks, for which there is ample, undetectable opportunity, then it is reasonable to conclude that U.S. elections are compromised through supply chain attacks. And it is reasonable to conclude that we do not know whether these systems have been compromised. Without access to comprehensive real-time and post-election data, and a cadre of cyber expertise that exceeds U.S. workforce quantity and quality resources, we may never know. This is true not only because supply chain attacks can be extraordinarily difficult to detect,[101] but also because the safeguards inherent in the U.S. voting system testing and certification regime are practically non-existent, and because the nation in which

[101] Supply chain attacks may be impossible to detect in complex computer systems without external validation and real-time data, like trying to determine if a drunk driver crossed over a lane divider on a deserted highway at night, at an undetermined time, without video evidence or telematics from the vehicle or occupant electronic devices.

most of the systems and their components are manufactured and assembled is engaged in a decades-long campaign to infiltrate, corrupt, and compromise western, and especially U.S., computers and computer-based systems, including government and election systems. There is no reason to suspect, much less believe, that Arizona's voting systems have not been compromised by supply chain attack. There is every reason to believe that they would already have been attacked and compromised. Overseas manufacture and supply, without oversight, provides both opportunity and means. The prospect of influencing or controlling U.S. policy provides incentive or motive. There is no effective deterrent. The attack either has happened or will happen.

81. In summary, the complexity, adoption, and connectivity of computers and computer-enabled systems in the U.S. have increased exponentially over the last decade, but the overseas manufacturing, assembly, integration, and configuration of the majority of U.S. computers and computer components, and significant proportions of the software supply chain, including those used in our voting systems, exposes those systems to the advanced persistent threat of massive, well-funded, decades-long nation-state efforts to subvert U.S. national security. Those advanced persistent threats are known to have targeted and penetrated all aspects of the USG, our state governments, defense industry, advanced technology industries, and our election systems, including the principal USG organization responsible to defend election systems against that threat. The American public is largely unaware of the juggernaut of nation-state offensive cyber warfare, including supply chain attacks, arrayed against their voting systems and elections, and due to the categorization of election and voting systems as "critical infrastructure," and the bias of the associated government and non-government institutions against sharing vulnerability and compromise information, our public officials and public are hearing almost exclusively what is simply not true: that our voting systems are both securable and secure.

I declare under penalty of the perjury laws of the United Sates that the foregoing is true and correct and that this declaration was executed this 7th day of June 2022.

Shawn A. Smith

5 Appendices

Appendix 1. Voting Systems of Arizona Largest 5 Counties, by Population

Appendix 2 – Voting System Vendor Ownership

Appendix 3 – Known Voting System Vulnerabilities

Appendix 4 – Country of Manufacture or Origin for Voting System Components

Appendix 5 – Comparison of Risk-Limiting Audit and Full, Independent Forensic Audit