38. This means that voting machine programs must go through the proper cybersecurity testing and computerized devices must be configured to Cybersecurity best practices so that access is controlled, systems are up-to-date with the latest patched versions of computer programs, and all actions on the system are properly logged so actions on the computerized device can be validated.

39. Proper cybersecurity testing includes all voting machine programs going through regular, independent 3rd party source code review as well as ethical hacking or penetration testing engagements by qualified personnel where real-world deployments are tested for exploitable security vulnerabilities. Current vulnerabilities found across voting machine vendors, as can be seen through evidence referenced in this declaration, heavily suggest that this practice is not happening.

40. Even in a well-designed and properly secured computer system, the factor of human error can lead to cybersecurity breaches.

41. Ultimately it is individual employees or officials who must choose secure passwords, keep their passwords secret, refrain from activating malware by opening email attachments or clicking on unsafe internet links, refrain from connecting computer hardware to portable computer memory media or computer networks, maintain software up-to-date, and a host of other mundane cybersecurity practices – including remembering what cybersecurity practices must be observed.

42. Experience has shown that humans err on these practices, through ignorance, forgetfulness, neglect, and even intention, simply because it is less demanding to ignore the proper procedure.

**Context: Cyber Security Conference Shows Vulnerable Voting Machines**

43. Since 2017, a Cyber Security conference, "DEFCON", has hosted a "Voting Machine Hacking Village" where voting machines from major vendors have been displayed and made available for participants to attempt to compromise. Conference participants had a maximum of 2.5 calendar days to work with these machines, mixed in with the rest of their conference activities. A report issued by conference organizers after the 2017 conference stated, "By the end of the conference, every piece of equipment in the Voting Village was effectively breached in some manner. Participants with little prior knowledge and only limited tools and resources were quite capable of undermining the confidentiality, integrity, and availability of these systems." A copy of the DEFCON 2017 report is attached as Exhibit A.

44. The statement "undermining the confidentiality, integrity, and availability of these systems" means the participants found methods by which votes could potentially be changed on such systems.

45. The DEFCON Report from the Voting Machine Hacking Village from 2018 shows that significant vulnerabilities remained, and that vulnerabilities that had been reported prior had not been fixed. The summary of the 2018 report stated,

- A voting tabulator that is currently used in 23 states is vulnerable to be remotely hacked via a network attack. Because the device in question is a high-speed unit designed to process a high volume of ballots for an entire county, **hacking just one of these machines could enable an attacker to flip the Electoral College and determine the outcome of a presidential election**.
- A second critical **vulnerability in the same machine was disclosed to the vendor a decade ago**, yet that machine, which was used into 2016, still contains the flaw.
- Another machine used in 18 states was able to be hacked in only two minutes, while it takes the average voter six minutes to vote. **This indicates one could realistically hack a voting machine in the polling place on Election Day within the time it takes to vote**.
- Hackers had the ability to **wirelessly reprogram, via mobile phone, a type of electronic card used by millions of Americans to activate the voting terminal to cast their ballots**. This vulnerability could be exploited to take over the voting machine on which they vote and cast as many votes as the voter wanted.

A copy of the DEFCON 2018 report is attached as Exhibit B.

46. The DEFCON 2019 report repeats similar high-level bullets, showing no noticeable improvements from prior years.:

- Commercially available voting system hardware used in the U.S. remains vulnerable to attack.
- There is an urgent need for paper ballots and risk-limiting audits.
- New Ballot Marking Device (BMD) products are vulnerable.

A copy of the DEFCON 2019 report is attached as Exhibit C.

47. All three reports highlight that there are a variety of ways that voting machines are compromised, even new systems are vulnerable when built, individuals with limited or no experience were able to compromise these systems, and those individuals were able to find these vulnerabilities in three days or less. This suggests that voting machine vendors are not undergoing the same standard security testing that is common and normal in the United States, for example, in the financial services industry.

**Antrim, MI: Dominion Configuration Allocates Votes to the Wrong Candidate**

48. Antrim County, Michigan initially misreported its vote totals for the 2020 presidential election. Antrim County later issued a revised count that was dramatically different, with the vote total for one candidate increasing significantly and the total for another candidate decreasing significantly.

49. In early 2021, the Michigan Secretary of State engaged J. Alex Halderman, a professor of computer science at the University of Michigan, to provide a technical explanation of what happened in Antrim. Professor Halderman's report[3] outlines a number of failures in the way the election was conducted, but specifically highlights some very alarming problems with the way that Antrim's electronic Election Management System, supplied by Dominion Voting Systems, tallies results.

50. Halderman stated that the Dominion software used numerical values to identify each candidate on the tabulators, and also used numerical values to identify the candidates on the Election Management System (EMS) Server where vote totals are aggregated for the official results. These numbers are supposed to match so that when the tabulator counts the votes for Candidate A, those results are attributed to Candidate A on the EMS Server. Halderman stated that in a number of precincts in Antrim County, MI the numbers had become misaligned due to improper device configurations. As a result, candidate Jorgenson's votes in those precincts were initially attributed to candidate Trump, Trump's votes attributed to candidate Biden, and Biden's votes marked as undervotes.

---

3 https://web.archive.org/web/20210327143045/https://content.govdelivery.com/attachments/MISOS/2021/03/26/file_attachments/1736734/Antrim.pdf

51. Halderman attributed this issue to "user error," since the county clerk employee creating the configuration files for the tabulators did not follow Dominion's recommended procedure for implementing ballot configuration changes. Specifically, after making a small ballot change in one precinct, the county employee remade the tabulator configuration files for that one precinct, but did not remake the configuration files for every other tabulator in every other precinct. The county employee presumptively assumed that since nothing changed on the ballots associated with those precincts, there was no reason to update the configuration files for the tabulator. However, Halderman's analysis was that this ballot change created a mismatch in any precinct that showed up in the Dominion software after the precinct that had the ballot change, so that votes for each candidate were misattributed. Halderman viewed this as a "human error" while acknowledging, "The election software also could have done more to help election staff avoid making mistakes that could lead to erroneous results." [4]

52. It is my professional opinion that Halderman's statement that more could have been done by the election software is a gross understatement. As a comparison, I typically see more validation implemented in commercial inventory control software. The primary purpose of election software is to make sure votes for a candidate are properly counted and attributed to the intended candidate. Failing to do any type of validation on the importing of results to be sure that the intended candidate receives the proper tallies at best constitutes gross negligence.

[4] J. Alex Halderman, Analysis of the Antrim County, Michigan November 2020 Election Incident at 3 (March 26, 2021) available at https://web.archive.org/web/20210327143045/https://content.govdelivery.com/attachments/MISOS/2021/03/26/file_attachments/1736734/Antrim.pdf

53. Subsequent analysis of the Dominion system has shown how exploitable the design flaw identified by Halderman is. Working with Dominion equipment, expert Jeff Lenberg was able to alter configuration files for a tabulator or settings on the EMS to intentionally cause the system to wrongly attribute votes to a favored candidate. In his testing Lenberg further caused the poll tape to output the manipulated results, thereby leaving no clear indication anything had been tampered with.

54. Halderman's and Lenberg's work show that to alter election results in the Dominion system, all that would be required is a small change on the media used in the tabulator. This could be accomplished through a malicious program, or by a person with temporary access to these cards. The only evidence that tampering had occurred would potentially be a copy of the media used in the tabulator or a full hand count of the ballots in an affected batch.

55. Many counties reuse the media utilized for configuring the tabulator from one election to the next. Such reuse means that at the time of the next election the evidence of previous tampering would be destroyed.

56. In Antrim County, MI this problem was identified because the reported results were so significantly different from the expected results based on historical trends, prompting an investigation. It is highly likely that this problem would go undetected in a county where the normal margins between candidates was less predictable; and it is in fact very likely this *has* happened elsewhere and gone undetected. The assumption that the county employee made in only creating the configuration files for the tabulator where a change happened is a reasonable assumption to make. It is unlikely this is the first time someone made this mistake, and yet it is the first time a mistake was publicly detected.

**Voting Machine Software Fails to Implement Best Practices**

57. I was given access to the Antrim County Dominion election equipment in connection with post-election litigation for which I provided expert witness services. After analyzing the equipment, I concluded it exhibited a large number of failures in implementing secure coding practices, application security design principles, and cyber security best practices. Specifically:

a. The Dominion Election Management System software did not follow application security best practices known for over 15 years, and widely adopted across industries.

b. Operating System credentials used generic accounts that multiple people knew and did not change from year to year. These credentials provided more than enough access and the tooling for any of the individuals who possessed them to change election results.

c. The systems had not been configured to any type of secure baseline. Lack of a secure baseline increases the chances the systems could be compromised and also means that the appropriate logs required to respond to a suspected breach would not exist on the system, making it nearly impossible to determine if election results were tampered with just by looking at the election equipment.

d. The system had Microsoft SQL Server Management Studio installed, which allows the direct editing of data in the election results database. This software is installed separately from Microsoft SQL Server and is not listed on the Election Assistance Commission's list of approved software. It was unclear what business purpose it could serve on this particular system. The Dominion software already has capabilities within it that could handle any normal expected use case for Microsoft SQL Server Management Studio.

58. These failings are indicative of an immature cyber security program that has not implemented the necessary steps to ensure secure software is created and cannot ensure the integrity of the votes tallied on the systems.

**Maricopa County, AZ: Failure to Follow Best Practices & Failure to Preserve Logs and Data**

59. The audit of the 2020 election results in Maricopa County, Arizona was the largest and most comprehensive election audit conducted to date. In addition to reviewing the actual voting machine systems used during the election, it involved a full hand-counting of all 2.1 million ballots, and forensic imaging and a forensic paper analysis of all the ballots. I served as the project lead who ran this audit.

60. Maricopa County used electronic election equipment supplied and supported by Dominion Voting Systems.

61. The audit's findings related to the Dominion electronic equipment used to case and tabulate ballots in the election included the following:

a. Operating System credentials used generic accounts that multiple people knew and did not change from year to year. These credentials provided more than enough access and the tooling for any of the individuals who possessed them to change election results.

b. The systems had not been configured to any type of secure baseline. Lack of a secure baseline increases the chances the systems could be compromised and also means that the appropriate logs required to respond to a suspected breach would not exist on the system, making it nearly impossible to determine if election results were tampered with just by looking at the election equipment.

c. Computer logs related to the equipment's performance during the election were lost, and files were deleted. In most cases it was not possible to determine who performed the actions because the required information to do so did not exist.

d. Information was withheld by the County and never provided to allow an analysis of this data. This included routers and log data, in addition to other requested election equipment.

62. While the Splunk logs and router data were later reviewed by Special Master John Shadegg's team, the scope of their review did not cover the time period where the audit detected files deleted, nor did it appear the County stored the necessary net flow data required to make any determination related to internet connectivity. This did not stop their report from stating there was no indication of deletion of files or internet connections. All participants besides Shadegg were prevented from saying anything about the analysis done due to a non-disclosure agreement.

63. The events in Maricopa County illustrate the unsecure practices surrounding electronic voting machines and voting equipment that are standard in Arizona and across the country that could result in the purposeful or accidental altering of election results. In Arizona, as in other states, after-the-fact review found that generic user accounts were used in the electronic election equipment, poor passwords were implemented, and there was insufficient logging to tell what actions had been done and by whom. Specifically in Arizona, every single Windows account on every system analyzed had the exact same password, including for users who could alter results. Election data had been purged and files deleted, and it was not easily attributable to any individual. This setup would make it difficult to detect, let alone respond to, any type of election result problems or mistakes.

64. While this and other aspects of the audit have been claimed by media to have been refuted, the rebuttal of Maricopa County's response has never been fully addressed. A copy of Maricopa County's response to the audit is attached as Exhibit D. The rebuttal to this response can be found as Exhibit E.

**Williamson County, TN: Insufficient Technical Oversight Over Voting Machine Code & Changes**

65. On November 3, 2021, the federal Election Assistance Commission (EAC) received a report from the Tennessee Secretary of State related to an anomaly from the October 26, 2021 municipal elections in Williamson County, Tennessee. The Tennessee report stated that the close poll reports from 7 of the 18 ICP tabulators used during the election did not match the number of ballots scanned. The election results were validated via a hand-count of ballots, but the EAC launched an investigation into what had caused the tabulating problem, and later issued a report related to the investigation.[5]

66. The equipment used in Williamson County, Tennessee, and investigated by the EAC was part of the D-Suite 5.5-B system supplied by Dominion Voting Systems.

67. The EAC report stated that the first step in the investigation was to validate that the proper version of all files was included on the system. This same process is typically part of the pre-election certification of the machines for use in an election. However, even though these systems had presumptively gone through the certification process, the EAC accredited voting system vendors Pro V&V and SLI Compliance hired to perform the analysis determined that two configuration files used by Williamson County were not the correct versions and were from a prior version. This was later determined to not be significant for the cause of the issue, but shows that the certification processes missed identifying differences that it should have found.

---

[5] https://www.eac.gov/sites/default/files/voting_system/files/EAC_Report_of_Investigation_Dominion_DSuite_5.5_B.pdf

68. Pro V&V and SLI Compliance were able to reproduce the erroneous results and found that the anomaly corresponded with either the error in the log, "QR code signature mismatch" or "Ballot format or id is unrecognizable."

69. Despite the work being conducted by two EAC accredited vendors, Pro V&V and SLI Compliance, and with representatives present from Dominion, the EAC, the Tennessee Secretary of State, and Williamson County staff, they were unable to determine the cause of this erroneous behavior.

70. The manufacturer, Dominion, submitted a Root Cause Analysis to the EAC stating "erroneous code is present in the EAC certified D-Suite 5.5-B and D-Suite 5.5-C systems." Dominion stated that when a certain part of a QR code was misread, the ICP interpreted the ballot as provisional and thereafter marked **all** ballots subsequently scanned as provisional, leaving these ballots out of the close poll report totals. Dominion's solution was to submit revised code that would reset the provisional flag within the tabulator after a ballot was scanned as provisional, so that subsequent ballots would not automatically be flagged as provisional.

71. A QR code is a defined standard for matrix barcodes which is capable of storing a significant amount of data within a small amount of space. This standard is very resilient and has error correction built into the standard[6]. Depending on the level of error correction implemented, a QR code can have from 7% to 30% of the QR code fully obstructed or damaged and the QR code can still be read properly. This is because a QR code essentially holds the data in it twice. It is in the QR code once in its normal format, and one other time as a polynomial representation of the data[7]. This error correction is robust enough that even at 7% error correction a QR code should fail to be read and error out rather than ever have values within it misread.

72. Dominion utilizes QR codes on ballots printed out of their ICX Ballot Marking Device (BMD) to represent all of the choices the voter made. In some states such as Georgia and Tennessee these ICX BMDs are utilized by all voters. In other states most voters will fill out a standard bubble fill ballot by hand and the ICX BMD will only be utilized for accessibility voters. In all cases the filled out ballot, whether by hand or by the BMD, will subsequently be fed through the ICP tabulator in order to be official cast and tallied.

---

[6] https://www.qrcode.com/en/about/error_correction.html
[7] https://blog.qrstuff.com/2011/12/14/qr-code-error-correction

73. The QR codes utilized by Dominion utilizes Level M of error correction, which offers 15% of redundancy. This can be seen in the photo to the right, which is a Dominion QR code from a Georgia ballot. The hockey puck like black box that has been highlighted by a red box is the indicator that this level of error correction is in the QR code[8].

74. At 15% error correction it would be extremely unlikely for a QR code to have a value in it misread. Credit cards utilize a single digit in the credit card number as a checksum to make sure the credit card was read properly. This is simple, yet sufficient to make sure when you swipe your credit card it either errors out and needs to be reswiped, or your account is charged and not someone else's. The level of validation in a QR code is significantly more complicated and sophisticated. Dominion's ICP tabulators are also fully capable of spitting a ballot back out and forcing the user to refeed the ballot in the case where something is not read correctly. As a result, Dominion's explanation that the QR code was misread is insufficient to adequately explain what occurred.

75. Even taking that into the consideration, per the description of the Engineering Change Order, Dominion's code change did not do anything to fix the situation which caused a ballot to be misread. The revised code simply reset the provisional flag for subsequent ballots so the error code would not impact everything afterwards

---

[8] https://blog.qrstuff.com/2011/12/14/qr-code-error-correction

76. The EAC report states, "Modified ICP source code was submitted by Dominion that resets the provisional flag following each voting session. The ECO analysis included source code review to confirm the change to both systems and to ensure no other code is changed." This appears to mean that the original ballot that was misread would still be misread and may be erroneously flagged as provisional, and not counted.

77. Yet the EAC report clearly states that testing after the change was implemented showed that the fix resulted in all ballots being properly counted and no errors in the log: "This software was then tested for accuracy by processing two thousand ballots printed by an ICX, utilizing the same election definition used in Williamson County, TN on October 26, 2021. The analysis and testing of the ECOs has demonstrated that the anomaly was successfully fixed. No instance of the anomaly or the associated error or warning messages in the ICP audit logs were observed during the testing." This either means that ballots that were utilized to test the fix never would have triggered the error condition in the first place, or it means that the misreading of a ballot did not impact the ballot itself but only impacted subsequent ballots.

78. If ballots were utilized to test the fix that never would have triggered the error condition, it means that it is unknown if this issue is actually fixed. More importantly, it suggests either gross technical incompetence by whoever performed the testing in not realizing that the test case did not validate the fix; or a knowing and willful misrepresentation to the EAC that the code changes were validated. In either case, by accepting the fixes from Dominion as resolving the issue, the EAC demonstrated a lack of technical competence to properly oversee the necessary actions needed to ensure the integrity of electronic voting machines.

79. If ballots were in fact used in the test case to validate the fix that would have created this error condition, but all the results came back properly and validated that the code change did fix the issue, this would indicate that misreading of a QR code ONLY impacted subsequent ballots and not the current ballot being processed. This would be an extremely abnormal programming error to accidentally occur and highly suggests intentional malicious code. The source code needs to be thoroughly reviewed by qualified personnel to determine the origins of this erroneous code and the reason it was put in place.

80. In summary, Dominion machines in Williamson County, TN failed to properly tally votes in a significant way. This ended up in an EAC investigation where they stated that "erroneous code" was in the Dominion software that had caused that issue. This same code has been utilized in elections across the country for quite some time with an unknown impact. The EAC accepted an explanation from the voting machine Dominion that doesn't make technical sense and let the voting machine vendor define the root cause and create the code to fix the issue. This code was either insufficiently tested to validate the issue was fixed, or the original code was a strong indication of a subversion of the voting equipment. In either case, the EAC demonstrated inadequate oversight to properly ensure the integrity of votes tallied in electronic voting machines.

**The Insufficiency of Air Gaps**

81. It is commonly argued that deficient cyber security practices concerning electronic election equipment are insignificant because these systems are "air-gapped" and not connected to any type of external computer networks.

82. There is substantial evidence that many election systems are not actually protected by "air-gapping." In Maricopa County, the analysis of the equipment revealed significant indications that the Election Management network had connections to the internet at times.· Both Dominion[9] and ES&S Software[10] advertise that their systems support modems of various types and modem support is part of Dominion's contract for Michigan.[11]

83. Even a properly "air-gapped" system is not safe from malicious code being copied into it. For example, computers in nuclear reactors are air-gapped to increase their security, yet the Stuxnet malicious code infected computers in a nuclear reactor in Iran, ultimately causing damage to the reactor. To do so, the Stuxnet code spread through computers in Iran until it copied itself to a system connected to a portable USB drive that was later also used on the nuclear reactor computer network. The Stuxnet code copied itself onto the USB drive and then onto the nuclear reactor network computers. Inside the air-gapped network, the Stuxnet code slowed down the nuclear reactor without causing a nuclear meltdown.

84. The same or a similar technique could be used to compromise "air-gapped" electronic voting machines, and in fact, electronic voting systems routinely utilize USB Drives and other portable media to transfer results, configuration files, and ballot images from one system to the next

---

[9] https://www.michigan.gov/-/media/Project/Websites/sos/01holland/071B7700117_Dominion.pdf

[10] https://web.archive.org/web/20150920041547/https://sos.idaho.gov/elect/Clerk/DS200%20Procedures/ESS_EVS5000_SOP00_DS200_Operator%20Guide.pdf

[11] https://www.michigan.gov/-/media/Project/Websites/sos/01holland/071B7700117_Dominion.pdf

## Conclusions

85. There is an extreme lack of cyber security maturity in the election software and equipment industry, which has not implemented best practices that have been known for more than 20 years and have been adopted and applied in most major industries in the United States.

86. The repetitive nature of severe vulnerabilities detected across multiple voting machine vendors over many years indicates that proper cybersecurity testing, such as secure code review and penetration testing are not being performed on a regular basis by competent personnel, and/or what is detected is not being remediated. Without proper cybersecurity testing and the prompt remediation of what is detected it is impossible for voting machine software to be secure.

87. The problem is further complicated by the fact that many election workers operating election systems are older[12] and have inadequate technical knowledge, forcing them to fully rely on the voting machine vendor or their subcontractors to perform the most basic tasks.

   a. Maricopa County has stated that it employs two Dominion individuals full-time in order to run its elections. These individuals do everything from configuring the elections to making backups and taking them offsite.

   b. Michigan uses a company called Election Source to build its elections. Local county officials have little understanding of the machines they use.

---

[12] https://www.eac.gov/documents/2017/11/15/eavs-deep-dive-poll-workers-and-polling-places

c. In Antrim County, the county clerk was quick to state the county had made a mistake and the problem was human error, even though she could not give any details as to why but merely relied on the vendor's analysis.[13] The technical explanation eventually provided by the Secretary of State, written by Professor Halderman, at best indicated extremely poorly written software.

d. The Williamson County, TN EAC report makes it very clear that the EAC lacks the needed technical knowledge to fully monitor and validate that identified issues are properly remediated by voting machine vendor.

88. Because election abnormalities directly affect partisan political interests, investigations related to electronic election equipment, in my experience, rapidly become heated and toxic. This makes it harder to conduct an adequate investigation, because one side has incentive to keep the investigation from finding anything. The complexity of the electronic equipment and software gives interested parties ample opportunity to obfuscate the investigation.

89. Without an understanding on how computer systems and election systems work or how to detect unauthorized modification of code on a system, elected officials, law enforcement officials, and court officials are not well-equipped to deal with controversies related to electronic election equipment.

[13] https://www.youtube.com/watch?v=S9uMlrnAVwo

90. The end result is that current electronic voting systems (1) are unsecure and can be compromised by individuals with no experience with voting equipment with less than three days of work, (2) are built and deployed without the proper safeguards for accountability to allow a proper investigation to happen, (3) are difficult to audit after the fact because they are too complicated for elected officials, law enforcement, and the courts to easily understand.

91. It is my professional opinion, for all of the reasons outlined, it is impossible for electronic voting machines to be properly secured by the 2022 elections, and that they should not be used. Something so essential to democracy should not be more complicated than the average American, law enforcement, and the courts can easily understand and handle in a timely manner.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 7, 2022.

[signature]

Douglas J Logan

# EXHIBIT A

# DEFCON 25 Voting Machine Hacking Village

*Report on Cyber Vulnerabilities in*

*U.S. Election Equipment, Databases, and Infrastructure*

**September 2017**

**Co-authored by:**
Matt Blaze, University of Pennsylvania
Jake Braun, University of Chicago & Cambridge Global Advisors
Harri Hursti, Nordic Innovation Labs
Joseph Lorenzo Hall, Center for Democracy & Technology
Margaret MacAlpine, Nordic Innovation Labs
Jeff Moss, DEFCON

## Forward

I've spent my entire adult life in the national security arena: Europe during the Cold War, the Balkans in the 1990s, the Middle East since 9/11, in the Pentagon, the White House, and most recently at NATO headquarters in Brussels. I've studied national security at West Point and at Harvard. So, why am I now introducing a report on cyber hacking of our voting systems?

The answer is simple: last year's attack on America's voting process is as serious a threat to our democracy as any I have ever seen in the last 40+ years – potentially more serious than any physical attack on our Nation. Loss of life and damage to property are tragic, but we are resilient and can recover. Losing confidence in the security of our voting process – the fundamental link between the American people and our government – could be much more damaging. In short, this is a serious national security issue that strikes at the core of our democracy.

This report makes one key point: our voting systems are not secure. Why is this so serious? Why must we act now? Why is this a national security issue? First, Russia has demonstrated successfully that they can use cyber tools against the US election process. This is not an academic theory; it is not hypothetical; it is real. This is a proven, credible threat. Russia is not going away. They will learn lessons from 2016 and try again. Also, others are watching. If Russia can attack our election, so can others: Iran, North Korea, ISIS, or even criminal or extremist groups. Time is short: our 2018 and 2020 elections are just around the corner and they are lucrative targets for any cyber opponent. We need a sense of urgency now. Finally, this is a national security issue because other democracies – our key allies and partners – are also vulnerable.

Thousands of state and local election officials are responsible for administering elections but they are often overburdened and under-resourced. It is not their job alone to deal with this national security threat.

This important report highlights the problems that demand our attention and solutions. The "Voting Village" at DEFCON in July 2017 was not intended to be something to entertain hackers. It was intended to make clear how vulnerable we are. The report describes clearly why we must act with a sense of urgency to secure our voting systems.

For over 40 years I voted by mailing an absentee ballot from wherever I was stationed around the world. I assumed voting security was someone else's job; I didn't worry about it. After reading this report, I don't feel that way anymore. Now I am convinced that I must get involved. I hope you will read this report and come to the same conclusion.

Douglas E. Lute
*Former U.S. Ambassador to NATO*
*Lieutenant General, U.S. Army, Retired*

# Contents


Introduction 4

On the Eve of DEFCON: The State of Our Election Security Landscape 6

Voting Village Goals 7

Equipment 7

Limitations 8

Technical Findings & "Accomplishments" 8

Impact & Lessons Learned 14

Next Year's Voting Village: Moving Forward 16

Conclusion 17

Acknowledgements 17

APPENDIX #1: Partial List of Attending Individuals & Organizations 18

## Introduction

Since its founding in 1993, DEFCON has become one of the world's largest, longest-running, and best-known hacker conferences. This year's DEFCON was held July 27-30, 2017 in Las Vegas and drew a record-breaking 25,000 participants. For the first time, DEFCON featured a Voting Machine Hacking Village ("Voting Village") to highlight cyber vulnerabilities in U.S. election infrastructure – including voting machines, voter registration databases, and election office networks. The voting machines available in the Voting Village were paperless electronic voting machines, and at a time when a number of U.S. voting jurisdictions are either committed to or considering purchasing newer equipment based on auditable paper records,[1] open examination of these types of systems could not be timelier. The event was organized by several cyber, voting equipment, and national security experts, along with DEFCON founder Jeff Moss.

The Voting Village acquired and made available to participants over 25 pieces of election equipment including voting machines and electronic poll books. Most models are still widely used in U.S. state and local elections today (with the exception of the AVS WinVote, described below). The Voting Village also featured a mock back-office training "range" to simulate databases and networks of real-world election administrators.

Hacking into voting machines is not new, but previously it was conducted in only in very limited academic or industrial settings under strict controls and publications restrictions. DEFCON's Voting Village represented the first occasion where mainstream hackers were granted unrestricted access to explore and share any discovered vulnerabilities. Legal restrictions including the 1998 Digital Millennium Copyright Act (DMCA)[2] and, to some extent, the Computer Fraud and Abuse Act, made such activities subject to criminal or civil liability.

A consequence of the limited access to voting machine hardware in the past, is that doubts have been frequently raised about if the various vulnerabilities identified in previous studies would be practical for technologists of ordinary skill to discover and exploit. At the DEFCON event, however, thousands of participants were invited to engage with and explore voting equipment and the network simulator in an environment free of restriction for the first time.

The results were sobering. **By the end of the conference, every piece of equipment in the Voting Village was effectively breached in some manner. Participants with little prior knowledge and only limited tools and resources were quite capable of undermining the confidentiality, integrity, and availability of these systems**, including:

- The first voting machine to fall – an AVS WinVote model – was hacked and taken control of remotely in a matter of minutes, using a vulnerability from 2003, meaning that for the entire time this machine was used from 2003-2014 it could be completely controlled remotely, allowing changing votes, observing who voters voted for, and shutting down the system or otherwise incapacitating it.
- That same machine was found to have an unchangeable, universal default password – found with a simple Google search – of "admin" and "abcde."
- An "electronic poll book", the Diebold ExpressPoll 5000, used to check in voters at the polls, was found to have been improperly decommissioned with live voter file data still on the system; this data

[1] Jenni Bergal, "Russian Hacking Fuels Return to Paper Ballots", *Huffington Post Stateline*, (Oct. 3, 2017), http://www.huffingtonpost.com/entry/russian-hacking-fuels-return-to-paper-ballots_us_59d39962e4b092b22a8e398d

[2] U.S. Copyright Office Summary, The Digital Millennium Copyright Act of 1998, December 1998, https://www.copyright.gov/legislation/dmca.pdf

should have been securely removed from the device before reselling or recycling it.[3] The unencrypted file contained the personal information – including home residential addresses, which are very sensitive pieces of information for certain segments of society including judges, law enforcement officers, and domestic violence victims – for 654,517 voters from Shelby County, Tennessee, circa 2008.

**Moreover, a closer physical examination of the machines found, as expected, multiple cases of foreign-manufactured internal parts (including hardware developed in China), highlighting the serious possibility of supply chain vulnerabilities.** This discovery means that a hacker's point-of-entry into an entire make or model of voting machine could happen well before that voting machine rolls off the production line. With an ability to infiltrate voting infrastructure at any point in the supply chain process, then the ability to synchronize and inflict large-scale damage becomes a real possibility. Also, as expected, many of these systems had extensive use of binary software for subcomponents that could completely control the behavior of the system and information flow, highlighting the need for greater use of trusted computing elements to limit the effect of malicious software. In other words, a nation-state actor with resources, expertise and motive – like Russia – could exploit these supply chain security flaws to plant malware into the parts of every machine, and indeed could breach vast segments of U.S. election infrastructure remotely, all at once.




Given the federal government's recent designation[4] of election systems as critical infrastructure – and in light of what is known about the Russian attempts to infiltrate election networks in at least 21 states in the 2016[5] Presidential Election – it is overwhelmingly evident that election security is now an extension of *national security*. In addition to Russia, other state and private actors (including Iran, North Korea, organized crime, terrorist groups, and even lone-wolf hackers) also possess the technical capability to attack our voting systems or credibly sow distrust in election results. Organized crime is also a serious threat in the larger cybercrime ecosystem and they may also have motives to attack election systems or provide such services for hire, which we've seen in areas like botnets, ransomware, and malware distribution. **The bottom line is: No matter the level of nation-state hacking or interference in 2016, if our enemy's goal is to shake public confidence about the security of the vote, they may already be winning.** And with critical

[3] Michelle De Mooy, Joseph Jerome, and Vijay Kasschau, "The Legal, Policy, and Technical Landscape Around Data Deletion", *Center for Democracy & Technology*, (2017) https://cdt.org/files/2017/02/2017-02-23-Data-Deletion-FNL2.pdf

[4] See Presidential Policy Directive (PPD) 21: https://obamawhitehouse.archives.gov/the-press-office/2013/02/12/presidential-policy-directive-critical-infrastructure-security-and-resil

[5] Congressional Testimony of Jeanette Manfra, then-Acting Deputy Under Secretary for Cybersecurity and Communications, National Protection and Programs Directorate, U.S. Department of Homeland Security, and Dr. Samuel Liles, Acting Director, Cyber Division, Office of Intelligence and Analysis, U.S. Department of Homeland Security, for a hearing entitled "Russian Interference in the 2016 U.S. Elections," before the Select Committee on Intelligence, United States Senate, on June 21, 2017. Link here: https://www.intelligence.senate.gov/sites/default/files/documents/os-jmanfra-062117.PDF

elections in 2018 and 2020, efforts to hack American democracy will only continue unless safeguards are put in place.

The encouraging news is that a growing, diverse group of stakeholders are embracing election security as national security. As evidenced by the robust, diverse turnout at the Voting Village, understanding cyber threats to our democracy is not just a "hacker thing." Bipartisan stakeholders from federal, state, and local government participated in the Voting Village. Advocacy groups, private sector businesses, think tanks, and national security, intelligence, and military leaders also contributed to the event. The level of interest and support from these groups and individuals parallels an outside movement that views election security as a national security imperative. Many are pressing for policy solutions and practical efforts that leverage best practices already embraced by the cybersecurity community, tailored to the unique nature of elections.[6]

## On the Eve of DEFCON: The State of Our Election Security Landscape

For years, computer science and cybersecurity experts have been sounding the alarm on U.S. election infrastructure which can best described as a patchwork of aging, insecure voting systems that vary from state-to-state. As their research has shown, among the most vulnerable voting systems are Direct Recording Electronic (DRE) voting machines. These systems utilize digital touch-screen technology and record votes on the internal memory of the machine, with no paper backup. Cautions about DREs have prompted some changes and a few victories. For example, in 2015 just weeks before a primary election, the State of Virginia decommissioned use of the AVS WinVote (a DRE machine featured at the Voting Village) because of a litany of problems including its Windows operating system, unchangeable default password, the ability to hack the machine remotely, and the fact that its results were transmitted via wireless connections.

There is still more work to be done. Currently there are five states – Delaware, Georgia, Louisiana, New Jersey and South Carolina – that are still operating entirely on paperless systems. Another 9 are partially paperless, making a total of 14 states that are still operating in a highly vulnerable manner.[7] Yet even when leaders recognize change is needed, other competing policy priorities or lack of resources at the state and local level can impede action.



Election security threats grew even more urgent this past election cycle when Government officials confirmed that a foreign adversary, Russia, attempted to interfere in the 2016 United States Presidential Election via "a multi-faceted approach intended to undermine confidence in our democratic process." According to U.S. intelligence official reports, Russia targeted voter registration databases in at least 21 states and sought to infiltrate the networks of voting equipment vendors, political parties, and at least one local election board.[8]

[6] Zetter, Kim. "Virginia Finally Drops America's 'Worst Machine'" *Wired*. August 17, 2015. Link: https://www.wired.com/2015/08/virginia-finally-drops-americas-worst-voting-machines/

[7] Verified Voting, "Voting Equipment in the United States" https://www.verifiedvoting.org/resources/voting-equipment/

[8] Congressional Testimony of Jeanette Manfra, National Protection and Programs Directorate, U.S. Department of Homeland Security, and Dr. Samuel Liles, Acting Director, Cyber Division, Office of Intelligence and Analysis, U.S. Department of Homeland Security, for a hearing entitled

Election administration has always been the constitutional responsibility of state and local jurisdictions. But when Russia – which has also been known to hack elections abroad[9] – decided to meddle in the 2016 U.S. election, it changed the game. The conversation has now been elevated to the level of military and homeland security experts who are increasingly getting involved to help dissect the motives, capabilities and implications of cyberattacks launched at the U.S. and our democracy, as well as assess what kinds of deterrents are available (beyond the scope of this report).

## Voting Village Goals

It is through the lens of the complex election security landscape – and on the heels of the Russian 2016 attacks – that Voting Village organizers presented the idea for the village to DEFCON. Media coverage and Congressional testimony on the Russian hacks has helped to advance awareness regarding cyber threats to elections. Yet Voting Village organizers believed there was still much to unpack. Their belief was that the hacker community, if given unfettered access to voting machines and equipment, would be able to enrich the basis of knowledge. As the largest gathering of hackers in the world, DEFCON would also provide the ideal forum to shine the national spotlight on any findings.

To that end, the goals of the DEFCON Voting Village were to:

- Provide examples of working voting systems for security researchers to evaluate, attack, and otherwise study;
- Educate and raise public awareness about the machinery of U.S. democracy, from the machines to how election technology interacts with legal, market, and normative barriers in elections that do not exist in general purpose computing contexts;
- Stimulate a discussion and ideas regarding how security researchers and hackers can help to make our election infrastructure more safe and secure;
- Create a forum to engage with other non-hacker stakeholders, including federal, state, and local policymakers who will be essential to implementing changes and reforms;
- Provide a training opportunity for state and local elections IT staff to learn about their networks and machines in use in this jurisdiction. For many, the village represented the first opportunity for election officials to study and inspect the very machines they are using in their daily operations, yet have not been legally permitted to study previously.

## Equipment

The Voting Village organizers procured a variety of voting equipment for examination. A recent DMCA waiver issued by the Library of Congress made it easier for the Voting Village to obtain the hardware for research purposes. Previous such an act was difficult, and in some cases illegal under the DMCA (of course, cyber criminals would not be so constrained by US law). Most of the equipment in the Village was purchased by DEFCON on secondary markets, such as eBay. The machines featured in the Village included:

- AVS WinVote DRE (software version 1.5.4 / hardware version N/A)
- Premier AccuVote TSx DRE (TS unit, model number AV-TSx, firmware 4.7.8)
- ES&S iVotronic DRE (ES&S Code IV 1.24.15.a, hardware revision 1.1)

"Russian Interference in the 2016 U.S. Elections," before the Select Committee on Intelligence, United States Senate, on June 21, 2017. Link: https://www.intelligence.senate.gov/sites/default/files/documents/os-jmanfra-062117.PDF

[9] Koval, Nikolay. "Revolution Hacking." *Cyber war in perspective: Russian aggression against Ukraine* (2015): 55-58. https://ccdcoe.org/sites/default/files/multimedia/pdf/CyberWarinPerspective_Koval_06.pdf

- PEB version 1.7c-PEB-S
- Sequoia AVC Edge DRE (version 5.0.24)[10]
- Diebold Express Poll 5000 electronic pollbook (version 2.1.1)[11]

The Voting Village also featured a "cyber range" – a simulator that created a mock virtual "election official's office" and network, built with the guidance and assistance of a large U.S. election jurisdiction staff who ensured quality control and real-world likeness. This range provided a training opportunity for state and local leaders in attendance to better understand the threats to their specific systems and domains, as well as learned best practices to protect their information and networks. The range was operated by CyberBit – a Ft. Meade, Maryland-based cyber training facility that, beyond DEFCON, has provided multiple industry-tailored training services to government and private sector entities.

## Limitations

There were significant limitations of the work at the Voting Village, including:

- Participants had no access to source code, operational data or other proprietary information that is not otherwise legally and publicly available. An actual nefarious actor might have little difficulty obtaining these materials.
- The Voting Village provided only a sample of voting technologies. Organizers obtained what they could get their hands on quickly, legally, and affordably. The most recently used system available was the AVS WinVote, which was decertified by the State of Virginia in 2014. A number of other systems, however, are still in use in U.S. elections including the AccuVote-TSx, Sequoia AVC Edge, and ES&S iVotronic.
- The Village had no access to optical scan or DRE systems with a Voter-Verified Paper Audit Trail (VVPAT). These systems, and those involving ballot marking devices, are the most software-independent and auditable systems, and are increasingly popular and heavily used.
- Finally, there was no access to any backend provisioning, counting, or voter registration systems. These kinds of systems are not generally available on the open market. This is especially significant as the evidence from the 2016 election seems to indicate strongly that these types of voting technologies – not voting machines themselves – were the primary target of Russian hacker attacks.

## Technical Findings & "Accomplishments"

**AVS WinVote**

The Advanced Voting Solutions (AVS) WinVote is a DRE voting system that utilizes touch-screen technology to make a voting selection, and then transmits a voter's choice via a wireless local area network (LAN). The AVS WinVote system was the only system in the Village that had been earlier decertified (in Virginia). It was also the most easily compromised. In addition, physical access to the machine proved just as easy of a path to complete compromise.

Carsten Schürmann, a democracy-tech researcher who hails from Denmark, was able to hack into the AVS WinVote within minutes remotely over Wi-Fi. The WinVote broadcasts its own Wi-Fi access point to which modern operating systems can easily connect. Using commonly available network tools (e.g., Wireshark)

---

[10] "PEB" stands for Personal Electronic Ballot, which functions similarly to a portable memory pack. It is used to authorize a new voting session by poll-workers and, when the polls close, poll workers move summary data from each machine onto the PEB. The PEBs are then transported to election headquarters or their contents transmitted via a computer network.

[11] An Electronic Pollbook is a system that essentially replaces the spiral-bound lists of registered voters in every polling place by putting that functionality into a laptop, tablet, or kiosk-like computing platform.

Schürmann determined immediately that the WinVote had a specific IP address and was able to use a vulnerability from 2003 (CVE-2003-0352[12]) and preinstalled attack payloads in Metasploit (a vulnerability analysis and penetration testing tool) to gain access to the filesystem and escalate privileges to an admin user – meaning he could make the machine think he was an administrator of the system, not simply a mere voter or poll-worker. Once he had this access, Schürmann was able to do anything on the system, from running code, to changing votes in the database, to turning the machine off remotely. This vulnerability had clearly been in the system since 2003, allowing anyone within 150-300 feet of a polling place complete control of any WinVote machine while it was being used. For $50, a hand-held high gain antenna could be purchased that would extend that range to over 1,000 feet and through walls.

Physical access to the machine afforded similar ease-of-access. The locked panel on the front of the device was easily picked or opened with readily available keys that could be purchased easily and cheaply online. The locked cover was easily bypassed without paying attention to the lock as well (by simply compromising the plastic hinge). The physical security protecting the USB port was ineffective and also irrelevant, due to the findings in the next paragraph.




While examining the case further, DEFCON hackers noticed that there were 2 unprotected, uncovered USB ports on the back of the machine. These were within easy reach of a voter, and unfortunately the privacy screen for the AVS WinVote is so private that it would be difficult to tell if someone was tampering with USB ports on the back of the machine while voting. There was no USB keyboard around in the Voting Village – a natural place to start with an unprotected USB port – but after an errand to a local electronics supply store to obtain one, all hackers had to do was to simply attach the keyboard, type "`ctrl-alt-del`" and the Windows task manager would pop up. At that point, they could type "`alt-f run`" and run any software they wanted to, including software on a USB stick that is inserted into the other USB slot on the back of the machine. As one hacker, Nick, remarked, "With physical access to back of the machine for 15 seconds, an attacker can do anything."

**AccuVote-TSx**

The AccuVote-TSx is touch screen DRE voting machine, manufactured by Premier/Diebold, that records votes on internal flash memory. In much the same way that an ATM works, voters insert a card into the machine and then pick their choice on a touchscreen. Votes are then recorded to internal electronic computer storage.[13]

As is natural in any DEFCON Village structured around hardware artifacts, Voting Village hackers seemed to spend more time on platforms other than the AccuVote-TSx. Just as with the ES&S iVotronic below, much of

[12] See: http://www.cve.mitre.org/cgi-bin/cvename.cgi?name=can-2003-0352

[13] Verified Voting, "Premier/Diebold (Dominion) AccuVote TS & TSx" https://www.verifiedvoting.org/resources/voting-equipment/premier-diebold/accuvote-tsx/

the work around this machine focused on examining the details of the internal hardware layout and examining the "firmware" – software that runs the low-level hardware functions and is not changed as often as the voting software itself.

Joe Fitzpatrick, Schuyler St. Leger, Ryan (@rqu45 on Twitter), Wasabi, and Ayushman were all involved in examining the innards of the TSx. First, Wasabi noticed that a particular chip (an EPROM chip) was wired to the machines battery controller, and removing this chip caused the machine to be completely inoperable. If not protected carefully, removing such chips from TSx machines could be used to selectively shut down voting in certain areas (assuming physical access and time necessary to open the case of the machine undetectably, remove the chip, and put the machine back together). This chip was socketed rather than soldered in place, making removal quite easy.



Wasabi also noticed that the `NK.bin` file (the main executable or "kernel" for the Windows CE operating system) had local networking and modem support, which would ideally be removed for software in jurisdictions that do not use those functions. Similarly, Ayushman noticed that there was a `.ini` configuration file that seemed to have passwords, users, and the modem configuration for the device, which he suspected could be changed (since there is little access control) with a serial (DB9) connection to the device. After the conference it was confirmed that connecting the debug jumped on the PCB would still activate the boot loader console on the DB9 VIBS.

Fitzpatrick, St. Leger, and Ryan focused on analyzing the firmware of the device and mapping the pins on the chips to functions useful for chip debugging tools. The TSx has what is called a JTAG interface which is a plug on the circuit board typically used during the manufacturing process to check correct functionality. However, after the unit is sold, the JTAG interface is still available and provides convenient access to the processor and the rest of the system. They noticed the TSx processor is an ARMv5 chip and common chip debuggers only go back as far as ARMv6. Therefore, they had to locate an older debugger in order to map the functionality of each pin and interact with the software. There are further details about this work available in the raw notes from the Voting Village on github.[14]

**ES&S iVotronic**

Like other DRE machines, the iVotronic, manufactured by ES&S, features a touch-screen interface and records votes in internal memory. A poll worker uses a device called a PEB (roughly the size of a deck of playing cards) to enable voting for each voter. PEBs are also used to store and aggregate the final vote tallies from all machines that are then physically transported to election headquarters. In some configurations, the PEB tally can be alternatively transmitted to headquarters over a computer network.[15]

[14] See: https://github.com/josephlhall/dc25-votingvillage-report/blob/master/notes-from-folks-redact.md#premier-accuvote-tsx

[15] Verified Voting, "Election Systems and Software (ES&S) iVotronic" https://www.verifiedvoting.org/resources/voting-equipment/ess/ivotronic/

Similar to the AccuVote-TSx, many of the interesting findings about the iVotronic related to examining the internals of the various components. Hackers in the Village examined the PEB device, the PEB readers, and the iVotronic DRE machine.

A hacker named Scott Brion examined the PEB and PEB reader. He found the PEB contains an 8-bit processor, EPROM (non-volatile storage, not easy to update), flash memory (non-volatile storage, easy to update), an infrared communications port (IRdA), a magnet, serial pins and a battery. The PEB reader – a device that serves as an interface for reading PEBs one by one to transfer contents – contained similar elements, including an 8-bit processor, EPROM, USB port, serial pins, and an IRdA receiver port. Brion was able to establish communication to the firmware through the serial PINs, however nothing of value was obtained (in some cases "security fuses" may have been intentionally blown by the manufacturer to prevent analysis and readout of firmware). With a bit of research, it became clear that green PEBs were "supervisor" units used to start and end elections on a set of machines and the security fuses are blown on those, preventing analysis and extraction of firmware on those units. However, the red PEBs, used to accumulate election data and authorize each new voter to vote did not have their security fuses blown, so the firmware analysis proceeded on those units. This is likely an inferior security design as the red PEBs actually accumulate and transmit vote totals, which is exactly what an attacker seeking to change an election result would attack by changing the firmware in a PEB or swapping a PEB out with a clandestine attacker PEB.

Another Village participant, Kris Hardy, also focused on attacking the PEBs and PEB readers as possible ways to get into the iVotronic in a way that could be undetectable (and mimic the goals of a malicious election attacker). Hardy and his colleagues (who asked not to be identified) used a PICkit 3 chip debugger/programmer and were able to identify several PEB chips that were configured without their security fuses blown (meaning the chips could be easily analyzed and interacted with). They were able to extract firmware from one of the chips, which they were able to decompile (a process that turns binary computer code into source code that humans can read – the opposite of "compiling" source code software into a binary executable). The contents looked promising but they did not have time to fully examine the firmware before the Village had to close. They recorded the chip pin-outs (mapping the pins to functionality on a debugger/programmer) in an online github repository for future researchers.[16]




**Sequoia AVC Edge**

The Sequoia AVC Edge, a Dominion product, is another widely-used DRE machine where voters insert a "smart-card" into the machine (a credit card-sized card that authorizes a voter to vote), pick their voting choice on a touchscreen, and then the results are recorded on the machine's internal storage. When polls close, the votes for a particular machine are written to a "PCMCIA" flash memory card which is removed from the system and either physically transported to election headquarters or their contents transmitted via computer network.[17]

[16] See: https://github.com/josephlhall/dc25-votingvillage-report/blob/master/notes-from-folks-redact.md#ess-ivotronic

[17] Verified Voting, "Sequoia (Dominion) AVC Edge" https://www.verifiedvoting.org/resources/voting-equipment/sequoia/avc-edge/

*Note:* As is the case with opportunistic hacking projects like the Voting Village, some equipment will receive more attention than others; in this case, the Sequoia AVC Edge did not attract as much attention as other systems. Below, we describe what are less findings and more features of what hackers found remarkable about this system.



Members of the University of Houston Cybersecurity Club – Tsukinaki and Joe (no last names given) – spent some time with the Sequoia AVC Edge. Through their investigation, it was determined that the AVC Edge has an internal CompactFlash (CF) card running on the pSOS operating system, a real-time operating system developed in 1989, before many of the Voting Village participants were born. This particular operating system has traditionally been used heavily in retail and kiosk equipment.

The Houston team also found that the Edge records data as a hex file; meaning it was difficult to figure out what the contents were without a bit more additional information or reverse-engineering of the file format (a labor-intensive activity not well-suited for the Village). Voting results were stored on the CF card, but then also sent to flash storage on a PCMCIA card in a slot in the back of the machine. It was obvious from the data that this particular AVC Edge was from the 24th precinct of Washington DC, which hackers got by just running the command strings on the data. In this process, one could definitely see the slate of candidates and such, though no voter identities or similar personal voter data was viable. (This was expected as no voter identity could make it from the pollbook process to the voting machine).

Hackers then tried to boot the operating system image in a virtual machine, but did not get too far; One could see a menu in the PSOS boot file – that is, could see the strings, but could not get it to boot. There was a RAM file that seemed to give them a "file not found" in the boot sequence. Nick used a utility called `binwalk` – a firmware reverse-engineering and analysis tool – to examine the firmware and it appeared that there may be use of an *8-bit cipher* (eight (8) bits is exceedingly insecure).

**Diebold ExpressPoll 5000**

While the devices detailed above are types of vote-recording and vote-casting equipment, the Village also had available an electronic pollbook (the ExpressPoll 5000), which is still currently used in states like Ohio to check in voters on Election Day. At the Voting Village, the pollbook was subject to a significant degree of scrutiny by participants, including:

***Voter Data Leakage***

On day 1 in the Voting Village, it was discovered that the ExpressPoll units obtained were not properly decommissioned and still contained voter records. Specifically, 650k voter records from Shelby County, Tennessee were still present on the pollbooks, containing names, addresses, dates of birth, driver's license numbers and a number of other potentially sensitive fields. Village organizers secured the data, removed it from the units available in the village, and one village organizer began a process of disclosure to Shelby County so that they could be aware of the issue.



***Technical Findings***

The unit did not have much in the way of physical security protections, allowing someone with a screwdriver to remove and replace the election media, or simply remove it to accomplish a denial-of-service attack. The default username and password for this unit was available with a simple google search. There were also two USB ports that seemed unprotected.

The ExpressPoll runs on an obsolete embedded operating system, Windows CE 5, and validates no input or software updates (it would load without any prompting or checking both a new bootloader – commands that tell the system how to start up – and OS image – the operating system the device runs after start-up). This could allow attackers to inject a new bootloader (which appears to be proprietary) or Windows CE image without detection. Similarly, the unit reads a file "`ExPoll.resources`" that contains all the parameters for the election that could also be injected with parameters chosen by an attacker. When the pollbook software is launched, this file is loaded into memory and then saved to non-volatile storage for use in future elections. Village hackers were able to change the parameters in this file, get it to load and have their own parameters loaded (in this case they "bricked" – rendered inoperable – an ExpressPoll unit, but were confident that further testing would have resulted in successful modification of pollbook parameters).

Hackers attempted to crash the main application by loading large amounts of data into the database fields, but this only slowed the device, instead of crashing the main application and potentially allowing further access. The unit's networking seemed to be well-locked down with essentially only data being broadcast from the unit and hackers were unable to make a successful connection and inject data through the network interface.



There was some hope that changing the `Consolidation_ID` on a smartcard that the unit writes to in order to authorize a voter would have silently discarded that voter's vote, but that was not possible to test without a smart card reader/writer, which was unavailable.

The device keeps an event log with login, logout, power, load, and open events. However, this log would not be sufficient to prevent tampering; it is only written by the device and does not reflect any file changes that occur on the storage media (and, of course, is not integrity protected).

## Impact & Lessons Learned

The technical findings of the Voting Village were not entirely new. As stated, hackers and researchers have breached these voting machines before under various circumstances. However, this experiment allowed mainstream hackers more time and access than ever before, generating several "real-world" lessons that policymakers should consider moving forward:

**Lesson #1: Even with limited resources, time, and information, voting systems can be hacked.**
The DEFCON Voting Village showed that technical minds with little or no previous knowledge about voting machines, without even being provided proper documentation or tools, can still learn how to hack the machines within tens of minutes or a few hours. Past official studies such as the California Top-To-Bottom Review[18] and the Ohio EVEREST Review,[19] conducted over ten years ago had significant restrictions on what participating researchers were allowed to try. Those studies were also done in a "white box" environment where researchers had access to source code, documentation, and equipment under strict non-disclosure agreement.

In the case of the DEFCON Voting Village, hackers had to create, copy, or cobble together their own tools though, in turn, they were given permission to fully experiment and take risks that may result in the machines being destroyed in the process.

The good news is, freedom to take such risks accelerates the process and can lead to completely new discoveries of new vulnerabilities. The bad news is, if relative rookies can penetrate a machine or system in a matter of hours, it becomes incredibly difficult to deny that a skilled, nefarious hacker – including sophisticated cyber criminals or nation-state attackers – with unlimited time and resources, could not do the same.

**Lesson #2: Foreign-made parts introduce serious supply chain concerns.**
"Phishing" scams via email are common, and for good reason: When successful, phishing can provide inside access to a machine, account, system or network without the hacker actually having physical access to the machine. Information can then be stolen or exploited in some fashion, without the victim ever knowing that entry has occurred. U.S. intelligence reports reveal that Russians were not only interested in hacking into voter databases but also into other aspects of the election, including the software supply chain. According to that report, Russian hackers affiliated with Russian military intelligence – the GRU – sent phishing emails to employees at a voting services company that provides state and local election offices with voter registration systems, comprising at least one account on that vendor's system that was then used to send spear-phishing emails to 120 local and state election officials.[20] Given the typical successes of a well-designed spear-phishing attack, we can be almost certain that one or more election officials fell victim to this attack, although we do not know what access and damage might have resulted (as this information is likely still classified).

Good cyber hygiene can help prevent some of these remote attacks. However, during the Voting Village, the extensive use of foreign-made computer parts – frankly, as expected given how many commercial computing devices are manufactured overseas – within the machines opened up a serious set of concerns that are very relevant in other areas of national security and critical infrastructure: the ability of malicious actors to hack our democracy remotely, and well before it could be detected. A frequent argument raised about the

[18] See: http://www.sos.ca.gov/elections/voting-systems/oversight/top-bottom-review/

[19] See: https://www.eac.gov/assets/1/28/EVEREST.pdf

[20] National Security Agency, "Report on Russian Spear-Phishing" November 2016. Parts redacted. https://assets.documentcloud.org/documents/3766950/NSA-Report-on-Russia-Spearphishing.pdf

defensibility of election systems is that the diversified, decentralized nature of our election infrastructure provides at least some protection from wide-scale hacks. But via a supply chain originating overseas, voting equipment and software can be compromised at the earliest of stages in manufacturing process. For example, foreign actors could design or plant a virus in software, memory, or even a small microchip that could affect an entire make/model of voting machine, theoretically allowing them to be compromised in one coordinated attack. To be sure, while we've known for over a decade that some voting machines have hardware manufacturing and/or assembly in foreign countries, less is known about sourcing of software. We do know, for example, of one case when Election Systems & Software failed to disclose it was manufacturing products in a sweatshop in the Philippines in 2007.[21]

One additional implication of foreign parts includes inability to limit insider threats. Cyberattacks originating from inside an organization are a serious concern. Yet U.S. election officials, vendors, or those involved in the voting administration process can be vetted to some degree. This is not the case when the process involves foreign components and facilities, including complicated but common relationships such as subcontractors further subcontracting work out to other entities. To be sure, there are very few entities – the Department of Defense, the National Security Agency, and large tech companies such as Google and Facebook – that have the ability and resources to design, develop, and manufacture entire computer systems on their own; a controlled supply-chain is a first step towards reducing these kinds of threats, but it would be best if voting systems moved to more trusted system design.

**Lesson #3: This was more than a "hacker" stunt and showed that a diverse community of stakeholders must be engaged.**

Organizers did not maintain a precise count of how many entered the Voting Village but estimate that the number exceeded several thousand. In just three days, the Voting Village expanded the number of people who have now had first-hand experience and knowledge of these systems. By Sunday, the attendees who started hacking on Friday had become the experts and they were teaching and helping the new people who just started on Sunday. Exponentially expanding the knowledge base in this regard is sure to have great impact on the solutions and policy-making process. Remarkably, many of the hackers that stayed in the Voting Village for a considerable amount of time at DEFCON 25 were young, between the ages of 16-19, demonstrating to organizers that this kind of civic infrastructure hacking may be a promising way to reach out to younger elements of the information security community.

Additionally, given the wide scope of stakeholders involved in election security, Voting Village organizers believed it was essential the Village did not come to be seen only as a "hacker thing." Organizers reached out to and involved hundreds of other "non-hackers" in the event, ranging from senior leaders of NGOs, to cyber and voting experts, to elected officials to national security leaders. Staff from U.S. Senate Homeland Security & Governmental Affairs Committee and representatives from National Institute for Standards & Technology (NIST), the U.S. Department of Homeland Security (DHS) and the National Governors Association (NGA) attended.[22] Members of the U.S. Congressional Cyber Caucus including Representative Will Hurd (R-TX) and Representative Jim Langevin (D-CT) also visited the Voting Village.

The Voting Village also intentionally encouraged state and local election officials to attend. For many of them in attendance, the Village was their first opportunity to look themselves into the machines – machines they are required to use and manage, but have been prohibited to study in depth – and find answers to their own

[21] Kim Zetter, "ES&S Failed to Disclose Manila Manufacturer to Fed Agency," *WIRED News*, August 14, 2007. https://www.wired.com/2007/08/ess-failed-to-d/

[22] APPENDIX #1: Partial List of Attending Individuals & Organizations

questions and learn more about that equipment. Moving forward, it will be critical to incorporate all of these stakeholders into the security and solutions discussion.

**Lesson #4: The Village challenged major criticisms – and reiterated the need for policy change.** Finally, the Voting Village helped to dispel a few long-circulating criticisms – as well as helped to affirm what election security advocates have been arguing for years: There is urgent need for federal, state and local election officials to implement measures to secure U.S. election infrastructure.

First, though voting machine manufacturers have historically denied claims that their machines are insecure, some have suggested the Voting Village demonstration did not constitute a "true" test because it was not conducted in a real election setting. Yet, enemy hackers are certainly not operating in a "sanctioned" environment and if a voting machine can be hacked by a relative novice in a matter of minutes at DEFCON, imagine what a savvy and well-resourced adversary could do with months or years.

Second, there is a common misconception that the internet is required for voting machines to be hacked. Obviously, the WinVote hacked at DEFCON is particularly vulnerable because it creates a local network that is completely unprotected. But even for the machines in the Village (or real world) that do not, they are still not as distant from the internet as it may seem, and many contain software and hardware that can be used to connect them to the internet. Before each election, the ballots need to be created via a software application, which runs on a desktop computer or is web-based. From there, the formatted ballot is transferred and uploaded to voting machines through memory cards or USB sticks. And even well before election day – indeed before a voting machine is assembled, sold to a government, and brought online for an election – the foreign parts in the machines suggest multiple voting systems could be compromised by laying the seeds of future attacks in supply chain processes. This new revelation heightens concerns, and more must be done to protect our systems at every point in the process, including across the supply chain.

Finally, another common argument is that voting systems are insulated to a degree by the diversity and decentralized nature of our election infrastructure. It is true voting systems do vary greatly from state to state, making it difficult to penetrate multiple voting machines simultaneously. Yet, the confirmation of foreign-made parts and software raises the possibility that hackers could take remote control of at least an entire line of voting machines at a later point, with the right level of access in the supply chain. And as pointed out, machines also touch the internet and non-networked forms of data transmission (USB sticks, etc.) at various other points in the process, potentially weakening resilience if not done very carefully. Yet even if that did not happen, the Voting Village helped to show that simply manipulating a voter file (or in the Village's case, poll book data) could create enough problems or long lines to affect an election outcome.

## Next Year's Voting Village: Moving Forward

The Voting Village will return to DEFCON in 2018. Organizers hope to expand the event next year to potentially cover a number of distinct areas in addition to hands-on hacking of voting equipment, including:

- **Closed-Loop System:** We would like to have a closed-loop system on which we can run an entire mock election using actual voting technologies. This would include voter registration, ballot generation, a mock polling place (with rules of engagement), and results reporting. This addition would allow us to go a step beyond just looking at the machinery of democracy on the technology level.

- **Election Tech Range:** Election officials and voting system manufacturers have some of their own

security technologies, compositions, or solutions that they find work well in defending against certain threats. We would like to invite election officials and voting system vendors to come and get advice and even testing of their tech. A good example would be if an election official or manufacturer would like to get feedback on a particular security system or challenge security researchers to evaluate it and give feedback on how it could be improved.

- **Election Tech Challenges:** There are a number of activities in elections that are difficult to secure. Some small fraction of votes are cast by email, fax, and web and a larger fraction cast on paper through vote-by-mail. We would like to set up examples of these technologies and challenge Voting Village attendees to demonstrate what failures can happen and to what extent those can be avoided.

- **Election Technology Usable Security Evaluations:** A secure voting system can still be highly usable. We would like to invite usable security researchers to join the village to build up a resource of usability and needs assessment conclusions and profiles of past, existing, and future voting technologies.

- **Request for Donation of Machines, Software, Databases, etc.:** DEFCON has embraced the notion that the DEFCON hacker community's role in the election security debate is one of providing a public service. To that end, DEFCON is offering to test any clerk or secretary of state's election administration equipment and provide training for their IT staff at DEFCON 26. Our door is always open to those who want to make their voting process more secure.

## Conclusion

DEFCON organizers believe the Voting Village was vital to growing the base of knowledge, expanding the circle of stakeholders beyond hackers, and shining a national spotlight on the serious cybersecurity weaknesses of U.S. election infrastructure.

The next step is to make clear that this is a conversation that cannot "stay in Vegas." It is imperative that leaders at the federal, state and local level come to understand this threat as a national security imperative and work together – leveraging the support of the national security and cybersecurity community – to better defend and protect the vote from cyberattacks in the upcoming elections in 2018 and 2020. Americans need the reassurance that their democracy is safe, starting at the ballot box.

## Acknowledgements

A number of individuals and organizations contributed to the Voting Village and to this report. A special thanks to:

- Organizers, subject-matter-experts and other visionaries who turned the Voting Village concept into a reality and helped to author this report, including especially Sandy Clark.
- ISP/CyberBit and the Cook County, Illinois Clerk's Office for supporting the cyber back-office simulator at the Voting Village;
- Speakers who contributed to the Voting Village discussions including representatives from the Center for Democracy and Technology, Center for Election Integrity, the Center for Internet Security, the National Governors Association, the U.S. National Institute for Standards and Technology (NIST), and Verified Voting.

## APPENDIX #1: Partial List of Attending Individuals & Organizations

Representatives attended the event from a variety of organizations including:

- Atlantic Council
- Aries Security
- Cisco
- Center for Internet Security
- Election Assistance Commission (EAC)
- IBM
- McAfee
- Microsoft
- Multi-State Information Sharing & Analysis Center (MS-ISAC)
- National Institute for Standards & Technology (NIST)
- National Governors Association (NGA)
- Nordic Innovation Labs
- Rochester Institute of Technology
- University of Buffalo
- University of Pennsylvania
- University of Texas San Antonio
- US-Computer Emergency Readiness Team (US-CERT)
- U.S. Department of Homeland Security (DHS)
- U.S. Senate Homeland Security & Governmental Affairs Committee
- U.S. Representative Will Hurd, Congressional Cyber Caucus (R-TX)
- U.S. Representative Jim Langevin, Congressional Cyber Caucus (D-CT)
- Verified Voting

# EXHIBIT B

# DEF CON 26

# Voting Village

*Report on Cyber Vulnerabilities in*

*U.S. Election Equipment, Databases, and Infrastructure*




**September 2018**

**Co-authored by:**
Matt Blaze, University of Pennsylvania
Jake Braun, University of Chicago
Harri Hursti, Nordic Innovation Labs
David Jefferson, Verified Voting
Margaret MacAlpine, Nordic Innovation Labs
Jeff Moss, DEF CON

# Contents


Introduction 3

New Findings on the Eve of the 2018 Midterm Elections 5

Media Overview 8

Equipment 9

Limitations 10

"Election Security is National Security" 11

Technical Findings 13

Forensic Studies - AVS WINVote 23

Recommendation: Make A Crisis Communications Plan Before Your Website is Hacked 27

Conclusion 30

Next Steps 31

End Notes 32

Acknowledgements 34

APPENDIX #1: Partial List of Attending Individuals & Organizations 35

APPENDIX #2: Biographical Information: Voting Village Speakers 36

APPENDIX #3: Don't Take Our Word For It 42

APPENDIX #4: Firewall Democracy: Best Practices for Securing America's Vulnerable Voting Infrastructure 46

## Introduction – "Election officials have plenty to learn from hackers"

**By: Alex Padilla, Secretary of State, California**
Originally published: *The Hill*, August 19, 2018[1]
(reproduced with permission of the author)

Every year, DEFCON convenes thousands of hackers who attempt to breach the security of important technologies in an effort to expose vulnerabilities. For the past two years, this has included voting machines in a room dubbed the "Voting Village."

Rather than watch from the sidelines, or read about the findings in the news, I wanted to see for myself. So, I went to DEFCON. I listened, I observed and I had the opportunity to address attendees.

While it's important to constantly search for and understand the vulnerabilities of any voting system, a unifying message at the conference — from hackers to elections officials alike — is that we must be on alert and Congress must invest more to better secure our elections.

Threats to the integrity of our elections are constantly evolving. Not too long ago, a primary focus for election officials was securing voting machines. Today, cyber attack vectors have expanded — and so must our defenses.

This includes protecting our state voter registration databases, county election management systems, election night reporting websites, state and local government social media accounts and ensuring the information voters consume is accurate.

Intelligence officials tell us that the "warning lights are blinking red" — and our adversaries are getting more sophisticated. It's clear to me, as California's chief elections official, that we cannot become complacent.

That's why attending DEFCON was important. Though, as my secretary of State colleagues are right to point out, the environment under which voting machines were "hacked" at DEFCON do not precisely reflect real-world conditions.

On Election Day, voting machines aren't left on tables to be opened or exposed for hours on end, and there isn't unlimited public access to equipment at polling places or county offices.

Still, we could learn a lot from friendly hackers. Their insight can help us stay one step ahead of those who seek to undermine our democracy. It forces us to take second, third and fourth looks at systems. Elections officials must constantly scrutinize, test, adapt and upgrade security measures.

But no matter how much we learn or how much we innovate, we cannot succeed without adequate resources. Election administrations in America has been historically underfunded and understaffed. The burden of funding for election administration typically falls on the limited budgets of local governments.

---

[1] Padilla, Alex. "Election Officials Have Plenty to Learn from Hackers." The Hill. August 21, 2018. Accessed September 25, 2018. https://thehill.com/opinion/cybersecurity/402458-election-officials-have-plenty-to-learn-from-hackers.

States have a responsibility when it comes to properly funding election administration, including security. I'm proud that in California we secured $134 million in this year's budget to upgrade or replace voting systems plus additional funding for the creation of the offices of Election Cybersecurity and Enterprise Risk Management.

We're also updating hardware and software, monitoring our networks around the clock, and we've strengthened communications and information-sharing channels with federal authorities.

Still, we can and must do better.

You may have heard that Congress recently appropriated $380 million for election security nationwide. Not quite. Remember butterfly ballots and hanging chads? The recent federal appropriation was simply the final disbursement of money originally approved in 2003 to address the debacle of the 2000 presidential election in Florida.

There has been no new additional funding authorized to address our modern security challenges. To make matters worse, this month, the Republican majorities in both the House and the Senate defeated measures that would have appropriated $250 million for election security grants to states.

Meanwhile, they approved a $700-plus billion national defense appropriation — with not one cent for shoring up our nation's election systems.

Protecting our elections from foreign interference is a matter of national security. That's why our election infrastructure has been designated as critical infrastructure by the Department of Homeland Security.

For elections officials to implement needed election security measures, state and local governments need ongoing funding from federal and state budgets. We can't let up, and we can't rely on dated equipment. The stakes for our democracy are too high.

Until Congress takes our requests seriously and makes the necessary investments to further fortify our voting equipment and systems, election officials must think and act outside the box.

While I'm told I was the first secretary of state to attend DEFCON, I'm confident I won't be the last. We have a responsibility to learn from hackers, particularly those wanting to help. We owe it to the nation to do all we can to protect our elections.

Nothing short of our democracy is at stake.

## New Findings on the Eve of the 2018 Midterm Elections

Back for its second year at DEF CON, the world's largest and best-known hacker conference, the Voting Machine Hacking Village (Voting Village) dramatically expanded its hands-on activities and audience in advance of the 2018 midterm elections. When the Voting Village first launched in 2017 - and was attended by thousands of white hat hackers, government leaders, and media - it aimed to identify vulnerabilities within the U.S. election infrastructure. In 2017, intelligence about Russian adversaries hacking the 2016 presidential election was increasing but the severity of the threat to U.S. election infrastructure was dying down. This year, DEF CON dramatically expanded its inquiries to include more of the election environment, from voter registration records to election night reporting and many more of the humans and machines in the middle. DEF CON had a greater variety of voting machines, election officials, equipment, election system processes, and election night reporting. Voting Village participants consisted of hackers, IT and security professionals, journalists, lawyers, academics, and local, state and federal government leaders.

This year, the Voting Village made more than 30 pieces of voting machines and other equipment available to its participants. All of the equipment (with the exception of the AVS WINVote, described below) is still used throughout the United States today. The Voting Village is the only public forum in United States at which hackers have nearly unrestricted access to discover vulnerabilities in the equipment. In addition, this year the Voting Village conducted unprecedented outreach to state and local election officials, inviting them to participate in the Village's activities and receive free training from cybersecurity experts.

As was the case last year, the number and severity of vulnerabilities discovered on voting equipment still used throughout the United States today was staggering. Among the dozens of vulnerabilities found in the voting equipment tested at DEF CON, all of which (aside from the WINVote) are used in the United States today, the Voting Village found:

- A voting tabulator that is currently used in 23 states is vulnerable to be remotely hacked via a network attack. Because the device in question is a high-speed unit designed to process a high volume of ballots for an entire county, **hacking just one of these machines could enable an attacker to flip the Electoral College and determine the outcome of a presidential election.**

- A second critical **vulnerability in the same machine was disclosed to the vendor a decade ago,** yet that machine, which was used into 2016, still contains the flaw.

- Another machine used in 18 states was able to be hacked in only two minutes, while it takes the average voter six minutes to vote. **This indicates one could realistically hack a voting machine in the polling place on Election Day within the time it takes to vote.**

- Hackers had the ability to **wirelessly reprogram, via mobile phone, a type of electronic card used by millions of Americans to activate the voting terminal to cast their ballots.** This vulnerability could be exploited to take over the voting machine on which they vote and cast as many votes as the voter wanted.

Further, in partnership with two other DEF CON villages, including r00tz Asylum, which allows children (accompanied by an adult) to learn and test white hat techniques, and Capture the Packet (CTP), the most popular competition at DEF CON, young DEF CON attendees were given the opportunity to hack mock ups of secretary of state election results websites for the thirteen Presidential Battleground States. In less than

10 minutes, an 11-year old in the competition hacked into a mock up of Florida's election results website, changing its reported vote totals. The attack the children were trained to use on the sites (SQL injection) is the same attack the Senate Intelligence Committee warned was used in a majority of Russian cyber attacks on election websites in 2016.[2] Further, the Open Web Application Security Project (OWASP), one of the leading organizations on website security globally, has cited this type of attack as the top web application security risk for organizations around the world.[3] While children in the r00tz Asylum village used this vulnerability for a variation of 'de-facing,' which is generally considered to be an easily found, "show-off" attack, in the hands of more skilled and malicious adversaries the underlying vulnerability can be used to initiate much more serious types of attacks.

Aside from introducing the youngest members of the DEF CON community to issues related to civics, media, and cybersecurity, the r00tz Asylum exercise was ***the first time the voting public was made aware of how fragile our election night reporting systems are to the ultimate fake news: hacked election results.*** No organization can protect a website from a determined nation-state, as was evidenced by the Iranian attacks on nearly dozens of financial institution websites from 2011 to 2013. The financial industry spends billions on cybersecurity and hires some of the best cyber defenders on the planet to protect their systems. Yet even with all their resources, they could not stop a determined nation state from hacking their websites despite two years of trying. Even more disconcerting, Russia has already executed an attack on election reporting websites in Ukraine, changing results and announcing the prefered Russian candidate won when in fact he had not. Thus democracies around the world need to prepare for this threat. DEF CON is stepping up as the first organization to publicly release Election Day crisis communication protocols (below) for election jurisdictions across the globe to train in advance of Election Day.

Over 100 election officials passed through the Voting Village over the course of three days, with many training on the KIG CyberRange generously donated to the Voting Village by Cyberbit. The CyberRange is a virtualized environment allowing election officials to be trained in defending a voter registration database and simulated state-of-the-art attacks. This year the defenses of the virtual election office were beefed up by an order of magnitude from the last year's exercise. Further, to our knowledge, this is the only capture-the-flag style training available for election officials to learn how they can protect a voter registration database from attackers already in their network.

High-profile experts lined the speaking track at the Voting Village. Speakers included leaders from the Department of Homeland Security; state and local election officials, including Alex Padilla, Secretary of State of California; Noah Praetz, Director of Elections for Cook County, Illinois; Neal Kelley, Chief of Elections and Registrar of Voters for Orange County, California; Amber McReynolds, former Director of Elections for City and County of Denver, Colorado; and the senior *New York Times* correspondent and best-selling author, David Sanger. Biographical information can be found more in detail in Appendix #2.

The unprecedented attendance of election officials at DEF CON did not happen by accident. The Voting Village sent thousands of invitations via mail and email, and even made 2,500 live phone calls to election officials across the country.

---

[2] US Senate Intelligence Committee, "Russian Targeting of Election Infrastructure During the 2016 Election: Summary of Initial Findings and Recommendations," May 8, 2018, https://www.burr.senate.gov/imo/media/doc/RussRptInst lmt1-%20ElecSec%20Findings,Recs2.pdf.
[3] "OWASP Top 10 Application Security Risks - 2017," *Open Web Application Security Project*, Accessed September 21, 2018, https://www.owasp.org/index.php/Top_10-2017_Top_10.

Matt Blaze, co-founder of the Voting Village, said, "It's been incredible, the response we've received. We've had over 100 election officials come through here and they expressed over and over again how much they have appreciated learning from this opportunity."

He went on, "Before the first DEF CON Voting Village in 2017, there were only a handful of experts on voting infrastructure cybersecurity in the United States, as well as an unknown number in Russia. Now, thanks to the efforts of the Voting Village, there are thousands of experts. Now is the time to leverage that expertise to improve election security across the United States."

Harri Hursti, another co-founder of the Voting Village, added: "It would be extremely expensive for professionals and trained experts to match the diversity of ideas, approaches, speed, and overall creativity generated by this unorganized, large group of highly skilled people working on a common objective. The reason why many industries and government agencies have implemented bug bounty programs and other ways of crowdsourcing security work is because they are incredibly effective tools to capture this energy and innovation to help to improve their own security. For the U.S. election system, the challenges at hand are much larger than just software bugs: there are fundamental design issues to sort out and fix. The innovation inherent in this kind of exercise can be of immeasurable impact."

## Media Overview

The public and media response to the second year of the DEF CON Voting Village has been truly staggering, both in terms of its reach and in terms of the conversations it has sparked about election security. In total, the media coverage following the annual DEF CON Voting Village reached more than 2.8 BILLION people. As reflected in the Heat Map below, almost 2,000 media stories were published world wide, covering every major continent except Antarctica.




Not only did prominent publications such as *The Washington Post*, CNN, *The Wall Street Journal*, *The New Yorker*, and BBC cover the event, the Voting Village also engaged with an active audience via social media, which touched more than 146 million people. Twitter alone garnered 33,400 engagements from just one tweet on the opening day of the DEF CON Voting Village. Since July 24, 2018 and covering the dates of DEF CON, Voting Village tweets earned 1.4 million impressions, with high activity during the event itself. With a successful and active media outreach, social media accounts continued to generate interest throughout the event. With thousands of followers, the Twitter handle for the Voting Village (@VotingVillageDC) provided continual updates on what was occurring at DEF CON, engaging followers and interested parties inside and outside the event.

Other top publications that covered the event included *TIME*, *USA Today*, CNBC, *Reuters*, NBC News, *The Los Angeles Times*, ABC News, and *Politico*. Articles covered the vulnerabilities of election infrastructure and the variety of machines investigated at the event. Some news sources developed the conversation further, covering not only the threats posed to traditional election infrastructure but the rising threat of disinformation. CNN, for example, after highlighting the importance of the work being done at DEF CON, used the hacker conference as a discussion platform to voice its fear of a future influence by coordinated information warfare campaigns. Additionally, top officials from DOD, NSA, DHS and the U.S. Congress attended the Voting Village.

## Equipment

The Voting Village organizers procured a variety of voting equipment for examination. The 2015 Digital Millennium Copyright Act exemption issued by the Library of Congress for good faith security research allowed Voting Village participants to find vulnerabilities without worrying about anti-circumvention liability. Prior to 2015, hackers might have faced significant liability for some of the research described in this report. Most of the equipment in the Village was purchased by DEF CON on secondary markets, such as eBay and government surplus auctions. The machines and equipment featured in the Village included:

- Dominion: Premier/Diebold AccuVote TSx
- Dominion: Diebold AccuVote OS
  *This machine was lent to the Voting Village by an election official for display purposes only. Because it was needed for use in the midterm elections in November 2018, it was not used for any research or analysis by Voting Village participants.*
- Dominion: AVC Edge
- ES&S: ExpressPoll Tablet Electronic Pollbook
- ES&S: M650
- AVS: WINVote
- AVC Edge activation device
- ACOSJ dual interface Java card

In addition, the Voting Village also featured the KIG CyberRange powered by Cyberbit, which provided a virtual exercise that was designed to mirror an Elections Voting Office. In a safe, virtual, and isolated network, hackers were asked to use common tools to penetrate a web application behind firewalls and manipulate records. The CyberRange exercise leveraged Kali Linux, which is a common Linux distribution including a wide range of free hacking tools and used by hackers, security professionals, and researchers today. Using the Kali Linux toolset, the hackers attempted to perform attacks like SQL Injections as a means to compromise the simulated elections office and exfiltrate the data designated as the target. However, it is noteworthy that Kali Linux offers only a small subset of the tools real cyber criminals have at their disposal. Offering Kali Linux was to facilitate participation without requiring hackers to bring their own computers and tools. However, it was also a disadvantage for the attackers as they were limited to certain tools and an environment which they may not have used otherwise.

The KIG CyberRange depends upon Cyberbit simulation technology. The Range is deployed as an isolated virtual environment, giving KIG the ability to customize network configurations to mirror real-world environments and develop unique attack scenarios.

As in the real world, the virtual exercise was not timed, and hackers were encouraged to continue trying to hack the system as long as they desired. Several made it past the web application, but none were able to penetrate the last firewall to retrieve voter records. Had hackers been successful, it is possible they could have potentially altered voter polling data – changing polling data or adding/deleting records. However, no hackers were successful in getting to the data in the simulated virtual attack exercise. It is noteworthy that this year the defenses of the virtual election office were fortified using Israeli military defense software, while attack tools were limited to what is available with Kali Linux.

The Voting Village does not manufacture opportunities for hackers to easily exploit the elections system. It is a forum for experimentation to improve the security of the U.S. elections infrastructure. The fact that no

one was able to fully penetrate the last firewall in the exercise provides useful information on a way to better protect voter data. If any state or local election official would like to better understand how the CyberRange works, please reach out to votingmachinevillage@gmail.com for more information.

## Limitations

There were significant limitations of the work at the Voting Village, including:

- Participants only had access to publicly available information and the contents of the machines. In contrast, nefarious actors would not be so constrained, and could attempt to gain access to proprietary information.

- The Voting Village provided a sample of voting technologies. Organizers obtained what they could get their hands on quickly, legally, and affordably.

- The Voting Village did not provide any Election Management Systems to attendees. In a real election environment, this system is a key element as originator and aggregator of election data, and in formal studies it has been found to be the most vulnerable element, particularly in its capacity to radiate additional attack surfaces and vectors across the elections system as a whole.

- Finally, there was no access to any backend provisioning or voter registration systems. These kinds of systems are not generally available on the open market.

## "Election Security is National Security"

**By: Rob Joyce, Senior Advisor for Cybersecurity Strategy, National Security Agency**
Originally published: *The Cipher Brief*, September 27, 2018[4]

Opinion - Many different organizations and individuals need to pull together to ensure we have secure and trustworthy elections. The distributed nature of our elections throughout the state and local governments means there are widely varying levels of expertise and resources available, even when state and local officials leverage the federal government for support. This election infrastructure can be expansive, and includes the voting machines themselves, the tabulation processes, the voter registration databases and the associated networks. Each of these requires a detailed focus from many entities to protect against adversaries seeking access to data for influence operations, threatening the availability of the services, or posing threats to the integrity of the information.

I recently caught a glimpse of the kind of offensive focus I'm talking about at the Voting Village at DEF CON 26. I witnessed private individuals donating their time to improve the security of our election processes. They've made incredible contributions, and are offering advancements for federal, state, and local election programs, as well as insights for the manufacturers of voting technology. Strongly connecting all the contributors to our election process needs to be a goal for improving election security. These connections are vitally important to ensure everyone is aware of the threats, best practices and needed improvements.

Amazing talent and expertise gathers at DEF CON with an enthusiasm to make things better. The combination of skilled cybersecurity experts in partnership with industry and the ultimate end users of the technology – state and local election officials – is a powerful alliance. . . . Steering the voting village to similar collaborative relationships will take us to the next level and address the constant erosion of trust, which only helps further the objectives of our adversaries.

Ignorance of insecurity does not bring you security. As time passes, the security of any device begins to erode. New exploitation techniques are developed. New investigative tools are created. Zero days are discovered in operating systems. The capabilities and repertoire of the exploiters grows. Developers of the security models for a device can never predict every creative idea that will be tried during exploitation. For these reasons, we need to continuously red team our devices and processes. This independent testing provides great benefit by straining assumptions and uncovering hidden flaws.

Another key aspect of securing our election processes is simply focusing on the fundamentals. As we embrace electronic technology, the basic security practices of updating and patching are critical. Having strong adherence to recommended security design practices is vital. Often, paying attention to detail in the things that we already know how to do, removes significant risk.

While DEF CON continues to foster a venue to investigate election infrastructure in the Voting Village, the focus cannot simply be about calling out the state of security in our current technology. Rather the result needs to be developing tangible actions that lead to collaborations that will make us more secure.

---

[4] Joyce, Rob. "Election Security is National Security." The Cipher Brief. September 27, 2018. Accessed September 27, 2018. https://www.thecipherbrief.com/column_article/election-security-is-national-security.

Election security is a matter of national security, and there's no question that progress has been made since 2016 – government-industry partnerships exist today that simply did not exist even a year ago. These security-focused engagements between election officials, the federal government, and vendors will undoubtedly contribute to making the 2018 mid-terms the most secure elections in recent memory. But there's more to be done, and securing our elections is like a race without a finish line. Together as a community – hackers, government and industry – can bring powerful assurances to a foundational component of our freedom: fair and trustworthy elections.

## Technical Findings

### Diebold ExpressPoll-5000

The Diebold ExpressPoll-5000 is an electronic pollbook, designed for use by individual pollworkers. It is used in precincts to check voters in before they are permitted to vote. The product line currently belongs to ES&S, but the ones used at DEF CON were models running Diebold-branded software, which is also still in use in several places in the U.S. Its operating system is a version of Windows CE, a system built by Microsoft for embedded applications. The pollbook application software was version 2.0.27. The data in an ExpressPoll-5000 is stored on a removable Compact Flash card with additional ability to utilize PCIMCI cards.

The principal investigators of the ExpressPoll-5000 machines at DEF CON were Miguel S., a software engineer, and Akin O, a Nigerian application software security engineer. These investigators were able to access the file system and read and write the voter databases using SQL Lite, a free database program widely available. The investigators found entries in the database where the passwords to the ExpressPoll-5000 were stored in cleartext.

The root password for the machine was "password".

The admin password was "pasta".

There are several security mistakes here if a jurisdiction is serious about security. First, the root password is apparently unchanged from the operating system default. When setting up a new machine the first thing one should always do is assign a new root password. It also is extremely bad practice to store passwords *in the clear* (i.e. unencrypted) and in a place that will ever fall into someone else's hands (as this ExpressPoll-5000 did). Presumably any poll worker in the jurisdiction from which this machine came can use the passwords to gain control of the machine and make arbitrary changes to it.

The admin password, "pasta", is probably not the default password, i.e. it probably was changed to that when the machine was configured. But it is a poor choice because it is short, all lower-case, and contains no digits or special characters. More significantly, it does not matter what the admin password is if the root password is the default value, since the root user has more privileges than the admin user. Additionally, it demonstrates that Federal Information Processing Standard rules, as defined by the National Institute of Standards and Technology (NIST), are not enforced by the software.

### Dominion AVC Edge

The AVC Edge is an electronic voting machine manufactured by Sequoia Voting Systems, later acquired by Dominion Voting Systems. It is a touch-screen machine with direct-recording electronic capabilities. It is activated by a smart card, and records votes on internal flash memory. Each unit contains a slot for a vote activation card. After the voter's ballot is cast, the smart card is deactivated to prevent multiple votes from being cast. Votes are subsequently documented. When polls close, the votes recorded in each machine are either physically or electronically relayed to election headquarters. It is currently in use in Arizona, California, Florida, Illinois, Louisiana, Missouri, New Jersey, Pennsylvania, Washington, and Wisconsin.

As the whole execution environment is stored on the removable storage device with no permanent physical security protections in the form of locks or even tamper-evident seals, researchers were able to simply open the machine's outer casing with common screwdrivers, gain access to the storage device slot, and

swap the device with a new device with a different operating system installation and application. Tamper-proof seals specific to a particular election would not protect against this, as an attacker would only need to swap out the removable media once during the lifetime of the device.

In the Voting Village the removable media were replaced with new media with completely different programming to verify that there were no security measures, such as secure boot or cryptographic signatures, preventing the device from accepting arbitrary new programming. Though old, the AVC Edge hardware is common; therefore there are no obstacles to creating rogue software deployments for the device.

**Dominion Premier/Diebold AccuVote TSx**

The AccuVote TSx is an electronic voting machine manufactured by Premier Voting Solutions, later acquired by Dominion Voting Systems. The product line currently belongs to ES&S, but it is unclear if the machines used at DEF CON are Dominion or ES&S products. The AccuVote TSx is currently in Alaska, Arizona, California, Colorado, Florida, Georgia, Illinois, Indiana, Kansas, Missouri, Mississippi, Ohio, Pennsylvania, Tennessee, Texas, Utah, Wisconsin, and Wyoming.

During DEF CON, the Voting Village organized a mock election to demonstrate vulnerabilities in the AccuVote TSx. The software used in the demonstration was unmodified from the software that is still used widely. Additionally, there are older, potentially more vulnerable versions of the software still in use.

The mock election demonstration consisted of multiple elements:

- All voters used the same voter activation smart card without the card being reactivated with a device of any kind to allow the next voter to cast their ballot. This is because the voter activation card was programmed to automatically reset itself after activating the device, therefore allowing it to be used to cast unlimited number of ballots.

- The election was programmed without using software provided by the vendor, therefore proving that a chain of custody of the election management software does not prevent new elections from being programmed. This also indicates that third parties with no access to the election management system can create rogue election definitions which are indistinguishable from real elections.

- An attack can be distributed remotely with no physical access to the voting machine. Malware needed in this demonstration can be distributed with the ballot/election definition. This also demonstrates the mechanism enabling a wholesale attack. Depending on how a particular county's system is set up, there may be multiple centralized systems in the chain of the information flow to the voting machines, and compromising any of the links in the chain enables a wholesale attack.

- Paperless, unauditable systems are extremely vulnerable to this kind of attack, as the only record of a voter's intent is in digital form.


Precinct 0
DEFCON Special Election
This is an AccuVote TSX, a voting machine used in 18 states, some with older firmware than this.
Attackers don't need physical access to hack it. Before every election, officials create the ballot design on a central PC and copy it to every machine. We built malware that hitches a ride.
On the next screen, please vote for your preferred candidate.
Touch Next to begin.
Next


DIEBOLD
President of the United States
George Washington
Framers Party
Benedict Arnold
Redcoat Party
Previous
Instructions
Next


DIEBOLD
President of the United States
George Washington
Previous
Cast Ballot


ELECTION RESULTS REPORT
President of the United States
DATE: DEFCON Special Election
TIME: 14:24 08/11/2018
BALLOTS CAST 113
President of the United States
George Washington 26
Benedict Arnold 26
The Dark Tangent < 61
WE, THE UNDERSIGNED, DO HEREBY CERTIFY THE ELECTION WAS CONDUCTED IN ACCORDANCE WITH THE LAWS OF THE STATE.
******* SIGNATURES *******

As a surprise, the largest social media visibility from the village was for viral video posted by social engineer Rachel Tobac. At the time of writing, the video (https://twitter.com/racheltobac/status/1028437783050776576?lang=en) has been viewed over 2 million times. While this hack that Tobac demonstrated was known before DEF CON, we revisit it here in light of the renewed public attention. The AccuVote TSx voter activation smart card reader unit is held in the place by a flimsy piece of plastic which can be easily pulled from the main casing and re-installed. The process requires no tools, very little physical force, and can be done in a matter of seconds within the privacy shield of the voting machine. By separating the piece, an attacker gets access to the connector cable of the reader unit. If an attacker disconnects the cable, during the next start-up the voting terminal will allow the attacker to enter the system settings dialog without any authorization checks. This vulnerability allows an attacker to potentially disrupt the election process, but based on the current understanding will not affect the integrity of the votes.

**ES&S M650**

The M650 is an electronic ballot scanner and tabulator manufactured by ES&S. The ES&S M650 is used for counting both regular and absentee ballots. It launches ballots through an optical scanner to tally them, and keeps count on an internal 128 MB SanDisk Flash Storage card (pictured below). Election staff are responsible for configuring the M650 for each election. It is currently in use in Arkansas, California, Florida, Idaho, Illinois, Indiana, Kansas, Minnesota, Missouri, Montana, North Carolina, Nebraska, New Jersey, Ohio, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Washington, West Virginia, and Wyoming.

The M650 runs QNX 4.2* on an Octagon 5066 Board with an AMD Am5x86 processor at 133MHz. QNX is a Real Time Operating System (RTOS) that has some loose parallels to modern-day Linux and Unix operating Systems. The version of QNX running on the M650's at DEFCON was last updated in 2008, and QNX 4.2 was released in 1996.



*Physical Security*

There is a common misconception that physical security precautions (tamper-evident seals, locks, etc.) keep voting machines safe from malicious attacks. While all equipment was shipped to us with keys, the researchers wanted proof that the locks in the machine did not inhibit access. In under a minute, a Voting Village researcher picked the lock on the back of the M650 (pictured at left) and unlocked its case, gaining full access to the computer systems and electronics via a serial connection to the main board. Features of note include two OKI Microline 9-pin dot matrix printers connected to two exposed parallel ports, an exposed ethernet jack, and a ZIP disk reader/writer. There was no other type of tamper-evident security on the machine. Physical security such as this lock, even in a small county office, is not sufficient to protect voting systems.

*Serial Terminal*

With a $10 adapter (VTC-9F to DB-9 adapter cable, item 1041), a serial connection can be established to the M650 by connecting to the main 5066 CPU board. The connection is extremely simple to establish, as it uses the default serial parameters for popular, free programs like Putty and TeraTerm (Windows), as well

as Linux commands like `screen` (where the only requirement to successfully opening a serial console is specifying a baud rate of 9600). Connecting a laptop allows root access to a serial terminal session with username 'root' and no password. There is not even minimal account security.

From this connection, an attacker can tamper with election data. All these data are stored in `/flshdr/elecdata`, the mount point for the 128MB SanDisk Flash Storage device that is on a standalone board inside the M650 computer board cage. An attacker could also conduct a denial of service (DoS) attack against the system, or display any message to the screen or printers connected to the computer.

Furthermore, there exist commercially available tools which can be used to automate an attack of this nature, as well as small, commercially available devices which can be installed into this interface to enable remote and wireless access to this port. Because the serial is not used during normal operations, adding such a device without detection is possible. Researchers estimated that it would take one to two minutes to pick the lock, carry out the installation of the attack and relock the device.



*Ethernet Port Vulnerability*

The ES&S M650 voting machine has two communication media options - Ethernet connection or Zip drive. On the side of the M650 is an RJ45 jack. This connection allows the M650 to send data over a network to a system running ES&S Unity, the election management system software.

During bootup the M650 makes a DHCP request to obtain an IP address using the DHCP client provided in the QNX TCP/IP module, dhcp.client. This DHCP client shares a substantial amount of DHCP protocol handling code with the ISC DHCP server version 1.0.0, although the client-specific portions seem to be closed source. Version 1.0.0 of the ISC DHCP server has several known buffer overflows. However, we were not able to trigger these overflows with server-provided data in this client implementation.

After obtaining an IP, the M650 sends a packet on port 6500 to the Unity server expected at a fixed IP address. This initial packet carries the following hexadecimal payload: `01 00 00 00 00 00 00 00 00 00 00 00 00 05 00 00 00 00 00 00 00 00`. The significance of this message (which is part of one of the TCP packets) is currently unknown.

*Zip Disk Vulnerabilities*

A second investigation of the M650's vulnerabilities revolved around the Zip drives and Zip disks used on the machine. The Iomega products that are used by the M650 are an old and obsolete removable disk technology. Zip disks were intended to be treated as if they were a "fat" floppy disks, but with a much larger capacity (100 MB or 250 MB compared to the 1.44 MB capacity of a common 3.5 inch "high-density" floppy).

There are eight different types of Zip drive devices, and each is different in terms of electronics, storage capacity and other aspects. As an added layer of complexity, the description of a 'super floppy' is an operating system-specific description, referring to Windows. Other operating systems commonly see the drive as more like a removable hard drive. In the M650 operating environment "Unity," the election management system uses a Windows Operating System while M650 itself uses QNX as its operating system. (Voting Village participants did not have access to Unity software.) Therefore they see and operate with the

drive and the file system(s) on it in an inconsistent way. The main difference is that a super floppy is a single file system, while the disk is not subdivided into separate sections, called partitions, which can not see each other - the hard drive type of media includes a partition table, which means that the disk can have multiple separate file systems. If the machine mounts one of the partitions assuming it is the whole disk, the computer will not be aware of the other file systems or the files stored on them.

As stated previously, the Zip drive's primary purpose is to store and transfer the election specific definitions and, ultimately, the results. However, the Zip drive also has the ability to alter or replace any and all of the programming stored on the internal storage devices. This kind of attack is called an advanced persistent threat (APT). APTs are a family of stealthy and continuous computer hack processes designed to be hard to detect, hard to clean, and potentially virally propagating.

On bootup, the M650 executes a startup script called "sysinit" (stored on the flash storage device, under /flshdr/sysinit). The sysinit script is run on every boot-up of the M650. It is responsible for starting drivers, mounting storage locations, and initiating an update. To decide if an update will be run, the machine runs this line:

```
if [ -f /dos/a/<redacted_1> -a -f /dos/a/<redacted_2>.etp -a -f
/dos/a/<redacted_3> ] ;
```

Although we have redacted the file names, they are all single, commonly used English words that can be easily guessed from the context.

In this line—one of the two checks required to perform an update—the machine runs a file presence check (-f <file>) on three files (<redacted_1>,<redacted_2>.etp, <redacted_3>) that should be on the zip disk (mounted as /dos/a/) to move on to the next step of running an update. This next step is even more trivial: a version check. The sysinit script, provided that it finds the three files listed above, runs this line to "check" version numbers:

```
if [ "$new_vers" != "$curr_vers" ] ; then
```

This line simply ensures that the new version of software (read from /dos/a/<redacted_2>.etp on the zip disk) is *not the same as the existing version* (thus the use of the != operator). The existing version is stored in (/flshdr/<redacted_2>.etp). By using the "!=" operator, the software could theoretically be downgraded as well as upgraded: a lower software version on the Zip disk would still make that "if" statement true. Following these two trivial and insecure checks, the machine continues to copy the update script to the root directory (/) and then runs:

```
display "Updating firmware to $new_vers."
/<redacted_1> &
```

Through this function, the machine checks for the presence of "<redacted_1>" (any script), "<redacted_2>.etp" and "<redacted_3>" on the Zip disk (mounted as /dos/a/) and, provided that the versions are dissimilar, runs the update script without checking any further. The lack of checks here would allow a knowledgeable attacker to run an arbitrary script on the machine - no integrity checks, passwords, or signatures are performed on any file from the Zip Disk (including the <redacted_2> script itself). The system also lacks any kind of potentially security-enhancing subsystems like sandboxing. If the

M650s are networked at the clerk's office, this vulnerability would allow a malicious actor to spread malware across the network, possibly infecting other machines.




Zip drives and Zip disks are discontinued end-of-life products, but the M650 depends upon this technology for loading and updating its software and firmware. This causes a number of serious security vulnerabilities. If a Zip drive in an M650 fails, it is difficult to replace. However, the Zip disks are even more problematic. Often jurisdictions have to buy them used, which means that they have already been formatted, probably on a Windows machine, and they may have files already recorded on them. Even if bought from Amazon, they in turn may have been purchased from random eBay sellers.

A Windows-formatted disk can be read by a machine running QNX. Thus, a used Windows-formatted Zip disk with files recorded on it will appear to work normally when inserted into an M650. But this necessary and useful capability opens the door to a serious security vulnerability.

The two operating systems, Windows and QNX, use different device drivers, volume drivers, and file system implementations. In fact, the QNX operating system is not on the list of officially supported operating systems for Zip disks, so presumably someone originally ported the Zip software from yet another platform, possibly Linux, with an unknown level of testing and skill. This leads to the possibility of differences in the two operating systems' use of Zip disks, and we know such differences exist at least in their handling of partition tables on Zip disks. Generally, with independent implementations on different platforms of the "same" software one always expects different behaviors in corner cases, different bugs, and different error behavior, leading to security vulnerabilities when the implementations attempt to interoperate.

One major potential security vulnerability arises from the possibility that used disks originally written on a Windows or Mac machine might be procured and used on the M650 without being reformatted. In that case the differences in operating systems provides a potential vector for attack. As described elsewhere in this report, a Zip disk is used to update the software of the M650. If there is an executable file named "update" on the disk at the time the M650 is booted (and a couple of other simple conditions are met) then the M650 will immediately run the update program. Normally the update program would install a new version of the code running on the M650, but it could do literally anything else, including inject malware to miscount votes or inject a virus that could spread among all the M650s in a jurisdiction through the exchange of Zip disks.

A clever attack on an election would start by the attacker writing a malicious QNX executable file named "update" on a bunch of Zip disks and giving those files the Windows attributes `hidden` and `system`. Then the attacker could find a way to offer those malicious disks for sale to a jurisdiction that needs more Zip disks and is having trouble buying brand new ones.

If an IT person inserts one of the malicious disks into an M650 without reformatting it first, the update file

will immediately and silently install the malicious software into the M650, thereby undermining the integrity of the election. If the IT person took the precaution of examining the contents of the Zip disk first, he or she would see nothing because the files have the `hidden` attribute. If he took the further precaution of issuing a command to delete all files from the Zip disk, the malicious files would not in fact be deleted because they are marked with the `system` attribute. Only if the disk is reformatted on a known clean machine before being inserted for the first time into an M650 would the malicious update file be destroyed.

It is very doubtful that the operators of M650s all over the U.S. are aware of the necessity of this precaution of reformatting every Zip disk before using it in the M650. As the M650s get older and Zip disks become scarcer, this vulnerability grows in importance.

This is an example of a broad class of vulnerabilities that are well-known in the computer security world — `autoplay` or `autoexecute` features in removable storage media alongside with Master Boot Record and other types of lower level attacks. We have seen attacks like it before with the auto-update feature in Diebold voting machines through their memory cards, and similar capabilities in other vendors' voting machines. We have also seen it historically with autoexecute features in CD drivers, in email clients, and in thumb drives (the latter believed to be one of the ways Stuxnet was introduced into the Natanz uranium enrichment facility in Iran). But the new feature here is that the scarcity of obsolete Zip disks will drive M650 jurisdictions to buy them from second-hand sources. Such disks must be treated as contaminated, even if they appear clean.

In other words, the M650 is simply looking for a file with a certain file name and is trusting it and executing it with the maximum level of privileges, which has never been an acceptable practice from a security point of view. This practice is made more dangerous because the different operating systems involved in making data hygienics difficult and making it possible to hide critical files, and even complete file systems, and making those potentially able to survive many commonly utilized methods of erasing content.

If the machines are disconnected from a network the attacker could initiate the printout of a false report from the report printer or Zip disk - the means used to record the totals. Of course, the attacker can also, through this vulnerability, change election data stored on the machine and create matching false digital records to be reported to the central tabulator.

Any of these vulnerabilities seriously compromises the integrity of an election. They require no passwords and necessitate only basic knowledge to successfully complete. **The dangerous update procedure was documented but file names were redacted in the 2007 EVEREST report because of the grave security risk.**[5]

Mitigation against this combination of factors would require additional measures for the secure cleaning of all residual data from the drive on the lowest level possible - not only when the drive is put into use, but also between every instance it is used in order to prevent a viral attack to utilize the drive as a distribution media in and of itself. All storage devices or removable media should be formatted before first use in any machine that is part of, or networked with, any voting system. This has to be a routine precaution faithfully practiced. Injection of malicious software through unclean media is one of the ways that it is possible to hack voting systems that are not connected to the Internet. Isolating a voting system from the Internet is

[5] Pennsylvania State University, the University of Pennsylvania, and WebWise Security Inc, EVEREST: Evaluation and Validation of Election-Related Equipment, Standards and Testing. Compiled by Patrick McDaniel. By Matt Blaze and Giovanni Vigna. December 7, 2007. Accessed September 25, 2018. https://www.eac.gov/assets/1/28/EVEREST.pdf.

necessary to protect it, but it is not sufficient. Malicious logic can enter by other means, and only careful diligence (or luck) can prevent it.

**Cross-Device Vulnerabilities: Smart Cards**

Several types of voting machines, including the Dominion Premier/Diebold AccuVote TSx and the Dominion AVC Edge, use smart cards to enable voters to vote on Election Day. Smart cards are commonly also referred as Java-cards, as the chip on the card is a low-powered computer which runs programs written in Java, a common programming language. When the card is plugged in, it gets its power from the connection to boot up. Once up and running, the card starts to communicate with the host computer. In the election environment, the smart card is set up for the voter to cast their ballot either by an ePollbook, such as the ExpressPoll 5000 (discussed above), or by a specialized programming device called Voter Card Encoder (VCE). It can also be used to select the voter's ballot.

Researchers in the village were able to set the VCE device to a mode accepting a new program image to be flashed in, completely replacing the old programming. However, the researchers ran out of time to create malicious demonstration image for the device. Installing new software on a VCE does not require any authentication or check mechanisms. Simply by pressing the "Off" button, the device will query if the user wants to upload a new software image.

Advances in electronics have enabled the power consumption of the chip to be reduced greatly enabling the chip to be powered wirelessly over Near-field Communication (NFC) without a physical connection. These cards are called dual-interface cards and have both a physical chip interface and a wireless NFC interface. These cards are readily available for purchase and retail for about $20. Modern mobile phones have NFC capability built-in, meaning that dual-interface cards are field-programmable by simply using a mobile phone as the programming device over wireless. The same programming is also able to communicate over the physical chip connection.

Due to a lack of security mechanisms in the smart card implementation, researchers in the Voting Village demonstrated that it is possible to create a voter activation card, which after activating the election machine to cast a ballot can automatically reset itself and allow a malicious voter to cast a second (or more) unauthorized ballots. Alternatively, an attacker can use his or her mobile phone to reprogram the smart card wirelessly. All elements of the system seem to accept smart cards with the hardcoded default password (0x01,0x02,0x03,0x04,0x05,0x06,0x07,0x08). Among other factors, the obviousness of the password makes forging smart cards easy. This password has been previously published as part of the EVEREST report in December 2007.[6]

In addition to allowing a malicious actor to vote more than once in jurisdictions where the voting terminals have more than one ballot style available, the modification of the voter activation card could also enable the malicious actor to cast multiple ballots, including for races for which the attacker is not eligible to vote at all.

**In-flight Email Ballot Modification**

Over thirty states allow at least some voters (usually overseas and military voters) to cast ballots as

---

[6] Pennsylvania State University, the University of Pennsylvania, and WebWise Security Inc, EVEREST: Evaluation and Validation of Election-Related Equipment, Standards and Testing. Compiled by Patrick McDaniel. By Matt Blaze and Giovanni Vigna. December 7, 2007. Accessed September 25, 2018. https://www.eac.gov/assets/1/28/EVEREST.pdf. Page 145.

attachments to an email message. This is an extraordinarily dangerous practice because email is not end-to-end encrypted, not authenticated, its headers (including the "From:" and "Date:" lines) are forgeable, and offers only "best effort" delivery, i.e no strong guarantees. Email is not remotely a secure transmission medium. Anyone who controls an email forwarding agent or email server is in a position to modify, copy, re-route, or discard any ballots he does not like. And since the ballots must be accompanied by the name of the voter, the secrecy of a ballot transmitted by email is totally compromised. Two DEF CON investigators helped demonstrate one of the innumerable kinds of potential attacks on email ballots.

The two principal investigators of email ballot modification at DEF CON were both researchers at Free & Fair, a company that provides open source elections services and systems: Dan Zimmerman, Principled Computer Scientist, and Lyell Read. Their investigation was not of any particular machines, but of general vulnerabilities inherent in email voting. In the past, Dan Zimmerman has demonstrated how a home router could be hacked to intercept an emailed ballot before it even leaves the voter's home. The malicious code in the router could modify votes arbitrarily, with neither the voter nor the election official running the server having any way to detect the problem.

In this case, the investigators demonstrated a similar hack, but instead of attacking the sending side of the communication, they attacked the *receiving* side, inside the email server such as a jurisdiction's election agency might run. They assumed that an emailed ballot consisted of three JPEG images attached to an email message, presumably to contain voter ID and authentication information, a signed oath or affirmation, and the voted ballot itself.

A modern email server has hooks to allow linking with "filter modules." The purpose of filter modules is to allow preprocessing of an email before it is delivered to the final recipients. Such modules are commonly used for spam filtering and other purposes, such as disabling URLs embedded in the email, stripping executable attachments, auto replying with a vacation message, blocking certain senders, apply classification rules, etc. An email filter can be written to do literally anything with an incoming message before it is delivered to the addressee.

The investigators wrote an email filter that modified the JPEG attachment that contained the incoming ballot. Technically the filter was a BASH script that ran the ballot through ImageMagick (an open source Linux utility for editing images) and used its `Convert` command to swap two known ovals on the ballot, before replacing it as a message attachment and delivering the email to the recipient's Inbox. The swapping of the two ovals, which represents moving a vote from one candidate to another, is just an example of the kind of arbitrary vote manipulation that could be done in an email filter. The malicious processing of the ballot would probably delay its delivery by a few milliseconds — essentially unnoticeable.

The programming of the demonstration was completed in approximately two hours, start to finish.

This hack illustrates how vulnerable email voting is to undetectable manipulation while in transit. A rogue individual (and it can easily be a single person) who maintains the email server can write and install such a filter module and later remove it after the election. It would be difficult to detect that the email ballots were manipulated to reflect the programmer's vote choices because neither voters nor election officials will see anything suspicious.

Alternatively, the email server might be remotely hacked by anyone on the Internet — criminals, domestic partisans, or foreign intelligence agencies. The hackers might install such a filter (and later remove it) and thus control the outcome of the election.

## Forensic Studies – AVS WINVote

The AVS WINVote machine is an electronic voting machine manufactured by Advanced Voting Solutions (AVS). It possesses a touch-screen voting terminal, a full color screen, as well as zoom capabilities. It is equipped with a wireless local area network and battery backup power, a printer, and modem. The AVS WINVote stands supported in a voting booth and was designed to function as a stand-alone system and it can be used as both a precinct voting device and as a non-geographic station. WINWare is the software used for election management in the WINVote system. As of the 2016 elections, the AVS WINVote is no longer in use.[7] Its reputation as "America's worst voting machine" is well-documented[8] and well-deserved.[9] Given the surfeit of information available about the WINVote's many vulnerabilities, this report will focus on new discoveries as reported at BlackHat 2018 by Carsten Schurmann, Associate Professor at the IT University of Copenhagen, and as uncovered at the DEF CON Voting Village.

The AVS WINVote machines used at the DEF CON Voting Village originally came from Virginia. The principal investigators at the Voting Village were Carsten Schurmann and Will Baggett, a computer forensic examiner. They were assisted by Minoo Hamilton, a security engineer.

The WINVote machine runs an early version of Windows XP from 2002. It thus has none of the updates (Service Packs 1, 2, and 3), bug fixes, or security patches that were offered by Microsoft in the seven subsequent years that the operating system was supported. Application of updates would require recertification of the whole system (according to Virginia law and practice).

In addition to one physical machine, the investigators had access to a total of 16 NTFS file system images from a total of eight WINVote machines, all from machines that had been used in Virginia for years, so they were able to do some comparative studies. At the end of DEF CON the investigators were still studying the WINVote system and the file system images, so this report is only inclusive of what they had discovered as of the end of the conference.

The investigators used the free forensics tool Autopsy to examine the file system images to look for anomalies. They also used various Windows utilities and a forensic undelete utility that could recover files that had been deleted but not overwritten.

*Music software and music file*

The first discovery that Schurmann made was that four of the eight machines investigated showed evidence of being used for ripping and playing music. The machines contained a copy of coolplayer.exe, an MP3 player program. One possible legitimate use of this program would be to play audio for blind voters, though there is no indication that this is the reason the program was added. However, the machines also had a copy of the "No1" CD-ripping program, a program used to copy music from an audio CD and store it as MP3 files. The WINVote does not have a CD drive, so one would have to plug a CD drive into the USB port on the

---

[7] Jeremy Epstein, "Decertifying the worst voting machine in the US," *Freedom to Tinker*, April 15, 2015, https://freedom-to-tinker.com/2015/04/15/decertifying-the-worst-voting-machine-in-the-us/.

[8] Virginia Information Technologies Agency, "Security Assessment of Winvote Voting Equipment for Department of Elections," *Wired*, April 14, 2015, https://www.wired.com/wp-content/uploads/2015/08/WINVote-final.pdf.

[9] Shaun Nichols, "Default Admin Password, Weak Wi-Fi, Open USB ports ... No Wonder These Electronic Voting Boxes are Now BANNED," *The Register*, April 17, 2015, https://www.theregister.co.uk/2015/04/17/virginia_nixes_highly_pwnable_voting_boxes/.

machine to use this program. There is evidence that this is exactly what happened at some point, because on the same four machines the investigators found copies of a Chinese-language pop song, the same one on each machine.

Since the same Chinese-language song was found on four different machines, this indicates that the song was copied onto the machines at the time the master software distribution for the WINVote was being built, i.e. from before the machines were delivered to Virginia. Most likely an engineer (presumably someone from China, or at least someone interested in Chinese music) was configuring the master software for the WINVote and also ripping CDs and listening to music while doing so. When the engineer committed the final software configuration he failed to erase the music, the MP3-player, and the CD ripper, and they were distributed along with the rest of the voting machine software to at least one jurisdiction in Virginia.

The Virginia jurisdictions that received the machines with the music and CD ripper probably never examined the application software that was installed on the machine. They apparently just accepted the system as delivered and used it for several years. There is no telling what other software, possibly malicious software, may have been installed on the WINVote machines that Virginia officials never noticed in the approximately ten years they were in use. Needless to say, the presence of such rogue files within the software image can only happen with extremely careless and unprofessional development practices and with complete negligence or disregard of any known best practices and quality controls.

*Records of past elections*

Aside from the musical discovery, the investigators found records from numerous past elections stored in a Microsoft Access Database (.mdb) file in the file system images. There were lists of candidates, voted ballot images, and vote totals. There is nothing inherently wrong with retaining data from past elections in a voting machine, since the data is not confidential, but it is a very poor management practice. First, Microsoft Access has notoriously weak security, which would not be an important point if the machines were forever isolated. However, these machines have WiFi connectivity, and as we describe below, there was clearly no prohibition on connecting the machines to the Internet.

Second, it shows that for many years the file systems of the machines were not re-initialized. The best practice would be to reinitialize the software at least once for each general election, if not for every election. That way errors in the file system do not accumulate, and any bad registry entries, bad data files (caused by I/O errors or power outages), or any software, especially any malicious software, that may have been installed since the last use would be wiped clean for the next election.

Finally, the fact that this data from past elections was still present on the voting machines as acquired by the investigators indicates that the machines were not wiped before they were disposed of by the Virginia jurisdictions that used them. It is always good practice to wipe a file system before disposing of a machine.

*Log files show election data had been transmitted over the Internet to a third party*

On at least one of the machines there are log files showing that the entire database of an election was transmitted to a third party company. It was transmitted via FTP, unencrypted and unauthenticated, to the IP address 184.69.193.146 which belonged to a server named ftp.enfocom.com. That server is still online. Today the Enfocom International Corporation is a technology company located in Calgary, Alberta, Canada, and its mission is "To be the leader in providing technology solutions in secure network services and secure software products."

Since the data in the WINVote database is not confidential, the transmission to Enfocom does not

necessarily represent any kind of privacy breach regarding the data itself. The investigators just do not know why voting data would ever be transmitted to any third party, or why they were transmitted to Enfocom in particular. The investigators also do not know whether the IP address they used was located outside the U.S. at the time of the transmission. They did determine that apparently that particular IP address is no longer associated with Enfocom, though that is not necessarily significant.

However, the log clearly shows that there was a direct FTP connection from a voting machine to a distant server over the Internet. This is a potentially disastrous security blunder because it could enable external attackers to penetrate and control the voting machines. Established best practices are that voting machines should *never* be connected to the Internet, even briefly. This is especially true of systems running old, unpatched Windows XP, which are often penetrated and infected with malware within a few minutes of their first connection to the Internet. Furthermore, from a basic operational security point of view, discontinuing the use and blocking of unsafe protocols like FTP has been recommended for years prior to the log entries found, further demonstrating that the baseline external security measures have not been in place at all, or were deeply flawed. These log entries cast doubt upon the claim that election environments are shielded from hostile environments with external security mechanisms.

*Deleted files*
The investigators ran a forensic "undelete" utility on one of the WINVote images and were able to recover 1764 deleted files, i.e. files which were put in the Windows Recycle Bin, and the Recycle Bin emptied, but the files were never overwritten. When examined, the files appeared to be routine information, including:

- change logs for years of changes
- photos of components
- a ringtone (modem noises)
- a deleted copy of the Windows registry
- .zip file of cast vote records
- an external drive insertion log
- a directory named "crypto"

The investigators did not have time to examine these files any further, but nothing appeared suspicious. The existence of these deleted files is, however, further evidence that the file system had never been re-initialized in the many years the WINVote machine was in use.

*Physical vulnerabilities*
A fourth major vulnerability was discovered by Mixael (pseudonym), a mathematician who was also working on the WINVote machines. In this case, the investigator noticed a simple keylock on the front panel (faceplate) of the WINVote. He applied the simplest lock picking tool there is, a "jiggler key." A jiggler key is a simple metal key cut from a totally flat blank with one or more generic bumps along one or both edges. It is not specific to any particular lock — it is intended just to move the mechanical components of the cylinder in a more or less random way until the lock spontaneously opens. This only works on the simplest, cheapest locks. A pack of 10 jiggler keys is available for less than $4 on Amazon.

The investigator was able to open the lock in just about five seconds using what was in fact the simplest of his jiggler keys. He was then able to open the panel, which exposed:

- The power switch
- The USB port

- The modem port
- The printing mechanism

The investigator also noticed that there was no sensor to indicate when the faceplate was opened or closed, so even when the machine is powered on and running there was no possibility of logging the occasions when it was opened or closed.

Anyone who has a few seconds access to the WINVote machine can open the front panel. This obviously includes election officials, warehouse workers, and poll workers. And, if a voter hides the front of the machine with her body as she jimmies the lock, she may be able to open the panel without detection.

Once the panel is open, anyone with sufficient time and preparation could:

- Power the machine on or off. Powering off at the wrong moment may result in a corrupted file system or database;
- Install malicious software through the USB port. This includes malicious software which could modify vote counts arbitrarily with no logging or forensic evidence that it happened;
- Connect the machine to the Internet through the modem port. Connecting a voting machine to the Internet opens it to a host of threats, including remote login and the installation of malicious software, particularly because the WINVote runs a very early and extremely vulnerable version of Window XP; or
- Disable the print mechanism.

## Recommendation:
## Make A Crisis Communications Plan Before Your Website is Hacked

Given the scope of vulnerabilities inherent in the U.S. election system, it is vital that state and local election officials not only seek to prevent cyber attacks on their systems, but also plan how best to recover from an attack. One of the primary challenges in this new era of foreign propaganda is disseminating accurate information to constituents in a reliable manner. The following is a list of recommendations to prepare for an attack against an election results reporting website on Election Day. These recommendations are intended to ensure results are communicated in a way that engenders trust in the election results from voters. This list is tailored to specifically address a cyber attack on an election website but was largely sourced from the Local Government Association of England and Wales[10] who created these recommendations for any government crisis communications plan in response to a cyber attack. We would like to thank the Local Government Association of England and Wales for their thoughtful work on this important topic.

1. **Anticipate crisis conditions and create a crisis communications plan**
   Organizational leaders should anticipate what conditions might be created by a cyber attack on their systems, such as the publication of false election results on official websites, as happened in Ukraine,[11] or a Distributed Denial of Service (DDoS) attack that could shut down the site altogether, as happened to many U.S. banks in the Iranian attack[12] and create a plan for how to communicate with the public and other stakeholders under such conditions. This plan should be part of a local or state government's overall emergency planning. Effective crisis communications plans should include:

   - Who will be part of the crisis communications team
   - Timeline of when the crisis communications team should meet during the first hours, days, and weeks following a crisis
   - Who has ultimate authority for signing off on key messages
   - List of audiences who need to be reached during a crisis, including contact details
   - List of stakeholders to reach out to or work with during a crisis, including contact details
   - List of channels to be used to communicate messages, including multiple backup options
   - Copies of passwords needed to access official communication channels

   Needless to say, this crisis communications plan should be kept in hard copy in case of compromised systems.

2. **Prepare and practice**
   Designated crisis communications teams should practice their response processes to ensure the plan works smoothly and each team member knows his or her role during an emergency. In case of

[10] "Crisis Communications - Cyber Attack," Local Government Association, https://www.local.gov.uk/our-support/guidance-a nd-resources/comms-hub-communications-support/cyber-attack-crisis.
[11] Andy Greenberg, "How An Entire Nation Became Russia's Test Lab for Cyberwar, June 20, 2017, https://www.wired.com/st ory/russian-hackers-attack-ukraine/.
[12] Dustin Volz and Jim Finkle, "U.S. Indicts Iranians for Hacking Dozens of Banks, New York Dam," *Reuters*, March 24, 2016, https://www.reuters.com/article/us-usa-iran-cyber/u-s-indicts-iranians-for-hacking-dozens-of-banks-new-york-dam-idUSKC N0WQ1JF.

a cyber attack, team members should be aware of what dangers they can expect and how to report concerns about suspicious activity.

3. **Establish facts, communicate early and regularly**
During a crisis situation, the crisis communications team should proactively communicate known facts as early as possible, rather than reacting to rumor and speculation. The team should also continually update the public and other stakeholders at regular intervals to remain in control of the messaging.

4. **Identify a spokesperson**
Before a crisis event, organizational leaders should designate a senior member of the organization to act as spokesperson for the team in case of a crisis. This should be a designated team member who is not directly involved in solving the crisis, which would distract them from focusing on key messages and relaying information in a timely manner.

5. **Avoid email and website updates**
If an organization is the target of a suspected or confirmed cyber attack, team members should stop using email and website messaging immediately.

6. **Embrace traditional channels**
When digital communications platforms are compromised by a suspected or confirmed cyber attack, the designated spokesperson should utilize other communications channels to relay key messages, including holding telephone calls with local media, staging in-person press briefings, or utilizing telephone trees to share updates with staff members.

7. **Brief media outlets and elected officials**
If a cyber attack takes place, the crisis communications team alert news media and elected officials that they may experience a surge in calls from the public. These stakeholders should also receive timely updates on the crisis so they can keep members of the public who contact them informed of the situation.

8. **Use personal devices if possible**
If an organization's IT systems are compromised, employees may still have access to the organization's digital communications platforms, such as social media accounts, via their personal devices. The crisis communications team should keep hard copies of social media passwords available for this situation.

9. **Use partner and community networks**
If an organization is targeted by a cyber attack, the crisis communications team should reach out to established partner organizations for help disseminating accurate, up-to-date information on their respective digital platforms. The crisis communications team should establish these relationships before a crisis occurs.

10. **Engage with IT and legal colleagues**
Members of the crisis communications team should work closely with the organization's IT and legal team when preparing to brief the public on updates throughout the crisis. Particularly in the case of a cyber attack, technical details may be difficult to communicate clearly and understand in the appropriate technical and legal contexts.

**11. Communicate with employees**

In the midst of a crisis, an organization's leaders should share updates with staff members before communicating with the broader public. If staff members hear updates via social media or other channels before hearing it from their leadership team, it can damage trust within an organization and undermine efforts to control and mitigate the effects of the crisis.

**12. Respond to the new normal**

Following a crisis like a cyber attack, an organization's leaders should craft messages for stakeholders and the broader public that communicate the lessons learned from the crisis and how the organization is evolving to safeguard against such attacks in the future. Such messaging can repair trust in the organization and help other organizations protect themselves against future crises.

## Conclusion

Over the last 26 years, DEF CON, and for the last two years, the Voting Village, have operated under two core principles:

1. **It is important to derive facts through reason and inquiry rather than blind faith.**

2. **When we discover new facts, it's important we share this information with the general public so individuals can decide how best to use the information.**

We did not make these principles up ourselves. Rather, these principles are the foundation of the Enlightenment, which has guided modern science to achieve the medical, engineering, and IT advances, among others, that underpin the modern world. Since these principles have largely guided the human race toward progress for the last 500 years, we plan to continue to follow them.

These principles matter most when we put them into practice. Therefore, it is relevant to ask what new facts all the poking and inquiring into our voting systems has identified since the Voting VIllage was established.

Among the dozens of vulnerabilities identified in the last two years, four key DEF CON Voting Village findings are grave and undeniable:

1. **Supply Chain Insecurity:** The voting machine parts supply chain is global and has essentially no security procedures to determine whether the machine parts are trustworthy or pre-hacked before the machine is assembled. Thus if an adversary compromised chips through the supply chain, they could hack whole classes of machines across the U.S., remotely, all at once.

2. **Remote Attacks Proven:** Despite insistence the fact that machines are "air gapped" from the Internet protects against all remote attacks, both DEF CON 25 and 26 found exploits to hack machines remotely, requiring physical access to the machine.

3. **Hacking Faster Than Voting:** This year DEF CON also demonstrated that while, on average, it takes about six minutes to vote, machines in at least 15 states can be hacked with a pen in two minutes. It is thus possible for someone to hack a machine while voting in a polling place on Election Day.

4. **Hacks Don't Get Fixed:** Finally, we discovered that even when vendors are told about serious flaws in machines by their customers, those flaws go unfixed.

These flaws are relevant and disturbing under the best circumstances. However, the fourth flaw suggests another reason for alarm - disclosing vulnerabilities does not seem to be enough to get them fixed, even years later. For example, the M650's lack of update authentication was noted in the 2007 EVEREST report, initiated by the Secretary of State of Ohio and reported to Election Systems & Software at the same time.[13]

[13] Pennsylvania State University, the University of Pennsylvania, and WebWise Security Inc, EVEREST: Evaluation and Validation of Election-Related Equipment, Standards and Testing. Compiled by Patrick McDaniel. By Matt Blaze and Giovanni Vigna. December 7, 2007. Accessed September 25, 2018. https://www.eac.gov/assets/1/28/EVEREST.pdf.

Hackers found the same design flaw in a current M650, eleven years later. As of 2018, the M650 was used in elections in 23 states.

The failure to fix existing, reported vulnerabilities and the disconnect between the reports of election security experts and the reactions of some election equipment vendors speaks directly to the reason Voting Village was created. The Voting Village aims to increase access to election security knowledge in order to better protect American democracy and the electoral system. We believe that knowing the risks involved in how America votes is always better than sticking our heads in the sand. Although we have redacted some information from this report, it is a realistic, if pessimistic, view of how easy it is for individuals to exploit bad design and sidestep election protections. We hope that it will move the United States towards action.

## Next Steps:

1. **Congress Must Act:** The problems outlined in this report are not simply election administration flaws that need to be fixed for efficiency's sake, but rather serious risks to our critical infrastructure and thus national security. As our nation's security is the responsibility of the federal government, Congress needs to codify basic security standards like those developed by local election officials.

2. **Congress Must Fund Election Security:** National defense is not the role of state and local government. Further, no state or local government will ever be able to raise enough capital to defend itself from a determined nation state. Thus, having codified the basic security standards developed by local election officials above, Congress must finance the implementation of these security standards.

3. **Create a Crisis Communications Plan Now:** State and local government election results web pages are, by their very nature, the most insecure component of our election infrastructure. Using the crisis communications plan listed in this document, election administration teams can plan for this attack in advance so they are not scrambling for solutions if an attack happens on Election Night.

4. **National Security Leaders Must Act:** While many local election officials have worked tirelessly to advocate for Congress to act and fund robust security practices, it's not enough. National security leaders must also remind Congress daily of the gravity of this threat and national security implications. It is the responsibility of both current and former national security leaders to ensure Congress does not myopically view these issues as election administration issues but rather the critical national security issues they are.

## End Notes

**By: Noah Praetz, Director of Elections, Cook County, Illinois**

There is nothing more important to election officials than security. Period. Security yields trust and participation. We have been securing votes and voter records for a long time. The threat environment has changed dramatically, we accept the admonitions of our intelligence community, and we understand the significantly increased likelihood of a successful cyber-attack on the election infrastructure. The Secretaries of State, State Election Directors, and local election officials are committed to ensuring that the election results we release are trusted and true.

In this new environment, and in light of existential threats to American faith in democracy, election officials will marshal all available resources, and work with all possible partners, in defense of elections. Those of us who manage elections, and our vendor community, have long-standing partnerships with private security researchers. However, those partnerships are no longer enough; we are building new partnerships with a broader security research community. Building these new partnerships, with organizations like DEF CON, has proven challenging for some in our community over the past two years. Maturing this partnership will require mutual trust and appreciation of each other's roles, responsibilities, and motives. Ultimately, a successful relationship will be forged, out of necessity.

Election officials recognize that today's cyber threat environment necessitates access to the highest levels of security expertise. This talent is expensive. Therefore, we must accept that our new partners are indispensable but bring stylistic and cultural differences that we'll need to learn to manage and accept. Our new partners must accept that the security and resiliency of the election infrastructure and process demands a unique level of sensitivity and care. When other industries are alerted to issues, there are patches at hand or in a pipeline. Frequently, election technology is frozen in time by federal and state certifications that make immediate fixes impossible.

This change in attitude and posture, from election officials and security researchers alike, is a dramatic one. This cultural difference is most pronounced when the public messaging over the same information sets about election security are diametrically opposed. In the security community, exploitable vulnerabilities are a binary fact that should be publicly disclosed and remediated with updated technology as soon as possible. The election official community sees the same vulnerabilities and recognize them as something to be mitigated with physical controls and managed with audits immediately and then remediated as soon as the technology and funding is available.

Despite the differences, the goals are the same for election officials and security researchers. It's the requirement to operate elections in the time between vulnerability disclosure and vulnerability fix, and to provide trust in the process simultaneously, that causes consternation and tension.

Given the capability and intent of American adversaries, whether nation states, groups, or individuals, election officials' failure to capitalize on the expertise of the broader security research community is no longer acceptable. Likewise, given the dire need for the expertise of the security community, failure of that community to appreciate and respond to sensitivities about the sanctity and security of American elections is also no longer acceptable. We must make this relationship work.

Our elected Clerk in Cook County, Illinois, David Orr, understood this two years ago and decided to seek

help where available, to interface with experts where possible, and to be available to well-meaning Americans focused on election security.

One of our first avenues of engagement was with the organizers of the Voting Village at DEF CON in the spring of 2017. We offered consulting services on what an election office backend network might reasonably look like to ensure that the conclusions reached by the security researchers, and by extension the lessons learned by election administrators, were grounded in reality. It does little good for the community of researchers or election officials if the conclusions drawn in the reports can be readily dispelled, either in fact or in art.

After DEF CON released its report in 2017 we drafted a white paper that laid out priorities for funders like federal, state and local governments, and for election officials. It was built around an election security framework, Defend, Detect, Recover. Do everything possible to defend the myriad digital systems relied upon to run modern elections. Recognize perfect defense may not be possible all the time. Ensure that defensive shortfalls can be detected. And that business continuity, or recovery, can be established such that our elections can be run even in the event of successful cyber-attacks.

Between 2017 and 2018 the Voting Village dramatically increased their focus and shifted their research and training to more vulnerable areas that are more likely to be attacked, like emailed ballots, voter registration databases, election officials' computer networks, and informational or election night results webpages. Some election officials consulted with the organizers in some of these areas. Where there was consultation, like on the computer network and voter registration databases, the resulting research and training is more valuable. Where there was less election official participation, like on the webpages, the research was less valuable. And while the headlines about 11-year-olds hacking website were overstated, and frustrating given the websites were not actual replicas, the DEF CON Voting Village has done as much to raise awareness about our needs for resources as we have been able to do for ourselves. For that we owe some acknowledgement and credit, even as some of us have been forced to reassure our voters that not everything they have read about applies. I believe that the leaders and participants in the Voting Village and of the DEF CON project broadly, are talented committed Americans dedicated to ensuring that election officials know what they are dealing with from a product standpoint, and that we are supported in our efforts to raise the funds necessary to ensure the highest possible state of readiness.

Simultaneous to the activities of the security research community, the U.S. Department of Homeland Security created a set of councils to help drive their investments in election security. They rely on election officials at all levels and on the vendor community. I co-chair the Government Coordinating Council. In that role I have sought to bring visibility to that fact that nearly the entire profile of election security is borne by the 8,800 local election officials in this country; and though we locals find overheated rhetoric about election security difficult and angering, our real and present needs to access security expertise supersedes those frustrations.

In closing, I'll repeat, there is nothing more important to election officials than security. The security researcher community, like those who managed and attended the Voting Village at DEF CON, also care greatly about election security. We need these security researchers on our team; and we also need them to be as careful and responsible with their disclosures and language as possible. We won't always agree and there will be very uncomfortable times. But I see a strong partnership moving forward as both communities learn to work together and appreciate each other's needs and perspectives.

## Acknowledgements

A number of individuals and organizations contributed to the Voting Village and to this report. A special thanks to:

- Organizers, subject-matter-experts and other visionaries who turned the Voting Village concept into a reality and helped to author this report;
- KIG and CyberBit, for providing use of the KIG CyberRange;
- Speakers who contributed to the Voting Village discussions, including representatives from the U.S. Department of Homeland Security, Free & Fair, Verified Voting, and the University of Chicago Harris Cyber Policy Initiative; and
- The Michael and Paula Rantz Foundation, for their generous support of this work.