## EAC's Commissioners

Thomas Hicks and Christy McCormick were sworn in January 13, 2015 as EAC commissioners following their nomination by President Barack H. Obama and unanimous confirmation by the U.S. Senate. Benjamin Hovland and Donald Palmer were sworn in on February 4, 2019 as EAC commissioners following their nomination by President Donald Trump and unanimous confirmation by the U.S. Senate.

Commissioner Thomas Hicks, Chairman

Commissioner Christy McCormick, Vice Chair

Commissioner Benjamin W. Hovland

Commissioner Donald L. Palmer

30. A vote for a VSTL's reaccreditation is taken by the EAC and shall be passed by a vote of (3) three commissioners. The EAC did not met quorum for the year of 2018 due to only having (2) commissioners. Until Hovland and Palmer were nominated; no quorum was met until February of 2019 in which Christy McCormick's signature would be required.

31. This means that no VSTLs were properly accredited for the 2020 Presidential election on November 3, 2020 and continue to be unaccredited due to lack of compliance.






32. EAC provided the following for SLI Compliance[21] and Pro V&V[22] dated January 21, 2021, stating Covid-19 circumstances which was not in accordance to VSTL Version 2.0 Section 3.8. (“**PRE**” Covid-19 pandemic)

33. Reaccreditation should have been properly issued in 2017 and 2018 respectively prior to Covid 19. The Covid excuse falls flat and crosses over to dishonesty.

34. During quorum, the EAC is required to vote on reaccreditation. There was no quorum for a year prior to 2019.

35. Accreditation would not have been possible in order to be in accordance with HAVA of 2002 Section 231(b) and the Voluntary Voting System Guidelines in clear violation of law. Quorum would have and needed to be held well before any real or perceived complications due to COVID-19.

---

21 https://www.eac.gov/sites/default/files/voting_system_test_lab/files/SLI_Compliance_Accreditation_Renewal_delay_memo012721.pdf (Last visited 5/20/22)

22 https://www.eac.gov/sites/default/files/voting_system_test_lab/files/Pro_VandV_Accreditation_Renewal_delay_memo012721.pdf (Last visited 5/20/22)

U.S. ELECTION ASSISTANCE COMMISSION
633 3rd St. NW, Suite 200
Washington, DC 20001

**FROM:** Jerome Lovato, Voting System Testing and Certification Director

**SUBJECT:** SLI Compliance EAC VSTL Accreditation

**DATE:** 1/27/2021

---

SLI Compliance, a division of Gaming Laboratories International, LLC (SLI) has completed all requirements to remain in good standing with the EAC's Testing and Certification program per section 3.8 of the Voting System Test Laboratory Manual, version 2.0:

> ***Expiration and Renewal of Accreditation.*** *A grant of accreditation is valid for a period not to exceed two years. A VSTL's accreditation expires on the date annotated on the Certificate of Accreditation. VSTLs in good standing shall renew their accreditation by submitting an application package to the Program Director, consistent with the procedures of Section 3.4 of this Chapter, no earlier than 60 days before the accreditation expiration date and no later than 30 days before that date. Laboratories that timely file the renewal application package shall retain their accreditation while the review and processing of their application is pending. VSTLs in good standing shall also retain their accreditation should circumstances leave the EAC without a quorum to conduct the vote required under Section 3.5.5.*

Due to the outstanding circumstances posed by COVID-19, the renewal process for EAC laboratories has been delayed for an extended period. While this process continues, SLI retains its EAC VSTL accreditation.

U.S. ELECTION ASSISTANCE COMMISSION
*633 3rd St. NW, Suite 200*
*Washington, DC 20001*

**FROM:** Jerome Lovato, Voting System Testing and Certification Director

**SUBJECT:** Pro V&V EAC VSTL Accreditation

**DATE:** 1/27/2021

---

Pro V&V has completed all requirements to remain in good standing with the EAC's Testing and Certification program per section 3.8 of the Voting System Test Laboratory Manual, version 2.0:

> ***Expiration and Renewal of Accreditation.*** *A grant of accreditation is valid for a period not to exceed two years. A VSTL's accreditation expires on the date annotated on the Certificate of Accreditation. VSTLs in good standing shall renew their accreditation by submitting an application package to the Program Director, consistent with the procedures of Section 3.4 of this Chapter, no earlier than 60 days before the accreditation expiration date and no later than 30 days before that date. Laboratories that timely file the renewal application package shall retain their accreditation while the review and processing of their application is pending. VSTLs in good standing shall also retain their accreditation should circumstances leave the EAC without a quorum to conduct the vote required under Section 3.5.5.*

Due to the outstanding circumstances posed by COVID-19, the renewal process for EAC laboratories has been delayed for an extended period. While this process continues, Pro V&V retains its EAC VSTL accreditation.

36. EAC again provided on it's website July 22. 2021 on both Pro V&V[23] and SLI Compliance[24] VSTL accreditation pages yet another excuse regarding the lack of proper and legal accreditations.

[1] Pro V&V was accredited by the EAC on February 24, 2015, and SLI Compliance was accredited by the EAC on February 28, 2007. Federal law provides that EAC accreditation of a voting system test **laboratory cannot be revoked unless the EAC Commissioners vote to revoke the accreditation**: "The accreditation of a laboratory for purposes of this section may not be revoked unless the revocation is approved by a vote of the Commission." 52 U.S. Code § 20971(c)(2). The EAC has never voted to revoke the accreditation of Pro V&V. Pro V&V has undergone continuing accreditation assessments and had new accreditation certificate issued on February 1, 2021.

37. "3.6.1.3. The effective date of the certification, which shall not exceed a period of two (2) years." To revoke is the process of **"taking away".** The accreditation was not "taken away". The regulation clearly states that the accreditation is for (2) two-year periods only. The EAC's use of this section is disingenuous.

38. 52 U.S. Code § 20971(c)(2) is not applicable to 3.6.1.3 and the effective date of the accreditation as the accreditation **EXCEEDED** the period of two (2) years. The statute does not refer to continued accreditation due to any failure of action by the private laboratories and or the EAC Program Director. This is erroneous reasoning at best, fraud at worst. Pro V&V and SLI Compliance were not accredited laboratories in accordance with HAVA of 2002 § 231(b). The EAC is not a legislative body and cannot create or establish law but must abide by HAVA of 2002. This is an overreach of power by disregarding the law set forth by HAVA of 2002 Section 231(b) and the federal legislative body.

[23] https://www.eac.gov/voting-equipment/voting-system-test-laboratories-vstl/pro-vv (Last visited 5/20/22)
[24] https://www.eac.gov/voting-equipment/voting-system-test-laboratories-vstl/sli-compliance-division-gaming-laboratories (Last visited 5/20/22)

39. Note that the same document provides another excuse as to why the VSTLs are not properly accredited. Accordingly, the "Accardi" decision requires that even governmental officials must follow agency regulations and guidelines. By the EAC's own admission of "administrative error"; the foundation of the rule of law under the Accardi doctrine; the EAC did not observe their own rules and guidelines, therefore violating the laws set by HAVA affording a domino effect of substantive restraints and violations of protected persons (class) from arbitrary or capricious treatment thus violating Plaintiffs' voting rights.

> **Due to administrative error** during 2017-2019, the EAC did not issue an updated certificate to Pro V&V causing confusion with some people concerning their good standing status. Even though the EAC failed to reissue the certificate, Pro V&V's audit was completed in 2018 and again in early 2021 as the scheduled audit of Pro V&V in 2020 was postponed due to COVID-19 travel restrictions. Despite the challenges outlined above, throughout this period, Pro V&V and SLI Compliance remained in good standing with the requirements of our program and retained their accreditation. **In addition, the EAC has placed appropriate procedures and qualified staff to oversee this aspect of the program ensuring the continued quality monitoring of the Testing and Certification program is robust and in place.**

40. Following the elections of 2016, Senator Ron Wyden sent a letter[25] to Traci Mapps, Director of Operations for SLI Compliance, specifically asking if the company had implemented the best practices described in the National Institute of Standard and Technology (NIST) 2015 VVSG 1.1.

41. According to the "General Information on Texas Voting System Certification Process" found on the SoS' website[26]

a. "The Secretary of State requires new systems and modifications to previously-certified systems be qualified by the Election Assistance

[25] https://www.wyden.senate.gov/imo/media/doc/wyden-sli-compliance-election-cybersecurity-letter.pdf (Last visited 5/20/22)

[26] https://www.sos.state.tx.us/elections/laws/generalinfo.shtml (Last visited 5/20/22)

Commission (EAC), with 2002 Voting System Standards/guidelines (VSSG) or newer, prior to being submitted for examination."

b. "The vendor applying for certification must complete and deliver application forms (Form 100[27], Form 101[28], and if applicable, Form 100 Schedule A), user operating and maintenance manuals, training material, final report(s) from an independent testing laboratory accredited by the EAC, a change log detailing changes from any previously-certified system or component, and application fee(s), to the Secretary of State no later than 45 days prior to examination."

**FORM 100**

[27] https://www.sos.texas.gov/elections/forms/form100.pdf#search=form%20100 (Last visited 5/20/22)
[28] https://www.sos.texas.gov/elections/forms/form101.pdf#search=form%20101 (Last visited 5/20/22)

**Materials Checklist (Indicate materials submitted with an "X")**

| | |
|---|---|
| 7 copies of the following (5 copies in electronic format and 2 hard copies): | |
| | Completed application Forms 100 and Form 101 |
| | If applicable, attach Form 100 - Schedule A, listing recommendations/issues made from previous Texas examination. List how they have been corrected or addressed. If the have not, explain why. |
| | If component has been modified, include log detailing changes from the previously Texas certified version |
| | Nationally accredited voting system test laboratory reports of all tests (including summary) conducted on items submitted |
| | Operating Manual(s) |
| | Maintenance Manual(s) |
| | Training Manual(s) |
| | Technical Specifications |
| | Operational Specifications |
| | List all COTS hardware/software used with the system and their version numbers – If listed in a nationally accredited test laboratory reports, state where |
| | List all configurations that will be marketed and sold in Texas<br>- indicate if the optical scan will be used as a precinct count, central count, or both |
| | Provide complete step-by-step installation instructions for all software installs and configurations specific to Texas |
| | List of other election jurisdictions where system is in use or has been in use |

**Acknowledge which voting system test laboratory has been notified to send a copy of the software and source code and expected delivery date to our office.**

| Nationally accredited voting system test laboratory Name | Delivery Date |
|---|---|
| | |
| | |

42. According to "*The Certification Procedures for Electronic Pollbooks,*" certification involves "Technical examination by a NIST-certified testing laboratory." However, which laboratories perform this type of testing, as well as their findings, are not listed on the SoS's website and remain in question.[29]

43. Not only must voting systems in Texas be EAC certified by an accredited VSTL...they must also be examined and approved for use by the Secretary of State and the Attorney General.[30]

a. Before a voting system or voting system equipment may be used in an election, the system and a unit of the equipment must be approved by the secretary of state as provided by this subchapter.

[29] https://www.sos.state.tx.us/elections/laws/generalinfo.shtml (Last visited 5/23/22)
[30] See Tex. Elec § 122.031

b. The secretary of state may seek a temporary restraining order, or a writ of injunction obtained through the attorney general to prevent the use of any part of a voting system or voting system equipment that has not been approved.

c. A person commits an offense if the person executes a contract to sell, lease, or otherwise provide a voting system or voting system equipment that the person knows has not been approved. An offense under this subsection is a Class A misdemeanor.

44. "Accreditation is the independent evaluation of conformity assessment bodies against recognized standards to carry out specific activities to ensure their impartiality and competence. Through the application of national and international standards, government, procurers and consumers can have confidence in the calibration and test results, inspection reports and certifications provided."[31]

45. Accreditation and certification are used in many aspects of our society. For example, universities and colleges are accredited by private agencies known as an accrediting agency or accreditor. The Department of Education administers and approves these accreditors under CFR Title 34, § 602.[32] Accreditation for the private accreditors is for five years; accreditors must reapply for renewal two years before accreditation lapses.

46. There are currently over 60 accreditors approved for accrediting our nation's colleges and universities[33]. The Harvard University of Institutional Research website explains:

[31] https://ilac.org/about-ilac
[32] https://www.ecfr.gov/current/title-34/subtitle-B/chapter-VI/part-602
[33] https://www2.ed.gov/admins/finaid/accred/accreditor-federal-recognition-process-steps.pdf

47. Accreditation is a voluntary, peer review process. It serves 4 main purposes: (1) to assure quality to the public, (2) to ease student transfer between institutions by signaling quality, (3) provides institutions with access to federal financial aid, and (4) certifies a graduate's credentials to employers.

48. An "accredited" university meets the Standards for Accreditation established by an accrediting agency. The Standards ensure that an institution has appropriate and clear goals, sufficient resources to achieve them, is fulfilling its objectives, and will continue to do so.

49. The process provides colleges and universities with an opportunity for reflection, honest assessment of strengths and weaknesses, along with a chance to develop strategies for continued improvement.[34]

50. Both accredited and non-accredited colleges and universities accept money, deliver a product (courses) and then award certificates and diplomas to attendees and graduates to document course and program completion. Imagine the public response if colleges and universities turn out to not be accredited due to an accreditor's lack of credentials. This would inspire demands for action loudly across the country, as should the lack of VSTL accreditation.

51. ES&S EVS 6.1.1.0 was only "certified" by the Election Assistance Commission (EAC) on July 27, 2020, by Pro V&V which did so with an expired EAC accreditation and was not certified to do the examination at the time.

52. On August 21, 2020, Election Systems & Software ("ES&S" or the "Vendor") presented the EVS 6.1.1.0 system for examination and certification by the Texas Secretary of State.

---

[34] https://oir.harvard.edu/faq/what-accreditation-why-should-university-be-accredited

53. Travis county officials have confirmed that Election Systems & Software's EVS 6.1.1.0 system was used to conduct the November 3, 2020, elections.

54. On December 9, 2020, pursuant to TEX ELEC § 122.0371 of the Texas Election Code, the Office held a public hearing, by telephone, for interested persons to express views for or against the certification of the EVS 6.1.1.0 system.

55. On January 8, 2021, The Secretary of State's office pursuant to Section 122.039 wrote and filed their official report certifying Election Systems & Software's EVS 6.1.1.0 system for use in Texas elections.

56. ES&S EVS 6.1.1.0 was NOT CERTIFIED for use in any election prior to the state certification on January 8, 2021.

> "Words do have a limited range of meaning, and no interpretation that goes beyond that range is permissible." --Antonin Scalia, From 1995 speech at Stanford University
> https://time.com/4220735/antonin-scalia-dead-quotes-opinions/

# APPENDIX P-7

FOREIGN COMPANIES IN TEXAS INFRASTRUCTURE

MANIPULATION AND SECURITY VULNERABILITIES

SUPPLY CHAIN VULNERABILITIES

## FOREIGN COMPANIES IN TEXAS INFRASTRUCTURE

**Scytl and Election Night Reporting (ENR)**

1. Scytl Election Technologies S.L.U. is a Spanish provider of electronic voting systems and election technology. Founded in 2001 in Barcelona, its products and services are used in elections and referenda across the world.[1]
2. Scytl grew out of a cryptography research project[2] at the Autonomous University of Barcelona. The name is a reference to the scytale, an ancient cryptographic tool.[3]
3. In 2017, Scytl divided itself into three companies.
   a. Original Scytl Secure Electronic Voting, which develops voting software
   b. Scytl Voting Hardware SL, which develops voting hardware (Owned by Scytl and an anonymous Dubai-based investor)
   c. Civiti (formerly OpenSeneca) which focuses on civic participation services
4. Paragon Group acquired Scytl in October of 2020.[4]
5. Scytl's products cover the entire election process, including election planning, online voter registration, poll worker management, electronic ballot delivery, online voting, results consolidation, and Election Night Reporting (ENR) and asset tracking.
6. Investors:
   a. Venture Capital (Wall Street)
   b. Balderton Capital (London, UK)
   c. Nauta Capital (Barcelona, London, and Berlin)
   d. Vulcan Capital (Privately held company by Microsoft co-founder Paul Allen and Jody Allen)
   e. Sapphire Ventures (Austin, Palo Alto, London and San Francisco)
   f. Paul Allen (co-founder of Microsoft with Bill Gates)
7. Scytl is headquartered at Travessera de Gràcia 17-21, 7th floor, 08021 Barcelona, Spain, Tel: +34 934 230 324.

---

[1] https://www.forbes.com/sites/rebeccaheilweil1/2017/12/02/eight-companies-that-want-to-revolutionize-voting-technology/?sh=5168353212c1 Last visited 07/16/22
[2] https://www.politico.com/story/2018/02/24/elections-vendors-russia-423435 Last visited 07/16/22
[3] https://www.scytl.com/about-us/company-overview/ Last visited 07/16/22
[4] Last visited 07/19/22

8. Scytl systems have been implemented in numerous countries, but problems have cropped up over the years with its solutions and voting systems, including those used in Australia, Ecuador, Norway and Switzerland.[5]

   a. Ecuador: 2014-Bungled regional elections so badly that all the scanned election ballots had to be counted manually at the company's Barcelona headquarters. Several Scytl managers were even temporarily arrested as a result for breach of contract. It took Scytl one month to count all of the ballots. Former employees now say it is strange that the case did not attract international attention.

      i. In some districts the software didn't work at all

      ii. The program couldn't read and interpret a large portion of the scanned ballots

      iii. Vast amounts of data caused several servers to crash completely[6]

   b. Australia: Australian state of New South Wales where serious vulnerability was discovered. Researchers Alex Halderman at the University of Michigan and Vanessa Teague at the University of Melbourne examined the system more closely and discovered a serious vulnerability that allowed them to circumvent the encryption between the voter's browser and the e-voting system.[7]

   c. Norway: In 2011 when Norway introduced electronic voting, the code was so flawed it was unusable.

      i. Reto Koenig, a professor of computer science at the Bern University of Applied Science (BFH) who examined the Norwegian e-voting system at the time, said the <<pile of code>> they received would not have worked to get it up and running.

      ii. The group working with Koenig, using simple programs, found <<a bug that had hidden itself deep in the cryptography>>after the voting systems had been used for two years.[8]

---

[5] https://www.republik.ch/2019/02/07/the-tricky-business-of-democracy Last visited 07/16/22

[6] http://www.ecuadorinmediato.com/index.php?module=Noticias&func=news_user_view&id=2818765879&umt=una sur_entrega_informe_final_observacion_electoral_2014 Last visited 07/16/22

[7] https://arxiv.org/pdf/1504.05646.pdf Last visited 07/16/22

[8] https://www.bfh.ch/ti/de/ueber-das-ti/ Last visited 07/16/22

iii. Norway has since restricted e-voting and one year later the e-voting project was shelved completely due to the concerns of citizens.[9]

d. Switzerland: In 2019, a cryptographic trap door could let someone change votes cast using Switzerland's online sVote system without being detected.[10]

i. Verification: The specific issue is the way the system receives and counts votes before shuffling them and anonymizing. The trap door means someone could switch all the legitimately cast ballots for fraudulent ones, undetected.

ii. Scytl, who provides electronic voting services to over 35 countries, including the United States, says it's working to fix the flaw.

9. The worrying aspect in the countries mentioned above is how did the "flaws" manage to creep into these systems in the first place. Researchers state that they have only tested a fraction of the code base as Scytl has not released source codes.

10. Scytl withholds important information about the testing of its e-voting systems and services (ENR) or requires expansive licenses for those reviews to be carried out.

11. The company had also spent Spanish public funds and EU research money into client acquisition instead of investing them into further development as stipulated (1.5 million euros Spanish Government and 9,000,000 euros EU funds on the Ecuadorian election)[11]

12. In 2008, Scytl made an international breakthrough when it won its first American client: Florida.

13. Researchers at the University of California, Berkeley, wanted to investigate voting-machine software in Florida as early as 2008, but did not have access to the documents that were crucial to their research. As a result, the researchers could not verify whether the system worked properly and weren't able to carry out test attacks on the system.[12]

14. Scytl then began offering software for voting machines as well as infrastructure and on-site support.

---

[9] https://www.technologyreview.com/2019/03/12/136676/a-major-flaw-has-been-found-in-switzerlands-online-voting-system/ Last visited 07/16/22

[10] https://www.technologyreview.com/2019/03/12/136676/a-major-flaw-has-been-found-in-switzerlands-online-voting-system/ Last visited 7/16/22

[11] https://www.republik.ch/2019/02/07/the-tricky-business-of-democracy

[12] https://people.eecs.berkeley.edu/~daw/papers/scytl-odbp.pdf Last visited 07/16/22

15. In 2012, Scytl acquired the American company SOE Software ("Supervisors of Elections")[13]

16. SOE Software, based in Tampa, FL, has developed Clarity, a suite of 8 software modules.

17. In 2013, Scytl acquired the software division of Gov2U.[14]

  a. "Gov2U, based in Brussels, is a non-profit, non-governmental organization by a group of visionary professionals from the field of Legislative Information and Communication Technology (ICT), and community activism who share…"

18. The EAC has since posted that SOE Software, A Scytl Company is an inactive voting system registered manufacturer but does not provide dates of when active or inactive.[15]

19. In 2020, SOE d/b/a Scytl provided various products and services in over 800 countries and several states in the United States.[16]




20.

[13] http://eon.businesswire.com/news/eon/20120111005636/en/Scytl/SOE/election-software Last visited 07/16/22

[14] https://www.marketwatch.com/story/scytl-acquires-gov2us-software-division-expanding-its-edemocracy-solutions-portfolio-2013-04-30 Last visited 07/16/22

[15] https://www.eac.gov/voting-equipment/registered-manufacturers/soe-software-scytl-company Last visited 07/16/22

[16] https://web.archive.org/web/20120527202144/http://www.soesoftware.com/customers.aspx Last visited 07/16/22

21.

## Partial Customer List

| | | | |
|---|---|---|---|
| Arapahoe, CO | Erie, NY | Martin, FL | Putnam, FL |
| Bloomington, IL | Escambia, FL | McHenry, IL | Riverside, CA |
| Broward, FL | Fort Bend, TX | Miami-Dade, FL | Rockford City, IL |
| Butte, CA | Highlands, FL | Monroe, NY | Sacramento, CA |
| Charlotte, FL | Hillsborough, FL | Nassau, NY | Salt Lake, UT |
| Chicago, IL | Indian River, FL | Niagara, NY | San Diego, CA |
| Citrus, FL | Jefferson, CO | Oakland, MI | Santa Clara, CA |
| Clay, FL | Jefferson, TX | Okaloosa, FL | Sarasota, FL |
| Cochise, AZ | Johnson, KS | Okeechobee, FL | Shasta, CA |
| Contra Costa, CA | King, WA | Olmsted, MN | St. Lucie, FL |
| Cortland, NY | Lake, IL | Orange, FL | Tarrant, TX |
| Dallas, TX | Lee, FL | Orange, NY | Ventura, CA |
| Dona Ana, NM | Los Angeles, CA | Palm Beach, FL | Volusia, FL |
| Dupage, IL | Madison, IL | Pasco, FL | Will, IL |
| Dutchess, NY | Manatee, FL | Pinellas, FL | Williamson, TX |
| Duval, FL | Marion, FL | | Winnebago, IL |

22. In 2018, Scytl became a partner of Amazon Web Services which hosts their services on Amazon's cloud platform.

23.

DATA CENTER SECURITY AND COMPLIANCE

Scytl products and services are hosted on Amazon Web Services, a secure cloud service platform built on sound network infrastructure. AWS has multiple certifications, including SSAE 16, adhering to an extensive list of global security standards.

For more information on AWS and their security processes, please visit http://aws.amazon.com/compliance and http://aws.amazon.com/security

[17]

24. The state of Texas via Department of Information Resources (DIR) has contracted with Amazon Web Services, Inc.[18]

25. Tarrant County contracted with Amazon Web Services via DIR contract #DIR-TSO-4221 which is a statewide contract that is subcontracted out to all Texas counties voluntarily.[19]

---

[17] https://scytl.us/scytl-secure-election-technology/ Last visited 07/16/22

[18] https://acrobat.adobe.com/link/review?uri=urn:aaid:scds:US:70191bd6-f30f-3bbd-92d9-ca55c3115659#pageNum=1 Last visited 07/16/22

[19] https://acrobat.adobe.com/link/review?uri=urn:aaid:scds:US:5ec4ae30-77db-33be-89d2-664d92cfe7ff#pageNum=1 Last visited 17/16/22

26. Our election system infrastructure is currently housed under the same web services as the vendor who reports our election results.

27. Texas counties contracted with SOE d/b/a Scytl are part of its international customers and are as follows: Tarrant, Comal, Gregg, Parker, Denton, Hood, Liberty, Jefferson, and Galveston.[20]

28. The United States has implemented several of Scytl's voting tools.[21]

  a. Election Night Reporting (ENR)
  b. Electoral administration: digitizing their training content and making it available to polling station workers through an online training platform.
  c. The launching of a voter portal: a tool used to create websites for public administrations in order to provide electoral information before, during and after elections.

29. "Electronic election infrastructure is one example of critical infrastructure[22] which can be subject to remote access operations. Foreign remote access operation capabilities threaten critical infrastructure in the United States, such as election systems."[23]

30. Mills further states that successful "...remote access operations conducted against the United States election infrastructure could change vote totals reported by the elections equipment, thereby nullifying the election as an expression of the collective will of the voters."[24]

31. When Scytl was queried about the subject of potential risks, a spokeswoman answered flippantly. "(Voters) don't have the ability to review the source code of their (online) banking either." The company claims that a public examination of the documentation would jeopardize its business model.[25]

32. How can Scytl's business practices be reconciled with the counties and states in the United States or Texas own government high security and transparency requirements?

33. How secure will Texas elections offerings be?

---

[20] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Tarrant, Comal, Gregg, Parker, Denton, Hood, Galveston, Liberty, and Jefferson
[21] https://www.scytl.com/resources-and-references/customers/u-s-elections/ Last visited 07/16/22
[22] https://www.cisa.gov/election-security
[23] https://files.ttttexas.com/static/docs/txsos/John-Mills.pdf See Declaration of John Mills 9
[24] Id. 10
[25] https://www.parliament.vic.gov.au/images/stories/committees/emc/2010_Election/submissions/14_Scytl_EMC_Inquiry_No.6.pdf Last visited 07/16/22

34. What exactly is the arrangement between Texas and the Spanish voting giant?

35. When it comes to transparency and auditability, Scytl's statements have been contradictory. At a 2017, trade conference called Swiss Cyber Storm, Jordi Puiggali, Scytl's longtime head of technology, gave a presentation.[26] When a participant asked him whether Scytl was prepared to release its source code, he stated it was out of the question of him.[27]

36. Two companies in particular that produce COTS are Huawei and Akamai, the latter of which is partnered with SCYTL and linked to Dominion Software. In the Election Whistleblower Affidavit Ms. Terpsehore Maras attests that the tallied votes on behalf of Dominion and, under contract with the Associated Press (AP), provide the results for reporting.[28]

37. A very similar contractual relationship is noted between several counties in Texas as noted above via SOE d/b/a Scytl.

38. Maras Affidavit corroborates to the vulnerabilities from COTS which are still culpable to domestic, as well as foreign hacking.[29]

**MANIPULATION AND SECURITY VULNERABILITIES**

39. In January of 2021, DNI Ratcliffe issued an unclassified letter to Congress that assessed that China interfered in the 2020 federal elections.[30]

40. CISA also released an Industrial Controls System Advisory (ICSA) detailing vulnerabilities affecting versions of the Dominion Voting Systems.[31]

41. The exploitation of these vulnerabilities would require physical access to individual Election Management System (EMS) or the ability to modify files.

42. These EMS systems are similar to, or the same as, the Decl. of Halderman detailed a number of these critical vulnerabilities in litigation with the state of Georgia.[32]

---

[26] https://2017.swisscyberstorm.com/2017/09/26/Introducing_Jordi_Puiggali.html Last visited 07/16/22

[27] https://www.republik.ch/2019/02/07/the-tricky-business-of-democracy Last visited 07/16/22

[28] Id. 25-26

[29] Id. https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Terpsehore Maras Election Software Whistleblower

[30] https://context-cdn.washingtonpost.com/notes/prod/default/documents/6d274110-a84b-4694-96cd-6a902207d2bd/note/733364cf-0afb-412d-a5b4-ab797a8ba154.#page=1

[31] https://www.cisa.gov/uscert/ncas/current-activity/2022/06/03/cisa-releases-security-advisory-dominion-voting-systems-democracy

43. After the 2016 general elections, then Georgia Secretary of State, Brian Kemp, confirmed that 10 separate cyberattack attempts on Georgia's network had been discovered --all of which were traced back to a U.S. DHS IP address.[33]

44. On December 6, 2019 Democrat Senators (Senators Elizabeth Warren, Ron Wyden, Amy Klobuchar, and Representative Mark Pocan) sent letters[34] to the private equity firms that own the major election machine vendors (Hart InterCivic, Dominion Voting Systems, ES&S) stating their concerns regarding vulnerabilities of election machines, but also requesting disclosure of a range of such information including ownership, finances and research investments, compliance with Election Assistance Commission's (EAC) Voluntary Voting System Guidelines (VVSG), as well as violations of any federal or state laws or regulations.

45. In August of 2020, the Bipartisan Senate Intelligence Committee report[35]_was released with the findings of the investigation into foreign interference of the 2016 elections. The report disclosed the lack of security in election systems utilized by the vast majority of the nation and warned of the likelihood of fraud and hacking in the November 3, 2020 elections.

46. Other significant findings were reported: regular targeting of numerous election infrastructures, security vulnerabilities with not only all major voting machine vendors, but also of all aspects of other election infrastructure (e.g., election night reporting (ENR), electronic poll book equipment, software, databases and cloud servers), and supply chains, lack of adherence to basic security practices, identification of two components of election infrastructure that required immediate, cybersecurity fixes: voter registration databases, and election night reporting websites, as well as no plausible means to audit elections.

47. Dr. Alex J. Halderman,[36] Professor of Computer Science at the University of Michigan, presented before the committee. He testified "our highly computerized election

---

[32] https://www.documentcloud.org/documents/21069743-2021-09-21-notice-of-filing-dckt-1177_1
[33] https://www.wsbtv.com/news/georgia/georgia-secretary-of-state-says-cyberattacks-linked-back-to-dhs/475707667/
[34] https://www.warren.senate.gov/imo/media/doc/H.I.G.%20McCarthy.%20&%20Staple%20Street%20letters.pdf
[35] https://www.intelligence.senate.gov/sites/default/files/documents/Report_Volume1.pdf
[36] https://www.c-span.org/video/?c4674512/user-clip-j-alex-halderman-voting-structure-vulnerable-sabotage-attacks-change-votes

infrastructure is vulnerable to sabotage and even to cyber-attacks that could change votes." He concluded "Voting machines are not as distant from the internet as they may seem."

48. Both the FBI[37] and CISA[38] issued two alerts regarding Iranian interference in the U.S. November 3, 2020, election in October of 2020.

49. The FBI and CISA reported targeting of state election websites with "intentional effort to influence and interfere with the 2020 U.S. presidential election".[39]

50. "The exploitation of key supply chains by foreign adversaries – especially when executed in concert with cyber intrusions and insider threat activities – represents a complex and growing threat to strategically important U.S. economic sectors and critical infrastructure".[40]

51. Several attacks on local, county and state government agencies have been reported over a short course of time. Texas was not and is not immune to these hacks, including in our own election systems[41].

   a. "The U.S. intelligence community developed substantial evidence that state websites or voter registration systems in seven states were compromised by Russian-backed covert operatives prior to the 2016 election — but never told the states involved, according to multiple U.S. officials.
   b. Top-secret intelligence requested by President Barack Obama in his last weeks in office identified seven states where analysts — synthesizing months of work — had reason to believe Russian operatives had compromised state websites or databases.
   c. Three senior intelligence officials told NBC News that the intelligence community believed the states as of January 2017

---

[37] https://www.fbi.gov/news/pressrel/press-releases/iranian-cyber-actors-responsible-for-website-threatening-us-election-officials
[38] https://www.ncsc.gov.uk/files/NCSC%20CISA%20Alert%20-QNAP%20NAS%20Devices.pdf
[39] https://www.cisa.gov/uscert/ncas/alerts/aa20-304a Last line of Summary Paragraph
[40] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Shawn Smith 15
[41] https://www.nbcnews.com/politics/elections/u-s-intel-russia-compromised-seven-states-prior-2016-election-n850296

were Alaska, Arizona, California, Florida, Illinois, Texas and Wisconsin."

52. According to the Declaration of John R. Mills; the "U.S. Government has pioneered and advanced the art and techniques of remote access operations targeting critical infrastructure."[42]

53. Based on his personal experience, Mr. Mills states that the U.S. Government has the capability to project significant effects[43] toward critical infrastructure worldwide. This would include Texas' own election systems. The capability to project "effects" exists in China, Russia, Iran, North Korea, and Venezuela as well as other countries. These foreign powers now use these same or similar, and improved remote access operation methodologies to advance their own national agendas. A growing talent base of personnel, software, and network enabled capabilities that are becoming global in the hands of companies and personnel outside of the U.S. Government.[44]

54. The Texas Election Systems are not the only state systems to have been hacked since 2016 even as recently as this year are the Texas Department of Agriculture, Public Utility Commission of Texas, Office of Court Administration, Department of Transportation, Texas Health and Human Services Commission and Texas Medicaid – in which information exposed included names, addresses, dates of birth, social security numbers and more – were compromised The state's answer was to pay a ransom to bad actors in an attempt to restore systems.[45]

55. Local county and city agencies reported – in which our tax dollars were paid to hackers – are Brooks County, Bexar County Appraisal District, Harris County US Port, City of Austin, Aransas County, Bowie County, Parker County, City of Odessa, George W. Bush Presidential Center in Dallas County, Nacogdoches County, Calhoun County, Grayson County Government Systems, Burnet County Government Systems, City of Waco in McLennan County, City of Fort Worth in Tarrant County, City of College Station in

---

[42] https://files.ttttexas.com/static/docs/txsos/John-Mills.pdf
[43] "Effects" an operator's and planner's term of art which implies the ability to degrade, exfiltrate, manipulate, change, or destroy See Mills Declaration 15-footnote 4
[44] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Declaration of John R. Mills 15-16
[45] https://www.dallasnews.com/news/politics/2021/03/05/terminated-texas-medicaid-subcontractor-dumped-after-data-breach-in-ransomware-attack-from-russia/

Brazos County, Travis County Appraisal District , Lubbock County Government Systems, and other state agencies.

56. If the state of Texas or any federal agencies cannot secure itself or our health and personal data from security breaches and exposure how are our elections safe or secure from manipulation? How do Plaintiffs know that our votes cast are not free from manipulation and dilution due to the former? The short answer is we cannot be sure. Plaintiffs know the electronic systems/machines are susceptible due to network connections and vulnerabilities of the electronic voting systems/machines themselves.

57. CISA acknowledged as early as October 2020 that hackers targeted not only Federal government, but also state, local, tribal, and territorial government -- that is critical infrastructure, and election organizations including unauthorized access to election support systems.[46]

58. "however, CISA has no evidence to date that integrity of elections data has been compromised…CISA's credibility in their conclusion must be tempered by the knowledge that this was during the same period that CISA was unaware that its own networks had been compromised."[47] *Id.*

59. In the litigation case of Curling and at its conclusion the federal court stated,

a. "Evidence presented in this case overall indicates the possibility generally of hacking or malware attacks occurring in the voting systems and this particular system through a variety of routes-whether through physical access and use of a USB flash drive or another form of mini-computer, or connection with the internet. As discussed in the declarations and testimony of the proffered national cybersecurity experts in this case, a broad consensus now exists among the nation's cybersecurity experts recognizing the capacity for the unobserved injection of malware into computer systems to circumvent and access key codes and hash values to generate fraudulent codes and data. In these experts' views, these

---

[46] https://files.tttexas.com/case/TX_SOS_Election_Violation_References See Shawn Smith Line 35
[47] https://www.cisa.gov/uncert/ncas/alerts/aa20-283a

risk issues are in play…" Curling v. Raffensperger, 493 F. Supp. 3d 1264, 1280 (N.D. Ga. 2020)

**SUPPLY CHAIN VULNERABILITIES**

60. The Affidavit of Terpsehore Maras highlights voting systems rely on foreign made Commercial Off The Shelf (COTS) components rather than custom components manufactured in the United States.[48]

61. While this presents an affordable and economic solution to meet the voting demand, it also means these COTS components introduce vulnerabilities into the Voting Systems. These vulnerabilities can take the form of proprietary hardware and software that has not been through vulnerability testing. [49]

62. The components are manufactured in countries that have strained political and economic relations with the United States. There are numerous intelligence reports, both US Government and Commercial-sourced, highlighting the vulnerabilities in hardware and software components manufactured by foreign countries.[50]

   a. In the light of CISA's inability to defend even its own computer systems from nation-state level supply chain attacks from March through December 2020, little credence can be given to CISA's July declaration that the 2020 election would be 'the most secure election in modern history, and its declaration in November 2020 that the 2020 election was the "most secure in American history. [51]

   b. In fact, the EAC's "test assertions" for the Voluntary Voting System Guidelines (VVSG) "which are meant to translate each VVSG requirement into unambiguous, specific, testable condition so that the Voting System Testing Lab (VSTL) may verify the conformance of a given voting system to the VVSG

[48] https://files.tttexas.com/case/TX_SOS_Election_Violation_References See Declaration of Terpsehore Maras Election Software Whistleblower Line 20
[49] Id. Line 22-24
[50] Id. Line 22, 25
[51] https://files.tttexas.com/case/TX_SOS_Election_Violation_References See Declaration of Shawn Smith Line 41

standard. Here is what the EAC's VVSG Test Assertions state for supply chain security of voting system components:" [52]

c. 2.1.1-A – General build quality…TA211A-2: If components from third-party suppliers are used for their intended purpose within the voting system, THEN the voting system manufacturer MUST ensure that third-party suppliers document the quality assurance procedures used to ensure components supplied from third-parties are free from damage or defect [53]

63. This is the proverbial fox guarding the hen house situation in which we trust third-party vendors in our supply chain. As the VSTL's are now to verify their conformance with Voting System Standards and VVSG, and that their tests ensure the security and integrity of voting systems but do not address the supply chain attack threats or their mitigation or assessment. [54]

64. Terpsehore Maras emphasized the significance of a VSTL's role in the certification process, stating the significance of VSTLs being accredited and examining the hardware is key.[55]

65. COTS software updates are the avenues of entry. While the use of outsourced COTS, manufactured outside the US presents an affordable and economic solution to meet the voting demand, it also means these COTS components introduce vulnerabilities into the Voting Systems. [56]

66. These vulnerabilities can take the form of proprietary hardware and software, which lack vulnerability testing and are outsourced for manufacturing in countries that have strained political and economic relations with the United States.[57]

67. COTS components by voting system machine manufactures can be used as "Black Box" and due to changes to their specs and hardware make up change continuously. Some changes can be simple upgrades to make them more efficient, cost effective, end of life extension and or even complete reworks to meet new standards. The key issue is that

---

[52] Id. 47
[53] Id. 47
[54] Id. 46-48
[55] https://files.tttexas.com/case/TX_SOS_Election_Violation_References See Declaration of Terpsehore Maras Election Software Whistleblower Line 22
[56] Id. 23
[57] Id. 23

MOST of the COTS are outsourced to China and makes us vulnerable to "Black Box" antics and backdoors.[58]

68. "The proprietary voting system software is done so and created with cost efficiency in mind and therefore relies on 3rd party software that is AVAILABLE and HOUSED on the HARDWARE. This is a vulnerability. Exporting system reporting using software like Crystal Reports, or PDF software allows for vulnerabilities with their constant updates."[59]

69. "…country of manufacture or origin for a representative sampling of computers and computer hardware components used in those voting systems…The voting systems used in these counties represent three of the top four U.S. voting systems vendors, whose voting systems are used to cast and or tabulate over 80% of votes in the U.S. elections." The third largest voting system vendor is Hart InterCivic, which unlike Dell used by ES&S, used Hewlett-Packard (HP) computers. It is a difference without distinction, as HP computers are manufactured and assembled primarily in the People's Republic of China by foreign workers with no U.S. government oversight. Effectively, there are no safeguards in the entirety of testing or EAC certification for these electronic voting system/machines. All electronic voting systems/machines utilize COTS software with thousands of known vulnerabilities which can be exploited both before and after delivery.[60]

70. One such component was found in the ES&S contracts for Collin County and Bexar County.[61]

71. Listed under Dell PowerEdge T430 is listed a component "iDRAC8" which is installed in the EMS.

---

[58] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Declaration of Terpsehore Maras Election Software Whistleblower Line 22

[59] Id. 23

[60] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Declaration of Shawn Smith Line 79

[61] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Collin and Bexar County ES&S Contract

72.

| Qty Ord. | Description | Price | Ext. Price |
|---|---|---|---|
| | EMS FILE SERVER | | |
| 1 | DELL POWEREDGE T430 | $7,200.00 | $7,200.00 |
| | PowerEdge T430 Server, No TPM<br>• Chassis with up to 8 3.5" Hot Plug Hard Drives, Tower Configuration Intel® Xeon® E5-2620 v3 2.4GHz, 15M Cache, 8.00GT/s QPI Turbo, HT, 6C/12T(85W) Max Mem 1866MHz<br>• 1 CPU Standard<br>• 2133MT/s RDIMMS<br>• (2) 4GB RDIMM, 2133MT/s, Single Rank, x8 Data Width<br>• RAID 1+ RAID 1 for H330/H730/H730P (2 + 2 HDDs or SSDs)<br>• PERC H730 RAID Controller, 1GB NV Cache<br>• (4) 2TB 7.2K RPM SATA6Gbps 3.5" Hot-Plug Hard Drive<br>• On-Board Broadcom 5720 Dual Port 1Gb LOM<br>• iDRAC8, Basic<br>• DVD+/-RW, SATA Internal<br>• Casters for PowerEdge TowerChassis<br>• Power Saving Dell active Power Controller<br>• Dual, Hot-Plug, Redundant Power Supply (1+1), 750W (2) NEMA 5-15P to C13 Wall Plug, 125 Volt, 15 AMP, 10 Feet (3m), Power Cord, NorthAmerica<br>• Keyboard and Optical Mouse, USB, Black, English Windows Server 2016, Standard Ed, Factory Inst, No MED, 2SKT, 2VM, NO CAL - Downgraded to Windows Server 2008 R2 Windows Server 2016, STD Ed, Media Kit w/Factory Inst ENT DGRD Images 5-pack of Windows Server 2016 Device CALs (Standard or Datacenter)<br>• 5 Year ProSupport and NBD On-Site Service | | |




73.

74. iDRAC is a Dell Remote Access Controller. "iDRAC….is part of a larger datacenter solution that helps keep business critical applications and workloads available at all times…allows administrators to deploy, monitor, manage, configure, update, troubleshoot and remediate Dell servers from any location, and without the use of agents."

75. "Leveraging the incomparable agent-free capabilities of the embedded, integrated Dell Remote Access Controller (iDRAC) with Lifecycle Controller technology, server deployment, configuration and updates are streamlined across the OpenManage portfolio and through integration with third-party management solutions."[62]

76. "Remote management: iDRAC8 with Lifecycle Controller, iDRAC8 Express (default), iDRAC8 Enterprise (upgrade), 8GB vFlash media (upgrade), 16GB vFlash media (upgrade)"

77. The Declaration of John R. Mills describes remote access operations as generally "... activities used to access computer networks, data centers, and other equipment, conducted in a manner to avoid leaving behind forensic evidence of the access. Remote access operations are often enabled by planted malware, enabling software, and/or algorithms in the targeted computer system."[63]

78. "Remote access operations are different from remote maintenance monitoring which is intended by network designers for transparent and auditable access to network enabled devises for maintenance and updates." These remote maintenance monitoring can be subverted or co-opted for reasons that do not involve or are in accordance with remote maintenance monitoring tenets, design or intent, network owners/operators, or for lawful access or purposes.[64]

79. The iDRAC8 modem creates a serious security breach and violates a multitude of election and penal codes.[65]

80. Bruce Sherbet, an Elections Administrator, stated via email that the county must receive an approval from the SoS's office prior to purchasing a voting system.[66]

81. If electronic systems are continued to be used in any Texas elections and are compromised, which there is opportunity, then it is more than reasonable to conclude that U.S. elections are compromised through our voting system vendors' supply chains. What resource is more valuable to this country than the vote of the American people?

---

[62] https://i.dell.com/sites/csdocuments/Shared-Content_data-Sheets_Documents/en/aa/Dell-PowerEdge-T430-Spec-Sheet.pdf Last visited 06/23/22

[63] https://files.tttexas.com/case/TX_SOS_Election_Violation_References See Declaration of John R. Mills 4

[64] *Id.* 5

[65] See Tex. Elec Code 122.001(a)(4), TEX. PEN. CODE § 16.02, § 33.05, 18 U.S.C. § 1030

[66] See Line 447 of this document, Tex. Elec Code 122.005(a)

a. Without access to comprehensive real-time and post-election data, and a cadre of cyber expertise that exceeds U.S. workforce quantity and quality resources, we may never know. This is true not only because supply chain attacks can be extraordinarily difficult to detect, but also because the safeguards inherent in the U.S. voting system testing and certification regime are practically non-existent, and because the nation in which most of the systems and their components are manufactured and assembled is engaged in a decades-long campaign to infiltrate, corrupt, and compromise Western, and especially U.S., computers and computer-based systems, including government and election systems."[67]

b. "The employment of machine-based algorithms to access electronic voting systems in the United States to impose a pre-determined election outcome through remote access operations is well within the capabilities of many nation-state actors such as China, Russia, Iran, and Venezuela, as well as even non-nation state actors." [68]

[67] https://files.tttexas.com/case/TX_SOS_Election_Violation_References See Declaration of Shawn Smith Line 80
[68] https://files.tttexas.com/case/TX_SOS_Election_Violation_References See Declaration of John R. Mills 11

FILED
MCLENNAN COUNTY
8/24/2022 10:54 PM
JON R. GIMBLE
DISTRICT CLERK
Nikki Price

**CAUSE NO. 2022-2685-3**

| | | |
|---|---|---|
| **KIMBERLY WISEMAN** *Petitioner(s),* | § | IN THE DISTRICT COURT OF |
| *v.* | § | MCLENNAN COUNTY, TEXAS |
| **JIM SMITH, PATRICIA MILLER, WILL JONES, BEN PERRY, JARED GOLDSMITH, SCOTT FELTON** *Respondents.* | § | 74TH JUDICIAL DISTRICT |

**PETITIONER'S MOTION FOR EMERGENCY HEARING WITH EXPEDITED AND COMPELLED DISCOVERY**

*TO THE HONORABLE DISTRICT COURT,*

Comes now, Pro se Petitioners KIMBERLY WISEMAN pursuant to Rules 680-686, 169, 190.2, and 215.1 of the Texas Rules for Civil Procedures, Texas Government Code §§ 23.301, 23.302, 28 U.S.C. § 2201, 52 U.S.C. § 20701, Texas Civil Practices and Remedies Code § 37.003, § 37.004 (a)(b), Chp. 65, Texas Election Code § 1.013 and 273.081 and move this honorable Court for an emergency hearing and an order allowing immediate preliminary discovery to preserve critical evidence related to issues addressed in Petitioner's Petition for Declaratory Order and Emergency Relief Against Electronic Voting Systems and Destruction of Records as follows:

Copy from re:SearchTX

**EMERGENCY HEARING**
**TRCP Rules 680-686, Texas Government Code §§ 23.301, 23.302, 28 U.S.C. § 2201, 52 U.S.C. § 20701, Texas Civil Practices and Remedies Code §§ 37.003, 37.004 (a)(b), 65.011, Texas Election Code § 1.013 and 273.081**

The Petitioners seek to have the Court ensure, by an appropriate Order, the safe-keeping and non-spoliation of all original ballots and all other related election information – tabulation databases, adjudication databases, pollbook databases, election definition files, scanned ballot images, cast vote records, logic and accuracy testing results, logs and reports stored on all electronic election equipment, including, but not limited to the Election Management System (EMS), client workstations, pollbooks, tabulators, Direct Recording Electronic (DRE) devices, Ballot Marking Devices (BMD), and Election Night Reporting (ENR) archives, project database backups, and any other form of backups – from the November 2020 election until such time that an extensive forensic inspection by qualified independent document examiners and experts is conducted to determine which ballots are original and which are counterfeit, if any. Petitioners request all other and further relief, at law and in equity, which the Court deems necessary to ensure accurate certifications of the elections occur in the State of Texas, given that the current certification is plagued with demonstrable errors. Petitioners show that the preservation of records and evidence – with subsequent investigation – will have the resulting benefit of ensuring that MCLENNAN County implements the necessary changes, safeguards and best practices to ensure that future elections are conducted in strict accordance with Texas law. Time is of the essence as the date for destruction of records is upon us.

**EXPEDITED DISCOVERY**
**Rules 169, 190.2, and 215.1 of the Texas Rules for Civil Procedures**

**REQUEST FOR PRODUCTION**

HART INTERCIVIC 6.2.1 Documentation of all communication with Secretary of State regarding Hash Validations and failure of 6.0.2.0., as well as all info on The DS200 and supposed certification.

Documentation of ENR ROUTERS and SPLUNK LOGS.

Documentation of UOCAVA and BCEASE voting from 2020 to the present: ballots, receipts, and contracts.

Copy from re:SearchTX

Documentation and contracts with Department of Homeland Security (DHS), AWS, Center for Internet Security and Scytl.

The list of DHS and CISA contractors/agents/security/workers/volunteers working or helping with "election security", "election data", or any other election-related work since the 2020 general elections.

i. Provide documentation for how they are paid: Are they paid by county, city, federal funds, non-governmental entity, or non-profit agency?
ii. What training and experience do they have?
iii. Who approved and/or hired the DHS/CISA contractors/agents/security/workers/volunteers to be involved in Texas elections?
iv. Who approved the collaboration of elections with DHS/CISA?

## OBTAIN COMPUTER AND ELECTRONIC DEVICES

a) Brand name, model number and any other identifying information on the voting machines *actually used* during the 2020 General Presidential, 2021 constitutional election, and 2022 primary election in MCLENNAN County.

b) Software name, version, release iteration and date of software installation on the voting machines *actually used* during the 2020 General Presidential, 2021 constitutional election, and 2022 primary election in MCLENNAN County.

c) Brand name, model number and any other identifying information used to collect, tabulate, or transmit vote tally information data *actually used* during the 2020 General Presidential, 2021 constitutional election, and 2022 primary election in MCLENNAN County.

d) Software name, version, release iteration and date of software installation on the technology in item (c) *actually used* during the 2020 General Presidential, 2021 constitutional election, and 2022 primary election in MCLENNAN County.

e) Brand name, model number and any other identifying information on the equipment used to scan, tabulate, or transmit mail-in paper ballot information data *actually used* during the 2020 General Presidential, 2021 constitutional election, and 2022 primary election in MCLENNAN County.

f) Software name, version, release iteration and date of software installation on the technology in item (e*) actually used* during the 2020 General Presidential, 2021 constitutional election, and 2022 primary election in MCLENNAN County.

g) The testing results and certification of all voting equipment *actually used* during the 2020 General Presidential, 2021 constitutional election, and 2022 primary election in MCLENNAN County.

Copy from re:SearchTX

h) Purchasing agreements and contracts between McLennan County and the voting system companies, as well as the approval letter(s) from the Secretary of State for items listed in a-g *actually used* during the 2020 General Presidential, 2021 constitutional election, and 2022 primary election in MCLENNAN County.

**OBTAIN ORDER FROM THE COURT**

In accordance with, the Constitutions of the United States and Texas, Texas Civil Practice and Remedies Code §§ 65, Texas Election Code §§ 273, Petitioners request this Court to enter an order:

a. Vacating and setting aside all uncertified and illegal voting systems/equipment, software, and modifications and implement a precinct level hand-marked paper ballot and hand counting system as permissible by TEX. CONST. art. VI § 4, Tex. Elec. Code Chp. 64 and 65;

b. Granting an emergency injunction prohibiting Respondents from requiring or permitting voters to have votes cast or tabulated using any electronic voting systems, pollbooks, or devices;

c. Granting an emergency, permanent injunction prohibiting Respondents from destruction/deletion of any and all election records created under Title 8 of the Tex. Elec Code to include all paper ballots created by voting systems, USB devices, memory cards, electronic storage devices, mail in ballots, tabulation tapes, USB final counts from precincts and all other election records not specifically stated from the 2020, 2021, and 2022 elections:

> All county officials to maintain AND preserve any and all ORIGINALS AND COPIES OF ALL DIGITAL AND ANALOG (E.g., ELECTRONIC, PAPER, OR OTHERWISE TANGIBLE ITEMS) ELECTION RECORDS CREATED UNDER THE TEXAS ELECTION CODE INCLUDING AND RELATED TO THE FOLLOWING:

1. Paper ballots including voting system created
2. Tabulation tapes
3. Tabulation databases
4. Adjudication databases
5. Pollbook databases
6. Election definition files
7. Qualified voter files
8. Scanned ballot images
9. Cast vote records
10. Logic and accuracy testing results
11. Logs and reports stored on the Election Management System (EMS)
12. Poll books

Copy from re:SearchTX

13. Tabulators
14. Direct Recording Electronic (DRE)
15. Ballot Marking Devices (BMD)
16. Election Night Reporting (ENR)
17. Project database backups
18. Any other form of backups
19. Mail in ballots
20. Provisional ballots
21. USBs from all precincts and the data on these portable drives
22. USB final counts
23. Chain of custody documents
24. All election forms required under Texas Election Code

d. Temporarily restraining, as well as preliminarily and permanently enjoining Respondents, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, from implementing and/or enforcing the certifications of all voting systems/equipment, software and modifications that are not in compliance with the applicable law:

> All county officials to maintain AND preserve any and all ORIGINALS AND COPIES OF COMMUNICATION (including but not limited to electronic mail, regular mail, or in person meeting notes) between all county officials and their staff, and to include but not limited to Texas Secretary of State offices and staff, Election Assistance Commission office and staff, and all other agencies and vendors connected to voting from the 2020, 2021, and 2022 elections.

e. Ordering to unseal absentee ballots, absentee ballot return envelopes, the absentee ballot election reports, and other paper and electronic information election materials from the 2020, 2021, and 2022 elections to permit Petitioners to review, examine, inspect, and duplicate such materials including, but not limited to electronic images of electronic drives used by Respondents in the General Election:

> All county officials to maintain AND preserve any and all ORIGINALS AND COPIES OF COMMUNICATIONS and CONTRACTS/INVOICES (including electronic, regular mail and or in person meeting notes) between you, your staff and all county officials and to include but not limited to Texas Secretary of State offices and staff, Election Assistance Commission office and staff, Voting System Vendors (including but not limited to ES&S and Hart) and all other agencies connected to voting and or elections

Copy from re:SearchTX

related to THE ABOVE-DESCRIBED ELECTIONS, to include but not limited to:

1. Voting System origination contracts
2. ENR origination contracts
3. Voting System software update invoices, contracts, or both -- with signatures
4. Approval Letters for voting systems
5. Security Analysis and Vendor which performed said analysis
6. Annual reports submitted to the Secretary of State

**PRAYER**

Petitioners pray this honorable Court:

1. Enters an order for an emergency hearing.
2. Enters a scheduling order expediting and compelling discovery.
3. Compel Respondents to file and serve documents and responses to Petitioners by September 2, 2022.
4. Grant any and all such other relief that the Court deem right and proper.

Respectfully submitted this 24TH day of August, 2022,

By: /s/ *Kimberly Wiseman*

Kimberly Wiseman
419 Barron Ln., Axtell, TX 76624
(760)525-7493
Kimwiseman522@gmail.com
*Pro se*

**Sole Petitioner**

Copy from re:SearchTX

2022-2685-3

August 10, 2022

**SCOTT FELTON**

**501 WASHINGTO**

**ROOM 214**

**WACO, TEXAS 7**

**KIMBERLY WIS**

Injunction: 08/08/2

In MCLENNAN C

No. 2022-2685-3

Mr./Ms. FELTON

Please be informed that this le
referenced date.

This letter will serve as a FO
EVIDENCE RELATING T
November 3, 2020, Novemb

Notice is hereby made for yo
ORIGINALS AND COPIE
photographs of the inside, C
24-hour period before and
EARLY VOTING, BALLO

Notice is hereby made for y
and all ORIGINALS AND C
PAPER, OR OTHERWISE TANGIBLE ITEMS) EL
THE TEXAS ELECTION C

1. Paper ballots includi
2. Tabulation tapes
3. Tabulation database
4. Adjudication databa
5. Pollbook databases
6. Election definition f
7. Qualified voter files

~~Affidavit~~ Card Missing from Will Jones Says "delivered" according to at address Aug 15 (

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

Waco, TX 76701

OFFICIAL USE

7022 0410 0000 0918 1865

| | | |
|---|---|---|
| Certified Mail Fee | $4.00 | 0800 |
| $ | $3.25 | 3 |
| Extra Services & Fees (check box, add fee as appropriate) | | |
| ☐ Return Receipt (hardcopy) | $ $0.00 | |
| ☐ Return Receipt (electronic) | $ $0.00 | Postmark Here |
| ☐ Certified Mail Restricted Delivery | $ $0.00 | |
| ☐ Adult Signature Required | $ $0.00 | |
| ☐ Adult Signature Restricted Delivery | $ | |
| Postage | $ $0.60 | |
| Total Postage and Fees | $ $7.85 | 08/11/2022 |

Sent To

Street and Apt. No., or PO Box No.

City, State, ZIP+4®

FILED 08/11/2022
MCLENNAN COUNTY
8/26/2022 12:37 PM
JON R. GIMBLE
DISTRICT CLERK
Rosa Perez

PS Form 3800, April 2015 PSN 7530-02-000-9047 See Reverse for Instructions

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Jared Gobism
214 N. 4th St
Suite 300
Waco, TX 767

9590 9402 6821 1074

2. Article Number (Transfer from service label)

7022 0410 0000 0918 1896

PS Form 3811, July 2020 PSN 7530-02-000-9053

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

Waco, TX 76701

OFFICIAL USE

7022 0410 0000 0918 1896

| | | |
|---|---|---|
| Certified Mail Fee | $4.00 | 0800 |
| $ | $3.25 | 3 |
| Extra Services & Fees (check box, add fee as appropriate) | | |
| ☐ Return Receipt (hardcopy) | $ $0.00 | |
| ☐ Return Receipt (electronic) | $ $0.00 | Postmark Here |
| ☐ Certified Mail Restricted Delivery | $ $0.00 | |
| ☐ Adult Signature Required | $ $0.00 | |
| ☐ Adult Signature Restricted Delivery | $ | |
| Postage | $ $0.60 | |
| Total Postage and Fees | $ $7.85 | 08/11/2022 |

Sent To

Street and Apt. No., or PO Box No.

City, State, ZIP+4®

PS Form 3800, April 2015 PSN 7530-02-000-9047 See Reverse for Instructions

☐ Collect on Delivery Restricted Delivery
Insured Mail
Insured Mail Restricted Delivery (over $500)
Restricted Delivery

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Barry Johnson
219 N 6th St
Waco, TX

9590 9402 6821 1074

2. Article Number (Transfer from service label)

7022 0410 0000 0918 1834

PS Form 3811, July 2020 PSN 7530-02-000-9053

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

Waco, TX 76701

OFFICIAL USE

7022 0410 0000 0918 1834

| | | |
|---|---|---|
| Certified Mail Fee | $4.00 | 0800 |
| $ | $3.25 | 3 |
| Extra Services & Fees (check box, add fee as appropriate) | | |
| ☐ Return Receipt (hardcopy) | $ $0.00 | |
| ☐ Return Receipt (electronic) | $ $0.00 | Postmark Here |
| ☐ Certified Mail Restricted Delivery | $ $0.00 | |
| ☐ Adult Signature Required | $ $0.00 | |
| ☐ Adult Signature Restricted Delivery | $ | |
| Postage | $ $0.60 | |
| Total Postage and Fees | $ $7.85 | 08/11/2022 |

Sent To

Street and Apt. No., or PO Box No.

City, State, ZIP+4®

PS Form 3800, April 2015 PSN 7530-02-000-9047 See Reverse for Instructions

☐ Collect on Delivery Restricted Delivery
Insured Mail
Insured Mail Restricted Delivery (over $500)
Restricted Delivery

Domestic Return Receipt

Copy from re:SearchTX

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Patricia Miller
501 Washington Ave
Waco, TX 76701

9590 9402 6821 1074 2365 81

2. Article Number (Transfer from service label)

7022 0410 0000 0918 1889

PS Form 3811, July 2020 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X C Brault
☐ Agent
☐ Addressee

B. Received by (Printed Name): RT 98 C-15
C. Date of Delivery: 9-15-22

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

OFFICIAL USE

Waco, TX 76701

| | | |
|---|---|---|
| Certified Mail Fee | $4.00 | 0800 |
| $ | $3.25 | 3 |
| Extra Services & Fees (check box, add fee as appropriate) | | |
| ☐ Return Receipt (hardcopy) | $ $0.00 | |
| ☐ Return Receipt (electronic) | $ $0.00 | Postmark Here |
| ☐ Certified Mail Restricted Delivery | $ $0.00 | |
| ☐ Adult Signature Required | $ $0.00 | |
| ☐ Adult Signature Restricted Delivery | $ | |
| Postage | $ $0.60 | 08/11/2022 |
| Total Postage and Fees | $ $7.85 | |

Sent To

Street and Apt. No., or PO Box No.

City, State, ZIP+4®

7022 0410 0000 0918 1889

8. Scanned ba
9. Cast vote r
10. Logic and a
11. Logs and r
12. Poll books
13. Tabulators
14. Direct Rec
15. Ballot Mar
16. Election Ni
17. Project data
18. Any other
19. Mail in bal
20. Provisional
21. USBs from all precincts and the data on these portat
22. USB final counts
23. Chain of custody documents
24. All election forms required under Texas Election Co

Notice is hereby made for your staff and all county officials
ORIGINALS AND
mail, regular mail, or
to include but not
Commission office
ABOVE DESCRIB

Notice is hereby mac
ORIGINALS AND
(including electronic
county officials and t
Assistance Commis
ES&S and Hart) an
ABOVE-DESCRIB

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Jim Smith
501 Washington Ave
Waco, TX 76701

9590 9402 6821 1074 2366 04

2. Article Number (Transfer from service label)

7022 0410 0000 0918 1872

PS Form 3811, July 2020 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X C Braut
☐ Agent
☐ Addressee

B. Received by (Printed Name): RT 98 C-15
C. Date of Delivery: 9-15-22

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

OFFICIAL USE

Waco, TX 76701

| | | |
|---|---|---|
| Certified Mail Fee | $4.00 | 0800 |
| $ | $3.25 | 3 |
| Extra Services & Fees (check box, add fee as appropriate) | | |
| ☐ Return Receipt (hardcopy) | $ $0.00 | |
| ☐ Return Receipt (electronic) | $ $0.00 | Postmark Here |
| ☐ Certified Mail Restricted Delivery | $ $0.00 | |
| ☐ Adult Signature Required | $ $0.00 | |
| ☐ Adult Signature Restricted Delivery | $ | |
| Postage | $ $0.60 | 08/11/2022 |
| Total Postage and Fees | $ $7.85 | |

Sent To

Street and Apt. No., or PO Box No.

City, State, ZIP+4®

PS Form 3800, April 2015 PSN 7530-02-000-9047 See Reverse for Instructions

7022 0410 0000 0918 1872

1. Voting Syste
2. ENR origina
3. Voting
4. Approval Le
5. Security Analysis and Vendor which performed said
6. Annual reports submitted to the Secretary of State

Kindly note that it is imperative that you take affirmative s the above-referenced lawsuit. The failure to do so may spoliation of evidence and which can result in the impositio including an order barring the introduction of any such evid



Copy from re:SearchTX

1. American Family Ins. v. Black & Decker (U.S.), Inc., No. 3:00CV50281, 2003 U.S. Dist. LEXIS 16245 (N.D. Ill. Sept. 16, 2003) (holding a party's pre-suit duty to preserve evidence is a substantive rule of law requiring application of state law in a diversity case).
2. Ward v. Texas Steak, Ltd., No. 7:03cv00596, 2004 U.S. Dist. LEXIS 10575 (W.D. Va. May 27, 2004) (applying Virginia law and stating, "When spoliation of evidence does not occur in the course of pending federal litigation, a federal court exercising diversity jurisdiction in which the rule of decision is supplied by state law is required to apply those spoliation principles the forum state would apply.")

Additionally, to preserve a
tangible items, you or anyo
and destruction policies, in
backup-tape rotation, or otl

Please notify your staff, or
or pictures, if you have no
possible but no later than t
to contact you further.

Thank you for your profess

Very truly yours,

KIMBERLY WISEMAN

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:
Ben Perry
501 Washington Ave.
Waco, TX 76701

9590 9402 6821 1074 2366 28

2. Article Number (Transfer from service label)
7022 0410 0000 0918 1858

PS Form 3811, July 2020 PSN 7530-02-000-9053

7022 0410 0000 0918 1858

**U.S. Postal Service™ CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com

Waco, TX 76701
OFFICIAL USE

| | | |
|---|---|---|
| Certified Mail Fee $ | $4.00 | 0800 3 |
| Extra Services & Fees (check box, add fee as appropriate) | $3.25 | |
| ☐ Return Receipt (hardcopy) $ | $0.00 | |
| ☐ Return Receipt (electronic) $ | $0.00 | Postmark Here |
| ☐ Certified Mail Restricted Delivery $ | $0.00 | |
| ☐ Adult Signature Required $ | $0.00 | |
| ☐ Adult Signature Restricted Delivery $ | | |
| Postage $ | $0.60 | 08/11/2022 |
| Total Postage and Fees $ | $7.85 | |

Sent To
Street and Apt. No., or PO Box No.
City, State, ZIP+4®

PS Form 3800, April 2015 PSN 7530-02-000-9047 See Reverse for Instructions

Domestic Return Receipt

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:
Scott Felton
501 Washington Ave
Room 214
Waco, TX 76701

9590 9402 6821 1074 2366 35

2. Article Number (Transfer from service label)
7022 0410 0000 0918 1841

PS Form 3811, July 2020 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

7022 0410 0000 0918 1841

**U.S. Postal Service™ CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

Waco, TX 76701
OFFICIAL USE

| | | |
|---|---|---|
| Certified Mail Fee $ | $4.00 | 0800 3 |
| Extra Services & Fees (check box, add fee as appropriate) | $3.25 | |
| ☐ Return Receipt (hardcopy) $ | $0.00 | |
| ☐ Return Receipt (electronic) $ | $0.00 | Postmark Here |
| ☐ Certified Mail Restricted Delivery $ | $0.00 | |
| ☐ Adult Signature Required $ | $0.00 | |
| ☐ Adult Signature Restricted Delivery $ | | |
| Postage $ | $0.60 | 08/11/2022 |
| Total Postage and Fees $ | $7.85 | |

Sent To
Street and Apt. No., or PO Box No.
City, State, ZIP+4®

PS Form 3800, April 2015 PSN 7530-02-000-9047 See Reverse for Instructions

Copy from re:SearchTX

FILED
MCLENNAN COUNTY
8/31/2022 12:24 PM
JON R. GIMBLE
DISTRICT CLERK

**CAUSE NO. 2022-2685-3**

| | | |
|---|---|---|
| **KIMBERLY WISEMAN**<br>*Petitioner(s),* | §<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT OF |
| *v.* | §<br>§<br>§<br>§ | MCLENNAN COUNTY, TEXAS |
| COUNTY COMMISSIONERS: JIM SMITH, PATRICIA MILLER, WILL JONES, BEN PERRY; ELECTIONS ADMINISTRATOR: JARED GOLDSMITH, CERA; COUNTY JUDGE: SCOTT FELTON<br>*Respondents.* | §<br>§<br>§<br>§<br>§<br>§<br>§ | 74th JUDICIAL DISTRICT |

Kimberly Wiseman
419 Barron Ln
Axtell, TX 76624
(760)525-7493
Kimwiseman522@gmail.com
*Pro se* Petitioner

**PETITIONER'S MOTION FOR EMERGENCY MANDAMUS ORDER**

*TO THE HONORABLE 146TH DISTRICT COURT,*

Petitioner in the above-mentioned cause respectfully presents emergency request for mandamus order to the 74th District Court.



Copy from re:SearchTX

**TABLE OF CONTENTS**

**Index of Authorities……………………………………..…………..……….3**

**Statement of the Case……………………………………………………………..4**

**Statement of Jurisdiction………………………………………………………5**

**Issues Presented………………………………………………………...………5**

**Statement of Facts………………………………………………..………6**

**Argument…………………………………………………………………..8**

**Prayer………………………………………………………………...………9**

**Appendix…………………………………………………………...……..11**



Copy from re:SearchTX

## TABLE OF AUTHORITIES

### *Statutes*

TEX. ELEC. CODE § 273.081 ....6
TEX. GOV. CODE § 23.301 ....6
TEX. GOV. CODE § 23.302....6
TEX. GOV. CODE § 24.007 .... 5
TEX. GOV. CODE § 24.008 .... 4
TEX. GOV. CODE § 24.011 .... 5
TEX. GOV. CODE § 51.318 .... 7
TEX. PEN. CODE § 38.16 .... 7

### *Rules*

TEX. R. CIV. P. Rule 501.1 .... 6
TEX. R. Civ. P. Rule 99(a) .... 6
TEX. R. CIV. P. Rule 99(d).... 7

### *Constitutional Provisions*

TEX. CONST. art. I § 13 .... 7
TEX. CONST. art. I § 3(a).... 7
TEX. CONST. art. V § 8.... 5



Copy from re:SearchTX

## STATEMENT OF THE CASE

Nature of Proceedings: On August 3, 2022, Pro se Petitioner filed a Petition for Declaratory Order and Emergency Relief Against Electronic Voting Systems and Destruction of Records. The Respondents for the cause are County Commissioners: Jim Smith, Patricia Miller, Will Jones, Ben Perry; Elections Administrator: Jared Goldsmith, Cera; and County Judge: Scott Felton.

Challenged Action: For multiple days, Pro se Petitioner has attempted to request issuance of citations. The district clerk required Petitioner pay fees the Petitioner did not request citing Texas Government Code § 51.318 and Texas Rule for Civil Procedures, Rule 99(d). After Petitioner walked copies into the District Clerk's office, the Clerk has delayed the issuance of citations.



Copy from re:SearchTX

## STATEMENT OF JURISDICTION

The district clerk falls under the district court's purview. The district court may hear and determine any cause that is cognizable by courts of law or equity and may grant any relief that could be granted by either courts of law or equity. *TEX. GOV. CODE § 24.008*. A judge of a district court may, either in termtime or vacation, grant writs of mandamus, injunction, sequestration, attachment, garnishment, certiorari, and supersedeas and all other writs necessary to the enforcement of the court's jurisdiction. *TEX. GOV. CODE § 24.011*. The district court has the jurisdiction provided by Article V, Section 8, of the Texas Constitution. *TEX. GOV. CODE § 24.007*.

## ISSUES PRESENTED

1. Pro se Petitioner requested issuance of citations on multiple days.

   Was it lawful for the clerk to deny issuing citations while requiring Petitioner to pay for services not requested?

2. Pro se Petitioner's process server produced copies to the clerk to issue citations upon.

   Was it lawful for the district clerk to delay the issuance of citations – especially in regard to emergency matters?



Copy from re:SearchTX

## STATEMENT OF FACTS

Petitioner, Kimberly Wiseman, filed a Petition for Declaratory Judgement and Emergency Relief Against Electronic Voting Systems and Destruction of Records with a Proposed order under TEX. ELEC. CODE § 273.081 causing it to be considered under TEX. GOV. CODE §§ 23.301 and 23.302 on August 8, 2022.

August 10, 2022, Petitioner received notification that Judge Gary Coley, Jr. from 74th District Court recused himself. The 74th District Court notified Petitioner via email that case would be reassigned to Third Administrative Judicial Region, no judge given

Walked in Requests for Issuance of Citations-8/24

Petitioner filed Motion for Emergency Hearing and Expedited Discovery with Proposed Order on August 25, 2022. Emailed 74th District copies of Motion for Emergency and Proposed Order-8/25

On August 26, 2022, Petitioner Called 3rd Admin Judicial Region 26th District Court to request hearing. The 26th District Clerk referred Petitioner back to the 74th District on August 26, 2022, and Petitioner emailed and called 74th District Clerk to request hearing.

Petitioner received an email from 74th District stating they were waiting to hear from 3rd Judicial Region to find out who the judge will be on August 29, 2022. In addition, Petitioner called the District Clerk to find out if citations were ready, and was told the citations would be ready in the afternoon on Tues August 30, 2022.

On August 30, 2022, Petitioner called to check status of citations, and was told maybe they would be ready Wednesday August 31, 2022.



Copy from re:SearchTX

## ARGUMENT

Pro se Petitioner, Kimberly Wiseman, requested issuance of 6 citations for the Respondents in the above cause pursuant to Tex. Rule Civ. Proc. Rule 99(a) Issuance. Upon the filing of the petition, the clerk, **when requested**, shall forthwith issue a citation and deliver the citation as **directed by the requesting party**. The party requesting citation shall be responsible for obtaining service of the citation and a copy of the petition. *(emphasis added)*; and in correlation with Tex. Rule Civ. Proc. Rule 501.1: When a petition is filed to initiate a suit, the clerk **must** promptly issue a citation and deliver the citation **as directed by the plaintiff**. (*emphasis added*). **The plaintiff is responsible for obtaining service on the defendant of the citation** and a copy of the petition with any documents filed with the petition. (*emphasis added*).

The district clerk first required Petitioner to pay copying fee, which copies were not requested. Therefore, Pro se Petitioner went physically to the McLennan County district clerk's office (*Tex. Rule Civ. Proc. Rule 99(d)*): The party filing any pleading upon which citation is to be issued and served shall furnish the clerk with a sufficient number of copies thereof for use in serving the parties to be served, and when copies are so furnished the clerk shall make no charge for the copies; therefore, TEX. GOV. CODE § 51.318 does not apply. Through the continual delay, the district clerk appears to be blocking matters in official proceedings and violating Petitioner's constitutionally protected rights to access the court. *TEX. PEN. CODE § 38.16, TEX. CONST. art. I §§ 3(a) and 13.*



Copy from re:SearchTX

## PRAYER

Petitioner respectfully asks the Honorable Court to issue Mandamus Order upon the McLennan County district to clerk to uphold the clerk's official duties to issue citations to Pro se as Pro se dictates for the commencement of the Petition for Declaratory Order and Emergency Relief Against Electronic Voting Systems and Destruction of Records. For an award of attorney fees and all other reliefs the court deems petitioner is entitled.

Respectfully submitted this ___ day of August, 2022,

By: /s/ *Kimberly Wiseman*
Kimberly Wiseman
419 Barron Ln
Axtell, TX 76624
(760)525-7493
Kimwiseman522@gmail.com
*Pro se* Petitioner

**Each Respondent:**

COMMISSIONERS COURT
501 Washington Ave.
Waco, TX 76701

JIM SMITH
254-757-5061

PATRICIA MILLER
254-757-5062

WILL JONES
254-757-5063

BEN PERRY
254-757-5064

JARED GOLDSMITH, CERA
Elections Administrator
elections@co.mclennan.tx.us
214 N 4th St
Suite 300
Waco, TX 76701
254-757-5043

SCOTT FELTON
County Judge
501 Washington Ave.
Room 214
Waco, TX 76701
254-757-5049



Copy from re:SearchTX

# APPENDIX



Copy from re:SearchTX

FILED
MCLENNAN COUNTY
9/8/2022 4:06 PM
JON R. GIMBLE
DISTRICT CLERK
Nikki Price

**Cause No. 2022-2685-3**

| | | |
|---|---|---|
| **KIMBERLEY WISEMAN**<br>*Plaintiff,* | § | **IN THE DISTRICT COURT** |
| | § | |
| **v.** | § | **74TH JUDICIAL DISTRICT** |
| | § | |
| **COUNTY COMMISSIONERS<br>JIM SMITH, PATRICIA MILLER,<br>WILL JONES, BEN PERRY;<br>ELECTIONS ADMINISTRATOR<br>JARED GOLDSMITH, CERA;<br>COUNTY JUDGE SCOTT FELTON, et. al.**<br>*Defendants.* | § | **McLENNAN COUNTY, TEXAS** |

**DEFENDANTS' JOINT ANSWER**

COME NOW, the Defendants/Respondents in the above-entitled and numbered cause and file their Joint Answer and show unto the Court as follows.

1. Defendants' Response to Request for Injunctive Relief filed concurrently herewith is incorporated herein by reference as if set out verbatim.

2. The Plaintiff's claims for injunctive relief are barred or must fail for the same reasons as set forth in Defendants' Response to Request for Injunctive Relief.

3. The Plaintiff's claims for declaratory relief are barred or must fail for the same reasons as set forth in Defendants' Response to Request for Injunctive Relief. The same equitable principles and legal authorities apply to a claim for declaratory relief.

4. Plaintiff lacks standing on all but one of her claims, which itself has been denied by the Texas Supreme Court.

5. Defendants are entitled to the protection of McLennan County's sovereign/ governmental immunity and hereby assert the same.

6. Plaintiff is guilty of laches in bringing her action.

7. Plaintiff comes to Court with unclean hands and should not be granted any equitable relief.

8. Plaintiff lacks standing to assert violations of the U.S. and Texas Constitutions.

9. Plaintiff lacks standing to assert violations of the Texas Election Code and federal laws dealing with elections.

10. Plaintiff has failed to sue and serve an indispensable party. The majority of the Plaintiff's suit complains of the Hart Intercivic eSlate DRE machines being certified by the Texas Secretary of State; yet the Texas Secretary of State has not been made a part to this action. No injunction can be entered by this Court without the proper parties before it.

11. The County's Hart Intercivic eSlate DRE machines have been certified for use in elections by both the Texas Secretary of State and the Federal government, and Plaintiff's allegations do not overcome this certification.

12. The County's Hart Intercivic eSlate DRE machines have been reviewed and tested by an independent cybersecurity expert and the Texas Secretary of State' Office and have passed with flying colors.

13. Defendants deny each and every allegation of the Plaintiff's Petition and require strict proof thereof in compliance with the Texas Rules of Civil Procedure.

14. The public interest would be harmed by granting Plaintiff any of her requested relief as the relief would necessarily interfere with the election, cause voter confusion, place great burdens upon those in charge of putting on the election and will cause the election to be delayed.

15. The balance of equities overwhelmingly supports the Defendants and establishes that Plaintiff's claims for equitable relief should be denied.

16. The Texas Supreme Court's holding in *Khanoyan v. Lugo*, 637 S.W. 3d 762, 764-69 (Tex. 2022) bars Plaintiff's request for injunctive relief.

WHEREFORE, Defendants pray that:

1) Plaintiff take nothing/receive no equitable relief from her lawsuit;

2) Plaintiff's Petition be dismissed; and

3) Defendants receive any other relief to which they may show themselves entitled, including receiving their attorney's fees incurred herein pursuant to Chapter 37 of the Texas Civil Practice & Remedies Code.

Respectfully submitted,

HALEY & OLSON, P.C.
100 N. Ritchie Road, Suite 200
Waco, Texas 76712
Telephone: (254) 776-3336
Telecopier: (254) 776-6823

By: */s/ Michael W. Dixon*
MICHAEL W. DIXON
State Bar No. 05912100
Email: mdixon@haleyolson.com
HERBERT S. BRISTOW
State Bar No. 03020500
hbristow@haleyolson.com
Attorneys for Defendants/Respondents

**CERTIFICATE OF SERVICE**

I certify that on September 8, 2022, a true and correct copy of the above and foregoing was served upon the following parties in accordance with the Texas Rules of Civil Procedure.

Kimberly Wiseman
419 Barron Lane
Axtell, Texas 76624
***Via E-File and Certified Mail***

/s/ *Michael W. Dixon*
MICHAEL W. DIXON

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Dyanne Carter on behalf of Michael Dixon
Bar No. 05912100
dyanne.carter@haleyolson.com
Envelope ID: 68077255
Status as of 9/8/2022 4:22 PM CST

Associated Case Party: Kimberly Wiseman

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Kimberley Wiseman | | Kimwiseman522@gmail.com | 9/8/2022 4:06:55 PM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Dyanne Carter on behalf of Michael Dixon
Bar No. 05912100
dyanne.carter@haleyolson.com
Envelope ID: 68077255
Status as of 9/8/2022 4:22 PM CST

Associated Case Party: Jim Smith

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Dyanne Carter | | dyanne.carter@haleyolson.com | 9/8/2022 4:06:55 PM | SENT |
| Herbert SBristow | | hbristow@haleyolson.com | 9/8/2022 4:06:55 PM | SENT |
| Roberta Bishnow | | rbishnow@haleyolson.com | 9/8/2022 4:06:55 PM | SENT |
| Michael WDixon | | mdixon@haleyolson.com | 9/8/2022 4:06:55 PM | SENT |

FILED
MCLENNAN COUNTY
9/8/2022 4:06 PM
JON R. GIMBLE
DISTRICT CLERK
Nikki Price

**Cause No. 2022-2685-3**

| | | |
|---|---|---|
| **KIMBERLEY WISEMAN**<br>*Plaintiff,* | §<br>§<br>§<br>§ | **IN THE DISTRICT COURT** |
| **v.** | §<br>§ | **74[TH] JUDICIAL DISTRICT** |
| **COUNTY COMMISSIONERS<br>JIM SMITH, PATRICIA MILLER,<br>WILL JONES, BEN PERRY;<br>ELECTIONS ADMINISTRATOR<br>JARED GOLDSMITH, CERA;<br>COUNTY JUDGE SCOTT FELTON, et. al.**<br>*Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§ | **McLENNAN COUNTY, TEXAS** |

**RESPONSE TO REQUEST FOR INJUNCTIVE RELIEF**

The Plaintiff/Petitioner has brought an action to prevent McLennan County from using its state and federally certified Direct Recording Electronic Machines ("DRE") in the 2022 General Election, or any election until the last three elections are investigated and reconciled. Pltff's Petition pp. 1-2. The allegations mimic actions that have been filed previously across the state, one of which has specifically been denied by the Texas Supreme Court. The Plaintiff seeks elections using only paper ballots hand-counted by humans. Pltff's Petition at p. 8. Boiled down to its base level the Plaintiff's argument is that computerized equipment cannot be trusted and her "constitutional rights to vote will be denied if computerized equipment is used". *Id.*

The Defendants respond as follows.

1. General Background. The HART Intercivic eSlate DRE used by McLennan County "is one of a handful of DREs the (Texas) Secretary has certified." *Andrade v. NAACP of Austin*, 345 S.W. 3d 1, 5-6 (Tex. 2011). The system has also been certified by the federal government. **Exhibit A** Affidavit of Jared Goldsmith, McLennan County Elections Administrator.

The Hart Intercivic eSlate DRE has been upheld by courts sitting in Texas against the same constitutional and statutory allegations and arguments put forth by the Plaintiff. *For example*, *Andrade v. NAACP of Austin, supra; Texas Democratic Party v. Williams,* 285 Fed. Appx. 194 (5th Cir. 2008), *cert. denied* 555 U.S. 1100 (2009), and the underlying district court case *Texas Democratic Party v. Williams*, 2007 W.L. 9710211 (W.D. Tex. 2007).

Much of Plaintiff's case attacks the decision of the Secretary of State in certifying the eSlate system. However, the Texas Secretary of State is not a party to her action but would seem to be an indispensable party.

In addition, the Petition ***is devoid*** of specific factual pleading of *McLennan County's* DREs incorrectly tabulating ballots, being tampered with, or being hacked. Indeed, the whole action is based on speculation and surmise which cannot support injunctive relief.

Furthermore, the requested injunctive relief would cause voter confusion, place unreasonable burdens on local election officials, and result in the delay of the 2022 General Election in McLennan County. **Exhibit A** Affidavit of Jared Goldsmith, McLennan County Elections Administrator.

2. Standing. In Plaintiff's Petition she selectively cites from *Andrade v. NAACP of Austin*, 354 S.W. 3d 1 (Tex. 2011). In that case the Texas Supreme Court held that the plaintiffs had standing for an Equal Protection claim, but thereafter denied the Equal Protection claim. The *Andrade* Court denied all of the plaintiff's other constitutional and statutory claims based on lack of standing or justiciability. *Id.* at 4. The same types of arguments were made by the plaintiffs in *Andrade* as are made in this case. Plaintiff's assertions are no more than generalized grievances applicable to the public at large.

3. Elements. The elements to obtain a temporary injunction are: 1) a cause of action against the defendant; 2) probable right to the relief sought; and 3) a probable, imminent and irreparable injury in the interim. *Butnaru v. Ford Motor Co.*, 84 S.W. 3d 198, 204 (Tex. 2002). Plaintiff's action fails on all three elements. In addition, before issuing temporary injunctive relief a court must look at the comparative injury or a balancing of the equities and hardships with a consideration of the important factor of the public interest. *Amend v. Watson*, 333 S.w.3d 625, 630 n.4 (Tex. App.---Dallas 2009, no pet.); *Methodist Hosps. of Dallas v. Tex. Indus, Accident Bd.*, 798 S.W. 2d 651, 660 (Tex. App. ---Austin 1990, writ dism'd w.o.j.).

*Timing*

In the context of elections, the timing of the request for injunctive relief and the effect that it would have on the election must be taken into consideration. That is, the proximity of the forthcoming election and the mechanics and complexities of election laws must be considered. *Reynolds v. Sims*, 377 U.S. 533, 585 (1964). *See also Veasey v. Perry*, 769 F.3d 890 (5th Cir. 2014) (stay of injunction, even where subject law was struck down, warranted due to proximity to election); *Texas Democratic Party v. Abbott*, 961 F, 3d 389 (5th Cir. 2020) (stay of injunction because of confusion that would be caused to election workers and voters in upcoming election); *The Hispanic Leadership Fund, Inc. v. Walsh*, 2012 W.L. 12888008 (N.D.N.Y. 2012) (delay in bringing action for injunction until shortly before election justified denial of requested injunctive relief claiming unconstitutional application of election statutes); *Grogan v. Graves*, 1990 W.L. 182373 (D. Kansas 1990) (Statutes under attack had been in place for years. Election preparations were underway, and an injunction would at best create voter confusion, disruption of the election, and place unreasonable demands on local election officials, and at worst could delay the election. Plaintiffs NOT entitled to preliminary injunctive relief).

The Texas Supreme Court has recently held that mandamus relief was not available to objectors who brought their case after preparations for the primary election were already underway. *Khanoyan v. Lugo*, 637 S.W. 3d 762, 764-69 (Tex. 2022). The Court was very clear that an elections case must be brought at a time when the requested relief would not interfere with election preparations or delay the election. *Id.*

The *Khanoyan* case is on point with the case at hand. Plaintiff did not file or serve this action until preparations for the 2022 General Election were well underway. In addition, granting the relief requested by Plaintiff would delay the election.

4. Preserving the Status Quo.

Temporary injunctions are intended to preserve the status quo pending the trial on the merits. *Walling v. Metcalfe*, 863 S.W. 2d, 58 (Tex. 1993). Mandatory injunctions which disturb the status quo are disfavored. Such require a higher burden of proof and may not be granted except where absolutely necessary to prevent irreparable injury or extreme hardship. *LaFaucheur v. Williams* 807 S.W. 2d 20, 22 (Tex. App. – Austin 1994, no writ); *Rodia, Inc., v. Harris County,* 470 S.W. 2d 415, 419 (Tex. Civ. App.--- Houston [1st Distr.] 1971, no writ).

Petitioner pleads no facts as to McLennan County's DREs causing any violation or being shown to be particularly vulnerable. Rather, she lumps all electronic voting machines together and then makes conclusory statements of constitutional and statutory violations. Allegations that are so conclusory as to fail to state a cause of action – especially as to McLennan County. ***The allegations also cannot overcome the fact that McLennan County's DREs have been certified by both the State of Texas and the Federal government.*** *Texas Democratic Party v. Williams*, 2007 W.L. 9710211 (W.D. Tex. 2007), approved by *Texas Democratic Party v. Williams,* 285 Fed. Appx. 194 (5th Cir. 2008), *cert. denied* 555 U.S. 1100 (2009):

- "The unfortunate reality is that the possibility of electoral fraud [and undervotes] can never be completely eliminated, no matter what type of ballot is used. **However, it is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems. So long as their choice is reasonable and neutral, it is free from judicial second-guessing.**" *Id.* at p. 5 (quoting *Webner v. Shelley,* 347 F. 3d 1101 (9th Cir. 2003). (emphasis added)
- **"Here, the Secretary of State of Texas made a reasonable and non-discriminatory choice to certify the eSlate voting machines for use in elections, and nothing in the Constitution forbids this choice."** *Id* at p. 5 (emphasis added).

Petitioner seeks to completely change the status quo – by stopping the use of DREs just two (2) months before the 2022 General Election. This is based on speculation, not specific allegations that there has been manipulation of the DREs in prior *McLennan County* elections.

Examples of the absolute havoc that would be created by granting the requested injunction are as follows:

Issue 1: Time Constraints

It will simply be impossible to replace the County's current voting system before the November 2022 election. If it cannot use its current voting equipment, there will not be an election in McLennan County, or it will be delayed.

Time constraints include:

- Visiting with certified vendors to purchase new voting equipment
- Contract negotiations with vendors
- Any voting system purchase must be approved by the Texas Secretary of State
- State mandated acceptance testing before implementing a new voting system
- Properly training poll workers and voters on how to use new voting system
- Complete overhaul of current election processes including logistics

Issue 2: Conforming to Helping America Vote Act (HAVA) regulations

HAVA states that any voting system implemented must be compliant with the Americans with Disabilities Act (ADA). This includes providing voters with an electronic device that can be manipulated by voters who cannot physically mark a ballot by hand.

The County's current equipment (and any equipment being considered for future purchase) meets this requirement.

Issue 3: Vote Centers

McLennan County currently uses countywide "Vote Centers" for its voters on Election Day. This system allows voters to vote at any open polling location on Election Day.

Vote Centers counties can only implement certain types of voting equipment, all of which require some type of electronic element.

Pre-printing ballots is not only arduous and expensive, it is currently not allowed by the Texas Election Code

For November 2022, if McLennan County were to move away from Vote Centers, we would need to significantly increase the number of polling sites, a task which cannot be completed in time to run the election.

The Vote Center concept is popular with our voters, who have become accustomed to the system. Moving away from this system would cause voter confusion, and would result in less voter participation.

Issue 4: Hand Counting Ballots is an unnecessarily time consuming process

By some estimates, counting the 98,000 + ballots that we saw during the November 2020 General Election may have taken over 1,000 man hours to count. This would result in election results being released significantly later than our current certified system.

Furthermore, hand-counting is not a guarantee of accuracy. In fact, it would likely be less accurate than electronic tabulation.

Overall, substantial preparation for the November 2022 Election has taken place. Forcing the Election to be held without use of the eSlate DREs would place unreasonable burdens on those in charge of running the Election and would result in voter confusion. At this point in time enjoining the use of the eSlate DREs would assuredly cause the 2022 General Election in McLennan County to be delayed.

**Exhibit "A"** Affidavit of Jared Goldsmith, Elections Administrator of McLennan County, Texas.

The very purpose of a temporary injunction is not addressed by the requested relief which itself would destroy the status quo. Before scrapping an election an applicant for injunctive relief must put forth more than what the Plaintiff has provided.

4. A Cause of Action Against the Defendant. Plaintiff's same allegations and arguments have been denied by courts in Texas. For example:

*Andrade v. NAACP of Austin,* 345 S.W. 3d 1 (Tex. 2011):

- Involved eSlate DRE.
- Held that petitioners had standing to assert an Equal Protection claim but then ruled that the Petitioners' Equal Protection claim could not succeed. *Id.* Pp. 11-14
- Held that Petitioners lacked standing to assert any other constitutional claims that DRE were vulnerable to hackers, that the lack of paper ballots violated the requirement that ballots be numbered, etc. because the petitioners' allegations amounted to only a generalized grievance shared in substantially equal measure by all or a large class of citizens, and there was no allegation that DRE had ever been manipulated in any election in that county. *Id.* Pp. 14-16
- DREs did not violate ballot purity under the Texas Constitution *Id.* Pp. 16-17
- Petitioners lacked standing to pursue any claims under the Texas Election Code. *Id.* Pp. 17-18

*Andrade* essentially destroys Petitioner's claims in this case. The petition in this case seems to track the petition filed in *Andrade* based on the opinion.

*Texas Democratic Party v. Williams*, 2007 W.L. 9710211 (W.D. Tex. 2007), approved by *Texas Democratic Party v. Williams,* 285 Fed. Appx. 194 (5th Cir. 2008), *cert. denied* 555 U.S. 1100 (2009):

- Upheld the eSlate DRE against Equal Protection, Due Process and First Amendment claims.
- "The unfortunate reality is that the possibility of electoral fraud [and undervotes] can never be completely eliminated, no matter what type of ballot is used. However, it is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems. So long as their choice is reasonable and neutral, it is free from judicial second-guessing." *Id.* at p. 5 (quoting *Webner v. Shelley,* 347 F. 3d 1101 (9th Cir. 2003).
- **"Here, the Secretary of State of Texas made a reasonable and non-discriminatory choice to certify the eSlate voting machines for use in elections, and nothing in the Constitution forbids this choice."** *Id* at p. 5 (emphasis added).
- Found as a matter of law that plaintiffs were not entitled to relief for alleged violations of the Texas Election Code. *Id.* at p. 6

*Bickham v. Dallas County*, 612 S.W. 3d 663 (Tex. App.---Dallas 2020, pet. denied)

- Poll watchers lacked statutory or common law standing to bring action for alleged violations of Election Code, most of which dealt with voting machines.

*Mere Use of DREs for Elections Does Not Give Rise to Constitutional Violations.*

The test for whether a "restriction" complies with the Constitution is whether the restriction imposes only "reasonable and non-discriminatory restrictions" upon First and Fourteenth Amendment rights. If so, the state's important regulatory interests are generally sufficient to justify the restrictions. *Burdick v. Takusi*, 112 S. Ct. 2059, 2063-64 (1992).

DREs have been repeatedly upheld against constitutional challenges as being reasonable and non-discriminatory restrictions justified by the state's important regulatory interests:

*Andrade* 345 S.W. 3d at pp. 13-14 (DREs did not violate Equal Protection);

*Tex. Democratic Party v. Williams*, 285 Fed. Appx. 194, 195 (5th Cir. 2008), cert denied, 555 U.S. 1100 (2009) (affirming summary judgment for the Texas Secretary of State in case involving allegations that eSlate deprived voters of Equal Protection and Due Process);

*Wexler v. Anderson*, 452 F. 3d 1226, 1233 (11th Cir. 2006) (no violation of Equal Protection);

*Weber v. Shelly*, 347 F. 3d 1101, 1107 (9th Cir. 2003);

*Favorito v. Handel*, 684 S.E. 2d 257 261-62 (Ga. 2009);

*Schade v. Md. State Bd. Of Elections*, 930 A. 2d 304, 328 (MD 2007) (preliminary injunction correctly denied as state board of elections acted reasonably in certifying DREs that lacked a paper trail); and

*Gusciora v. Corzine*, 2010 N.J. Super. LEXIS 2319*332-33 (N.J. Super. Ct. Law Div. 2010) (holding that certification of state's DREs did not violate voter's Equal Protection or Due Process rights).

The Plaintiff has pleaded nothing factual that would show the use of McLennan County's DREs to be a severe or unreasonable restriction on her constitutional rights and has failed to state a claim under the First or Fourteenth Amendments, or any other constitutional right. Conclusory and speculative allegations will not suffice. Again, Plaintiff makes no factual allegation that anyone in McLennan County has been denied the right to vote by the County's DREs or that there has been any effect on McLennan County elections by hackers, foreign saboteurs, or others. *Andrade*, 354 S.W. 3d at 15 ("All voting systems are subject to manipulation, but there is no evidence or allegation that the eSlate has ever been manipulated in any Travis County election.").

5. Probable Right to the Relief Sought. The foregoing paragraphs are incorporated herein by reference. Much of the Plaintiff's Petition addresses the now irrelevant question of whether the Texas Secretary of State committed a violation by certifying the eSlate DRE. However, these assertions have been specifically barred by *Texas Democratic Party v. Williams*, 2007 W.L. 9710211 (W.D. Tex. 2007), approved by *Texas Democratic Party v. Williams,* 285 Fed. Appx. 194 (5th Cir. 2008), *cert. denied* 555 U.S. 1100 (2009):

> **"Here, the Secretary of State of Texas made a reasonable and non-discriminatory choice to certify the eSlate voting machines for use in elections, and nothing in the Constitution forbids this choice."**

*Id* at p. 5 (emphasis added).

In addition, *Andrade v. NAACP of Austin,* 345 S.W. 3d 1, 11-18 (Tex. 2011) specifically denied the same Equal Protection claim, held that the plaintiffs had no standing to bring the same other constitutional claims, and held that the plaintiffs had no standing to bring the same statutory claims. In *Williams*, *supra* the Court upheld the eSlate DRE against both constitutional and statutory attacks.

Plaintiff does mix in some allegations relating to federal statutes, however these federal statutes do not provide a private cause of action. All of these are criminal statutes or statutes that can only be enforced by the Attorney General and, thus can provide no relief to Plaintiff. *Gill v. Texas*, 153 Fed. Appx. 261, 262-64 (5th Cir. 2005); *Northeast Ohio Coalition for the Homeless v. Husted,* 837 F. 3d 612, 630 (6th Cir. 2016); *Gorelik v. W.C.A.B.*, 108 F. 3d 337, 1 n.1 (9th Cir. 1997); *Bowling v Dahlheimer*, 2019 W.L. 4463466*3 n.2 (E.D. Tex. 2019), adopted by 2020 W.L. 5369984 (E. D. Tex. 2020). Exceptions are 42 U.S.C. Section 1983 and its sister remedial statutes. However, these statutes do not create substantive rights themselves, they provide a vehicle or

remedy for violations of substantive rights. Since, as set forth above, Plaintiff has failed to plead a violation of her constitutional rights she cannot use these remedial statutes as grounds for the relief requested. As examples of why Plaintiff's allegations under the federal statutes must fail consider:

> Plaintiff cites 52 U.S.C. § 20511 (2)(a)(b), 52 U.S.C. § 1001, 28 U.S.C. § 1943. But none of these statutes create a private civil cause of action. 52 U.S.C. § 10101 is entitled "Criminal penalties" and provides that a person who engages in the conduct prohibited therein "shall be fined in accordance with Title 18 ...." Title 18 of the United States Code defines federal crimes and "provide[s] no civil remedies." *Hanna v. Home Ins. Co.*, 281 F.2d 298, 303 (5th Cir. 1960); *Gill v. Texas*, 153 F. Appx 261, 262-64 (5th Cir. 2005) (per curiam) (noting the same and, further, that a private citizen "has no standing to institute a federal criminal prosecution and no power to enforce a criminal statues"). 52 U.S.C. § 10101 provides that "the Attorney General may institute for the United States ... a civil action or other proper proceeding for preventive relief," but does not permit private rights of action. *Northeast Ohio Coalition for the Homeless v. Husted*, 837 F.3d 612, 630 (6th Cir. 2016).
>
> 18 U.S.C. Section 254 confers no rights-it is a criminal statute that concerns voter intimidation or interference. *See*, 18 U.S.C. 245(b); *Williams v. Tri-Cty. Cmty. Cent.*, 452 F. 2d 221, 223, fn 3 (5th Cir. 1971). Further, it does not authorize a private right of action. *Id.*; *Merritt v. Franco*, No. 2:19-cv-175-Z-BR, 2020 WL 2454228 at *4 (N.D. Tex. April 8, 2020).
>
> Plaintiff claims that the Defendants violated her rights under 52 U.S.C. § 20511. Section 20511 provides only for criminal penalties; it does not expressly

provide for any civil remedies. That is unsurprising, as federal criminal statutes do not afford civil remedies. *Gill v. Texas*, 153 Fed. App'x 261, 262-64 (5th Cir. 2005) (per curiam).

HAVA does not provide a private cause of action and will not support declaratory or other relief. *Morales-Garza v. Lorenzo-Giguere*, 277 Fed. Appx. 444, 446 (5th Cir. 2008); *Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 572 (2004); *Latinos for Trump v. Sessions* 2021 W.L. 272215*2 (W.D. Tex. 2021).

Even assuming that Plaintiff cited to one different statute or constitutional right; against this backdrop, either would fail. Therefore, it is most probable that Plaintiff's requested relief will be denied. And the probability of Plaintiff succeeding on her requested relief is slim to none.

Plaintiff pleads nothing but conclusory and speculative assertions that electronic voting machines are vulnerable to cyberattacks, manipulation by foreign countries, etc. However, once again the Plaintiff fails to plead any facts as to McLennan County's DREs. Instead, the only evidence indicates exactly the opposite of Plaintiff's allegations as shown by the Affidavit of the McLennan County Elections Administrator, a portion of which is set forth as follows:

> Section 129.054 (a) of the Texas Election Code states "A voting system may not be connected to any external communications network, including the Internet". Strictly following this code is and has been the policy of the McLennan County Elections Administration office. None of our four Hart InterCivic computers running the BOSS, Ballot Now, Tally, and Servo software is ever connect to any type of network, whether that be an internal county run intranet or external such as the Internet.
>
> McLennan County Elections Administration has participated in two cybersecurity assessments, one voluntary and the other State of Texas mandated. Working in conjunction with the McLennan County IT department, McLennan County contracted with Sentinel Cyber Intelligence to run a voluntary cyber security

> analysis of McLennan County Elections procedures and election relation hardware/software. Analyst Richard Martin from Sentinel Cyber Intelligence wrote of McLennan County Elections "based on the work performed, I believe the Department has a robust control structure in place that would prevent and/or detect any attempt at election manipulation. Furthermore, I believe the technology components have adequate safeguards such that material and consequential manipulation of votes could not occur." Further, McLennan County Elections Administration completed and passed the State of Texas mandated Texas County Election Security Assessment. The Texas Secretary of State in conjunction with AT&T and CyberDefenses administered this assessment in June of 2020.

**Exhibit "A"** Affidavit of Jared Goldsmith, McLennan County Elections Administrator.

6. Imminent and Irreparable Harm

The requested injunction would not protect the Petitioner from imminent or irreparable harm. In fact, it would create imminent and irreparable harm for election officials and the public as set forth above.

The Petitioner does not plead that the *McLennan County* DREs have been interfered with by foreign powers or hackers, etc. in the past or have been shown to have been manipulated. Therefore, her allegations do not even rise to the level of speculation as to *McLennan County's* DREs. This is a case looking for an arguable basis in fact, not a case arising from facts. **The Petitioner seeks to have the County enjoined from using the DREs in any election (indefinitely) until proper investigations and reconciliation of the elections for 2020 General, 2021 Special, and 2022 Primaries are conducted." Plaintiff's Petition at Pp. 1-2.** This does not protect the status quo, rather it creates a whole new landscape and causes wholly new burdens and problems for those in charge of holding elections and confusion to voters.

Furthermore, the Plaintiff's allegations do not establish irreparable harm. Nowhere in the Petition are deficiencies in past *McLennan County* elections alleged. The allegations of the Petition

as to imminent and irreparable harm *are at best* speculative. *See Lightning Oil Co. v Anadarko Onshore, LLC*, 520 S.W. 3d 39, 49-50 (Tex. 2017) (speculation is not enough to show imminent, irreparable harm); *Fox v. Tropical Warehouses, Inc.*, 121 S.W. 3d 853, (Tex. App. -Fort Worth 2003; no pet.) ("An injunction is not proper when the injury claimed is merely speculative; fear and apprehension of injury are not sufficient to support a temporary injunction."); *Frequent Flyer Depot, Inc. v. American Airlines, Inc.*, 281 S.W. 3d 215, 227 (Tex. App. – Forth Worth 2009, pet. Denied) (An injunction is not proper when the claimed injury is merely speculative. Fear and apprehension of injury are not sufficient to support a temporary injunction.); *City of Brownsville v. Brownsville GMS, Ltd*, 2021 W.L. 1804388*20-21 (Tex. App. – Corpus Christi – Edinburg 2021) (same). *See also Higgins v. Lumpkin*, 2022 W.L. 1517039*1 (5th Cir. 2022); *Holland Am. Ins. Co. v. Succession of Roy*, 777 F. 2d 992,997 (5th Cir. 1985) ("Speculative injury is not sufficient [to show irreparable harm]"; *Switzer v. Johnson*, 78 Fed. Appx. 941*1 (5th Cir. 2003) (same).

The Plaintiff's alleged apprehension (if even truly felt) does not establish imminent and irreparable injury. Further, any "injury" to Plaintiff is far outweighed by the injury to the public and those in charge of holding the 2022 General Election.

7. Balancing of Equities and Hardships and the Public Interest. Before issuing temporary injunctive relief a court must look at the comparative injury or a balancing of the equities and hardships with a consideration of the important factor of the public interest. *Amend v. Watson*, 333 S.w.3d 625, 630 n.4 (Tex. App.---Dallas 2009, no pet.); *Methodist Hosps. of Dallas v. Tex. Indus, Accident Bd.*, 798 S.W. 2d 651, 660 (Tex. App. ---Austin 1990, writ dism'd w.o.j.).

To begin with, Plaintiff engaged in inequitable conduct by filing and serving this action at a time when an injunction would leave the 2022 General Election and how it is to be handled in

shambles. As stated above, such an injunction at this time would threaten the election itself and place tremendous hardships on election officials. **Exhibit "A"** Affidavit of Jared Goldsmith, Elections Administrator of McLennan County, Texas.

The public interest would be harmed by either a delayed election or a thrown-together election. On the other hand are Plaintiff's conclusory allegations that are barred by existing authorities. And Plaintiff has wasted no ink on allegations relating specifically to the McLennan County election. If the requested injunctive relief were to be granted, it is clear that the 2022 General Election would have to be delayed. Plaintiff cannot even identify an instance of her speculative assertions occurring in a McLennan County election. But even if those assertions had a shred of validity as to McLennan County, such is not substantial enough to justify delaying an election. *Veasey v. Perry*, 769 F.3d 890 (5th Cir. 2014) (stay of injunction, even where subject law was struck down, warranted due to proximity to election); *Texas Democratic Party v. Abbott*, 961 F, 3d 389 (5th Cir. 2020) (stay of injunction because of confusion that would be caused to election workers and voters in upcoming election).

The balancing of equities and the public interest support the denial of Plaintiff's requested injunctive relief. *This is especially true in this election context.* The proximity of the forthcoming election and the mechanics and complexities of election laws must be considered. *Reynolds v. Sims*, 377 U.S. 533, 585 (1964). *See also Veasey v. Perry*, 769 F.3d 890 (5th Cir. 2014) (stay of injunction, even where subject law was struck down, warranted due to proximity to election); *Texas Democratic Party v. Abbott*, 961 F, 3d 389 (5th Cir. 2020) (stay of injunction because of confusion that would be caused to election workers and voters in upcoming election); *The Hispanic Leadership Fund, Inc. v. Walsh*, 2012 W.L. 12888008 (N.D.N.Y. 2012) (delay in bringing action for injunction until shortly before election justified denial of requested injunctive relief claiming

unconstitutional application of election statutes); *Grogan v. Graves*, 1990 W.L. 182373 (D. Kansas 1990) (Statutes under attack had been in place for years. Election preparations were underway, and an injunction would at best create voter confusion, disruption of the election, and place unreasonable demands on local election officials, and at worst could delay the election. Plaintiffs NOT entitled to preliminary injunctive relief).

Plaintiff delayed in filing and then serving this action until preparations for the 2022 General Election were well underway. A temporary injunction at this time would at best create voter confusion, disruption of the election, and place unreasonable demands on local election officials, and at worst could delay the election. The balance of equities clearly establishes that Plaintiff is not entitled to her requested injunctive relief. **Exhibit "A"** Affidavit of Jared Goldsmith, Elections Administrator of McLennan County, Texas.

*Khanoyan* 637 S.W. 3d 764-69 is on all fours with the case at hand, and essentially mandates that the Plaintiff's requested relief be denied.

WHEREFORE, Defendants/Respondents respectfully request that the temporary injunctive relief requested by the Plaintiff/Petitioner be in all things DENIED, and that the Defendants be granted any other relief to which they show themselves to be entitled in law or in equity. Specifically, because Plaintiff's requests for declaratory relief are inextricably intertwined with her request for injunctive relief, and fail for the same reasons as Plaintiff's request for injunctive relief, it is respectfully requested that Plaintiff's requests for declaratory relief be in all things DENIED and that the Defendants be awarded their reasonable and necessary attorney's fees incurred in this matter pursuant to Chapter 37 of the Texas Civil Practice & Remedies Code.

Respectfully submitted,

HALEY & OLSON, P.C.
100 N. Ritchie Road, Suite 200
Waco, Texas 76712
Telephone: (254) 776-3336
Telecopier: (254) 776-6823

By: */s/ Michael W. Dixon*
MICHAEL W. DIXON
State Bar No. 05912100
Email: mdixon@haleyolson.com
HERBERT S. BRISTOW
State Bar No. 03020500
hbristow@haleyolson.com
Attorneys for Defendants/Respondents

**CERTIFICATE OF SERVICE**

I certify that on September 8, 2022, a true and correct copy of the above and foregoing was served upon the following parties in accordance with the Texas Rules of Civil Procedure.

Kimberly Wiseman
419 Barron Lane
Axtell, Texas 76624
***Via E-File and Certified Mail***

*/s/ Michael W. Dixon*
MICHAEL W. DIXON

# EXHIBIT A